JUDGE BATTS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

ANTRON MCCRAY, LINDA MCCRAY, KEVIN
RICHARDSON, GRACE CUFFEE, CONNIE
RICHARDSON, VALERIE CUFFEE, CRYSTAL
CUFFEE, ANGELA CUFFEE, RAYMOND SANTANA,    x
JR., RAYMOND SANTANA, SR., and JOANN
SANTANA,                                                              x

     Plaintiffs,      x   **03 Civ.**

     -against-      x   **COMPLAINT**

THE CITY OF NEW YORK; NEW YORK CITY  x   **JURY TRIAL**
POLICE DEPARTMENT; NEW YORK COUNTY      **DEMANDED**
DISTRICT ATTORNEY'S OFFICE; NEW YORK  x
COUNTY DISTRICT ATTORNEY ROBERT
MORGENTHAU; CITY POLICE COMMISSIONER  x
RAYMOND KELLY; FORMER NEW YORK CITY
POLICE COMMISSIONER BENJAMIN WARD;  x
FORMER NEW YORK CITY POLICE DEPARTMENT
CHIEF OF DETECTIVES COLANGELO; FORMER  x
NEW YORK CITY POLICE DEPARTMENT
MANHATTAN CHIEF OF DETECTIVES    x
ROSENTHAL; FORMER NEW YORK CITY POLICE
DEPARTMENT CHIEF OF PATROL BOROUGH  x
MANHATTAN NORTH SELVAGGI; NEW YORK
CITY POLICE DETECTIVES RAMON ROSARIO,  x
CARLOS GONZALEZ, HARRY HILDEBRANDT,
MICHAEL SHEEHAN, JOHN HARTIGAN, THOMAS  x
MCKENNA, HUMBERTO ARROYO, SCOTT JAFFER,
JOHN O'SULLIVAN, JOHN TAGLIONI, BILL KELLY,  x
ROBERT NUGENT, BRUNO FRANCISCI, THOMAS
McCABE; NEW YORK CITY POLICE SUPERVISORY  x
DETECTIVES DEPUTY INSPECTOR POWELL,
SERGEANT ROBERT FISTON, LIEUTENANT JACK  x
DOYLE; NEW YORK CITY POLICE DETECTIVES
JOHN DOES AND MARY ROES; NEW YORK   x
YORK COUNTY ASSISTANT DISTRICT ATTORNEYS
LINDA FAIRSTEIN and ELIZABETH LEDERER,  x

     Defendants.      x

------------------------------------------------------------------ x

03 CV 9685

## PRELIMINARY STATEMENT

This is a civil rights action in which the plaintiffs, ANTRON MCCRAY, LINDA MCCRAY, KEVIN RICHARDSON, GRACE CUFFEE, CONNIE RICHARDSON, VALERIE CUFFEE, CRYSTAL CUFFEE, ANGELA CUFFEE, RAYMOND SANTANA, JR., RAYMOND SANTANA, SR., and JOANN SANTANA, seek relief for the defendants' violation of their rights secured by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections 1983 and 1985, of their rights secured by the Fourth, Fifth, Thirteenth and Fourteenth Amendments to the United States Constitution, and of their rights secured under the laws and Constitution of the State of New York.  The plaintiffs seek damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys' fees, and such other and further relief as this court deems equitable and just.

## JURISDICTION

1.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331, 1343 (3) and (4), this being an action seeking redress for the violation of the plaintiffs constitutional and civil rights.

2.      Plaintiffs' claim for declaratory and injunctive relief is authorized by 28 U.S.C. §§2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3.      The plaintiffs further invokes this Court's pendent jurisdiction, pursuant to 28 U.S.C. §1367(a), over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

4.      The plaintiffs demand a trial by jury on each and every one of their claims as pled

2

herein.

## VENUE

5.      Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 (a), (b) and (c).

## PARTIES

6.      The plaintiff, ANTRON MCCRAY, is an African-American citizen and resident of the United States, and was at all times relevant herein a resident of the City, County and State of New York.

7.      The plaintiff, LINDA MCCRAY, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

8.      The plaintiff, KEVIN RICHARDSON, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

9.      The plaintiff, GRACE CUFFEE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

10.     The plaintiff, CONNIE RICHARDSON, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

11.     The plaintiff, VALERIE CUFFEE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and

3

State of New York.

12.     The plaintiff, CRYSTAL CUFFEE, is an African-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the County of Bronx, City and State of New York.

13.     The plaintiff, ANGELA CUFFEE, is an African-American citizen and resident of the United States, and was at all times relevant herein a resident of the City, County and State of New York.

14.     The plaintiff, RAYMOND SANTANA, JR., is an Hispanic-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

15.     The plaintiff, RAYMOND SANTANA, SR., is an Hispanic-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City, County and State of New York.

16.     The plaintiff, JOANN SANTANA, is an Hispanic-American citizen and resident of the United States, and is and was at all times relevant herein a resident of the City of New York, Bronx County, State of New York.

17.     Defendant CITY OF NEW YORK is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The defendant CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the NEW YORK CITY POLICE DEPARTMENT.

4

18.     Defendant NEW YORK CITY POLICE DEPARTMENT is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to carry out all police functions for the defendant CITY OF NEW YORK and assumes the risks incidental to the maintenance of its police force and the employment of police officers.

19.     Defendant NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE is a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County and City of New York and assumes the risks incidental to the employment, training and supervision of its assistant district attorneys.

20.     Defendant NEW YORK COUNTY DISTRICT ATTORNEY ROBERT MORGENTHAU is and was at all times relevant herein the Distirct Attorney of the County of New York, and is responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the assistant district attorneys who work in his office.  He is sued individually and in his official capacity.

