I make the following conclusions of law.

Defendants Raymond Santana and Steven Lopez contend that their statements and physical evidence must be suppressed as the tainted fruit of arrests made without probable cause. Defendant Kevin Richardson does not specifically raise this argument, however the circumstances surrounding his seizure also implicate this issue.

In evaluating the legality of the seizures of these three defendants, I note, at the outset, that probable cause to arrest did not exist as to any of them when they were first stopped by Officers Powers and Reynolds. This conclusion, however, does not end the analysis; rather it is the beginning.

It is "clear that not every seizure constitutes an arrest (see, Terry v Ohio, 392 US 1). Thus, even though it is concluded that a person is seized, this does not mean that the law enforcement officer's actions must be measured, in all instances, against the probable cause standard." (People v Chestnut, 51 NY2d 14, 20, cert denied 449 US 1018.)

An investigative stop short of probable cause is lawful if based upon a reasonable suspicion of criminal activity.

> "The absence of probable cause, however, is
> not dispositive of the outcome here since
> probable cause is not a necessary predicate
> for all contact between police and the citi-
> zenry in the course of a criminal investiga-
> tion. (See United States v Mendenhall, 446
> US 544, opn of Stewart, J., in which Rehnquist,
> J., joined.) It is settled that, under appro-
> priate conditions, an officer may briefly detain
> and question a suspect in a public place on
> information not amounting to probable cause,
> for, until an actual arrest occurs, the Consti-
> tution demands only that the action of the
> police be justified at its inception and
> reasonably related in scope and intensity to
> the circumstances surrounding the encounter.
> (See People v Cantor, 36 NY2d 106, 111;
> Terry v Ohio, 392 US 1, 20; cf. Dunaway

v New York,)442 US 200.)... Thus, in measuring
the lawfulness of police conduct, we are
called upon to strike a balance between the
citizen's inestimable right to personal
liberty and security--his 'right to be
let alone' (Olmstead v United States, 277
US 438, 478, Brandeis, J., dissenting) --
and the degree to which the seizure is
necessary to advance the public interest
in the detection of crime and the appre-
hension of criminals. (See People v Howard,
50 NY2d 583; People v Cantor, supra, p 111;
Brown v Texas, 443 US 47, 50-51.) And in
weighing those interests the standard to
be applied is that of reasonableness, the
touchstone of the Fourth Amendment. (See
People v Chestnut, 51 NY2d 14; People v
Lemmons, 40 NY2d 505, 508; Pennsylvania v
Mimms, 434 US 106, 108-109; Delaware v
Prouse, 440 US 648, 653-654; Camara v
Municipal Ct., 387 US 523.) For '[i]t must
always be remembered that what the Consti-
tution forbids is not all searches and
seizures, but unreasonable searches and
seizures' (Elkins v United States, 364 US
206, 222; see also, People v Rivera, 14
NY2d 441, 447, cert denied 379 US 978.)

The reasonableness standard contemplates
and permits a flexible set of escalating
police responses, provided only that they
remain reasonably related in scope and
intensity to the information the officer
initially has, and to the information he
gathers as his encounter with the citizen
unfolds. (cf. People v De Bour, 40 NY2d 210.)
The greater the specific and articulable
indications of criminal activity, the greater
may be the officer's intrusion upon the citi-
zen's liberty." (People v Finlayson, 76 AD2d
670, 674-675, lv denied 51 NY2d 1011, cert
denied 450 US 931).

The application of the reasonableness standard to the
facts of a given case is not "readily, or even usefully, reduced
to a neat set of legal rules."(Illinois v Gates, 462 US 213,
232). The Supreme Court of the United States held in United
States v Sokolow, 490 US    , 109 S Ct 1581, 1587, that where
stops are based on "reasonable suspicion" a court must consider
the totality of the circumstances -- the whole picture." United

72

States v Cortez, 449 US 411, 417, . . . . As we said in Cortez:
'the process does not deal with hard certainties, but with
probablilities.  Long before the law of probablilities was
articulated as such, practical people formulated certain common-
sense conclusions about human behavior; jurors as fact-finders
are permitted to do the same -- and so are law enforcement
officers' Id., at 418, 101 S Ct, at 695."

Here, the "specific and articulable facts" upon which
the officers based their suspicions included, but were not
limited to, the descriptions provided in the series of radio runs
which they received prior to stopping the defendants.  While
general in many respects, the descriptions did indicate the age
of the perpetrators, their sex, and their ethnicity.
Significantly, these descriptions were further particularized by
the unusual number of perpetrators reported to be grouped
together (see, People v Allen, 141 AD2d 405, affd 73 NY2d 378;
People v Nowell, 90 AD2d 735; see, also, People v Hicks, 68 NY2d
234; People v Alford, 146 AD2d 635; People v Palmer, 140 Ad2d
720).

The reliability of the officers' information was
reinforced by the proximity of the defendants, in time and place,
to the commission of the crimes.  The evidence established that
Officers Powers and Reynolds first observed the defendants within
minutes of the previous radio call and less than six blocks north
of the assault on 96th Street. Clearly, the conjunction of time
and place with the distinct characteristics of the group as
described in the series of radio runs made reasonable the
inference that the members of this group might be the

perpetrators of the reported crimes.  (People v Perry, 71 NY2d 871; People v Hicks, supra; People v Chestnut, supra; People v Alford, supra; People v Allen, supra.)

The officers' suspicions were further heightened by the fact that the group of which defendants were a part was moving north; the same direction that the previous radio run indicated the perpetrators had fled (see, People v Allen, supra; People v Bowens, 129 AD2d 297).

Moreover, that there was little or no other civilian "traffic" in the area, and the group when encountered, constituting the only cluster of black and Hispanic youths observed in the immediate vicinity, served to make even more likely the inference that this particular group included the perpetrators (see, People v Hicks, supra; People v Palmer, supra; People v Denby, 125 AD2d 867; People v Brooks, 125 AD2d 481; lv denied 68 NY2d 877; People v Finlayson, supra).

In the light of all the attendant circumstances, therefore, Officers Powers and Reynolds were "entitled, and indeed . . . duty bound to stop the [defendants] and detain [them] for questioning." (People v Finlayson, supra, at p 677 and cases cited therein). When the officers sought to do so, the circumstances before them rapidly escalated.  These developments operated to heighten the officers suspicion, and correspondingly elevated the level of intrusion permitted (see, People v De Bour, 40 NY2d 210).

This escalating dynamic was triggered by the flight of all members of the group except Lopez and Santana in direct response to Officer Powers' lawful directive that they stop. Circumstantially, the flight of Lopez and Santana's companions,

including Richardson, provided Officers Reynolds and Powers with an additional basis for suspecting Lopez and Santana (see, People v Boyd, 91 AD2d 1045).

