Myron Beldock, Esq. (MB-4076)
Karen Dippold, Esq. (KD-2966)
Sofia Yakren, Esq. (SY-4874)
Beldock Levine & Hoffman LLP
99 Park Avenue - Suite 1600
New York, New York 10016
*Attorneys for the Salaam Plaintiffs*

Lennox Hinds, Esq. (LH-8196)
Juliette Chinaud, Esq. (JC-3046)
Aaron D. Frishberg, Esq. (AF-6139)
Stevens Hinds & White
116 West 111th Street
New York, New York  10026

*Attorneys for the Wise Plaintiffs*

Jonathan C. Moore, Esq. (JM-6902)
Sofia Yakren, Esq. (SY-4874)
Beldock Levine & Hoffman LLP
99 Park Avenue - Suite 1600
New York, New York 10016

Michael W. Warren, Esq. (MW-1187
Evelyn W. Warren, Esq. (EW-5223)
Michael W. Warren, P.C.
580 Washington Avenue
Brooklyn, New York 11238

Roger S. Wareham, Esq. (RW-4751)
394 Putnam Avenue
Brooklyn, New York 11206

*Attorneys for the Richardson, McCray,
and Santana Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

|  |  |  |
|---|---|---|
|  | x | **03 Civ. 9685 (DAB)(RLE)** |
|  | x | **ECF Case** |
| In re McCray, Richardson, Santana, Wise and | x |  |
| Salaam Litigation | x | **AMENDED CONSOLIDATED** |
|  | x | **COMPLAINT** |
|  | x |  |
|  | x | **JURY TRIAL DEMANDED** |

------------------------------------------------------------

Plaintiffs ANTRON McCRAY, LINDA McCRAY, KEVIN RICHARDSON, GRACE

CUFFEE, CONNIE RICHARDSON, VALERIE CUFFEE, CRYSTAL CUFFEE, ANGELA

CUFFEE, RAYMOND SANTANA, JR., RAYMOND SANTANA, SR., JOANN SANTANA,

KHAREY WISE, DOLORIS WISE, DANIEL WISE, MICHAEL WISE, VICTOR WISE,

YUSEF SALAAM, SHARONNE SALAAM, AISHA SALAAM, and SHAREEF SALAAM, by

their attorneys, allege as follows for their Amended Consolidated Complaint against defendants CITY OF NEW YORK, CITY POLICE COMMISSIONER RAYMOND KELLY, FORMER NEW YORK CITY POLICE DEPARTMENT MANHATTAN CHIEF OF DETECTIVES ROSENTHAL, FORMER NEW YORK CITY POLICE DEPARTMENT CHIEF OF PATROL BOROUGH MANHATTAN NORTH SELVAGGI, FORMER OR CURRENT NEW YORK CITY POLICE DETECTIVES RAMON ROSARIO, CARLOS GONZALEZ, HARRY HILDEBRANDT, MICHAEL SHEEHAN, JOHN HARTIGAN, THOMAS McKENNA, HUMBERTO ARROYO, SCOTT JAFFER, JOHN O'SULLIVAN, JOHN TAGLIONI, BILL KELLY, ROBERT NUGENT, BRUNO FRANCISCI, AND THOMAS McCABE, FORMER OR CURRENT NEW YORK CITY POLICE SUPERVISORY DETECTIVES DEPUTY INSPECTOR POWELL AND LIEUTENANT JACK DOYLE, and FORMER OR CURRENT ASSISTANT DISTRICT ATTORNEYS LINDA FAIRSTEIN, ELIZABETH LEDERER and ARTHUR "TIM" CLEMENTS:

## PRELIMINARY STATEMENT

1.     This is a consolidated civil rights action against the City of New York ("City") based on and arising out of the wrongful acts and omissions of the New York City Police Department ("Police Department" and "NYPD") and the New York County District Attorney's Office ("District Attorney's Office") and certain of the employees and agents of these offices, and against named individual employees and agents of these offices, in which the plaintiffs seek relief for the violation of their rights secured by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. Sections 1981, 1983 and 1985, of their rights secured by the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution, and of their rights

2

secured under the laws and Constitution of the State of New York.

2.     The plaintiffs seek damages, both compensatory and punitive, an award of costs and attorneys' fees, and such other and further relief as this court deems just and proper, for having spent the majority of their adolescence in prison, deprived of significant familial contacts, for crimes they did not commit.  Although they consistently maintained their innocence throughout their long years in prison, they were paroled as sex offenders, branded as rapists both in and out of prison, and required to register as sex offenders with the State of New York. Likewise, their family members, also plaintiffs in this case, were deprived of the love and affection of their children and siblings and have suffered their own independent injury.

3.     The tragic events that form the backdrop of this litigation arose on April 19, 1989, with the discovery in Central Park of the body of a young affluent white woman who had been jogging in Central Park and was brutally attacked and raped and left in a coma. The pressure on police to solve this heinous crime, which quickly became known world-wide as the "Central Park Jogger Case," was enormous.  Within hours, detectives had focused their investigation on the main plaintiffs in this suit, five black and Hispanic adolescents, none of whom had ever been in trouble with the police.

4.     The resources of the New York City Police Department and the New York County District Attorney's Office became a juggernaut hurdling them toward conviction. Within the next twenty-four to forty-eight hours, using coercive and deceptive interrogation techniques, including force and trickery, sleep deprivation and isolation from their families, detectives and assistant district attorneys wrested from each of these young boys admissions that they knew were false which implicated them in the crime, even though the details of their statements were wrong and

despite the lack of any physical evidence to corroborate these details.

