of lying in very loud, intimidating voices.

147.    After about an hour into the interrogation, in an effort to manipulate Mrs. Cuffee into helping them elicit a false statement from Kevin, Detectives Hartigan and Jaffer asked Mrs. Cuffee to "step outside" with them.

148.    The two detectives escorted Mrs. Cuffee outside of the station house to a driveway/alley area near the precinct.

149.    The detectives told Mrs. Cuffee that they knew Kevin was "a good boy" and "we don't want to see him go to jail, we just want him to tell the truth and then he can go home." The detectives kept Mrs. Cuffee outside for several minutes.

150.    When they returned with Mrs. Cuffee to the interrogation of her son, several detectives had Kevin surrounded and were yelling and cursing at him, and threatening that he would be sent to Spofford or that he could get 25 years to life if he didn't confess to a rape.

151.    Kevin was crying while repeating, "I didn't do anything, I don't know anything."

152.    This was the first time Mrs. Cuffee heard anything about a rape.

153.    Shortly thereafter, at approximately 12 noon, Kevin's sister, Angela Cuffee arrived at the Central Park Precinct to relieve her mother in the interrogation room.

154.    Mrs. Cuffee went home with the understanding, albeit false, that her son would soon follow.

155.    With Angela Cuffee, who had little or no understanding of what was happening, sitting in the room, the detectives continued to tell Kevin he would be able to go home if he cooperated by putting himself into the crime, at least acting as a witness, and telling them what they wanted to hear.

156.    Throughout the interrogation, detectives deceptively and suggestively fed Kevin with pieces of information about what they had learned of the rape and assault of the female jogger, such as, where the Jogger was found in the park, things about her clothing, her physical appearance, her condition in the hospital.

157.    The detectives who interrogated Kevin repeated to him the names of the boys who the detectives had learned about from interviews of Clarence Thomas and Lamont McCall and which had been conveyed to Kevin's interrogators at the briefing meeting, and from their conversations with other defendants who were present at the Central Park Precinct.

158.    Approximately three hours into the interrogation,  under unyielding pressure and unbearable duress, Kevin, who had been kept awake all night, and deprived of food and drink for more than 14 hours, began to acquiesce to the detectives' version of events in the form of a statement.

159.    In the early afternoon of April 20th, at approximately 12:30 p.m., Kevin was handed a piece of paper and pen while Hartigan and other detectives stood over him to make sure the false statement was reflective enough of what detectives wanted Kevin to say.

160.    Kevin wrote out his false statement while detectives coaxed and coached him.

161.    Hartigan even testified during cross examination at Kevin's trial that he told Kevin while he was writing his statement, "Kevin, you're leaving something out [referring to information about the rape]."

162.    Even though Kevin was coerced by police to "put [himself] more in the story," the last line of his written statement reads, "and I was the one who didn't rape her."

163.    Hartigan and the other interrogators knowingly manipulated and convinced Kevin

to record a number of fabrications/falsifications[**] in his statement.

164.    For example, even though Kevin knew his eye had been injured while he was being apprehended, Kevin was manipulated by police into falsifying that this injury was caused by the female jogger scratching him.

165.    At or around 1 p.m. on April 20th, detectives called Kevin's father Paul Richardson into the interrogation room and asked him to sign off on Kevin's statement. Mr. Richardson, who was not present during any part of the interrogation and who was told by police that after he signed the document Kevin could go home, signed the statement.

166.    During the interrogation of Kevin Richardson, or at least during portions thereof, ADAs Linda Fairstein and Elizabeth Lederer were present at Central Park Precinct and participated in the effort to secure false statements from Kevin and the other plaintiffs in this case.

167.    Following the false admissions that Kevin was manipulated and forced into making at the Central Park Precinct by Hartigan and the other detectives, Kevin was transferred by Detective Gonzalez to the 20th Precinct.

168.    At the 20th Precinct, at approximately 8 p.m. on April 20, 1989, Kevin was made to undress, he was photographed and his clothes were taken away and tagged into evidence by Detective Henry Fieldsa.  Fingernail clippings of Kevin were also obtained. These items were bagged, vouchered and handed over to Detective Gonzalez.

169.    At or around 3:00 a.m. on the morning of April 21, 1989, Kevin was transferred to the 24th precinct where, at approximately 4:50 a.m., approximately 31 hours after he had been

---

[**] Use of either word throughout this complaint is meant to include the other.

arrested, he was videotaped in the presence of Detective Hartigan, ADA Lederer and Kevin's father.  During the taping, ADA Lederer conducted the interview.

170.    Lederer was made aware of and/or received and reviewed Kevin's fabricated written statement prior to the taping.

171.    During the taped statement, Lederer coached Kevin, in part on the basis of the fabricated written statement he had given and in part on the basis of other information that she had already learned about the case.

172.    During the taping, Kevin made many statements that were either inconsistent with the fabricated information of his written statement, contradictory to statements obtained from the other boys and/or contrary to the physical evidence police had gathered.

173.    Those inconsistencies and contradictions were obvious and pertained to crucial evidence, including things such as: the clothing of the Jogger, where she was found, the condition she was found in, the names of the boys who participated and their involvement in the rape, descriptions of how the Jogger was assaulted.