21.     Defendant NEW YORK CITY POLICE COMMISSIONER RAYMOND KELLY is the Police Commissioner for the CITY OF NEW YORK, and is responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK CITY POLICE DEPARTMENT as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers and detectives under his command.  He is sued individually and in his official capacity

22.     Defendant FORMER NEW YORK CITY POLICE COMMISSIONER

5

BENJAMIN WARD was, at the time of the arrest and investigations alleged herein, the Police

Commissioner for the CITY OF NEW YORK, and was and is responsible for, and the chief

architect of, the policies, practices and customs of the NEW YORK CITY POLICE

DEPARTMENT as well as responsible for the hiring, screening, training, retention, supervision,

discipline, counseling and control of the police officers and detectives under his command.  He is

sued individually and in his official capacity.

     23.    Defendant NEW YORK CITY POLICE CHIEF OF DETECTIVES (FNU)

COLANGELO was, at all times relevant herein, the Chief of the Detective Division of the New

York City Police Department and was and is responsible for, and the chief architect of, the

policies, practices and customs of the Detective Division as well as responsible for the hiring,

screening, training, retention, supervision, discipline, counseling and control of the police

officers and detectives under his command.  He is sued individually and in his official capacity.

     24.    Defendant NEW YORK CITY POLICE CHIEF OF MANHATTAN

DETECTIVES (FNU) ROSENTHAL, was, at all times relevant herein, the Chief of the

Detective Division of the New York City Police Department and was and is responsible for, and

the chief architect of, the policies, practices and customs of the Detective Division as well as

responsible for the hiring, screening, training, retention, supervision, discipline, counseling and

control of the police officers and detectives under his command.  He is sued individually and in

his official capacity.

     25.    Defendants NEW YORK CITY POLICE DEPARTMENT CHIEF OF PATROL

BOROUGH MANHATTAN NORTH (FNU) SELVAGGI was at all times relevant herein an

officer, employee, and agent of the NEW YORK CITY POLICE DEPARTMENT, a municipal

agency of the CITY OF NEW YORK.  He is are sued individually and in his official capacities.

26.   Defendants NEW YORK CITY POLICE DETECTIVES RAMON ROSARIO, CARLOS GONZALEZ, HARRY HILDEBRANDT, MICHAEL SHEEHAN, JOHN HARTIGAN, THOMAS MCKENNA, HUMBERTO ARROYO, SCOTT JAFFER, JOHN O'SULLIVAN, JOHN TAGLIONI, BILL KELLY, ROBERT NUGENT, BRUNO FRANCISCI and THOMAS McCABE, were, at all times relevant herein, officers, employees, and agents of the NEW YORK CITY POLICE DEPARTMENT, a municipal agency of the CITY OF NEW YORK.   They are sued individually and in their official capacities.

27.   Defendants NEW YORK CITY POLICE DETECTIVES DEPUTY INSPECTOR POWELL, SERGEANT ROBERT FISTON, LIEUTENANT JACK DOYLE and NEW YORK CITY POLICE DETECTIVES JOHN DOES AND MARY ROES were, at all times relevant herein, officers, employees, and agents of the NEW YORK CITY POLICE DEPARTMENT, a municipal agency of the CITY OF NEW YORK.   They are sued individually and in their official capacities.

28.   Defendants NEW YORK COUNTY ASSISTANT DISTRICT ATTORNEYS LINDA FAIRSTEIN and ELIZABETH LEDERER, were, at all times relevant herein, officers, employees and agents of the New York County District Attorneys Office. They are sued individually and in their official capacities.

29.   At all times relevant herein, the individual defendants herein were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of either the NEW YORK CITY POLICE DEPARTMENT and the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE and otherwise performed and engaged in

conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NEW YORK CITY POLICE DEPARTMENT and the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE at all times relevant herein with the power and authority vested in them as officers, agents and employees of the NEW YORK CITY POLICE DEPARTMENT and the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE and incidental to the lawful pursuit of their duties as officers, employees and agents of the NEW YORK CITY POLICE DEPARTMENT and the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE.

## STATEMENT OF FACTS

30.     On April 19, 1989, plaintiff Antron McCray was 14 years old and lived at home at 40-44 West 111th Street, Apt. 2J, New York, New York, 10026, with his mother, Linda McCray and his father Bobby McCray, who has since passed away. He was a student in the 9th grade at Career Academy. As of that date McCray had never been arrested or taken into custody by any law enforcement agency.

31.     On April 19, 2003, plaintiff Kevin Richardson was 14 years old and lived at home at 1309 Fifth Avenue, Apt. 34F, New York, New York, 10029, with his mother, Grace Cuffee and one of his sisters. He was a student in the eighth grade at P.S. 113 located at 106th Street and Madison Avenue in New York City. As of that date Richardson had never been arrested or taken into custody by any law enforcement agency.

32.     On April 19, 2003, plaintiff Raymond Santana, Jr., was 14 years old and lived at home at 175 E. 117th Street, Apt. 2, New York, New York, 10035, with his father, Raymond Santana, Sr. He was a student in the seventh grade at Tito Puente Education Complex, 240 E.

8

109th Street, New York, New York. As of that date Santana had never been arrested or taken into custody by any law enforcement agency.

33.     On April 19, 1989, sometime between 9:00 and 9:30 p.m., a series of incidents allegedly occurred in Central Park in New York City in the following order: A man was allegedly accosted by a group of youths on the East Drive of the park. A few minutes later another person was allegedly assaulted and robbed. Thereafter a couple on a tandem bicycle was allegedly menaced. Moments later, a taxi cab driver allegedly had rocks hurled at his cab and was allegedly threatened when he got out of the car to investigate. Thereafter, a series of four male joggers were allegedly set upon on the jogging path at the northern end of the Central Park reservoir. Two of the male joggers escaped unharmed but two were allegedly assaulted.