Both Santana and Lopez appeared wide eyed and shocked and then made what the officers knew from their own observations to be false statements as to their relationship to the dispersed group. Their denials that they were with the group and their allegations that the group was going to "jump" them were entirely inconsistent with what the officers recognized as an "homo-genized" and dense group of people moving together. Here, as in People v Ortiz, (137 AD2d 727), the false nature of defendants' responses "concerning their activities . . . and their nervous and apprehensive appearance gave the officers additional reasons to suspect that both had committed a crime. Thus, at this point, the officers were clearly justified in detaining [Lopez] and [Santana] pending further investigation (see, People v Hicks, 68 NY2d 234)." (People v Ortiz, supra at p 728; People v Chambers, 52 NY2d 923; People v Williamson, 107 AD2d 727; People v Holt, 121 AD2d 469).

Similarly, the flight by Richardson raised the level of suspicion as to him. Such flight, upon a lawful inquiry, "indicates a guilty state of mind (see, People v Amarillo, 141 AD2d 551)."(People v Andre A., 146 AD2d 704; People v Grimslev, AD2d , NYLJ Jan. 5, 1990, p 24 col 1.) As in People v Allen, supra, Richardson immediately fled upon the officer's lawful command, "Stop, police." In that case, as here, in the context of the attendant circumstances, the officers were "justified in considering that flight as an escalating factor." (People v Allen, supra, 141 AD2d at p 406.)

Thus, "[a]lthough each factor, standing alone, could be susceptible to an innocent interpretation, a view of the entire circumstances indicates that the officers entertained a reasonable suspicion that [Richardson] had committed a crime ... and was attempting to flee." (People v Evans, 65 NY2d 629, 630).

Accordingly, the factors, all taken together, justified the pursuit and seizure of Richardson by Officer Powers (People v Leung, 68 NY2d 734; People v Allen, supra; People v Hill, 127 AD2d 144, appeal dismissed 70 NY2d 795).

The fact that Richardson's detention, unlike that of Santana and Lopez, was by force does not change this conclusion. Again, as in People v Allen, supra, "When Officer [Powers] pulled

defendant to the ground and handcuffed him after a struggle, he did not arrest him." (Id at 407.) Rather, he effectuated a lawful "nonarrest detention" as a necessary incident to the pursuit of their investigation.

Accordingly, the stop and detention of Lopez, Santana and Richardson for the purpose of further investigation was reasonable in each instance.

The testimony established that the defendants were transported to 100th Street in anticipation of a showup with the victim John Loughlin, who had been robbed and assaulted earlier, and that the feasibility of such a procedure was specifically discussed by the police while the defendants were in their custody at 100th Street. Indeed, Officers Powers and Reynolds had been present at a showup involving another victim prior to their encounter with Santana, Richardson, and Lopez. Manifestly, "Even in the absence of probable cause, the nonarrest detention of an individual, and even transportation to the crime scene for possible identification, is within the bounds of a lawful investigatory stop (People v Hicks, 68 NY2d 234)." (People v Allen, supra, 141 AD2d at p 407; People v Boyd, 78 AD2d 225; People v Pinkney, AD2d , 548 NYS2d 226; United States v Sharp, 470 US 675).

Thereafter, Richardson's volunteered statements, while en route to and at 100th Street, provided the police probable cause to arrest him. (See, People v Allen, supra; People v Wade, 143 AD2d 703).

77

His statements about the "murder" were circumstantially incriminating because they revealed information which the officers believed to be consistent with the facts of the Loughlin assault and which, given the short time frame, logically could only have been acquired first hand (see, People v Bay, 67 NY2d 787). His awareness of the violent nature of the prior attack, his concurrence with Thomas concerning their knowledge of the identity of the "murderer ", their demeanor, his apparent presence during the incident with Thomas, who also knew that a weapon had been employed and its location, in combination with his manifest consciousness of guilt in fleeing, made reasonable the inference that he had joined - not just watched - the acts about which he spoke. Moreover, the conclusion that his presence at the crime included his participation was consistent with the officers' information that the crimes had been committed by a large number of perpetrators and that these perpetrators, like Richardson and Thomas, were young, black or Hispanic and male.

Accordingly, the coincidence of their presence in time and place to the crime, their presence with the only large group of youths in the vicinity, their panicked flight, the consistency of their physical characteristics with those described in the radio runs, and their insight into the underlying facts of at least one recent violent crime constituted, upon all the attendant circumstances, probable cause.

"Probable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrent a conviction (e.g., People v Miner, 42 NY2d 937, 938; People v White, 16 NY2d 270,

78

273), but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed" (People v McCray, 51 NY2d 594, 602 and cases cited therein).

Given the existence of probable cause to arrest Richardson and Thomas, the comment at 100th Street by one of them to the effect that Santana and Lopez "were with us in the park" served to establish probable cause as to Santana and Lopez as well. They shared with Richardson the conjunction of time and place of the crime, consistency as to description, presence with the only large group of youths in the vicinity and had demonstrated consciousness of guilt as well: failure to truthfully respond (see, People v Hernandez, 77 AD2d 548). Further, a statement by a codefendant or accomplice implicating a defendant in the commission of a crime constitutes ample probable cause for an arrest (People v Berzups, 49 NY2d 417; People v Crawford, 113 AD2d 771; People v Rivera, 124 AD2d 69; People v Scherifi, 147 AD2d 663).

In view of the foregoing, it is clear the police action, at every step of the escalating encounter, was properly related in scope to the surrounding circumstances (see, People v DeBour, supra). Neither the initial detention of Santana, Lopez or Richardson, nor their subsequent arrests were, in any respect, precipitous or unreasonable. No taint, therefore, can flow from it.

In reaching this determination, it is worth noting that the subjective views of the police regarding the appropriateness of their seizing the defendants for the crime of unlawful assembly are not binding on the court. "[J]udicial evaluation of police action must be based on objective criteria and not an officer's subjective view of his right to make an arrest." (People v Lopez, 95 AD2d 241, at p 242; People v Peters, 136 AD2d 750.) Moreover, neither are the subjective beliefs of police as to when a de facto arrest has taken place legally binding (see, People v Chestnut, supra, at p 20; People v Hicks, supra). Such a determination is reserved for the court.

At the hearing it was established that the first encounter Kharey Wise and Yusef Salaam had with the police was when they were together with Eddie de la Paz in the hallway of Yusef's apartment on the night of April 20. Defendants maintain that the atmosphere was "police dominated"; they were not free to leave and effectively arrested without probable cause at that time. As a consequence, each moves to suppress statements and physical evidence obtained from them thereafter.

Detective Taglioni and his fellow officers approached defendants Wise and Salaam in a nonthreatening manner, and made brief inquiries of them as to their name and age. Salaam admitted that they knew the police were upstairs when they returned to his floor. Prior to leaving the lobby, either Kharey or Eddie said, "Well, the cops are here. We know we didn't do anything, so since Al and everybody else that went down or got in the police car came back to the complex of Schomberg, then we

thought -- we know we didn't do anything, so why run." The
record supports the conclusion that defendants' agreements to go
to the precinct were voluntary and unconstrained... (see, People v Yukl,
25 NY2d 585, cert denied 400 US 851; People v Rhodes, 111 AD2d
194; People v Goodrich, 126 AD2d 835; People v Ruffin, 148 AD2d
644; see also, Oregon v Mathiason, 429 US 492).

Therefore, probable cause was not required as a
predicate for their presence, and their statements and physical
evidence will not be suppressed on that ground.