5.     Meanwhile, Matias Reyes, who, acting alone, had committed this heinous crime and whose identity was known to the police and to some of these defendants because of an eerily similar crime he had committed two days earlier in the same area of Central Park, was, because of these defendants' conduct, allowed to go, it is believed, uninvestigated and free to commit other rapes of young women and the murder of one of them on the Upper East Side of Manhattan.

6.     The depth of those defendants' bias against these plaintiffs is perhaps best demonstrated by the fact that, after Reyes's responsibility for the attack on the Central Park Jogger was discovered, and the wrongful convictions of the adolescent plaintiffs vacated on motion of the District Attorney's Office, the defendant City of New York, acting through its Police Commissioner Raymond Kelly, as well as numerous other defendants such as Linda Fairstein and Michael Sheehan, continued— and continue — to maintain and publicly affirm their belief that these adolescent plaintiffs were and are still guilty of the rape and assault of the Central Park Jogger on April 19, 1989.

7.     The grounds for this action arise out of these wrongful, unlawful, and improper acts of these defendants, including, without limitation, creation and perpetuation of false evidence and conspiracy to create and perpetuate false evidence, suppression and concealment of exculpatory evidence and conspiracy to suppress and conceal exculpatory evidence, malicious prosecution, intentional infliction of emotional distress, and interference with the intimate right to familial association.

4

## TABLE OF CONTENTS

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ADMINISTRATIVE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A. The Events in Central Park and the Surrounding Area Preceding
    April 19, 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B. The Events in Central Park on April 19 and 20, 1989 . . . . . . . . . . . . . . . . . . 17

    C. The Unconstitutional and Unlawful Efforts to Elicit False Statements . . . . . 19

        1. The General Interrogation Techniques Used . . . . . . . . . . . . . . . . . . . . 19

        2. The Interrogation of Kevin Richardson . . . . . . . . . . . . . . . . . . . . . . . 23

        3. The Interrogation of Raymond Santana, Jr. . . . . . . . . . . . . . . . . . . . . 36

        4. The Interrogation of Antron McCray . . . . . . . . . . . . . . . . . . . . . . . . . 50

        5. The Interrogation of Kharey Wise . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

        6. The Interrogation of Yusef Salaam . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    D. The Gross Inconsistencies in the Alleged "Confessions" . . . . . . . . . . . . . . . 98

    E. The Wrongful Arrests and Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    F. The Concurrent Evidence Implicating Matias Reyes . . . . . . . . . . . . . . . . . . 101

    G. The Unconstitutional and Unlawful Efforts to Perpetuate
       the False Confessions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

    H. The Resulting Wrongful Convictions and Sentences . . . . . . . . . . . . . . . . . . 103

    I. The Disclosures Regarding Matias Reyes . . . . . . . . . . . . . . . . . . . . . . . . . . 105

J. The Defendants' Unconstitutional Suppression and Concealment
   Of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

K. Plaintiffs Were Injured by Defendants' Unconstitutional
   and Unlawful Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

L. Liability of the Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

M. Municipal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

   1.  For the Actions of the Police Defendants Pursuant to
       Policies and Practices in Existence at the Time
       of the Jogger Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

   2. For the Actions of Police Commissioner Kelly in
      Condoning and Ratifying the WrongfulConduct
      Of the Police Officer Defendants Herein . . . . . . . . . . . . . . . . . . 126

   3. For the Actions of the Prosecutors Pursuant to the
      Policies and Practices in Existence at the Time of the
      Jogger Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

   4. For the Actions of the District Attorney  . . . . . . . . . . . . . . . . . . . . . 130

N. Liability of Police Department Supervisors  . . . . . . . . . . . . . . . . . . . . . . . . 133

FIRST CLAIM (Violation of Rights Secured by 42 U.S.C. § 1981 and
the Thirteenth Amendment to the United States Constitution)  . . . . . . . . . . . . . . . . . . . 135

SECOND CLAIM (Violation of Rights Secured by 42 U.S.C. § 1983 and
the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United
States Constitution)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

THIRD CLAIM (Violation of Rights Secured by 42 U.S.C. §§ 1983 and
1985(3) and the Fourteenth Amendment to the United States Constitution) . . . . . . . . 138

FOURTH CLAIM (Loss of Familial Association Claim for Plaintiffs
under 42 U.S.C. § 1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

FIFTH CLAIM (42 U.S.C. § 1983 *Monell* Claim Against the City of
New York for the Actions and Omissions of the Police Officer Defendants
and the Police Department)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

SIXTH CLAIM (42 U.S.C. § 1983 *Monell* Claim Against the City of
New York for the Actions and Omissions of the Defendant Prosecutors
and the District Attorney's Office)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

SEVENTH CLAIM (Violation of Rights Under State Law) . . . . . . . . . . . . . . . . . . . . . 147

EIGHTH CLAIM (*Respondeat Superior* Against the City of New York) . . . . . . . . . . 148

DEMAND FOR A JURY TRIAL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

## JURISDICTION

8.       This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1988 and the

Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United States

Constitution and pursuant to Article 1, §§ 1, 6, 11 and 12 of the Constitution of the State of New

York.

9.       Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously

mentioned statutory and constitutional provisions.