174.    Instead of questioning Kevin about the inaccuracies, inconsistencies and contradictions, Lederer intentionally disregarded and/or glossed over them, accepting the false information at face value for purposes of questioning him.

175.    According to testimony given by officers and ADA Fairstein, the videotaping of Kevin took approximately two hours, even though the videotaped statement of Kevin that was used during the criminal trial (and the only one plaintiffs have seen) runs for only about 20 minutes.

176.    After Kevin made the false statements under pressure from the defendants, he was

34

taken, at approximately 7:00 a.m. on April 21, 1989, by Fairstein and Sheehan to what was described to him as the crime scene in Central Park.

177.    According to testimony of Fairstein, she and Detective Sheehan took Kevin and Kharey Wise to the crime scene to "clarify their statements."

178.    Fairstein also testified that she asked Kevin's father if she could take Kevin to the park and he allegedly agreed that Kevin could go without him, his father, being present.

179.    However, contrary to Fairstein's sworn testimony, Mr. Richardson was never *asked* if Kevin could be taken to the crime scene.

180.    Instead Mr. Richardson was *told* by Fairstein and Sheehan that Kevin was going to the park and in fact, when he did ask to go, *he was denied*.

181.    Kevin and Kharey were brought back to the 24th Precinct about a half an hour later by Sheehan and Fairstein.

182.    According to the testimony of Detective Hartigan, he took Kevin to the crime scene for a second time at approximately 8:30 a.m. There is a DD-5 authored by Hartigan about that event.

183.    Fairstein lied about the purpose of taking Kevin to the crime scene.

184.    In the Huntley hearing she testified that she spoke to Kevin's father and told him that she wanted to take Kevin to the crime scene but that they would be asking him no more questions.

185.    According to Fairstein, based on that statement, Kevin's father agreed not to accompany his son to the crime scene.

186.    Yet, upon arriving at the crime scene, Fairstein testified that immediately after

35

exiting the vehicle that took them there, she and Sheehan began interrogating Kevin, asking him

if anything at the crime scene looked familiar to him.

187.    Later on, upon arriving at the alleged scene where the Jogger was actually found,

Fairstein and Sheehan asked Kevin and Kharey to get out of the car and walk up to the spot when

the Jogger was found, where there was, in Fairstein's words, "an astounding amount of what

appeared to be dry blood."

188.    At this second location, Fairstein and Sheehan again questioned Kevin about the

crime, and allegedly Kevin stated, this is where it happened, "the raping."

189.    Fairstein also has admitted that she had conversations with other detectives before

she and Sheehan took Kevin and Kharey to the scene where they made their incredibly damaging

admissions, but only in the presence of Fairstein and Sheehan.

190.    Following his return from the crime scene, Kevin was returned to his cell and was

not released as the detectives and ADAs had promised.

**3.      The Interrogation of Raymond Santana, Jr.**

191.    On April 19, 1989, plaintiff Raymond Santana, Jr., was 14 years old.

192.    Raymond lived at home at 175 East 117th Street, New York, New York, with his

father, Raymond Santana, Sr.

193.    Raymond was a student in the seventh grade at Tito Puente Education Complex,

240 E. 109th Street, New York, New York.

194.    As of April 19, 1989, he had never been arrested or taken into custody by

any law enforcement agency.

195.    On the evening of April 19, 1989, Raymond and several other young boys were

36

walking northbound on Central Park West.

196.     Without any warning, P.O. Eric Reynolds and P.O. Robert Powers, both assigned
to the Central Park Precinct Anti-Crime Unit, undercover, and in a green Parks Dept.
van, pulled into the path of the boys at 102nd Street.

197.     Although some of the boys ran, Raymond remained at Central Park West and
102nd Street where he was detained by P.O. Reynolds.

198.     Officer Reynolds placed him against the wall of a building.  And, when Raymond
turned towards the officer to make an inquiry, Reynolds struck him in the head with a walkie
talkie

199.     Shortly thereafter, Sgt. Wheeler and P.O. Morales arrived at the location.

200.     P.O. Reynolds handcuffed Raymond and put him in the back of Wheeler's car.

201.     Sgt. Wheeler and P.O. Morales then drove Raymond and another young boy into
Central Park and stopped at the site of an in-progress police action.

202.     Sometime after 10:30 p.m., Raymond and four other young boys were finally
taken to the Central Park Precinct.

203.     All of the boys were presented at the precinct desk, lined up, photographed and
then placed in the Youth Room.

204.     P.O. Reynolds told the boys, who in addition to Raymond included Kevin
Richardson, Lamont McCall, Clarence Thomas and Steve Lopez, they would be allowed to go
home when their parents arrived.

205.     P.O. Reynolds immediately prepared all the paperwork required for the boys to
face charges in Juvenile Court.  The paperwork, including a Desk Appearance Ticket charging

Raymond with Unlawful Assembly, was completed by 2:30 a.m. on the morning of April 20th.

206.    At approximately 2:45 a.m. on April 20th, while Raymond was awaiting the arrival of his father at the Central Park Precinct so he could go home, defendant Detective Jose Rosario and Detective Gillner, arrived at Metropolitan Hospital, where in the trauma room Rosario observed the Jogger's appearance while doctors were treating her.