34.     At approximately 1:30 a.m., on April 20, 1989, an unconscious woman, who has since been publicly identified as Patricia Meili, was found by two men walking on a foot path through Central Park. The victim, a twenty-nine-year-old white woman, who came to be known as the "Central Park Jogger," was removed to a hospital. She had been brutally beaten about the head and eyes, and suffered numerous bruises, scratches and abrasions elsewhere on her body. She had lost significant amounts of blood. Her t-shirt had been rolled into a ligature and used to tie her in a distinctive fashion. Subsequent investigation revealed that she had been raped and sodomized.

35.     Raymond Santana and Kevin Richardson, as well as a number of other youths, were apprehended sometime during the evening on April 19, 1989, after police officers, responding to reports concerning some of the alleged incidents described above, spotted them on the western outskirts of the park in the vicinity of 100th Street and Central Park West. In the

9

course of their apprehension, plaintiffs Santana and Richardson were subjected to unnecessary and excessive force.

36.     Antron McCray, along with two others who were subsequently arrested, prosecuted and convicted, Yusef Salaam and Kharey Wise, was brought in for questioning on April 20, 1989, after they had allegedly been identified by other youths as having been present at or participated in some of the events in the park on the evening of April 19, 1989.

37.     Over the course of the next 24 to 48 hours, McCray, Santana and Richardson were questioned by numerous teams of detectives, police officers and representatives of the District Attorney's office, including, but not limited to, defendants Ramon Rosario, Carlos Gonzalez, Harry Hildebrandt, Michael Sheehan, John Hartigan, Thomas McKenna, Humberto Arroyo, Scott Jaffer, John O'Sullivan, John Taglioni, Bill Kelly, Robert Nugent, Thomas McCabe and Assistant District Attorney Elizabeth Lederer.  Present and consulting with the above listed defendants during the questioning and investigation was Assistant District Attorney Linda Fairstein.  The questioning was done, in part,  without family advisors being present and, with the exception of a rehearsed videotape statement which came at the end of the interrogation process, no audio or video recordings were made of the questioning.  These interrogations were undertaken by the individual defendants pursuant to the policies, practices and customs of the defendants City of New York, the New York City Police Department and the New York County District Attorney's Office and were undertaken in a manner and method designed to exploit the youth of the plaintiffs and their lack of familiarity with the criminal justice system.

38.     As a result of this prolonged questioning, the defendants obtained inculpatory statements from all of the plaintiffs, although the statements were inconsistent with and

10

conflicted with each other.  These statements were obtained as a result of a variety of methods

employed by the defendants which exploited the youthful age of the plaintiffs and the lack of

experience they and their parents and family members had with the criminal justice system.

These methods included, *inter alia*, coercion, isolation, intimidation,  manipulation,

suggestiveness, deceit, false promises, sleep deprivation, actively shaping the statements'

contents before they were formally given, telling the plaintiffs what facts to put in their written

statements, withholding certain information from the plaintiffs and their family members,

distracting family members during the interrogations when they were at a critical juncture, and

misleading the plaintiffs and their parents and family members about the true intent behind the

defendants questioning.  Because of the youth of the plaintiffs, they were especially vulnerable to

the methods utilized by the defendants.  The defendants also manipulated the relationships

between the plaintiffs and their parents or family members, converting them into authority

figures against the plaintiffs and in effect turning the family members into interrogators.   The

defendants used these techniques to elicit certain statements from the plaintiffs which  implicated

themselves in a number of crimes which had occurred in the park on April 19, 1989.   Although

none of the plaintiffs admitted attacking or raping Meili, each ultimately rendered an account of

events in which he unwittingly made himself a possible  accomplice to the crimes committed

against her.

     39.    The statements elicited from the plaintiffs, and the others charged with them, had

serious weaknesses and major inconsistencies.  The accounts allegedly given by the plaintiffs,

and the others charged with them, differ on significant details, such as who initiated the attack,

who knocked the victim down, who held her, who undressed her, who struck her, who raped her,

11

what weapons were used during the attack, the location of the attack, the time of the attack, and when, in the sequence of events, the attack took place.  For example, on the issue of who knocked the jogger to the ground, Richardson said McCray, Santana and Steve Lopez did it. McCray said everyone charged her.  Santana said Richardson did it.  On the issue of who raped Meili, Richardson allegedly named McCray, Santana and Steve Lopez.  McCray alleged identified a tall, skinny black male, a Puerto Rican with a black hoodie, Clarence Thomas and Richardson as the persons who raped Meili and further allegedly stated that he himself simulated having sex with her.  Santana alleged identified Richardson as the person who raped Meile.

40.     The others who were arrested and prosecuted with the plaintiffs also gave inconsistent and conflicting statements.  For example, Wise allegedly stated that the jogger's clothes had been cut off and that her legs had been cut with a knife.  However, the record reveals that the jogger's clothes were not cut off and there were no knife wounds on the jogger. Richardson allegedly said that the jogger's bra was ripped off, when it fact it was still on her when she was found.  Santana allegedly described the jogger as naked when they left, although she was found with her jogging bra still on and her t-shirt tied around her head.  Moreover, none of the plaintiffs, or the others arrested and charged with them, accurately described where the attack on the jogger took place.

41.     The statements also conflicted with the physical evidence.  For instance, Meili lost significant amounts of blood, yet, there was no blood evidence that implicated any of the plaintiffs in the crimes against her.  In addition, the impression left on the ground from the spot where Meili was first knocked down to where she was dragged was measured at the time by crime scene detectives to be 40 feet long and no more than 16 to 18 inches wide, a fact which

excluded the possibility that she was dragged by five un-regimented teenage boys.

42.     The unreliability of the methods utilized by the defendants to elicit the false statements from the plaintiffs concerning their involvement in the attack on Meili is most clearly demonstrated by that fact that the DNA evidence and the later confession by another individual, Matias Reyes, demonstrates that they were false.