Although the circumstances under which Michael Briscoe
was initially approached by the police differ somewhat from those
of Salaam and Wise, the record is clear that Brisco's decision to
accompany the officers to the precinct for questioning was
similarly voluntary.

Accordingly, the arguments by the defendants Wise,
Salaam and Briscoe that evidence obtained from them must be
suppressed for lack of probable cause must fail.

Defendant Richardson contends that the totality of the
circumstances do not reflect a knowing and voluntary waiver of
his Miranda rights and that the absence of such a waiver mandates
suppression of his statements. He submits that his mother and
sister were unable to grasp the significance of his Miranda
rights because they were not explained to them and, coupled with
the "frail and nervous" condition of his mother, effectively
rendered them incapable of issuing a valid waiver of Kevin's
rights. Richardson does not mention his father's presence during
the Miranda rights on at least two occasions.

It is beyond cavil that "special care must be taken to insure the rights of minors who are exposed to the criminal justice system (<u>Matter of Gault</u>, 387 US 1; <u>Haley v Ohio</u>, 332 US 596; cf., <u>Fare v Michael C.</u>, 442 US 707)." (<u>People v Ward</u>, 95 AD2d pp 351, 354.) This solicitude is rooted in the long-recognized vulnerability of youths as compared with adults and because of the "great instability which the crisis of adolescence produces." (<u>Haley v Ohio</u>, 332 US 596, 599.)

Notwithstanding such concerns, the totality of the circumstances approach has been deemed "adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." (<u>Fare v Michael C.</u>, <u>supra</u>, at p 725.) This approach, in application to the facts of a given case, "... mandates - inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. (<u>See</u>, <u>North Carolina v Butler</u>, 441 US 369)." (<u>Fare v Michael C.</u>, <u>supra</u>, at p 725.)

In this case, one aspect of the special care shown juveniles is reflected in the proper notification of Richardson's mother by the police as required by statute. Mrs. Cuffee's ability to respond to the circumstances is demonstrated by her prompt arrival at the precinct shortly after being notified of her son's situation. Indeed, she was the first parent to respond. Moreover, that she was not passive in the presence of

the police is evidenced in her taking the initiative to see that Richardson's interview proceeded ahead of other defendants. Clearly, to whatever extent the events of the evening took a physical and emotional toll on her, that toll was itself in part the product of Mrs. Cuffee's comprehension of the gravity of the charges against her son.

I find further that, contrary to defendant's contention, his sister Angela Cuffee was capable of participating in a meaningful way when she succeeded her mother during Kevin's interview. Their testimony at the hearing satisfies me that both Mrs. Cuffee and Angela Cuffee possessed the intelligence to understand Kevin's rights and the ability to press them had they chosen to.

I find as well, upon an application of the totality of the circumstances test, that Kevin Richardson, in addition to his mother and sister, understood his _Miranda_ rights and possessed the emotional and intellectual capacity to waive them (see, _Fare v Michael C._, _supra_). His manner and poise reflected this. So too did his appreciation of the significance of the scratch on his face. Further, his reluctance to incriminate himself in the most serious of crimes demonstrated both an understanding of his right not to do so and a realistic sensitivity towards law and its consequences.

Richardson also argues that the police deceived and misled Mrs. Cuffee into believing that his detention was to be temporary, and her waiver of his rights was obtained by a false promise that Kevin would be released to her after his statement. Here, too, this contention is not borne out by the record.

Pursuant to the provision of CPL 60.45(2)(b), a waiver is invalidated and a confession deemed involuntary when obtained from the defendant:

> "(b)　By a public servant engaged in law enforcement activity . . .
>
> (±)　by means of any promise or statement of fact, which . . . creates a substantial risk that the defendant might falsely incriminate himself; or
>
> (ii)　in violation of such rights as the defendant may derive from the constitution of this state or of the United States."

In specific circumstances, this standard has been held to render involuntary, waivers that were obtained upon a promise that defendant would not be criminally prosecuted or incarcerated (cf., People v Sunset Bay, 76 AD2d 592 appeal dismissed 54 NY2d 808; People v Fox, 120 AD2d 949). The record in the present case indicates, however, that the police honestly conveyed information to the defendant's mother based upon the facts as they understood them. Indeed, the first two individuals interviewed, Clarence Thomas and Lamont McCall, were released.

However, as the full import of Richardson's partici-
pation in a possible homicide came to be understood, statements
by the police to his mother -- and to the other parents -- as to
the impending release of the defendants stopped.

Nor did other remarks in this record, not specifically
mentioned by defendant, create a substantial risk that Richardson
would incriminate himself. For example, Detectives Jaffer and
Hartigan's suggestions to Mrs. Cuffee that it was "important" to
tell the truth and that it would "behoove" Kevin to do so did not
constitute improper inducements (<u>People v Perry</u>, 77 AD2d 269;
<u>People v Jackson</u>, 143 AD2d 471).

It can only be concluded that no misrepresentations
were made to Mrs. Cuffee, Angela Cuffee, Paul Richardson or to
Kevin himself such as would induce an involuntary confession
within the purview of CPL 60.45.

Richardson also argues that statements which he made
at the crime scene, in the absence of a parent, must be sup-
pressed. He maintains that the waiver by his father of his right
to be present was obtained by the Assistant District Attorney's
allegedly "disingenuous" representation that they were not going
to ask Kevin any further questions.

The clear thrust of Assistant District Attorney
Fairstein's discussion with Paul Richardson, Kevin's father, was
that he could accompany them if he chose, but that no new avenues
or subjects of inquiry were to be pursued. This conclusion is

supported not only by the testimony at the hearing but by the inherent illogic of taking a defendant to a crime scene for any reason except to question him about it.

I find that in issuing this waiver, Mr. Richardson was aware of Kevin's rights because they had been read to Kevin in his presence shortly before leaving for the crime scene and at the videotaped interview earlier.

Accordingly, I find that Richardson's statements were obtained upon knowing and voluntary waivers of his rights by all concerned. His motion to suppress these statements is, in all respects, denied.

Raymond Santana seeks suppression of his statements on a variety of statutory and constitutional grounds in addition to the Fourth Amendment discussed supra. He contends that those statements made outside the presence of his father must be suppressed as having been obtained in derocation of the Family Court Act; that the statement to Detective Sheehan in the presence of his father was the product of deceitful represen-tations to the father; that the duration of his prearraignment detention was such as to render his statements involuntary; and that the delay of his arraignment deprived him of his constitutional right to counsel.

He also argues that his statement to Detectives Arroyo and Hartigan must be suppressed because his grandmother should have been provided a Spanish interpreter, and secondly, because Detective Arroyo's translation of the Miranda rights created confusion resulting in the grandmother's not being fully advised.

The arguments advanced by Santana pursuant to the Family Court Act are grounded on his contention that he was not afforded certain statutory protections incorporated in section 305.2 of that Act to which, he claims, his status as a juvenile entitles him. In substance, he contends that the failure of the police to contact his father at work and to secure his presence at each of Raymond's statements violated his rights under the Act, mandating suppression.