10.      Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28

U.S.C. § 1367(a), to hear and decide claims arising under state law that are so related to claims in

this action within the original jurisdiction of this Court that they form part of the same case or

controversy.

## VENUE

11.      Venue is proper for the United States District Court for the Southern District of

New York pursuant to 28 U.S.C. § 1391 (b).

## PARTIES

12.     Plaintiff ANTRON McCRAY is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

13.     Plaintiff LINDA McCRAY, Antron McCray's mother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

14.     Plaintiff KEVIN RICHARDSON is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

15.     Plaintiff GRACE CUFFEE, Kevin Richardson's mother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

16.     Plaintiff CONNIE RICHARDSON, Kevin Richardson's sister, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

17.     Plaintiff VALERIE CUFFEE, Kevin Richardson's sister, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

18.     Plaintiff CRYSTAL CUFFEE, Kevin Richardson's sister, is an African-American citizen of the United States and was at all times relevant herein a resident of the City of New York, Bronx County, State of New York.

19.     Plaintiff ANGELA CUFFEE, Kevin Richardson's sister, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and

8

State of New York.

20.    Plaintiff RAYMOND SANTANA, JR., is a Hispanic-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

21.    Plaintiff RAYMOND SANTANA, SR., Raymond Santana, Jr.'s father, is a Hispanic-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

22.    Plaintiff JOANN SANTANA, Raymond Santana, Jr.'s sister, is a Hispanic-American citizen of the United States and was at all times relevant herein a resident of the City of New York, Bronx County, State of New York.

23.    Plaintiff KHAREY WISE is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

24.    Plaintiff DOLORIS WISE, Kharey Wise's mother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

25.    Plaintiff DANIEL WISE, Kharey Wise's brother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.  At the filing of this suit, Daniel was a minor, suing by his parent and next friend, Doloris Wise.  He is no longer a minor.

26.    Plaintiff MICHAEL WISE, Kharey Wise's brother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

27.     Plaintiff VICTOR WISE, Kharey Wise's brother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

28.     Plaintiff YUSEF SALAAM is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

29.     Plaintiff SHARONNE SALAAM, Yusef Salaam's mother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

30.     Plaintiff AISHA SALAAM, Yusef Salaam's sister, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

31.     Plaintiff SHAREEF SALAAM, Yusef Salaam's brother, is an African-American citizen of the United States and was at all times relevant herein a resident of the City, County and State of New York.

32.     Defendant CITY OF NEW YORK was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York.

33.     Defendant CITY OF NEW YORK was, at all times relevant herein, authorized by law to maintain and did maintain a police department known as the NEW YORK CITY POLICE DEPARTMENT which acted as its agent in the area of law enforcement, including, without limitation, conducting investigations of and evaluating and causing charges to be brought about alleged crimes.

34.     The NEW YORK CITY POLICE DEPARTMENT was, at all times relevant

herein, a municipal agency of the CITY OF NEW YORK and was charged with the responsibility of enhancing the quality of life in New York City by working in accordance with constitutional rights to enforce the law.

35.    Defendant NEW YORK CITY POLICE COMMISSIONER RAYMOND KELLY is the Police Commissioner for the CITY OF NEW YORK, and is responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK CITY POLICE DEPARTMENT, as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers and detectives under his command.  He is sued individually and in his official capacity.

36.    Defendant FORMER NEW YORK CITY POLICE CHIEF OF MANHATTAN DETECTIVES (FIRST NAME UNKNOWN — "FNU") ROSENTHAL was, at all times relevant herein, the Chief of the Manhattan Detective Division of the New York City Police Department and was responsible for, and the chief architect of, the policies, practices and customs of the Manhattan Detective Division, as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers and detectives under his command.  He is sued individually and in his official capacity.

37.    Defendant FORMER NEW YORK CITY POLICE DEPARTMENT CHIEF OF PATROL BOROUGH MANHATTAN NORTH (FNU) SELVAGGI was at all times relevant herein an officer, employee, and agent of the NEW YORK CITY POLICE DEPARTMENT.  He is sued individually and in his official capacity.

38.    Defendants FORMER OR CURRENT NEW YORK CITY POLICE DETECTIVES RAMON ROSARIO, CARLOS GONZALEZ, HARRY HILDEBRANDT,

11

MICHAEL SHEEHAN, JOHN HARTIGAN, THOMAS McKENNA, HUMBERTO ARROYO, SCOTT JAFFER, JOHN O'SULLIVAN, JOHN TAGLIONI, BILL KELLY, ROBERT NUGENT, BRUNO FRANCISCI and THOMAS McCABE were, at all times relevant herein, officers, employees, and agents of the NEW YORK CITY POLICE DEPARTMENT.  They are sued individually and in their official capacities.

39.     Defendants FORMER OR CURRENT NEW YORK CITY POLICE DETECTIVES DEPUTY INSPECTOR (FNU) POWELL and LIEUTENANT JACK DOYLE were, at all times relevant herein, officers, employees, and agents of the NEW YORK CITY POLICE DEPARTMENT.  They are sued individually and in their official capacities.

40.     Defendant CITY OF NEW YORK was also, at all times relevant herein, authorized to act through the NEW YORK COUNTY DISTRICT ATTORNEY'S office in regard to investigation, evaluation and prosecution of alleged criminal conduct within the County and City of New York.