207.    Subsequently, defendant Rosario, after being told that five black and Hispanic youths were arrested that night by officers at the Central Park Precinct, promptly phoned the precinct and instructed the person on the desk to hold the youths for questioning by him.

208.    At the trial, defendant Rosario testified: "She was a jogger. At the time I believe she was married, because we saw a gold band which we believe was a wedding band. I noticed that even though she was bloody and covered with mud, you could tell she took care of herself, she had regular pedicures, perhaps. She was well -- she was a person who normally is well groomed."

209.    Detective Rosario, having presumed a connection between the Jogger's victimization and the less affluent minority juveniles, including Raymond and Kevin Richardson, who were already being detained at the Central Park Precinct, caused the continued detention of the youths.

210.    Meanwhile, P.O. Reynolds repeatedly told the boys and their arriving parents that the boys would be allowed to go home shortly.

211.    At approximately 3:45 a. m., Sgt. Duffy, defendant Rosario's supervisor, arrived at Metropolitan Hospital and took charge of the investigation.  Duffy sent Detective Rosario to the Jogger crime scene in Central Park.

212.     At approximately 4:00 a.m., P.O. Reynolds was called outside the building that contained the Youth Room, and was told by Lt. McInerny, the desk sergeant, to go to the Jogger crime scene at 102nd Street inside the Park.

213.     After Reynolds arrived there, defendant Detective Rosario interviewed P.O. Reynolds concerning the incidents in the park and the boys detained at the Central Park Precinct.

214.     Raymond's father, Raymond Santana, Sr., and his grandmother, Natividad Colon, arrived at the Central Park Precinct between 4:30 and 5:00 a.m. on the morning of April 20th, but were not allowed to see Raymond Jr., at that time.

215.     Following the arrival of Mr. Santana, Sr., P.O. Reynolds and other officers at the precinct again told the parents the boys would be allowed to go home.

216.     However, numerous detectives and supervisory police personnel began to arrive at the Central Park Precinct starting shortly after 4:00 a.m. on April 20th:  Sgt. Duffy, Night Watch Supervisor, Detectives Bureau of Manhattan South Task Force and Detectives Farrell and Whepley, Manhattan Night Watch arrived before 5:30 a.m.; Defendant Rosario arrived at the precinct at approximately 7:00 a.m.; defendant Chief Rosenthal, Manhattan Chief of Detectives, arrived before 7:30a.m.  Also present were: defendant Chief Selvaggi, Chief of Manhattan Borough Patrol; Deputy Inspector Powell, Commanding Officer of Manhattan North Detective Operations; Chief Colangelo, Chief of Detectives for the City of New York; Captain Gunther; Lt. Doyle, Commanding Officer of Manhattan North; Sgt. Richard Kled, Commanding Officer of the Central Park Precinct Detective Squad.

217.     The aforementioned detectives and supervisors participated in briefings with the officers who arrested the boys on the night of April 19, 1989, and with those officers and

Assistant District Attorneys who had been to the Jogger crime scene.

218.     None of the families were told of their constitutional right to a lawyer from the time the boys were arrested until more than six hours later.

219.     Finally, detectives started the interview of the boys, who had been in the precinct all night.  Lamont McCall was first.  His interview was conducted at 5:30 a.m. on April 20th, with Detectives Farrell and Whelpley and P.O. Reynolds present.  At the end of the interview, he was given a Desk Appearance ticket charging him with assault and released to his mother.

220.     At approximately 6:30 a.m., Clarence Thomas was interviewed by the same police officers.  He also was charged with assault, given a Desk Appearance ticket, and released to his mother.

221.     Sometime after Clarence Thomas's release at 8:00 a.m., Kevin Richardson's interview began and continued until 1:00 p.m.

222.     At approximately 1:40 p.m. on April 20th, after his father departed the Precinct without seeing his son and without being able to obtain any information about why the police were continuing to hold his son, Raymond and his grandmother, Natividad Colon, who understood very little English, were taken into a room where five detectives, including, Detective Scott Jaffer, were present.

223.     Over the course of the next approximately 16 hours, Raymond was improperly questioned, misled and manipulated to make false statements by a team of detectives including defendants Humberto Arroyo of the Central Park Detective Squad, Det. John Hartigan, Michael Sheehan and August Jonza of the Manhattan North Homicide Unit and representatives of the New York County District Attorney's office, including ADA Elizabeth Lederer.

40

224.    Detective Humberto Arroyo read Raymond his Miranda rights in English, which Raymond did not fully comprehend because of his age and inexperience with the criminal justice system.  And, although Arroyo testified at a court proceeding that he read the Miranda rights in Spanish to Ms. Colon, Arroyo actually only asked her in Spanish if she knew the "court rules".  Indeed, in his testimony, Arroyo was forced to concede that he did not have sufficient mastery of Spanish to be able to say, "I'm going to give you the Miranda warnings."  Hence, Natividad Colon was left with her interpretation of "court rules": If Raymond went to court and could not afford a lawyer, one would be assigned.

225.    In response to Arroyo asking about what happened in the park, Raymond recounted several incidents he witnessed involving a group of young boys.