43.     In fact, the defendants knew at the time they were interrogating the plaintiffs, or reasonably should have known, of a far more likely suspect, Matias Reyes. On April 17, 1989, or shortly thereafter, some of these same defendants, including but not limited to defendants Michael Sheehan and Bruno Francisci,  took or knew about a statement by another one of Reyes's victims who described a similar attack by a single attacker in the park very near the location of the Meili attack only two days earlier.   Moreover, these same defendants knew at or around the time they were eliciting the false statements from the plaintiffs, that Reyes had been treated at an area hospital for an injury which was described by the victim of his April 17th attack.

44.     The failure to connect Reyes to the attack on the Central Park Jogger at the time of the arrests and interrogation of the plaintiffs, as well as subsequently, was not simply the result of sloppy investigative work; it demonstrates a deliberate intent on the part of the defendants to cover-up Reyes' connection to the Central Park Jogger case because it would have completely undermined the integrity of the prosecution of the plaintiffs; a prosecution which both the district attorney and police officer defendants were heavily invested in both because of the extreme amount of public attention to the prosecution and for the benefit of their careers.

45     On May 4, 1989, based on the investigation conducted by the defendants herein, plaintiffs Richardson, McCray and Santana were indicted by a New York County Grand Jury,

13

Indictment Number 4762/89, and charged with Attempted Murder in the Second Degree; Rape in

the First Degree; Sodomy in the First Degree; Sexual Abuse in the First Degree; two counts of

Assault in the First Degree; Robbery in the First Degree; two counts of Robbery in the Second

Degree; three counts of Assault in the Second Degree; and Riot in the First Degree.

46.     On April 18, 1990 a jury convicted plaintiffs McCray and Santana, along with

Yusef Salaam, who were tried jointly on a 13-count indictment, of one count of Assault in the

First Degree and Rape in the First Degree for the attack on Meili; Robbery in the First Degree

and three counts of Assault in the Second Degree for the attack on John Loughlin; Assault in the

Second Degree for the attack on David Lewis; and Riot in the First Degree.   Since each

defendant was less than 16 years of age, the trial court set aside all their convictions except those

for First Degree Robbery and Rape.  The false statements elicited from the plaintiffs and other

suspects were admitted into evidence in the trial and were critical to the conviction of McCray

and Santana.

47.     On December 11, 1990 a jury convicted plaintiff Richardson, who was tried

jointly on a 13-count indictment with Kharey Wise, of each count of the indictment.  Because of

Richardson's age, the trial court set aside all of Richardson's convictions except for Attempted

Murder in the Second Degree, First Degree Robbery, Rape and Sodomy.  The false statements

elicited from the plaintiffs and other suspects were admitted into evidence in the trial and were

critical to the conviction of Richardson.

48.     McCray's convictions were affirmed by the Appellate Division, 198 A.D.2d 200,

604 N.Y.S.2d 93, and the Court of Appeals denied leave to appeal.  He served seven and one-half

(7 ½ ) years in prison and was required to register as a sex offender following his release from

prison.

49.     Richardson's convictions were affirmed by the Appellate Division, 204 A.D.2d 133, 612 N.Y.S.2d 627). He served seven (7) years in prison and was required to register as a sex offender following his release from prison.

50.     Santana never perfected an appeal from his convictions. He served seven (7) years in prison and was required to register as a sex offender following his release from prison.

51.     Throughout their confinement in jail and subsequent to their release, the plaintiffs have consistently denied any involvement in the attack on Meili.

52.     In January, 2002, Matias Reyes informed law enforcement officials that he, alone, committed the rape and other crimes concerning the female jogger. Subsequent DNA testing, and a thorough review of the evidence by the District Attorney's office, confirmed that he alone perpetrated these crimes against Meili. Reyes is serving sentences totalling thirty-three and one-third years to life imprisonment for three rape/robberies, one rape/murder, and one robbery that he committed between June 11 and August 5, 1989. In addition, he committed a rape and sexual assault on April 17, 1989, just two days before the attack on Meili, which was investigated by defendants herein. The April 17th assault presented fingerprint-like characteristics similar to that which were also present in the rape and assault of Patricia Meili on the 19th.

53.     On May 8, 2002, the District Attorney's office was notified that Reyes' DNA matched the DNA taken from the sock that had been found at the Central Park crime scene.

54.     On September 5, 2002, plaintiffs Richardson, McCray and Santana filed a motion to vacate the judgment of conviction, pursuant to Criminal Procedure Law (CPL) 440.10(1)(g), which had previously been handed down and affirmed by the New York appellate courts on the

15

grounds of newly discovered evidence.

55.   Following an investigation of Reyes' claim, the District Attorney's Office conceded the veracity of the newly discovered evidence contained in the plaintiffs' 440 motion, which consisted of accounts of events provided by Reyes, who stated that he alone attacked and raped Meili, and DNA test results which conclusively established that Reyes was the sole source of semen found on the sock at the crime scene and a cervical swab taken from the victim, as well as a pubic hair found on the same sock.

56.   The evidence provided by Reyes included a record of prior, similar attacks committed by him, including an assault and rape committed in Central Park two days before the attack on Meili, his description of the victims radio headset and keys, which was never mentioned in the earlier investigation, and scientific test results undermining the probative value of other evidence introduced at the criminal trials.

57.   Following Reyes' admissions, the District Attorney's Office conducted further forensic testing of DNA and hair sample to see whether the results corroborated Reyes' version of his involvement in the crime.  These tests corroborated Reyes' account, including, inter alia, that the DNA on the sock found at the Central Park crime scene and the DNA on the cervical swab taken from the victim matched Reyes' DNA.  Moreover, testing of previously untested semen found on the sock established that Reyes was the source of the DNA on the sock to a factor of one in 6,000,000,000 people.