This line of argument presents a threshold issue as to whether the provisions of the Family Court Act apply in the Supreme Court. In addressing this issue, I note, parenthetically, that other defendants similarly rely upon the provisions of the Family Court Act.

Both the New York Family Court Act and the Criminal Procedure Law contain specific provisions which pertain to the arrest, without a warrant, of a juvenile. "When a child under 16 is arrested for a crime cognizable in the adult justice system as a 'juvenile offense' the CPL requires that the police officer notify the parent or other legally responsible person of the arrest and the place of detention (CPL 120.90, subd. 7; 140.20, subd. 6, see, also, CPL 140.40, subd. 5). A similar duty is imposed by the Family Court Act in regard to youths the same age who are arrested for acts constituting 'juvenile delinquency'." (People v Susan H., 124 Misc 2d 341, 345).

Moreover, "[t]he Family Court Act, unlike the Criminal Procedure Law,. . .accords minors additional safeguards beyond

parental notification." (People v Susan H., id at 345).  Included
among these is the obligation, where a parent or guardian is
present, to advise them of the Miranda rights, as well as the
juvenile.  Additional protections raised by other defendants
(infra) require that questioning take place only in specially
designated facilities and that defendants be taken to court after
arrest "with all reasonable speed", or alternatively, that their
questioning be limited to a "reasonable period of time." (Family
Court Act 305.2, subds. 4, 7.)

        A child under the age of sixteen charged as a juvenile
offender in the Supreme Court is governed by the provisions of the
Criminal Procedure Law.  The provisions of the Family Court Act
section 305.2 do not apply.  However there is some commonality in
both and to that extent they are treated the same (see Family
Court Act 305.2(3); Criminal Procedure Law section 140.20(6) and
140.40(5))(see People v Bonaparte, 130 AD2d 673, lv. denied, 70
NY2d 703; People v Ward, 95 AD2d 351; People v Castro, 118 Misc 2d
868; see also, People v Acero, 146 AD2d 787; People v Susan H,
supra,; but see, People v Ventiquattro, 138 AD2d 925).

        In any event, the record establishes that those
defendants who have specifically raised this issue did in fact
receive the additional safeguards mandated by the Family Court Act
as is noted in the findings pertaining to them (infra).

        Contrary to Santana's position, this record compels the
conclusion that the police complied with the notice provisions
contained in both CPL 140.20(6) and Family Court Act 305.2(3).

Neither statute mandates the presence of a parent before custodial interrogation can commence. Rather, the CPL requires that the police "immediately notify the parent. . .", and the Family Court Act requires that "every reasonable effort" to give such notice be made.

The provisions of each statute "recognize what is unfortunately, a not uncommon situation--an uncooperative or even hostile parent who refuses to attend the questioning or who is otherwise unavailable. (See, e.g., Matter of Raphael A., 53 AD2d 592.) As long as the police have made reasonable efforts to notify and to await the arrival of the parent, they are free to question. (Matter of Emilio M., 37 NY2d 173; Matter of Raphael A., supra; cf. Matter of Brian P.T., 58 AD2d 868; Matter of Kevin R., 42 AD2d 541). Statements obtained in such circumstances are admissible as long as they are otherwise voluntary." (People v Susan H., supra at p. 346-347).

Thus, both acts anticipate that it may be necessary to question a child when a parent is notified but does not appear. For this reason, "the Family Court Act requires that. . .the parent need be advised of the child's rights only 'if present' (Family Court Act 305.2(7)). Moreover, the statute provides that in determining the appropriateness of questioning, the presence or absence of the child's parents is but one of several factors to be considered (Family Court Act 305.2(8); People v Susan H., supra, at p 346)." (People v Bonaparte, supra at p 675; Matter of Raphael A., 53 AD2d 592).

89

The police contacted Mr. Santana promptly after their arrival at the Central Park Precinct on the evening of April 19, and made repeated efforts to obtain his presence throughout the following morning. Indeed, they sent a police car to the grandmother's residence in order to obtain her presence before they began to formally question Raymond. Raymond's father came with the grandmother.

The facts further show that Mr. Santana, despite being fully advised with regard to his son's circumstances, left the Central Park Precinct on the morning of April 20 and went to work. During the day he never called to inquire about his son. He returned after work and after he went home. He arrived as Raymond had completed his statement. He again left the Central Park Precinct later that day after consenting to his son's speaking to Detective Hartigan alone. Clearly, the decision by Mr. Santana not to attend the questioning of his son is not attributable to any action or inaction by the police and could not operate to forestall the police inquiries of Raymond. In sum, "[b]ecause the defendant was arrested as a juvenile offender, the police discharged their statutory duty (see, CPL 140.20(6)) by immediately notifying his [father] of the arrest and place of detention." (People v Bonaparte, supra, at p 674.)

Even if the greater protections afforded to juvenile delinquents were applied, I would reach the same conclusion.

Given that he was properly notified, the father's presence was not a condition precedent to the questioning by Detectives Hartigan, Arroyo, or Sheehan, either at the precincts or elsewhere.

and his absence therefrom poses no basis for suppression under either the Family Court Act or the Criminal Procedure Law.

Santana's argument that Detective Sheehan made deceitful representations to his father, thereby obtaining the father's consent to take another statement, is not founded in fact. The record shows, to the contrary, that the detectives delayed further questioning of Santana until the father was present and then commenced their interrogation only after fully and fairly advising the father as to what had previously occurred and as to what they intended to do and after he had an opportunity to speak to his son.

Similarly, the facts adduced at the hearing refute Santana's argument that the circumstances attending his prearraignment detention denied him due process and rendered his statements involuntary. It was established that Raymond slept; he was fed, and that repeated efforts were made by the police to provide him access to a member of his family. The extent to which such access was delayed was clearly a product of his family's behavior, and not that of the police.

Moreover, the alleged debilitating effect upon Raymond from lack of food and sleep are belied by his raucous behavior in the cell block, and his participation, with his codefendants, in the lewd comments and exuberent laughter with which they accepted their incarceration.

Santana's contention that the delay in his arraignment denied him his right to counsel is unavailing. "[A]bsent extraordinary

circumstances, a delay in arraignment is but a factor to consider on an issue of underlying involuntariness (People v Holland, 48 NY2d 861; People v Dairsaw, 46 NY2d 739.). And such a delay does not cause the right to counsel to attach automatically." (People v Hopkins, 58 NY2d 1079, 1081.) In applying that general rule to the facts of this case, it should be noted that all of the statements which are the subject of Santana's motion to suppress were obtained within twenty-nine hours of his initial detention.

Moreover, the investigation which the police were pursuing was an extraordinarily complex one, replete with "unexpected revelations". (People v Hopkins, supra). Finally, the delay, to the extent that there was any, was in part caused by the efforts of the police to reach defendant's family and by their reluctance to come to the precinct, or, once there, to remain. For all these reasons, I find that the record reflects no unnecessary delay in arraignment and no basis for finding that Santana's right to counsel was interfered with.

I find that Santana's arguments addressed to his grandmother's understanding of the Miranda warnings are not sustained; in fact, they are undercut by Mrs. Colon's own testimony at the hearing in which she demonstrated an ability to understand English far beyond her willingness to admit it.