41.     The NEW YORK COUNTY DISTRICT ATTORNEY'S office was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County and City of New York.

42.     Although not a named party, NEW YORK COUNTY DISTRICT ATTORNEY ROBERT MORGENTHAU was at all times relevant herein the District Attorney of the County of New York, responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE, as well as responsible for the hiring, screening, training, retention, supervision, discipline, counselling and control of the assistant district attorneys who worked in his office.

43.     Defendants FORMER and CURRENT ASSISTANT DISTRICT ATTORNEYS LINDA FAIRSTEIN, ELIZABETH LEDERER and ARTHUR "TIM" CLEMENTS were, at all times relevant herein, officers, employees and agents of the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE.  They are sued in their individual capacities.

44.     There were numerous other police officers of various ranks who are referred to and identified throughout the factual discussion in this complaint who are not named as defendant parties, but who, as shown in that discussion, participated directly or indirectly in defendants' wrongful actions against the plaintiffs and whose acts are relevant to determining the defendants' liability.  They are sometimes collectively referred to below as "other related persons" or as "other persons."

45.     At all times relevant herein, the individual defendants and those other persons were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of either the NEW YORK CITY POLICE DEPARTMENT or the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE and otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

<u>**ADMINISTRATIVE PROCEEDINGS**</u>

46.     On March 12, 2003, within ninety days after the claims in this action arose, plaintiffs Antron McCray, Linda McCray, Kevin Richardson, Grace Cuffee, Angela Cuffee, Connie Richardson, Valerie Cuffee, Crystal Cuffee, Raymond Santana, Jr., Raymond Santana, Sr., and JoAnn Santana caused a Notice of Claim, in proper form, to be duly filed with the Comptroller's Office of the City and served upon the Police Department and the District

13

Attorney's Office.

47.     On March 14, 2003, within ninety days after the claims in this action arose, plaintiffs Yusef, Sharonne, Aisha and Shareef Salaam caused a Notice of Claim, in proper form, to be duly filed with the Comptroller's Office of the City of New York and served upon the Police Department and the District Attorney's Office.

48.     On March 17, 2003, within ninety days after the claims in this action arose, plaintiffs Kharey and Doloris Wise caused a Notice of Claim, in proper form, to be duly filed with the Comptroller's Office of the City of New York and served upon the Police Department and the District Attorney's Office.

49.     In addition, on March 18, 2004, plaintiffs Michael, Victor, and Daniel Wise caused a Notice of Claim, in proper form, to be duly filed with the Comptroller's Office of the City of New York and served upon the Police Department and the District Attorney's Office.

50.     Administrative hearings pursuant to New York General Municipal Law §50-h were requested by defendant City.

51.     In response to defendant City's notices, the adolescent plaintiffs appeared and testified at 50-h hearings: Kharey Wise testified on November 12, 2003 and December 23, 2003; Kevin Richardson testified on January 13, 2004; Antron McCray testified on January 14, 2004; Raymond Santana, Jr., testified on January 15, 2004; Yusef Salaam testified on January 16, 2004.

52.     Although more than thirty (30) days have elapsed since service of the above referenced Notices of Claim, the Comptroller and defendant City have neglected and refused to adjust or pay said claims.

53.     Actions were brought on behalf of all plaintiffs within one year after the state

14

causes of action set forth herein accrued and well within the one year and ninety (90) days

limitation of time applicable to state law claims against the City of New York.

## STATEMENT OF FACTS

54.     The facts stated in this complaint are based, *inter alia*, on the personal knowledge

of various plaintiffs regarding events in which they were directly involved and upon information

and belief.  The sources of "information and belief" factual statements are primarily  transcripts,

documents and videotapes from the underlying criminal prosecutions and post-conviction

proceedings and related public documents which are currently available to plaintiffs.  Those

sources are incomplete, particularly, without limitation, as to numerous documents and court

exhibits.  This complaint is drawn without the benefit of discovery proceedings.  Regular efforts

by plaintiffs' counsel to persuade defendants' counsel to engage in voluntary discovery

exchanges have been neglected and rejected.   In the event defendants challenge by motion the

sufficiency of the facts alleged by plaintiffs to state claims plausible on their face, plaintiffs

respectfully request discovery to amplify their claims in accordance with *Iqbal v. Hasty*, 490 F.3d

143 (2d Cir. 2007) and *Makas v. Orlando*, 2007 WL 2717129 (S.D.N.Y. 2007), and request that

any such motion not further delay discovery in this matter.

**_____A.     THE EVENTS IN CENTRAL PARK AND THE SURROUNDING
        AREA PRECEDING APRIL 19, 1989**

55.     The attack on the Central Park Jogger was the fourth in a series of nine similar

attacks perpetrated by Matias Reyes between September 21, 1988 and August 5, 1989, when, no

thanks to the investigative actions of the Police Department, Reyes was finally arrested.

56.     On September 21, 1988, a young, petite, white woman by the name of Jacqueline

Herback was sexually assaulted by Reyes.

57.     She reported this attack to the NYPD and was interviewed by detectives from the NYPD's Sex Crimes Unit.

58.     In February, 1989, another young woman was attacked in an Upper East Side apartment building by Reyes.

59.     On April 17, 1989, a twenty-six year-old woman was sexually assaulted, raped, beaten and robbed while exercising in Central Park approximately at the level of 107th Street.