226.    Detective Arroyo then asked about the woman in the park who was beaten and raped.

227.    Raymond replied, "What woman?"

228.    Detective Arroyo told Raymond to start over and tell him what happened in the park.

229.    Raymond told him about the incidents he witnessed, and again Arroyo asked about the woman in the park who was beaten and raped.

230.    Raymond responded that there was no woman.

231.    During this process, Arroyo spoke briefly on several occasions to Raymond's grandmother, primarily in Spanish, but sometimes in English interspersed with Spanish.

232.    Then, Detective Arroyo threatened that Raymond could face 20 years in prison if he was found to be lying.

41

233.    At this point an officer, whose identity is currently unknown, knocked on the door, and, in Spanish, called Raymond's grandmother out of the room, leaving him without the presence of a family member.

234.    Immediately following his grandmother's departure, Arroyo started to yell at Raymond and another officer, whose identity is currently unknown, entered the room, got very close to Raymond, intimidated him and said, "You know what you guys did. . . "

235.    Raymond started to cry.

236.    When Raymond's grandmother returned to the room, the intimidating officer (identity unknown) departed the room.

237.    Arroyo told Raymond to start from the top again.  Raymond repeated his earlier comments about the incidents in the park.  Arroyo again asked about the woman in the park. Raymond insisted there was no woman in the park.

238.    Ms. Colon spoke in Spanish to Arroyo, and Arroyo responded in Spanish that they knew her grandson knew something.

239.    Detective Arroyo started the questioning of Raymond again, in English.

240.    For a second time, Raymond's grandmother was called out by the same Spanish speaking officer.

241.    Another officer, whose identity is also currently unknown, entered the room. Detective Arroyo informed the officer that Raymond was not giving up any information.

242.    The officer cursed and rushed toward Raymond, as if to attack him.

243.    At no time did any of the other officers intervene to halt those wrongful interrogation tactics.

42

244.    Raymond again started to cry.

245.    Thereafter, Ms. Colon returned to the room and the questioning started again.

246.    The repeated intentional removal of Natividad Colon from the interrogation room where her grandson was being questioned represented a pattern of deceit designed to prevent Raymond from having parental guidance while he was subjected to threats and intimidation.

247.    Equally important, the interrogation continued despite the fact that 14-year-old Raymond had not slept since awakening the morning of April 19th and it was then the afternoon on the 20th.

248.    At some point Detective John Hartigan entered the room.

249.    The interrogation continued with Detective Hartigan questioning and Detective Arroyo writing until they had a statement that was allegedly made by Raymond concerning some assaults, which had taken place in Central Park on the previous night.

250.    At about 4:40 p.m., the Detectives asked Raymond to sign the statement that Arroyo had written, after which Detectives Arroyo and Hartigan signed the statement.

251.    The Detectives also asked Ms. Colon to sign the statement, but she refused.

252.    Given Ms. Colon's limited knowledge of English and the failure of the detectives to fully translate the interrogation of Raymond into Spanish, he was, in effect, further deprived of the guidance of his grandmother.

253.    Detective Arroyo took the signed statement to the Detective Squad Office, which was located in the next building, where he conferred with his co-defendants including those Assistant District Attorney co-defendants who were present.

254.    Lt. Doyle reviewed the statement and noted that it did not mention anything

43

regarding the female jogger.

255.    At approximately 5:00 p.m., Raymond Santana, Sr., returned to the Central Park Precinct.

256.    As part of their "tact plan," Arroyo and Hartigan pulled Mr. Santana, Sr., aside and out of the hearing of Raymond, Jr., and told him that they didn't feel his son was being completely truthful.

257.    As a result of that conversation, Mr. Santana, Sr., joined in the questioning of Raymond.

258.    Raymond, nonetheless, continued to answer as he did before, protesting that he had no involvement in the attack on the Jogger.

259.    The detectives acted intentionally to disrupt the integrity and stability of the family relationship between Raymond and his father.

260.    Detective Hartigan asked if he could speak to Raymond, Jr., alone.

261.    As a result, Raymond Santana, Sr., Natividad Colon, and Detective Arroyo left the room and exited the building.

262.    Arroyo returned to the Detective Squad Office where various detectives and supervisors were sharing information.

263.    After waiting outside for some time, Raymond's father and grandmother departed the precinct just before 6:00 p.m.

264.    While they were alone, Detective Hartigan told Raymond he knew he didn't have anything to do with the rape.

265.    Raymond cried, and Hartigan told him not to worry, everything was going to be

44

all right.

266.    Then, Hartigan pulled out a photograph of Kevin Richardson and said the officers knew Kevin did the rape because he had a scratch under his eye; and told Raymond that Kevin was in another precinct saying Raymond did it.

267.    Hartigan told Raymond he knew he didn't do it; if Raymond helped him, he would help Raymond go home.

268.    As a result, contrary to the truth but, overcome with the pressure of the defendants to extract an admission from him and hoping to satisfy Hartigan, Raymond told Hartigan that he saw Kevin Richardson grab a lady and take her down.

269.    Hartigan continued in this manner, naming other individuals, until he had persuaded Raymond to state that other young men were involved.

270.    Hartigan repeatedly said he didn't want to see Raymond go down for something he didn't do.

271.    When Detective Arroyo arrived back at the interrogation room, Detective Hartigan told him that, in his absence, Raymond had admitted involvement in an incident concerning the female jogger.