58.   Following Reyes' admission, the District Attorney's Office also conducted further forensic testing of evidence allegedly linking plaintiff Richardson to these crimes.  Three hairs found on Richardson were reexamined following FBI protocols for questioned hair samples.  The

16

microscopic analysis of the hairs, performed by the former Chief of the Hair and Fibers Unit of the FBI, disagreed with the expert opinion offered at the original trials, concluding that the hairs were not suitable for comparison and could not be used to link Richardson to the Central Park jogger.

59.    At the time of the original proceeding, DNA evidence was extracted from semen deposited on the jogger's sock, found near her at the crime scene.  It did not match any of the plaintiffs, or any other known sample at the time.  The same was true of DNA evidence extracted from a cervical swab; it did not match the defendants or any other known sample at the time.

60.    The testimony at the original trial established, however, that the DNA from both the victim and the sock appeared to have come from the same source.  It also established that the DNA was not a mixture, it was from a single source, meaning that only one individual had ejaculated.

61.    No physical or forensic evidence recovered at the scene or from the person or effects of the victim connected any of the plaintiffs to the attack on the jogger.

62.    Reyes' statement that he, and he alone, was responsible for the assault on the jogger, is corroborated by, consistent with, or explanatory of objective evidence in a number of important respects, including, *inter alia*, that his DNA, and his alone, was found on the victim; that the narrow physical trail left by Reyes when he dragged Meili from the location of the initial attack to the nearby woods clearly established that Meili was attacked by a single assailant; that the manner in which Meili was bound was consistent with other attacks perpetrated by Reyes; that the manner in which Meili was struck around the eyes was consistent with other attacks perpetrated by Reyes; that Meili had injuries on her face which were consistent with the ring that

17

Reyes was wearing; that he had described Meili's radio headset and keys, which were never mentioned in the earlier investigation; and, that all of Reyes' other victims, including the one on April 17th, were assaulted by a lone assailant, Reyes.

63.     Corroboration of Reyes' account of his participation in the crime is found both in the pattern of his other sexual attacks and in some of their specific facts.  He consistently targeted and stalked Caucasian women, or women who appeared to be Caucasian.  All of his rapes or attempted rapes also involved robbery.  He would characteristically tie and bind his victims in an unusual manner, which, combined with other aspects of the crime, clearly identified him as the perpetrator of the attack on Meili.  He would characteristically severely beat his victims around the face and eyes in an attempt to blind them so that they would be unable to identify him.

64.     Prior to April 19, 1989, there is no evidence that Reyes knew or associated with the plaintiffs or any of the individuals known to have been in Central Park on the night of April 19, 1989.

65.     In or about August, 1989, Reyes was apprehended and questioned by, *inter alia*, defendants Sheehan and Francisci and questioned about numerous sexual assaults that he was suspected of perpetrating.  Reyes' DNA was analyzed and he was matched to several sexual assaults that occurred during the spring and summer of 1989 in or about the same general vicinity as the attack on Meili.  Reyes eventually pled guilty to several rapes and sexual assaults.  His plea of guilty occurred prior to the commencement of the trial of the plaintiffs.

66.     On December 19, 2002, the Supreme Court, New York County, by Justice Charles J. Tejada, found that the new evidence offered in plaintiffs' 440 motion was newly discovered within the meaning of the applicable statutes and case law and that it could not have reasonably

been discovered by the defendants before the original criminal trial by the exercise of due diligence. The Court therefore granted the plaintiffs' motion to vacate the judgment of convictions as to all the convictions against all of the plaintiffs.

67.     The defendant police officers, detectives and district attorneys knew, or should have known at the time, and, on information and belief, concealed from the plaintiffs and their defense counsel, and from the public as well, that at the time they had elicited false statement from the plaintiffs which implicated them in the rape and sexual assault on Meili in Central Park in April, 1989, a serial rapist who habitually stalked white women in their 20's, who attacked them, beat them, and raped them, who always robbed his victims, and frequently stole Walkmans, who tied his victims in a fashion much like the Central Park jogger, and who beat and raped a woman in Central Park two days before the attack on the transverse a few hundred yards from where Meili was found, and whose DNA was the only DNA recovered inside and alongside the victim, who had no connection with any of the plaintiffs or their alleged cohorts and who committed all of his sex crimes alone, was also at large. All of these facts were known to the defendants at the time they were investigating the Jogger case. Yet, the defendants deliberately ignored these facts, in favor of a speedy and politically expedient accusation that it was the plaintiffs who had committed the attack on Meili.

68.     The defendants, in concealing and not disclosing this evidence, not only put the public at great risk, they deprived the plaintiffs of the opportunity to argue at their criminal trials a theory of the case different than that which was put forward at trial by the District Attorney's Office and the police officers and detectives who testified, and they led directly to the convictions of all the plaintiffs.

19

69.    The alleged accounts by the plaintiffs, and those arrested and prosecuted with them, were inaccurate and inconsistent and differed on significant details of the crime. In contrast, the account by Reyes was accurate about specific details of the crimes against the jogger. Reyes accurately described the crime scene in detail, as well as what the victim was wearing. He also indicated that he used a heavy branch to attack her, which was consistent and explanatory of the forensic medical and crime scene evidence. Most persuasively, his account was corroborated by the fact that his modus operandi in the Jogger case matched the ones he had used in similar sexual attacks involving the targeting and stalking of other women during the same period of time.

70.    Moreover, although there was no DNA forensic evidence offered against the plaintiffs at trial, Reyes' DNA matched the DNA found on one of Meili's socks found at the Central Park crime scene and the DNA on the cervical swab taken from the victim. In addition, mitochondrial DNA testing established that Reyes was also the source of the pubic hair found on the sock in Central Park and confirmed that no one else's DNA was present in the samples taken from the victim or at the crime scene.