Furthermore, the rights were addressed to her in Spanish by Detective Arroyo and she gave an affirmative response. Thereafter, when a discussion ensued about the simultaneous

92

translation of Raymond's interview, Mrs. Colon's statement to
Detectives Hartigan and Arroyo that "It's okay.  I understand" was
a clear reflection of her awareness of the events taking place.
Her refusal to sign Raymond's first written statement "in case it
had any adverse effect on Raymond"--though stated in
Spanish--evidenced her understanding of his rights and of the
objectives of the police investigation.

In any event, the precautions that the detectives
exercised vis-a-vis Mrs. Colon were the result of an abundance of
caution and were not statutorily or constitutionally required
since Raymond's father had previously been notified of, but waived
his right to be present.  His cavalier approach to his son's
situation was reflected in his initial failure to show up at the
precinct when called; his later arrival with his mother after the
police sent a car for her and his departure for work before
Raymond's case was called; his failure to communicate with anyone
concerning his son, while at work.  Mr. Santana's itinerant
conduct throughout this time and the fact that he left his mother
Mrs. Colon to stand with her grandson speaks volumes about him and
also belies the argument that she did not understand English.

I therefore find that Raymond Santana's statements at
the Central Park Precinct; to Detective Sheehan enroute to and in
the 20th Precinct as well as his videotaped statement were
obtained upon a knowing and voluntary waiver by him and in a
manner consistent with his constitutional and statutory
guarantees.  His motion to suppress these statements is, in all
respects, denied.

93

However, although not specifically raised by defendant, the circumstances which attended his statement to Officer Powers at the Central Park Precinct, to wit, "I already got mines" requires a different conclusion.

Statements which are the product of custodial interro-
gation, undertaken in the absence of Miranda warnings and a
waiver thereof, must be suppressed.  It is clear that Raymond
Santana had not been given his rights as of the time that Officer
Powers stated to the defendants, "you guys shouldn't be out here
beating up on people.  You should be out with your girlfriend."
The admissibility of Santana's response, depends upon whether
Officer Powers' declaratory statement constituted "interrogation".
"The term 'interrogation' under Miranda refers not only to
express questioning, but also to any words or actions on the part
of the police (other than those normally attendant to arrest and
custody) that the police should know are reasonably likely to
elicit an incriminating response from the suspect."  (Rhode
Island v Innis, 446 US 291, 301; People v Ferro, 63 NY2d 316 cert
denied 472 US 1007; People v Lanahan, 55 NY2d 711).

I find that Powers' statement, despite its declarative
nature, should reasonably have been anticipated to produce a
potentially incriminating response.  It was made directly to the
defendants, and its subject matter specifically encompassed the
facts underlying their criminal liability, i.e., that they had
been beating people (see, People v Ferro, supra; cf., People v
Bryant, 59 NY2d 786; People v Wilson, 149 AD2d 376; People v
Allnutt, 148 AD2d 993).  The People have not carried their burden
of proof to establish the admissibility of this statement (see,
People v Lanahan, supra; People v Stoesser, 53 NY2d 648).

Steven Lopez has forwarded a number of arguments in
support of his motion to suppress statements and clothing.  That
branch of his motion which was premised on the theory that he was

seized without probable cause has been resolved <u>supra</u>. I now
address his remaining contentions, which include the arguments
that his detention was unreasonable as violative of the Family
Court Act; that his and his father's waivers of <u>Miranda</u> rights
were induced by a false promise; that the Miranda warnings and
respective interviews should have been translated into Spanish
for his mother; that defendant's father invoked his right to
counsel when he asked, in substance, whether he should or had to
have a lawyer; that defendant's will was overborne by his cir-
cumstances; and that the videotape must be suppressed because it
was taken after defendant's father had cut off questioning.

With respect to the suppression of physical evidence
obtained from him, he contends further that the police did not
have his consent to take his clothes.

As incident to his motion to suppress, Lopez also seeks
to have the hearing reopened so that he might have the oppor-
tunity, denied him previously, to cross-examine witnesses
regarding statements other defendants made implicating him.

Lopez's arguments addressed to alleged violations of
section 305.2 of the Family Court Act fail both for procedural
and substantive reasons. Procedurally, I find that, as indicated
<u>supra</u>, the Family Court Act provisions are not applicable to the
prosecution of juvenile offenders in Supreme Court.
Substantively, I find that the pertinent Family Court Act
provisions were satisfied anyway. Defendant, both at the Central
Park Precinct and at the 24th Precinct, was questioned in an
officially designated facility. Moreover, the police were under
no obligation to take him to Family Court prior to questioning

and, in the special circumstances of this case, his questioning was for a "reasonable period of time" and concluded as expeditiously as possible. (Family Court Act 305.2[4][b].)

Lopez's argument that the police obtained waivers of _Miranda_ rights from him and his father by means of a false promise regarding Steven's imminent release also fails. There is no evidence that the representations -- which were true as of the time they were made -- operated as inducements in any sense or that as such they created "a substantial risk that the defendant might falsely incriminate himself." (CPL 60.45(2)(b)(i); _People v Vail_, 90 AD2d 917; _People v Rosencrants_, 77 AD2d 768).

The further argument that Lopez's statement must be suppressed because his rights and the proceedings were not translated for his mother ignores his father's adult status, as well as the father's ability to translate those proceedings for his wife had he found it warranted. Again, even were I to apply the "greater protections" extended defendants under the Family Court Act, I would find those provisions fully satisfied in this case by the participation of the father. Neither the constitution nor any statute mandates the joint participation of both parents as a prerequisite for the admissibility of a juvenile offender's statements.

The contention that Lopez's father invoked the right to counsel, thereby precluding further interrogation, is not supported in the record. "It is well established that if a suspect 'indicates in any manner and at any stage of the process

97

that he wished to consult with an attorney before speaking there can be no questioning! (<u>Miranda v Arizona</u>, 384 US 436, 444-445)." (<u>People v Lubanski</u>, 148 AD2d 947).

However, to be effective, a defendant's expression of such a desire must be unequivocal and explicit. (<u>People v Roe</u>, 73 NY2d 1004; <u>People v Fridman</u>, 71 NY2d 845; <u>cf</u>. <u>People v Esposito</u>, 68 NY2d 961). Here, the question by defendant's father as to whether he had to have an attorney was properly responded to by Detective Arroyo (<u>see</u>, <u>People v Banks</u>, 135 AD2d 643). In that context, the record is clear that the father's question "did not serve to invoke his right to counsel (<u>see</u>, <u>e.g.</u>, <u>People v Hicks</u>, 69 NY2d 969)." (<u>People v Banks</u>, <u>id</u>. at pp 645-646).

Lopez next argues, pursuant to CPL 60.45(2)(a), that his statements must be suppressed because the circumstances under which he was kept in custody operated in their totality to overbear his will and thereby provoked an involuntary waiver of his right not to incriminate himself. He alleges in support of this theory, his age, his lack of familiarity with police practices, a twenty-hour delay before he was advised of his rights, his lack of sleep, the absence of a bed and the fact that he was in custody for 22 hours before his first statement was signed and 29 hours before the videotaping began.