60.     She had been brutally beaten about the head and right eye, and suffered numerous bruises, scratches and abrasions elsewhere on her body.

61.     The victim described her solitary attacker as having stitches in a cut on the right side of his chin.

62.     The April 17th attack was the third in a series of nine similar sexually motivated assaults committed by Reyes in the period leading up to the assault on the Central Park Jogger on April 19, 1989.

63.     On April 17, 1989, or shortly thereafter, certain of the defendants in this case, including but not limited to Detective Bruno Francisci, and also including an unserved previously named defendant, Sergeant Robert Fiston, and other yet-to-be identified police officers and Assistant District Attorneys, are believed to have known about the attacks on and the statement of the April 17th victim, as well as the developing pattern of rapes and sexual assaults mentioned above.

64.     Prior to the April 19th attack on the Central Park Jogger, it is believed that these same defendants and other yet-to-be identified police, including, without limitation, other named

16

defendants in this complaint, knew that Matias Reyes had been treated at an area hospital for an injury which was described by the victim of the April 17th attack.

65.     The New York City Police Department ("NYPD"), including, but not limited to, the Central Park Detective Squad and the Sex Crimes Unit at the 20th Precinct, and believed to have included at least Sgt. Robert Fiston who worked with the other defendants to investigate the April 19th attack, were notified of the April 17th attack and provided with a description of the perpetrator.

66.     For reasons that remain to be investigated and/or discovered, and which are believed to be related to the wrongful actions alleged in this complaint, the criminal charges regarding the April 17, 1989 Central Park attack were not pursued.

**B.     THE EVENTS IN CENTRAL PARK ON APRIL 19 AND 20, 1989**

67.     On April 19, 1989, sometime between 9:00 and 9:30 p.m., a series of mostly relatively minor incidents allegedly occurred in Central Park involving several individuals, including a man who was allegedly accosted by a group of youths on the East Drive of the Park, another person who was allegedly assaulted and robbed, a couple on a tandem bicycle who were allegedly threatened but not otherwise harmed, a taxi cab driver who allegedly had rocks hurled at his cab and was allegedly threatened when he got out of the car to investigate, but was not otherwise harmed, and three male joggers who were allegedly set upon on the jogging path at the northern end of the Central Park reservoir, including two who were allegedly assaulted.

68.     In response to this activity, the police began to arrest several youths, all of whom were either Black or Hispanic, including some of the adolescent plaintiffs herein who were in and around Central Park at the time, for questioning in connection with this series of events.

17

69.     Prior to the discovery of the body of the Central Park Jogger some hours later, the focus of this police activity was on charging some of the young boys who had been picked up in or near the Park, contacting their parents, and releasing them into their parents' custody with a Desk Appearance Ticket soon after the parents arrived at the precinct to pick them up.

70.     Several hours after the incidents described above, at approximately 1:30 a.m., on April 20, 1989, an unconscious woman, who has since been identified publicly as Patricia Meili, was found by two men walking on a foot path through Central Park.

71.     The victim, a twenty-nine-year-old white woman who came to be known as the "Central Park Jogger" (the "Jogger"), was removed to a hospital.

72.     She had been raped, sodomized and brutally beaten about the head and eyes; suffered numerous bruises, scratches and abrasions elsewhere on her body; and had lost significant amounts of blood.

73.     Her t-shirt had been rolled into a ligature and used to tie her in a distinctive fashion.

74.     The convergence of the arrests of several Black and Hispanic youths earlier in the park for mostly minor offenses and the discovery several hours later of the brutal rape and assault of the young, white female in the park naturally led the police to consider whether these young men had any involvement in the attack on the Jogger.

75.     However, what began perhaps as a reasonable focus on these youths, soon turned into a deliberate and unjustified effort by these defendants to manufacture guilt against these youths.

76.     This deliberate effort to frame these young men for the brutal rape and assault of

18

the Jogger was fueled, as well, by the intense media coverage which almost instantly was drawn to this case, coverage on a level rarely seen at any time in the history of New York City.

77.     This deliberate effort was fueled as well by the biases and prejudices of the mostly white detectives and assistant district attorneys, who set aside all objectivity in a deliberate and concerted effort, not to discover who was responsible for the rape and assault of the Jogger, but to manufacture through coercion and deception a case against the adolescent plaintiffs.

## C.     THE UNCONSTITUTIONAL AND UNLAWFUL EFFORTS TO ELICIT FALSE STATEMENTS

### 1.     The General Interrogation Techniques Used

78.     Over the course of the 24 to 48 hours following discovery of the Jogger's body, Antron McCray, Kevin Richardson, Raymond Santana, Kharey Wise and Yusef Salaam (the "adolescent plaintiffs"[*]) were unlawfully and improperly questioned about the events of April 19th by numerous teams of detectives, police officers and representatives of the District Attorney's Office, acting in concert, including, but not limited to, defendants Ramon Rosario, Carlos Gonzalez, Harry Hildebrandt, Michael Sheehan, John Hartigan, Thomas McKenna, Humberto Arroyo, Scott Jaffer, John O'Sullivan, John Taglioni, Bill Kelly, Robert Nugent, Thomas McCabe, Jack Doyle and Assistant District Attorneys Linda Fairstein, Elizabeth Lederer and Arthur "Tim" Clements.

79.     All of these defendants were operating on the assumption that these adolescent plaintiffs were guilty and it was just a matter of time before they would admit their guilt.