272.    Detective Hartigan wrote this information as an addendum at the bottom of the first statement.

273.    At 6:00 p.m., Raymond was asked to sign the addendum, and then Detectives Hartigan and Arroyo signed it.

274.    Next, Hartigan told Raymond he needed one more thing before Raymond went home: he needed him to give the same statement to another detective and do a video statement.

45

275.   After securing this addendum to the first statement, Detective Hartigan reported to supervisors, including various co-defendants.

276.   Shortly thereafter, Detective Michael Sheehan, Manhattan North Homicide, was ordered by his supervisor, Sgt. T.J. O'Connor, to transport Raymond to the 20th Precinct where he was to obtain a statement from Raymond in the presence of his father.

277.   At that time, the Central Park Precinct was packed, and a "high level meeting" was taking place there. A.D.A. Fairstein and A.D.A. Lederer were present for the meeting.

278.   After 6:00 p.m., Detectives Sheehan, Augusta Jonza and Rudy Hall departed the Central Park Precinct with Raymond.

279.   The entire Jogger investigation was moved to the 20th Precinct.

280.   Between 8:00 and 9:00 p.m. on April 20, Inspector Powell conducted a briefing at the 20th Precinct, which was attended by detectives and Assistant District Attorneys, including Detective Sheehan, A.D.A. Lederer and A.D.A. Fairstein..

281.   At 10:10 p.m., another interrogation of Raymond Santana, Jr., was conducted at the 20th Precinct by Detectives Sheehan and August Jonza with Raymond Santana, Sr., present.

282.   At this point, Raymond had been in custody for about 24 hours and had not been allowed to sleep.

283.   Sheehan read to Raymond the first statement prepared by Arroyo and Hartigan. Sheehan then questioned Raymond and wrote a statement.

284.   The result was a signed written statement very similar to the first statement, with the addition of more names.

285.   Then, Sheehan told Mr. Santana, Sr., to sign the statement.

46

286.    When Mr. Santana, Sr., resisted, Sheehan told him he was a hardworking man and they could make his life hell – that he worked hard for a living, he didn't want them to take that away from him.

287.    As a result, Raymond's father signed the statement.

288.    At 2:00 a.m. on April 21st, the Detectives drove Raymond and his father to the 24th Precinct.

289.    There, ADA Lederer recorded a videotaped statement with Detectives Sheehan and Arroyo present.

290.    During the taping, Raymond made many statements that were either inconsistent with the fabricated information of his written statement, contradictory to statements obtained from the other boys and/or contrary to the physical evidence police had gathered.

291.    Those inconsistencies and contradictions were obvious and pertained to crucial evidence, including things such as: the clothing of the Jogger, where she was found, the condition she was found in, the names of the boys who participated and their involvement in the rape, descriptions of how the Jogger was assaulted, etc.

292.    Instead of questioning Raymond about the inaccuracies, inconsistencies and contradictions, Lederer intentionally disregarded and/or glossed over them, accepting the false information at face value for purposes of questioning him.

293.    According to testimony given by officers and ADA Fairstein, the videotaping of Raymond took approximately two hours, even though the videotaped statement of Raymond that was used during the criminal trial (and the only one plaintiffs have seen) runs for only about 20 minutes.

47

294.    During the taping of the video statement, A.D.A. Lederer, knowing at that time that the Jogger was found wearing some articles of clothing, never challenged the detectives' version of events, which had Raymond asserting that the Jogger was nude.

295.    Indeed, fully aware that the Jogger was found bound, Lederer twice asked whether anybody had tied her up, a fact Raymond could not confirm.

296.    In the face of contrary evidence, Lederer continued to accept the detectives' version of events despite Raymond's contention that the Jogger was not bleeding a lot after being struck in the head.

297.    Most egregiously, Lederer made repeated attempts to coax Raymond into saying he saw Kevin Richardson's penis and that Kevin had an erection.

298.    Following the first videotaped statement, a second videotape was made in which Raymond was shown wearing the clothes he had been wearing in Central Park, providing further contradictory evidence which should have caused Sheehan, Arroyo and Lederer to question whether they had the wrong suspect: i.e., although Raymond stated that he was kneeling on the ground when he touched the Jogger's breast, the area around the knees of his pants did not show any evidence of having had any contact with the wet, muddy ground.

299.    Sometime after 3:30 a.m. that same morning, Detectives Sheehan and Jonza drove Raymond to Central Park.  Their purpose was for him to identify the Jogger crime scene.

300.    In the park, Raymond, however, incorrectly indicated the Jogger was raped by the reservoir.

301.    On a second occasion, Raymond was taken to a place in Central Park where ADA Fairstein was present.  He was asked if that was the scene where the Jogger was raped and he

48

responded no, it happened at the reservoir.  Clearly annoyed, Fairstein told Sheehan to get Raymond out of there.

302.    Detectives Arroyo, Hartigan and Sheehan perpetuated Raymond's false statements, which they perpetuated in the first place through coercive interrogation tactics, by lying about how the statements were obtained.