71.    It is virtually self evident that the confession of a self admitted murderer and serial rapist, corroborated by physical evidence including scientific testing demonstrating that Reyes was the sole source of DNA evidence connected to the Central Park jogger's rape to a factor of one to 6,000,000,000, would have resulted in an acquittal of the plaintiffs at their criminal trials. Indeed, an honest appraisal of this evidence would have resulted in a dismissal of the indictment prior to any trial.

72.    Upon information and belief, evidence which connected Reyes to the rape and

20

assault of Meili on April 19, 1989, was known to the defendants who were responsible for investigating and prosecuting the plaintiffs and was deliberately and purposefully withheld from the plaintiffs and their defense counsel, resulting in their malicious prosecution and subsequent convictions.    Moreover, following the arrests of the plaintiffs, information obtained by the defendants which was exculpatory, inconsistent with or contradicted the defendants' theory of the case that Meili was attacked and assaulted by a gang of black and hispanic youth, was not, pursuant to the policies and practices of the NYPD and the District Attorney's Office, recorded in official NYPD forms or, if recorded, was kept from the plaintiffs' attorneys during the prosecution of the criminal cases.

73.    At no time from April 19, 1989 until April 18, 1990, when the first convictions were handed down by a jury, did the defendants, despite their knowledge of Reyes and his method of operating, particularly after his arrest in August, 1989, ever reveal the existence of Reyes to the plaintiffs or their counsel or to the Court.  Nor did the defendants reveal the existence of Reyes to the plaintiffs and their counsel after April 18, 1990, up to the present.

74.    Despite the evidence demonstrating Reyes' guilt for the crimes against Meili, which corroborated and established the innocence of the plaintiffs, the defendants herein have continued to suppress the truth about what happened in Central Park on April 19, 1989, by, inter alia, establishing a special commission that ratified the wrongful conduct of these defendants.

75.    If not in April, 1989, certainly by August, 1989, the defendants knew or should have known that their theory that the plaintiffs had committed the crimes against Meili had no evidentiary support, particularly after DNA tests conclusively demonstrated that the plaintiffs were not responsible for the attack on her.  Moreover, the evidence as of August, 1989,

21

particularly after the arrest of Reyes for his other crimes, would have led even the most neophyte investigator to conclude that it was more likely that a single assailant had raped and battered Meili, and not, as the defendants slavishly maintained, that the plaintiffs were responsible for that crime.

76.     Certainly no later than August, 1989, and probably well before, the defendants knew or should have known that the crimes committed against Meili and Reyes' other crimes demonstrated many of the same characteristics, such as the manner in which the victim was tied and the manner in which the victim was battered in the eyes and face.  Rather than question the integrity of their prosecution, the defendants, including those working in both the NYPD and the District Attorney's Office, suppressed the truth about Reyes, including, on information and belief, encouraging the victim of Reyes' crime on April 17, 1989, two days before Meili was attacked and raped, to drop the prosecution.

77.     In addition to their efforts to suppress the truth at the time of the prosecution, the defendants have continued to actively  conspire to propound the belief that the plaintiffs were and are in fact guilty of the crimes they were charged with, notwithstanding their exoneration by the court, the DNA evidence linking Reyes to the crimes against Meili and Reyes confession that he alone perpetrated this crime, and that the defendants engaged in no misconduct in the course of their investigation and prosecution of the plaintiffs.  Overt acts in furtherance of this conspiracy include, *inter alia*, public statements which continue to state that the plaintiffs committed all the crimes they were charged with and the empaneling of a commission which was charged with reviewing the conduct of the police in this case and which fully exonerated the police and the NYPD from any wrong doing, thereby ratifying the bad faith, dishonest and concealment of the

22

truth about who raped and assaulted Patricia Meili on April 19, 1989.

78.     On November 1, 2002, defendant Police Commissioner Raymond Kelly announced the establishment of an investigatory panel (hereinafter referred to as the "Armstrong Commission") consisting of Michael Armstrong, a former prosecutor now in private practice, Stephen L. Hammerman, the current Deputy Commissioner of the NYPD for Legal Matters, and Jules Martin, a former high ranking chief in the NYPD, to review the events of April 19, 1989 and thereafter to determine, *inter alia*, whether police supervisors or officers acted properly or improperly.  Based on their investigation, this panel of so-called experts issued a report that concluded that there was no misconduct on the part of the New York City Police Department in the arrests and interrogations of the plaintiffs, either in the manner in which they interrogated the plaintiffs or in their failure to connect Reyes to the rape and sexual assault of Meili prior to him coming forward and admitting his involvement.

79.     In addition, although they were not officially charged with the task, the Armstrong Commission went further and concluded that, notwithstanding the Reyes confession and the evidence that corroborated his guilt as the sole assailant of Meili, the plaintiffs were nevertheless guilty of the sexual assault on Meili on April 19, 1989.

80.     Defendant Police Commissioner accepted the findings of this panel and by so doing he has ratified the wrongful conduct perpetrated by the defendant police officers, detectives and their supervisors.

81.     The defendants' illegal arrest, confinement and imprisonment, malicious prosecution, and wrongful conviction of the plaintiffs, without probable cause,  with the attendant suppression of  exonerating exculpatory evidence, the coercion and manufacture and

intentional misrepresentation of knowingly false inculpatory evidence, and the deception of grand juries, judges, petit juries, and the New York courts concerning this evidence, constituted an unconstitutional seizure of the plaintiffs, and was effected without due process of law, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and proximately and directly caused the plaintiffs grievous permanent injury, including more than 7 years of imprisonment in prison, and the attendant loss of freedom, companionship, and income; mental and physical pain, suffering, anguish, fear, and humiliation and defamation of character and reputation which was caused by their public branding as rapists.