CPL 60.45(2)(a) provides, in pertinent part: "A confession, admission or other statement is 'involuntarily made' by a defendant when it is obtained from him:

> (a) By any person by the use or threatened
> use of physical force upon the defendant . . .,
> or by means of any other improper conduct or
> undue pressure which impaired the defendant's
> physical or mental condition to the extent of
> undermining his ability to make a choice
> whether or not to make a  statement".

An application of that statute to the facts of this case requires that this branch of Lopez's motion be denied.  The evidence establishes that Lopez did sleep and was fed.  Moreover, his allegation that he was reduced to passivity and subordination is entirely inconsistent with his loud and vulgar behavior when in the pens amongst his codefendants and especially by the aggressive posture that he assumed when Detective Nugent directed him to sit down.  Defendant's allegations are refuted by the videotape itself which shows Lopez to be composed and calm.

Defendant further contends that his father's assertion "No more questions. My son will not provide any more answers" made at approximately 9:10 p.m. on April 20, precluded a subsequent waiver by him and his father at 3:30 a.m. on April 21. It follows, he maintains, that his videotaped statement must be suppressed.

"[A] suspect's right to remain silent, once invoked, must be 'scrupulously honored' (Miranda v Arizona, 384 US 436 at p 479; Michigan v Mosley, 423 US 96, 103-104; People v Wander, 47 NY2d 724, 725; see People v Grant, 45 NY2d 366, 373, 376). He may not within a short period thereafter and without a fresh set of warnings be importuned to speak about the same suspected crime (People v Gary, 31 NY2d 68, 70; Michigan v Mosley, 423 US 96, 106, supra; see People v Buxton, 44 NY2d 33, 37)." (People v Ferro, supra, at p 322.)

Clearly, this rule, as contrasted with a defendant's invocation of his right to counsel, does not "per se, prohibit his later being asked to speak upon reiteration of the requisite warnings, provided that the subsequent statement is not the product of 'continued importunity or coercive interrogation in the guise of a request for reconsideratiion' (People v Gary, 31 NY2d 68, 70)." (People v Buxton, supra, at p 37; People v Collins, 114 AD2d 373; People v Pugh, 70 AD2d 664.)

To hold otherwise, "regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and

100

deprive suspects of an opportunity to make informed and intelligent assessments of their interests."   (<u>Michigan v Mosley</u>, 423 US 96, 102.)

I find on the facts of this case, that Lopez's right to cut off questioning was "scrupulously honored" (<u>Miranda v Arizona</u>, <u>supra</u>.)  Detectives Arroyo and Hartigan immediately cut off questioning upon the father's directive, left the room and further initiatives to question defendant were not undertaken for over six hours.  Here, as in <u>People v Cicciarelli</u>, (145 AD2d 938), "the police immediately ceased questioning defendant when he invoked his right to remain silent.  Defendant's subsequent statement was made only after the passage of time, without further police pressure and after having been again fully given his <u>Miranda</u> warnings."  (<u>People v Cicciarelli</u>, <u>id</u> at p 939; <u>see</u>, <u>People v Jefferson</u>, 139 AD2d 531.)

Accordingly, the waiver which defendant issued in the presence of his mother and father immediately prior to the commencement of his videotaped statement was legally effective and does not provide a basis for suppression.

Lopez has not specifically moved to suppress the statements he made to Officer Powers concerning how many individuals the officers had caught compared to how many they had chased.  Nor has Santana moved to suppress that part of the exchange attributable to him.

101

because they were spontaneously generated (People v Ferro, supra).
Officer Powers' "terse and pointed response to the defendant's
questions can in no way be viewed as the functional equivalent of
interrogation (People v Rivers, 56 NY2d 476, rearg denied 57 NY2d
775; People v Stoesser, 53 NY2d 648; People v Stevenson, 104 AD2d
835)."(People v Coleman, 142 AD2d 586, 587.)

Defendant argues that consent to take his clothes was
required and that a lack of proof as to consent requires the
suppression of that clothing.  However, the seizure of Lopez's
clothing under the circumstances did not require his consent
because it was incident to his lawful arrest (People v
Singletary, 35 NY2d 528; see, People v Sweeney, 115 AD2d 502.)

Defendant has also moved to reopen the hearing, arguing
that he was improperly precluded from cross-examining witnesses
as to statements by other defendants which implicated him.  This
motion is denied.  "Defendant lacks standing to challenge the use
of those statements as the basis for his arrest, even assuming
they were unconstitutionally obtained (see People v Thomas, 103
AD2d 854, 855; see also, People v Henley, 53 NY2d 403.)" (People
v Williams, 115 AD2d 627.)

In any event, reference to the record reveals that
counsel for Lopez had an opportunity to cross-examine as to the
statements which provided probable cause against him--those of
Richardson or Thomas--indeed it was on his cross-examination that
this evidence was elicited.

Defendant's motion to redact portions of his video statement is reserved for trial.

Antron McCray seeks to suppress the series of statements that he made to Detective Hildenbrandt on April 20 at the 20th Precinct and the video statement that he gave the following day at the 24th Precinct. He has not put in issue the statement that he made to Officer Powers, when, accompanied by his mother he went to the Central Park Precinct at around midnight on April 20.

McCray initially argues that he was not afforded certain statutory protections incorporated in Family Court Act 305.2. Specifically, he contends, pursuant to subdivision 4 that his statutory rights were violated by the failure of the arresting officers to take him to court "with all reasonable speed" or alternatively, to limit their questioning to a "reasonable period of time" (Family Court Act 305.2 [4][b]). He maintains as well, under the Family Court Act, that the results of his questioning at the 20th Precinct must be suppressed because the room in which that interrogation took place was not, on that date, a properly designated facility.

Defendant also argues that his questioning was custodial and, as such, required a knowing and voluntary waiver of his Miranda rights as a predicate thereto. Pursuant to this line of argument, he contends that his waiver was not voluntary because of misleading and unfair inducements on the part of the detectives.

103

He also contends that his arraignment was unnecessarily delayed and that this denied him his right to counsel.

I will address, first, the argument that defendant's waiver of his <u>Miranda</u> rights was not fairly and properly obtained. This contention turns initially on whether a reading of his rights and waiver thereof was required under the circumstances. <u>Miranda</u> warnings are required only when there has been such a restriction imposed on a person's freedom as to render him in custody (<u>Miranda v Arizona</u>, <u>supra</u>; <u>Oregon v Mathiason</u>, 429 US 492). "In determining whether a suspect was in custody at the time of the police questioning and therefore entitled to receive pre-interrogation <u>Miranda</u> warnings, the test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position (<u>see</u>, <u>People v Yukl</u>, 25 NY2d 585, 589; <u>see also</u>, <u>People v Kwok T.</u>, 43 NY2d 213)." (<u>People v Hall</u>, 125 AD2d 698, 700.)

Defendant argues that a number of factors establishes his custodial status: that Antron was not a "mere" witness; rather the police believed they had probable cause to arrest him; the manner in which he was "picked up" at his apartment including the failure of the police to first telephone and the number of police; that the questioning took place at the police precinct instead of at his home; and Detective Rosario's statement to Mr. McCray that a parent "would have" to accompany Antron to the precinct because he was a juvenile.