---

[*] "Adolescent plaintiffs" is a factual statement and also serves to distinguish the former adolescent defendants in the underlying criminal cases from family members having the same last name.

80.     As evidence of this predisposition, none of the defendants, even those who were aware of the sexual assaults which had pre-dated the assault on the Jogger and had characteristics which suggested that a serial sexual predator was on the prowl in this area of the City, considered or pursued any other investigative leads in this case other than those directed at trying to prove that the adolescent plaintiffs were guilty.  The attention of the defendants was focused first and only on the adolescent plaintiffs, in large part because defendants, like many New Yorkers at the time, succumbed to racial and class stereotypes as to who were the likely perpetrators of this heinous crime.

81.     In addition to their individual intentions with respect to the interrogation of the adolescent plaintiffs, these teams of detectives, police officers and representatives of the District Attorney's Office agreed and conspired together to control access to the adolescent plaintiffs in order to produce statements that could be used as a basis to arrest, charge, prosecute and convict the adolescent plaintiffs of this high-profile crime without regard for the actual existence of probable cause or physical evidence and without regard for their rights.

82.     The interrogations of the adolescent plaintiffs were undertaken by the individual defendants and other related persons pursuant to the policies, practices and customs of defendant City of New York, the New York City Police Department and the New York County District Attorney's Office and were undertaken in a manner, and by methods, designed to exploit the adolescent plaintiffs' youth and lack of familiarity with the criminal justice system.

83.     The questioning was conducted, in part with respect to certain of the adolescent plaintiffs and entirely with respect to others, without the presence of parents, guardians and other family members and, with the exception of rehearsed videotaped statements (for all but Yusef

Salaam) at the end of the interrogation process, without audio or video recordings of the preceding questioning.

84.     As a result of the prolonged and improper questioning, characterized by the employment of deceptive, false and coercive tactics as more fully established below, those police and assistant district attorney defendants obtained allegedly inculpatory statements from McCray, Santana, Richardson and Wise and notes of allegedly inculpatory statements by Salaam, all of which were inconsistent and conflicted with each other — all of which constituted the principal if not the only evidence of their purported guilt.

85.     These statements were obtained as a result of a variety of methods employed by the defendants and other related persons which exploited the youthful age of the adolescent plaintiffs and the lack of experience they, their parents and other family members had with the criminal justice system.

86.     These methods, specifically described below as to each individual adolescent plaintiff, included, *inter alia*, coercion, isolation, intimidation, manipulation, suggestiveness, deceit, false promises, sleep and food deprivation, actively shaping the statements' contents before they were formally given, telling the adolescent plaintiffs what facts to put in their written and video statements, fabricating statements, falsely recording oral statements, withholding certain information from the plaintiffs and their family members, distracting family members during the interrogations when they were at a critical juncture, and misleading the adolescent plaintiffs and their parents and family members about the true intent behind the defendants' questioning.

87.     Those defendants also manipulated the relationships between certain of the

adolescent plaintiffs and their parents or family members, converting them into authority figures against the adolescent plaintiffs and in effect turning the family members into prosecution interrogators.

88.     Those defendants used these techniques to elicit certain statements from the adolescent plaintiffs which improperly implicated them in a number of crimes that had occurred in the park on April 19, 1989.

89.     At no time during the prolonged and coercive custody of the adolescent plaintiffs did any defendant police officer or other related person police officer, or any defendant District Attorney or other related person Assistant District Attorney intervene to stop or mitigate those wrongful interrogation tactics, despite their obligations to do so.

90.     The statements elicited from the adolescent plaintiffs had serious weaknesses and blatant inconsistencies.

91.     The accounts allegedly given by the adolescent plaintiffs differ in significant details, such as who initiated the attack, who knocked the victim down, who held her, who undressed her, who struck her, who raped her, what weapons were used during the attack, the location of the attack, the time of the attack, and when, in the sequence of events, the attack took place.

92.     In other words, in almost every significant detail, the statements coerced from the adolescent plaintiffs were at odds with each other.

93.     Rather than viewing those contradictions and inconsistencies as indicating serious questions about whether the adolescent plaintiffs were the wrong suspects, the defendants' and other related persons' bias and prejudice towards those young men of color, stirred up by what

22

was being viewed as a racially motivated attack in the park on an affluent young white woman, caused those defendants and persons to knowingly and deliberately engage in a pattern of unjustified and unconstitutional behavior.

94.     Although none of the adolescent plaintiffs admitted to raping the Jogger, each ultimately allegedly rendered an account of events, wrongfully obtained by those defendants and other related persons, in which he unwittingly made himself a possible accomplice to the crimes committed against the Jogger.

### 2.     The Interrogation of Kevin Richardson

95.     On April 19, 1989, plaintiff Kevin Richardson ("Kevin") was 14 years old and lived at home at 1309 Fifth Avenue, #34F, New York, New York, 10029, with his mother Grace Cuffee, and one of his sisters, Angela Cuffee.

96.     He was a student in the eighth grade at P.S. 113 located at 106th Street and Madison Avenue in New York City.

97.     As of April 19, 1989, Kevin had never been arrested or taken into custody by any law enforcement agency.

98.     On the evening of April 19, 1989, at approximately 10:15 p.m, Kevin, who was on his way home from Central Park, and a group of approximately ten other boys around his age, were walking northbound on the sidewalk along Central Park West.