303.    Detectives Arroyo and Hartigan falsely represented throughout the investigation and criminal prosecution that:

        a.    without any inducement, Raymond voluntarily provided facts from his personal knowledge of the attack on the Jogger.

        b.    Raymond requested to speak with Hartigan without the presence of his father or grandmother.

        c.    they instructed Raymond to sign the statement, only if it was true.

        d.    Raymond's grandmother was present for the entirety of the first segment of his interrogation.

304.    Detective Sheehan falsely represented throughout the investigation and criminal prosecution that:

        a.    he did not use the Hartigan statement when questioning Raymond.

        b.    without hesitation or reservation, Raymond Santana, Sr., signed the statement.

        c.    he emphasized to Raymond and his father that they had the option of not doing a videotaped statement.

        d.    when taken to Central Park, Raymond pointed out a heavily wooded area

49

as the scene of the attack.

305.     Prior to his arrest, Raymond Santana, Jr., did not know Steve Lopez, Kevin

Richardson, Antron McCray, Yusef Salaam or Kharey Wise.

**4.     The Interrogation of Antron McCray**

306.     On April 19, 1989, plaintiff Antron McCray was 15 years old.

307.     Antron lived at home at 40-44 West 111th Street, Apt. 2J, New York, New York,

10026, with his mother, Linda McCray, and his stepfather, Bobby McCray (who has since passed

away).

308.     Antron was a student in the ninth grade at Career Academy.

309.     As of April 19, 1989, he had never been arrested or taken into custody by any law

enforcement agency.

310.     Sometime around noon on April 20, 1989, defendant Detective Rosario arrived at

Antron's apartment with Manhattan Sex Crimes Detective F/N/U Rivera, Manhattan Sex Crimes

Detective F/N/U Morin, and Police Officer Reynolds.

311.     Detective Rosario was charged with bringing Antron to the Central Park Precinct

for questioning regarding the previous night's events in Central Park.

312.     Before taking Antron to the precinct, Detective Rosario asked Antron to change

into the clothing he had worn in Central Park the night before.

313.     Antron complied with that request.

314.     Detective Rosario testified that he noticed a lot of mud and dirt on the clothing.

315.     Detective Rosario immediately considered Antron a suspect but, nonetheless, he

did not inform the McCrays of his belief.

50

316.    To the contrary, while transporting Antron and his parents to the Central Park Precinct, Detective Rosario told Mrs. McCray and Mr. McCray to explain to Antron, who wept during the ride, that he should tell his interrogators the truth, regardless of how serious or bad Antron thought the truth was, and that his parents would continue to love him anyway.

317.    By omitting to administer Miranda rights, Detective Rosario worked in concert with other police officers, including but not limited to Detectives Gonzalez, Hildebrandt and McCabe, to interrogate Antron and manipulate him into disregarding his Miranda rights in order to secure a false inculpatory statement.

318.    Detective Rosario was a critical member of the conspiracy to maliciously prosecute the adolescent plaintiffs as he originated and perpetuated the notion that plaintiffs, including Antron, were responsible for the beating and rape of the Central Park Jogger.

319.    Roughly nine or ten hours prior to picking up Antron at his family's home, Detective Rosario was directed by Sergeant Duffy, the Night Watch supervisor, to go to the Emergency Room of the Metropolitan Hospital to see the Jogger, who was taken there after her body was discovered.

320.    Detective Rosario, while in a trauma room at Metropolitan Hospital at approximately 2:45 a.m. on April 20, 1989, observed the Jogger's appearance while doctors were treating her.

321.    At the trial, Detective Rosario testified: "She was a jogger.  At the time I believe she was married, because we saw a gold band which we believe was a wedding band.  I noticed that even though she was bloody and covered with mud, you could tell she took care of herself, she had regular pedicures, perhaps.  She was well -- she was a person who normally is well

51

groomed."

322.    Detective Rosario immediately presumed a connection between the Jogger's

victimization and the less affluent minority juveniles, including Kevin Richardson and Raymond

Santana, who were already being detained at the Central Park Precinct.

323.    At approximately 2:55 a.m. on April 20, Detective Rosario instructed a desk

officer at the Central Park Precinct to hold Richardson, Santana, and the other juveniles who

were about to be released until he arrived to interview them.

324.    The juveniles were held on the basis of Detective Rosario's instruction.

325.    After leaving Metropolitan Hospital, defendant Rosario went to the crime scene

(i.e., the location where the Jogger was found) and remained there from about 3:45 a.m. until 7

a.m., during which time he interviewed Officer Reynolds.

326.    Between the hours of 7 a.m. and 11:30 a.m., just before going to Antron McCray's

apartment, Detective Rosario was at the Central Park Precinct sharing information with

detectives from Night Watch, Central Park, the Manhattan North Task Force, the Sex Crimes

Unit, and other units that had responded to the Central Park Precinct to investigate the Jogger

case.

327.    Upon their arrival at the Central Park Precinct sometime after noon on April 20,

Detective Rosario placed Antron, his mother, and his stepfather in the Community Affairs office.

328.    However, when Detectives Hildebrandt and McCabe reported to the Central Park

Precinct the same day at around noon, they spoke with Deputy Inspector Powell, the

Commanding Officer of Manhattan North Detectives, who, instead, instructed them to take

Antron and his parents to the 20th Precinct and to obtain a statement from Antron there.