82.     The conduct of the defendants in maliciously prosecuting and conspiring to cover up the truth about what happened in Central Park on April 17, 1989, and in subsequently ratifying this wrongful conduct in 2003, proximately caused the plaintiff serious and permanent physical and emotional injury, pain and suffering, mental anguish, humiliation and embarrassment.

**FIRST CLAIM**
**(Violation of Rights Secured by 42 U.S.C. §1981 and the**
**Thirteenth Amendment to the United States Constitution)**

83.     The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 82 as if fully set forth herein.

84.     The conduct and actions of defendants, acting under color of state law, in subjecting the plaintiffs, who are African-American and Hispanic-American, to malicious prosecution and wrongful conviction and a conspiracy to cover-up the truth, was motivated by racial animus, was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, was done without lawful justification, and was designed

24

to and did cause specific and serious bodily, mental and emotional harm, pain and suffering in violation of the plaintiff's Constitutional rights as guaranteed under 42 U.S.C. §1981 and the Fourth and Thirteenth Amendments to the United States Constitution.

## SECOND CLAIM
**(Violation of Rights Secured by 42 U.S.C. §1983 and the
Fourteenth Amendment to the United States Constitution
for Assaulting and Detaining the Plaintiff)**

85.     The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 84 as if fully set forth herein.

86.     The conduct and actions of defendants acting under color of law, in subjecting the plaintiffs, who are African-American and Hispanic-American, to malicious prosecution and wrongful conviction and a conspiracy to cover-up the truth, was motivated by racial animus, was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of their acts, was done without lawful justification, and was designed to and did cause specific and serious bodily, mental and emotional harm, pain and suffering in violation of the plaintiff's Constitutional rights as guaranteed under 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

## THIRD CLAIM
**(Violation of Rights Secured by 42 U.S.C. §§ 1983 and 1985
and the Fourteenth Amendment to the United States Constitution)**

87.     The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 86 as if fully set forth herein.

88.     Defendants Colengelo, Rosenthal, Selvaggi, Rosario, Gonzalez, Hildebrandt, Sheehan, Hartigan, McKenna, Arroyo, Jaffer, O'Sullivan, Taglioni, Kelly, Nugent, Francisci,

McCabe, Powell, Fiston, Doyle, Does and Roes and Fairstein and Lederer, with other investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, and otherwise conspired among and between themselves to deprive the plaintiffs of their Constitutional rights, and did deprive plaintiffs of said rights, including their right to be free from unreasonable arrest and seizure, from wrongful confinement, imprisonment, and conviction, and from malicious prosecution; and their right to access to the Courts, as protected by the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Sec. 1983. Because said actions were done with the knowledge and purpose of depriving plaintiffs, who are African-American and Hispanic-American, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial animus toward the plaintiffs, they also deprived plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. Secs. 1983 and 1985.

89. In furtherance of this conspiracy or conspiracies, the defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts set forth above, including, but not limited to, the wrongful arrest, imprisonment and prosecution of plaintiffs and their co-defendants; the manufacture by the methods articulated above of knowingly false inculpatory evidence against plaintiffs and their co-defendants; the suppression of exonerating exculpatory evidence, including, but not limited to, the Matias Reyes evidence, the failure to investigate the Matias Reyes evidence, either at the time it was received or after it became known that there was no scientific or physical evidence that linked the plaintiffs to these crimes, the physical abuse and psychological coercion of the plaintiffs and their co-defendants in an attempt to compel them to make false inculpatory statements against themselves and their co-defendants; the making

26

of known misstatements and the presentation of this knowingly false and incomplete evidence to prosecutors, judges, juries, and appellate courts; and  the filing of false and incomplete statements and reports.

90.     Said conspirac(ies) and overt acts were continuing in nature, and caused plaintiffs' constitutional violations and injuries, pain, suffering, fear, mental anguish, incarceration, conviction, imprisonment, humiliation, defamation of character and reputation, and loss of freedom, companionship, and income, as set forth more fully above.

## FOURTH CLAIM
### (42 U.S.C. §1983 *Monell* Claim Against the City of New York)

91.     The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 90 as if fully set forth herein.

92.     Defendant Kelly, as Police Commissioner for the City of New York, is, by operation of state law and as a matter of fact, the final decision maker for New York with regard to the investigative, arrest, custodial, and administrative acts, omissions, and decisions which he made or participated in, as alleged above.

93.     On January 27, 2003, the three person panel appointed by Commissioner Kelly to investigate whether any misconduct occurred by members of the New York City Police Department concerning the events of April 19, 1989, the Armstrong Commission,  issued a report containing its finding.  Those findings exonerated members of the New York City Police Department of any wrongdoing, and, moreover, continued to assert that the plaintiffs herein were guilty of the sexual assault on Meili.  Those findings were accepted by defendant Commissioner Kelly.  In so doing, defendant Kelly ratified and condoned the wrongdoing that took place.

27

94.    These acts by defendant Kelly, directly and proximately caused the constitutional violations and injury to the plaintiffs, and are directly chargeable to the defendant City of New York because of Commissioner Kelly's status as final decision maker for the City with respect to matters involving the New York City Police Department.

95.    Additionally, and/or alternatively, on information and belief, the City of New York, through its Police Department and Police Commissioners, including defendant Benjamin Ward, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

(a)    a policy, practice and custom of suppressing, destroying or otherwise secreting from criminal defendants exculpatory or exonerating evidence; and

(b)    a policy, practice and custom of failing to properly train or supervise officers in the proper techniques of investigating serious crimes, particularly where juveniles were involved, or to properly discipline officers who violate the Constitution or law, or otherwise transgress the rights of criminal suspects during their investigations;

96.    These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of the plaintiffs' Constitutional violations and injuries, as set forth above.