I find, however, that the presence of these factors either individually or in their totality, did not render Antron's status custodial within the contemplation of People v Yukl, (supra).

There is no obligation inherent in Miranda v Arizona (supra) that the police give warnings to every person whom they question even if they be a suspect or the focus of an investigation (Oregon v Mathiason, supra; People v Liccione, 63 AD2d 305, affd 50 NY2d 850; People v Basso, 140 AD2d 448; People v Scott, 116 AD2d 755.)   Nor does the fact that the questioning takes place at a police precinct necessarily render the surrounding circumstances custodial (Oregon v Mathiason, supra; People v Mack, 131 AD2d 784; People v Goodrich, 126 AD2d 835).

Further, while the number of police officers present at the McCray apartment and the fact that they had not called first arguably conveyed certain coercive aspects, such circumstances do not render an environment custodial. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.   But police officers are not required to admnister Miranda warnings to everyone whom they question.   Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (Oregon v Mathiason, supra, at p 495; see, People v Liccione, supra.)

Moreover the giving of <u>Miranda</u> rights does not preclude a finding that he was not in custody (<u>People v Feneque</u>, 133 AD2d 646; <u>People v Ross</u>, 134 AD2d 298, <u>lv</u> <u>denied</u> 70 NY2d 937; <u>People v Basso</u>, <u>supra</u>; <u>People v Sohn</u>, 148 AD2d 553).

Pertinent, as well, is recognition of the fact that Antron had earlier gone voluntarily to the precinct with his mother, made significant admissions to Officer Powers and nevertheless been allowed to leave (<u>see</u>, <u>People v Anderson</u>, 127 AD2d 775, <u>lv</u> <u>denied</u> 69 NY2d 947).

I find, therefore, that the defendant, in the presence of his parents, voluntarily agreed to accompany the police to the precinct for the express purpose of questioning and that the circumstances of this questioning were not custodial in nature (<u>see</u>, <u>People v Bertolo</u>, 65 NY2d 111; <u>People v Yukl</u>, <u>supra</u>; <u>People v Young</u>, 113 AD2d 852).

Accordingly, the questioning of defendant did not require a preliminary waiver of <u>Miranda</u> rights. This branch of defendant's motion to suppress statements is, therefore, denied.

Even if I were to find that the circumstances were, or became, custodial (<u>see</u>, <u>People v Hall</u>, <u>supra</u>), a different conclusion would not follow from this record. The testimony established that defendant was given his full <u>Miranda</u> warnings in the presence of both his mother and father and that he waived those rights prior to his interrogation at the 20th Precinct and his videotape at the 24th Precinct. Defendant's contention that his waiver was involuntary because his parents had been misled by the police is not substantiated. The basis for this alleged

misleading was the statements by Detective Rosario that Antron should "tell the truth, no matter how horrible" and two later conversations between the father and Detectives Hildebrandt, Gonzalez and McCabe outside Antron's presence, in which they discussed whether Antron was telling the truth.  In both conversations Mr. McCray agreed with the detectives that the son was not being truthful and on one occasion he relayed that information to Antron and on the second occasion he asked his wife to leave.  Contrary to defendant's theory, none of the detective's statements "rise to the level of those promises or statements which create a substantial risk that defendant might falsely incriminate himself.  (People v Diaz, 77 AD2d 523, 526 . . . These statements urging defendant to tell the truth . . . are not the kind which involve a substantial risk of inducing a false confession .... )"  (People v Perry, 77 AD2d 269, 273 and cases cited therein).

Moreover, the record reflects that the direct result of the detective's second discussion with Mr. McCray was not a waiver by defendant of any right he had not previously waived, but only that his mother stepped out of the room, leaving Antron with his father and the police.  Clearly, the conversations between the detectives and Mr. McCray did not result in any "improper displacement of free choice on the part of the child . . ."  (Matter of Raymond W., 44 NY2d 438, 441; cf., People v Diaz, 54 NY2d 967, cert denied 455 US 967).

Therefore, defendant's motion to suppress his statement on the ground that his waiver of rights was illegally obtained is denied.

Neither is defendant's argument that he was denied his right to counsel by the unnecessary delay in his arraignment sustained in this record. The delay in defendant's arraignment was not calculated to deny defendant his right to counsel but was instead necessitated by the dimensions of the investigation and the "gravity of the crimes being investigated." (People v Zehner, 112 AD2d 465, 466.)

The fact that the People "had probable cause did not create a duty to arrest the defendant . . . it was entirely proper for the police to attempt to gain a confession in order to secure the quality and quantity of proof necessary to commence a successful prosecution (see People v Brinsko 115 AD2d 859,860, lv denied 67 NY2d 940; People v Williams, 112 AD2d 259, lv denied 66 NY2d 923; see also, United States v Lovasco, 431 US 783, 791 reh denied 434 US 881)" (People v DiFabio, 134 AD2d 918,919; app dismissed 72 NY2d 949; People v Keller, 148 AD2d 958). The contention, then, by McCray, that he should immediately have been brought before a judge upon being picked up by the police, fails.

The provisions of Family Court Act section 305.2(4) are not pertinent to this determination (see discussion, supra), and in any case they were complied with.

The fact that Room 125 at the 20th Precinct--where McCray gave his statement--was not a designated facility is not material.  Indeed, Room 125 was so designated approximately one month later.  An irregularity of such minor dimension does not operate to require the application of the exclusionary rule, especially where, as here, "there is no evidence of wilful or negligent disregard of the statutory requirements . . . and no evidence of inattention to such requirements as a pattern or practice, no sufficiently useful prophylactic purpose would be served in penalizing the police for failure to conform to the terms of the statute taken literally" (Matter of Emilio M., 37 NY2d 173, 177; Matter of Luis N., 112 AD2d 86).

Acordingly, McCray's motion to suppress is, in all respects, denied.

Yusef Salaam's motion to suppress is premised on a number of arguments arising under statutory protections embodied in the Criminal Procedure Law and the Family Court Act and under the Fourth, Fifth, and Sixth Amendments to the Constitution.

His argument that he was arrested without probable cause, and that the evidence obtained from him was thereby tainted, has been discussed supra.  In addition, he argues that his statements were involuntary because they were not obtained in a manner consistent with the stringent standards afforded

juveniles in that the police did not comply with the statutory requirements contained in the CPL and Family Court Acts; and further, that defendant's statement was not made upon a knowing and intelligent waiver but, rather, was the product of isolation and deceit.

In the first branch of this motion, Salaam contends that his rights were violated by the failure of the police to notify his mother of his arrest as required under Family Court Act 305.2 and CPL 140.20(6).

Clearly, there is no dispute that the police made no effort to notify Salaam's mother. His questioning was commenced outside her presence and completed while she was making unsuccessful efforts to see him.

The record establishes that Salaam misrepresened his age to the police, telling them he was sixteen. I find that the reliance by the police on his misrepresentation was reasonable. The police had been informed earlier by Al Morris that Yusef was sixteen. His school transit card shown to Detective Taglioni showed him to be sixteen. Further, Salaam's appearance is entirely consistent with that of an adolescent sixteen or older (see, People v Coker, 103 Misc 2d 703).