99.     At or near 102nd Street, NYPD plainclothes Police Officers Eric Reynolds and Robert Powers of the Anti-Crime Unit, who were driving a green Parks Department van, suddenly pulled into the boys' path without warning.

100.     Kevin, who was startled by this, began running toward the park.  Some of the

other boys also ran, while others stood frozen in their tracks.

101.    P.O. Powers ran after Kevin.  When he caught up to him, he tackled Kevin to the ground. Kevin, who was face down on the ground with P.O. Powers on top of him, tried to lift his head and as he did, was struck in the face by P.O. Powers.  The blow to Kevin's face caused swelling, bruising and redness around his left eye.

102.    Kevin was handcuffed by P.O Powers and placed in the backseat of a police vehicle.

103.    Shortly thereafter, one of the other apprehended youth, Clarence Thomas (whose name was unknown to Kevin at that time), was put into the backseat of the same police vehicle, next to Kevin. The two of them were driven by P.O. Powers to the Central Park Precinct.

104.    Sometime around 11 p.m., Kevin, along with Thomas and three other boys, Lamont McCall, Raymond Santana and Steven Lopez, who had also been arrested in or near the park, were placed in the Youth Room at the Central Park Precinct.

105.    At the time of his arrest, Kevin and the other boys with whom he was arrested were told by P.O Reynolds that they would all be allowed to go home as soon as their parents arrived.

106.    P.O. Reynolds stayed with these five boys in the Youth Room while P.O. Powers telephoned their parents.

107.    At approximately 11:15 p.m., Kevin's mother, Grace Cuffee, received a call at her home from P.O. Powers, who informed her that the police were holding her son, that he had been arrested for unlawful assembly and assault and that she needed to come to the precinct to get him.

108.    Upset and tired, Mrs. Cuffee asked her son-in-law, Chris Weaver, to drive her to

24

the stationhouse.

109.    Mrs. Cuffee arrived at the Central Park Precinct at approximately 11:30 p.m.  She was apparently the first parent to arrive at the precinct.

110.    Although she asked to see her son, Mrs. Cuffee was made to sit outside in a clerical room from the time she arrived at the stationhouse until approximately 4 a.m. the following morning, April 20, 1989.

111.    During this time, Mrs. Cuffee made numerous attempts to see and/or speak to her son.  She was repeatedly denied access to her son by P.O. Reynolds, who promised Mrs. Cuffee over and over that her son would be released as soon as the "paper work" was completed.

112.    While Mrs. Cuffee sat anxiously awaiting the release of her son, police officers, including P.O. Reynolds and P.O. Powers, questioned Kevin without his mother or any other parent or guardian present.

113.    Finally, at approximately 4 a.m., on April 20th, Mrs. Cuffee was called into the Youth Room by P.O. Reynolds who told her she needed to sign release forms and she would be able to take her son home.

114.    During this exchange, P.O. Reynolds was interrupted by the desk sergeant, Lieutenant McInerny,  who called P.O. Reynolds outside to speak to him.

115.    When P.O. Reynolds returned, he told Mrs. Cuffee they were not going to allow her son to go home at that time.

116.    Sometime between the hours of approximately 3 and 4 a.m., Lieutenant McInerny received a telephone call from Detective Jose Ramone Rosario of the Detectives Bureau, Manhattan Night Watch who was calling from Metropolitan Hospital in New York City.

117.    Detective Rosario instructed Lieutenant McInerny not to release the boys who were earlier arrested in the park because he was on his way to the Central Park Precinct to question the youths in connection with "a female jogger," later identified as Patricia Meili, who had been found in the park severely beaten and raped.

118.    Detective Rosario and his partner, Detective George Gilner, were among the first detectives to be assigned to the investigation of the female jogger rape case.

119.    At approximately 2:20 a.m. on April 20, 1989, Detective Rosario and his partner, Detective George Gilner, arrived at the Emergency Room of Metropolitan Hospital in response to an assignment given to them by Sergeant Duffy, the supervisory officer of the Night Watch Command to investigate the alleged rape and assault of a young woman who was found lying on the ground, unconscious, near the 102nd transverse road in Central Park.

120.    Upon arrival at the hospital, Detective Rosario spoke to two female police officers, Rubenich and Fortier, who informed Rosario that in addition to the rape victim found in Central Park, "several kids, youths, males; young males, had been arrested on the four to twelve tour (4 p.m. to midnight tour). . .   they had allegedly assaulted a jogger, a male jogger in Central Park near the reservoir. . . ., and that they were at – they were at one point in the station house [the Central Park Precinct]".

121.    With very little information to go on, and before conducting *any* investigation of either of the assaults that took place in Central Park on the night of April 19th - 20th, Detective Rosario "surmised" that the Black and Hispanic "juveniles" being held at the Central Park Precinct were in fact involved in the assault on the male jogger *and* presumably connected to the brutal and heinous, rape-beating of the victim at the hospital.

122.    Based on this assumption, Detective Rosario phoned the Central Park Precinct, informed Lieutenant McInerny of the rape victim, and directed him to keep the youths under arrest until Night Watch investigators arrived.

123.    Shortly thereafter, Sergeant Duffy arrived at Metropolitan Hospital and assumed the role of lead investigator.

124.    Detectives Rosario and Gilner were sent by Sergeant Duffy to investigate the crime scene of the rape victim.

125.    Other Night Watch detectives, including but not limited to, Whelpley and Farrell were directed by Sgt. Duffy to report to the Central Park Precinct to participate in the interrogations of some of the arrested youth suspects.