329.    Over the course of approximately 12 hours following the arrival of Antron and his parents at the Central Park Precinct, Antron was improperly questioned by teams of detectives, including Carlos Gonzalez of the Central Park Detective Squad, Harry Hildebrandt and Thomas McCabe, both of the Manhattan North Homicide Task Force, and representatives of the District Attorney's Office, including Assistant District Attorney Elizabeth Lederer.

330.    Assistant District Attorney Linda Fairstein was present and consulting with various defendants, including Lederer, during the questioning and investigation.

331.    As directed by Deputy Inspector Powell, defendants Hildebrandt and McCabe transported the McCrays to the 20th Precinct and placed them in a waiting area outside of the Youth Room while they first interrogated fourteen-year-old Clarence Thomas for about two hours.

332.    At approximately 3 p.m. on April 20, the McCrays were brought into the Youth Room for Antron's interrogation.

333.    Just as defendants Hildebrandt and McCabe were about to begin Antron's interrogation, Detective Gonzalez joined the interrogation at the direction of Sergeant Fiston of the Sex Crimes Unit.

334.    The interrogation began at around 3:15 p.m.

335.    Detective Gonzalez had been briefed by a Night Watch officer about the crime against the Jogger when he arrived at the Central Park Precinct that morning.

336.    Prior to participating in the interrogation of Antron, Detective Gonzalez had questioned Kevin Richardson, commencing at around 9:40 a.m.

337.    Before Detectives Rosario, Rivera, Morin and Officer Reynolds questioned or

even contacted Antron and his parents, Gonzalez falsely told Kevin Richardson that Antron had

given him up.

338.    On the basis of the prior interrogation he conducted, Detective Gonzalez had a

preconceived notion of the sequence of events in Central Park the previous night and of the

desired contents of the "confession" to be elicited.

339.    With Detective Hildebrandt directing much of the questioning, the detectives

started Antron's interrogation by asking Antron what happened in Central Park on the night of

April 19, 1989.

340.    Antron recounted several incidents that he had observed in the Park without any

mention of the Central Park Jogger.

341.    The Detectives asked Antron the same question repeatedly, accusing him of lying

in very loud, rough voices.

342.    Antron nonetheless reiterated his original account of the previous night.

343.    Defendant Detective Gonzalez specifically asked Antron about the female jogger.

344.    Antron responded that he did not know anything about a female jogger.

345.    Again, shouting, the Detectives accused Antron of lying.

346.    Antron's mother, Mrs. McCray, was crying and very upset.

347.    Shouting in response to the Detectives, she repeatedly asserted that Antron was

telling the truth.

348.    Antron was crying.

349.    The Detectives told Antron that he would be able to go home if he cooperated by

putting himself into the crime, acting as a witness, and telling them what they wanted to hear.

54

350.    Otherwise, they threatened, Antron would go to jail.

351.    Despite Antron's denial of his involvement, the Detectives asked him leading questions such as: "Did you hold her arm?. . . Did you get on top?"

352.    In an effort to manipulate Bobby McCray into helping them elicit a false statement from Antron, Hildebrandt invited Antron's stepfather to speak with him in the hallway.

353.    Gonzalez joined them in the hallway, while McCabe remained in the room with Antron and Mrs. McCray.

354.    The Detectives told Mr. McCray that Antron was not telling the complete truth, falsely telling him that they already had information implicating Antron in the rape of the female jogger, and that Antron had better go along with them.

355.    Mr. McCray told the Detectives that he raised Antron better than to do something like this.

356.    Mr. McCray returned to the interrogation room with Detectives Hildebrandt and Gonzalez.

357.    Detective Hildebrandt started questioning Antron about the female jogger again.

358.    Antron maintained that he did not know anything about the female jogger.

359.    The Detectives continued to accuse Antron of lying.

360.    Mrs. McCray was crying, screaming and insisting that Antron was telling the Detectives what he knew.

361.    In loud voices, the Detectives repeated that Antron had better tell them what he did and that, if he cooperated, then he could go home.

362.    Otherwise, the Detectives threatened, Antron would go to jail.

55

363.    Antron was crying and insisting that he did not do anything.

364.    This back-and-forth exchange continued for a long time, until Detectives Hildebrandt and Gonzalez again took Mr. McCray out into the hallway.

365.    Detective Hildebrandt told Mr. McCray that Antron was going to jail if he did not cooperate (i.e., tell the detectives what they wanted to hear), but that he would go home if he cooperated.

366.    Mr. McCray told the detectives that Antron was telling them what he knew.

367.    Detectives Hildebrandt and Gonzalez insisted that Antron was lying.

368.    In order to secure the "confession" they desired, Detectives Hildebrandt and Gonzalez also told Mr. McCray that it would be best if Mrs. McCray left the room.

369.    Detective Gonzalez then escorted Antron's mother, who had proven to be Antron's most vehement advocate during the interrogation, out of the room.

370.    The Detectives purposefully separated Mrs. McCray from her fifteen-year-old son for the remaining duration of his interrogation, leaving only his stepfather, whom the Detectives had turned into another interrogator, in the room with Antron.

371.    The Detectives acted intentionally to disrupt the integrity and stability of the family relationship between Antron and his parents.