### FIFTH CLAIM
### (42 U.S.C. §1983 *Monell* Claim Against the
### New York County District Attorney's Office)

97.    The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 96 as if fully set forth herein.

98.    The New York County District Attorney's Office itself, also had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

28

(a)    a policy, practice and custom of suppressing, destroying or otherwise secreting from criminal defendants exculpatory or exonerating evidence; and

(b)    a policy, practice and custom of failing to properly train or supervise assistant district attorneys and investigators in the proper techniques of investigating serious crimes, particularly where juveniles were involved, or to properly discipline officers and investigators who violate the Constitution or law, or otherwise transgress the rights of criminal suspects during their investigations.

99.    These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of the plaintiffs' Constitutional violations and injuries, as set forth above.

## SIXTH CLAIM
### (Violation of Rights Under State Law)

100.    The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 99 as if fully set forth herein.

101.    By the actions described above, each and all of the defendants, jointly and severally, have committed the following wrongful acts against the plaintiff, which are tortious under the laws of the State of New York:

a.    malicious prosecution;

b.    conspiracy to cover-up;

c.    negligence in causing the injuries to the plaintiffs;

d.    intentional infliction of emotional distress upon the plaintiffs, in that the defendants intended to and did cause the plaintiffs severe emotional distress, and the defendants' acts were outrageous in the extreme and utterly unacceptable in a civilized society;

e.    negligent hiring, screening, retention, supervision and training of defendant

29



police officers by defendants City of New York and New York City Police Department;

f.    negligent hiring, screening, retention, supervision and training of defendant assistant district attorneys by defendants New York County District Attorney's Office and by the City of New York;

g.    conspiracy by the defendants to commit all of the above acts;

h.    violation of rights otherwise guaranteed to the plaintiff under the laws and Constitution of the State of New York.

102.    The foregoing acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiffs and violated their statutory and common law rights as guaranteed them by the laws and Constitution of the State of New York.

### SEVENTH CLAIM
#### (*Respondeat Superior* Against the City of New York and the New York County District Attorney's Office)

103.    The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 102 as if fully set forth herein.

104.    Defendants were, at all times relevant to this Count, employees and agents of either the City of New York or the New York County District Attorney's Office. Each of the defendants was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore directly chargeable to their respective employers under state law under the doctrine of *respondeat superior*.

### EIGHTH CLAIM
#### (Loss of Familial Association Claim for Plaintiffs under 42 U.S.C. §1983)

105.    The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 104 as if fully set forth herein.

106.    At all times mentioned, plaintiffs LINDA MCCRAY, GRACE CUFFEE, CONNIE RICHARDSON, VALERIE CUFFEE, CRYSTAL CUFFEE, ANGELA CUFFEE, RAYMOND SANTANA, SR., and JOANN SANTANA were the parents and siblings of ANTRON MCCRAY, KEVIN RICHARDSON and RAYMOND SANTANA, JR., respectively.   At the time of the incarceration of ANTRON MCCRAY, KEVIN RICHARDSON and RAYMOND SANTANA, JR., they did and still continue to live and associate together as a family and as such were and are entitled to the companionship, guidance, support and parenting services of plaintiffs ANTRON MCCRAY, KEVIN RICHARDSON and RAYMOND SANTANA, JR., and did and still do have attachments to them arising from the familial relationship.

107.    By reason of the foregoing conduct of the defendants, jointly and severally, acting under color of state law and within the scope of their employment, plaintiffs  LINDA MCCRAY, GRACE CUFFEE, CONNIE RICHARDSON, VALERIE CUFFEE, CRYSTAL CUFFEE, ANGELA CUFFEE, RAYMOND SANTANA, SR., and JOANN SANTANA were and are deprived of the companionship, guidance, support, daily intimacy and services of plaintiff ANTRON MCCRAY, KEVIN RICHARDSON and RAYMOND SANTANA, JR., which are guaranteed under the Fourteenth Amendment of the United States Constitution, including the plaintiffs liberty interest in preserving the integrity and stability of the family relationship from intervention by the state without due process of law.

108.    The foregoing acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiffs LINDA MCCRAY, GRACE CUFFEE, CONNIE RICHARDSON,

31

VALERIE CUFFEE, CRYSTAL CUFFEE, ANGELA CUFFEE, RAYMOND SANTANA, SR., and JOANN SANTANA and violated their rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution as well as their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

WHEREFORE, the plaintiffs demand the following relief jointly and severally against all of the defendants:

a. Compensatory and punitive damages for plaintiffs Antron McCray and Linda McCray in the amount of $50,000,000;

b. Compensatory and punitive damages for plaintiffs Kevin Richardson, Grace Cuffee, Connie Richardson, Valerie Cuffee, Crystal Cuffee and Angela Cuffee in the amount of $50,000,000;

c. Compensatory and punitive damages for plaintiffs Raymond Santana, Jr., Raymond Santana, Sr. And Joann Santana in the amount of $50,000,000;

d. The convening and empanelling of a jury to consider the merits of the claims herein;

e. A court order, pursuant to 42 U.S.C. §1988, that the plaintiffs are entitled to the costs involved in maintaining this action and attorneys' fees;

f. Such other and further relief as this court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

32

DATED:    December 8, 2003
          New York, New York

                    MOORE & GOODMAN, LLP

              By:   _____
                    JONATHAN C. MOORE, Esq. (JM-6902)
                    WILLIAM H. GOODMAN, Esq. (WG-1241)
                    740 Broadway - Fifth Floor
                    New York, New York  10003
                    (212) 353-9587

                    MICHAEL W. WARREN, P.C.
                    MICHAEL W. WARREN, Esq. (MW-1187)
                    EVELYN WARREN, Esq. (EW-5223)
                    580 Washington Avenue
                    Brooklyn, New York    11238
                    (718) 230-9790

                    ROGER WAREHAM, Esq.
                    572 Flatbush Avenue - Suite 2
                    Brooklyn, New York    11225
                    (718) 941-6407

                    *Attorneys for the Plaintiffs*

33