The issue becomes, then, whether the reliance by the police on Salaam's misrepresentation excuses their alleged failure to comply with CPL 140.20 or, arguendo, Family Court Act 305.2. Defendant contends that a failure to comply with the statutory notice provisions requires, per se, the suppression of his statements. The application of the "per se" rule "has

resulted in an abundance of often inconsistent case law--as

courts have alternatively moved toward and away from a per se

rule requiring the parent's presence. [For a comprehensive

summary of this case law, see, People v Castro, 118 Misc 2nd

868])." (Matter of Candy M., 142 Misc 2d 718,719.)

Defendant should not derive a benefit from his

deliberate falsification.  Rather, because any "failure of

compliance was the direct result of a deliberate

misrepresentation on the part of" Salaam, he is bound by the

consequences of that falsehood (Matter of Hector C., 95 Misc 2d

255, 258; People v Coker, supra).

Accordingly, any failure to notify defendant's mother

did not operate to foreclose the detectives' right to question

him.

I turn, then, to defendant's contention that the police

questioning was improperly conducted because he was denied access

to his family.  "[T]here is no per se rule invalidating a

confession where the police isolate an infant defendant from his

parents during questioning (People v Taylor, 16 NY2d 1038, 1039-

1040, affd after remand 27 NY2d 493)." (People v Green, 147 AD2d

955, 957.)

Defendant was given a full set of Miranda warnings; his

questioning was of short duration; he had appeared at the

precinct voluntarily; and he made no request that his mother be

notified or that she be present (Cf. People v Bevilacqua, 45

NY2d 508; People v Ventiquattro, 138 AD2d 925).  Most

significantly, the police did not employ any deception such as

would "have sealed off the most likely avenue by which the assistance of counsel" might have reached the defendant (<u>People v Townsend</u>, 33 NY2d 37, 41).

The fact that Ms. Salaam's request to see her son was denied "is not in and of itself sufficient reason or basis for excluding the defendant's confession . . ." (<u>People v Hocking</u>, 15 NY2d 973, 975).

Yusef's mother was granted the opportunity to see her son as soon as the police were made aware of his true age. Her earlier access was denied only because he had mislead them.

The police did not covertly take Yusef into custody. He went with them voluntarily and the police notified his sister of their destination. That this was understood by his family is borne out by the arrival of his aunt and her friends, his mother, and his Big Brother at the 20th Precinct within a relatively short time thereafter.

Ms. Salaam's opportunity to retain counsel on his behalf was not interfered with. Indeed, the testimony established that she did ultimately invoke defendant's right to counsel, but his questioning had already ceased. The <u>Townsend</u> Court itself recognized the distinguishing factor presented in an earlier case where "[n]o attempt was made by the police to conceal the presence of the defendant or to deceive the family when inquiry was made" (<u>People v Townsend</u>, <u>supra</u>, at p 42; <u>see</u>, <u>People v Hocking</u>, 15 NY2d 973; <u>People v Taylor</u>, 16 NY2d 1038).

Defendant also contends that his statements should be suppressed because they were obtained by trickery and deceit. This allegation is based on the fact that Detective McKenna informed Salaam that he had been implicated by others and that, if his fingerprints were found on the female jogger's outfit, he "was going down for the rape."

The record shows that Detective McKenna's statement to Salaam that he had been implicated by others was truthful. Statements by the police to defendants, informing them that others have implicated them in a crime are not unfairly coercive--(People v Diaz, 54 NY2d 967, cert denied 455 US 957). Although not the case here, this is so even where such statements constitute misrepresentations (see, People v Green, supra; see also, People v Tarsia, 50 NY2d 1). Accordingly those statements provide no basis for defendant's motion to suppress.

To the extent that McKenna's remark about fingerprints was untrue, this statement could, in no way, create a "subsantial risk that the defendant might falsely incriminate himself" (CPL 60.45[2][b][i]).

For the foregoing reasons, I find that none of the factors raised by defendant, individually or collectively, were such as to obviate Salaam's ability to issue a knowing and voluntary waiver of his Miranda rights and that such a waiver did issue. His statements to Detective McKenna will not be suppressed. The obtaining of Yusef's signature on the Miranda card after Detective McKenna was aware of Salaam's true age does not affect the voluntariness of his statement but the use of such signature may be addressed in limine at trial.

Salaam does not specifically challenge the admissibility of his statement to Detective Neenan concerning how much "time" he might expect to do. The record establishes that this statement was not provoked by police conduct and was spontaneous in nature (People v Ferro, supra). It is therefore admissible.

Defendant Kharey Wise contends that his statements must be suppressed because they are the product of an arrest made without probable cause and because they were involuntary within the meaning of CPL 60.45. His contention that his statements comprise the tainted fruit of an illegal arrest has been resolved supra.

His argument that his statements were involuntarily obtained under CPL 60.45(2)(a) proceeds on the contention that physical force was employed to obtain them.

The record simply does not sustain that. I note that the video taken of Wise after the time of the alleged beating gave no indication of any bruises.

Nor does the record support Wise's argument that his will was overborne by shouting, intimidation, and the lack of rest, food and drink. Wise slept, ate and received milk when he asked for it. Further, his behavior while in the cell at the 24th Precinct, particularly his laughing and asking his codefendants if they had told the police allegedly humorous incidents involving joggers, belies his contention that he suffered from physical abuse or psychological duress.

114

Wise also argues that the second statement to Detective Hartigan at 9:20 a.m. on April 21 is inadmissible because it was not preceded by Miranda warnings.  The record shows that defendant had been given his warnings twice prior to the taking of that statement: first, before his interview at 12:30 a.m. and then by ADA Fairstein that morning at around 7:00 a.m.  There is no "requirement that the Miranda warnings be intoned every single time a suspect in custody is subjected to separate series of questioning within a short time interval."  (People v Crosby, 91 AD2d 20, 29, lv denied 58 NY2d 974; People v Adkins, 145 AD2d 937.)

Wise argues that his statements must be suppressed because he was promised that, if he made them, he would be released.  The only basis in the record for this proposition is defendant's own testimony, which I find incredible.  His motion to suppress statements is in all respects denied.

Defendant Briscoe's motion to suppress is predicated upon an alleged arrest without probable cause and upon the argument that his right to counsel was denied him because the police did not permit him to consult with his grandmother and failed to readvise him of his Miranda warnings.

Defendant's assertion as to his alleged seizure without probable cause has been discussed  supra.

His argument that he was denied an opportunity to call his grandmother is specifically refuted in the record by the testimony of Detectives Kelly and Neenan.  The proof at the hearing disclosed that he did not indicate an interest in

speaking to his grandmother until his statement was almost completed and then he decided to do it later.  Thereafter, he did speak to her on the telephone.  Prior to his videotaped statement, he was properly apprised of his <u>Miranda</u> rights and he understood and waived them.

Accordingly, his motion to suppress is without factual or legal support and is denied (<u>People v Crosby</u>, <u>supra</u>).

Defendants' motions for a severance will be determined prior to trial.

Dated: *February 23*, 1990

J.