126.    During the early morning of April 20, 1989, detectives, supervisors and officers from an assortment of NYPD investigative units, including, Manhattan North Task Force, Anti-Crime, Sex Crimes, Night Watch, and Homicide, along with the attorneys from Manhattan's District Attorney's Office, were beginning to get involved and take on, variously, pieces of what would become a major criminal investigation, which became most famously known as the "Central Park Jogger Case."

127.    At approximately 7 a.m., on April 20, 1989, an initial briefing on the brutal rape and assault of the female jogger took place at the Central Park Precinct.

128.    That briefing session, initially conducted by Sergeant Duffy of the Night Watch Command in an office at the Central Park Precinct, included, without limitation, high ranking supervisory officers who began arriving at the precinct, among whom were Deputy Inspector Powell, Commanding Officer of Manhattan North Detectives, Captain Gunther of the Central

Park Precinct and Chief Rosenthal, Manhattan Chief of Detectives.

129.    At or about the same time, in Central Park at the crime scene of the female jogger, detectives, including Rosario, Gilner, Robert Honeyman and (FNU) Marousek of the Crime Scene Unit, were conducting field tests and gathering evidence from the area where the female jogger victim was found.  They had been there since approximately 4 a.m.

130.    Also, during the early morning hours on April 20, 1989, Elizabeth Lederer, an Assistant District Attorney of the New York County District Attorney's Office, arrived at the Central Park Precinct to begin her participation in the investigation of the rape/assault victim pursuant to the assignment by her supervisor, ADA Linda Fairstein of the Sex Crimes Unit.

131.    During these early morning hours, while detectives and their commanders conspired to falsely accuse Kevin and the other wrongfully convicted boys of the rape/assault of Patricia Meili, and as they conspired and conjured up *their* version of what took place in Central Park the night before, Mrs. Cuffee and Kevin Richardson, exhausted, frightened and emotionally drained, sat in the designated areas of the Central Park Precinct, unaware of *all* things related to the subterfuge of the police, patiently waiting for police to complete the paperwork and release Kevin from custody (the promise of Kevin's release was the one constant and consistent refrain made by police to Kevin and his mother from the time Kevin was brought to the Central Park Precinct, into the morning hours and throughout the interrogation of him).

132.    Over the course of the next approximately 24 hours, Kevin was improperly questioned, misled, manipulated and coerced to make false statements by teams of detectives, including, defendants Carlos Gonzalez of the Central Park Detective Squad, Detective John O'Sullivan, Scott Jaffer and John Hartigan of the Manhattan North Homicide Unit, and

defendants from the New York County District Attorney's Office, including ADA Elizabeth Lederer.

133.    Assistant District Attorney Linda Fairstein was also present and consulting with various defendants, including Lederer and the detectives, during the questioning and investigation of the adolescent plaintiffs. ADA Fairstein also accompanied detectives to the crime scene in Central Park where Kevin was shown where the Jogger was raped on the morning of April 21, 1989.

134.    Finally, detectives started the interview of the boys, who had been in the precinct all night.  Lamont McCall was first.  His interview was conducted at 5:30 a.m. on April 20th, with Detectives Farrell and Whelpley and P.O. Reynolds present.  At the end of the interview, he was given a Desk Appearance ticket charging him with assault and released to his mother.

135.    At approximately 6:30 a.m., Clarence Thomas was interviewed by the same police officers.  He also was charged with assault, given a Desk Appearance ticket, and released to his mother.

136.    On April 20, from approximately 9:30 a.m. until 1 p.m., Kevin, separated from the other youths who were arrested with him the night before, was made to sit at a desk located in the youth room of the Central Park Precinct.

137.    His mother, Mrs. Cuffee, was called into the room and seated next to Kevin. At some time during the interrogation, Mrs. Cuffee, who was exhausted, sick and on the verge of passing out, was relieved by her 21 year-old daughter, Angela Cuffee.

138.    Upon information and belief, the interrogation began with detective Carlos Gonzalez asking Kevin questions. Detective John O'Sullivan and Sergeant Fiston were also

present.

139.    At the beginning of the interrogation, Kevin was read his Miranda rights; however, he was 14 years old at the time and did not nearly understand what they were and/or what they meant.

140.    Mrs. Cuffee was present when Kevin was read his rights; however, she too did not fully understand and accepted the reading of the rights as a mere procedural formality or technicality.

141.    She also had no idea as to the seriousness of the crimes on which Kevin was about to be accused of by police because police had told her nothing about them, and she was repeatedly and expressly told by detectives that after Kevin answered some questions he was sure to be released.

142.    Detectives Hartigan and Jaffer joined the interrogation at approximately 10 a.m., after they were briefed at the precinct. At some point during the interrogation, Detective Hartigan took over the questioning.

143.    Kevin and Mrs. Cuffee were repeatedly and falsely told by detectives Hartigan, Gonzalez and O'Sullivan during the interrogation, that if Kevin told "the truth," he would be free to go home.

144.    Kevin was led through several incidents that the detectives believed he had observed in the park without any mention of the Central Park Jogger.

145.    When Kevin was asked about the female jogger, he responded that he didn't know anything about her.

146.    The detectives repeatedly asked Kevin questions about the Jogger, accusing him

30