372.    Detectives Hildebrandt and Gonzalez sent Mr. McCray into the room to talk with his stepson alone.

373.    Mr. McCray told Antron that he knew he was telling the truth, but that he should tell the Detectives what they wanted to hear so that he could go home.

374.    Mr. McCray was scared and did not want his stepson to go to jail.

56

375.    Antron refused to lie.

376.    Mr. McCray threw a chair across the room in anger at the situation.

377.    When the Detectives returned to the interrogation room, they told Antron that he should be able to talk to them now that his mother was no longer in the room.

378.    They repeatedly asked Antron what happened to the female jogger.

379.    Antron continuously insisted that he never saw a female jogger.

380.    The Detectives nonetheless accused Antron of lying and aggressively pointed their fingers at him.

381.    Again, they said that Antron would go to jail if he failed to tell them what they wanted to hear.

382.    This exchange of accusations and denials continued for a long time.

383.    Mr. McCray instructed his stepson to tell the Detectives what they wanted to hear so that they could go home.

384.    Antron continued denying any knowledge of the female jogger.

385.    Mr. McCray was then asked to leave the room.

386.    With neither Antron's mother nor his stepfather in the room, the Detectives continued to interrogate Antron using loud, rough voices.

387.    Antron again repeated his original statement about what happened in the park the previous night.

388.    The Detectives nonetheless persisted in asking Antron about the woman who was raped and beaten in Central Park.

389.    When Antron denied any knowledge of such a woman, the Detectives accused

57

him of playing games.

390.    When Antron's stepfather reentered the room, Antron again repeated his original statement.

391.    The detectives said that they knew Antron had something to do with the lady jogger who got raped, that others were implicating him, and that he could go home if he told them what they wanted to hear.

392.    Antron continued to deny knowledge of the rape.

393.    On the basis of the Detectives' representations, Mr. McCray believed that Antron would be released if Antron told the Detectives whatever they wanted to know about the other boys.

394.    Mr. McCray repeatedly instructed Antron to tell the police what they wanted to hear, so that they could go home.

395.    The Detectives insisted over and over again that Antron tell them what they wanted to hear.

396.    Everyone, including his stepfather, was yelling at Antron.

397.    Nonetheless, Antron continued to deny all knowledge of the female jogger.

398.    The Detectives and Mr. McCray continued pressuring Antron.

399.    Eventually, without understanding or being properly informed of his rights, unable to resist any longer and seeing no alternative after hours of repeating the truth in the face of intimidation and disbelief, Antron began conceding facts fed to him by the Detectives about the rape and beating of the Central Park Jogger.

400.    For instance, the Detectives told Antron that Kevin Richardson had accused him

58

of getting on top of the female jogger and removing his pants.

401.    Antron went along with this false accusation.

402.    Antron simply repeated everything the Detectives suggested to him about the events in Central Park on the evening of April 19.

403.    Detective Hildebrandt recorded Antron's acquiescence to the Detectives' version of events in the form of a statement.

404.    However, he did not record the preceding interview and interrogation events, including Antron's numerous denials of involvement in the attack on the Jogger or the leading questions posed by the Detectives.

405.    When asked to sign the statement, Mr. McCray did not look at it; he simply signed where he was told to sign.

406.    After Detective Hildebrandt completed the statement, Detective Gonzalez brought Mrs. McCray back into the room for the first time since she had been removed.

407.    Mr. McCray told Mrs. McCray to sign the statement.

408.    Mrs. McCray signed the statement even though she was too upset and tearful to decipher its contents.

409.    None of the Detectives read the statement to Mrs. McCray.

410.    Antron's interrogation lasted over two hours, until approximately 5:30 p.m. on April 20.

411.    Antron had had nothing to eat since his arrival at the Central Park Precinct.

412.    At no time during the interrogation did Detectives Hildebrandt, Gonzalez or McCabe seek factual information, such as last names or addresses, in follow-up to Antron's

responses to their questions.

413.   The Detectives did not take any notes of the interrogation until the very end, when Hildebrandt began preparing the written statement.

414.   The Detectives did not record anywhere what Antron said during the earlier parts of the interrogation, or what his parents and the Detectives said at any point.

415.   Gonzalez explained the Detectives' failure to take notes as follows: "Well, that's the way we operate . . . ."

416.   At no time did Detective Hildebrandt tell Antron or his parents that Antron was under arrest, even though Hildebrandt knew that he would not have allowed Antron to leave his custody once the Detectives were successful in securing the "confession" they desired.

417.   From the start, the Detectives endeavored to implicate Antron, rather than to thoroughly investigate the crime against the Jogger.

418.   Sometime after 6 p.m., Detective Gonzalez took Antron's clothing.

419.   Detective Henry Fieldsa photographed the clothing and returned it to Gonzalez for transport to the police lab.

420.   Detective Gonzalez kept Antron's clothing in the trunk of his car until delivering it to the lab the next day at around 2 p.m.

421.   At approximately 9 p.m. on April 20, Deputy Inspector Powell conducted a briefing about the investigation, which Lederer and Fairstein attended, at the 20th Precinct.

422.   The briefing addressed, *inter alia*, the female jogger, her medical condition, the crime scene, the investigation generally, and possible suspects.

423.   Lederer asked questions during this briefing.