748.    When he arrived at the 20th Precinct, Yusef was initially placed in a small room alone.

749.    Yusef believed the police were just going to ask him some questions and let him go.

750.    After some time alone, Yusef was confronted by four unknown police officers, who were, upon information and belief, detectives, including, but not limited to Detectives McKenna and Taglioni.

751.    The officers asked his name and age.

752.    Yusef gave them his name and told them he was fifteen.

753.    Then the officers asked him to tell them what happened in the Park.

754.    He told them what happened, commencing with events that took place in the area around his family's apartment building at 1309 Fifth Avenue.

755.    Yusef told them about a confrontation that had taken place earlier in the day in the plaza outside the building where he lived.

756.    Yusef described his belief that an older teenager with a bad reputation had come to the plaza on April 19th intending to attack and beat up Yusef and his friend Eddie de la Paz because of a dispute over dating Eddie's sister.

757.    Yusef told the police officers that he and Eddie were frightened and told Kharey Wise of their fear the person in the plaza would return to attack them.

758.    Kharey and Eddie then went into Kharey's apartment and Eddie emerged with a piece of pipe that he asked Yusef to hold for him.

759.    Yusef told the police he put the pipe in the inside pocket of his trench coat.

91

760.    He also told the police officers that he accidentally hit himself near his right knee while doing some "Kung Fu moves" before he entered Central Park and was, as a result, limping for the rest of the day.

761.    Yusef told the officers about entering Central Park at the rear of the group and about the events he had witnessed: about the Spanish guy the group let go because someone knew him; about the couple that the group decided not to harass because they were a couple; about the attack on the bum; about the rocks thrown at the taxicab; about running from the police; about the interactions with the man on the bicycle and the couple on the tandem bicycle; and about the interactions with three male joggers near the reservoir.

762.    With respect to each of these events, Yusef truthfully described himself as a witness to the actions of other persons, persons unknown to him, rather than as a participant in those actions.

763.    Yusef also described the path he took through Central Park – on the road along the east side of the Park, the dirt path he subsequently took, the grassy area on the east side of the North Meadow, the area of tree stumps, the area around the reservoir, and described leaving Central Park to take the subway to return home after witnessing confrontations with the male joggers at the reservoir.

764.    Yusef told the police officers interviewing him that the pipe fell out of his pocket while he was running along a dirt path on the east side of Central Park in the vicinity of 106th Street and was never seen again.

765.    After Yusef finished describing these events, the officers said to him "What about the woman?. . . the woman you guys raped?"

766.     Yusef responded, "What woman are you talking about. . . .I didn't rape anybody."

767.     One of the officers said, "This guy is lying. . . .Tell us what happened again."

768.     Yusef repeated the sequence of events to the point at which he mentioned walking on the east side of the North Meadows.

769.     One of the officers interrupted Yusef, saying: "Isn't that when you walk and went around there with the group and assaulted the woman?"

770.     Yusef responded, "No, that's not what happened."

771.     Yusef kept telling the officers what happened.

772.     The officers interrogating Yusef became more and more upset and angry.

773.     They began shouting at Yusef.

774.     The officers' anger frightened Yusef, who began to feel the officers were so angry they would kill him and dump him in the back of the Precinct in plastic.

775.     During this questioning by the four police officers, Yusef was under the impression that he was alone and that there was absolutely no family member in the Precinct.

776.     For a time, the officers left the room.

777.     This was followed by a period during which officers went in and out of the room, at times speaking to Yusef and at other times just looking at him as if he were despicable.

778.     At one point, while he was alone in the room, Yusef fell asleep.

779.     He was awakened by a loud sound and heard Kharey saying, "Okay, okay, I'll tell you . . . ."

780.     Yusef believed the police officers were beating Kharey up.

781.     Later, Yusef learned from Kharey that he had been "smacked up" and Yusef saw

his face was injured and swollen.

782.    After some time passed, police officers returned to question Yusef, asking him to tell them again what happened from the beginning.

783.    After Yusef finished describing the events in Central Park, the officers again became very angry with him and again accused him of lying.

784.    The officers became so angry they were spitting when they were talking and they were so close to Yusef that spit was hitting him in the face.

785.    The officers would ask Yusef questions such as "Didn't you hold her down?. . . Didn't you hit her in the head?. . . Didn't you hold her legs?. . . Didn't you have sex with her?"

786.    Yusef kept saying "no" and that he did not do any of those things.

787.    The officers told Yusef that some of his friends were telling them that he was the one who was doing such things as hitting her in the head, holding her legs down, having sex with her.

788.    Detective McKenna falsely told Yusef his fingerprints were on pants worn by the Jogger.

789.    At trial, McKenna testified and bragged about his lie to a fifteen-year-old boy.

790.    This interrogation was interrupted by ADA Fairstein who spoke to one of the officers in the room.

791.    The questioning then stopped for a period of time and Yusef was allowed to briefly speak to his mother, who told him she had been waiting a long time for him to be brought down.

792.    Prior to the time that ADA Fairstein had interrupted the interrogation, everything

94

Yusef had said to the officers was true, including his denial that he had been involved in the attack on the Jogger.

793.    After Yusef spoke to his mother, he was taken back upstairs to the same small room and left alone for awhile.

794.    Then a black officer came in and told him everything was going to be okay, and asked what happened.

795.    Yusef told the officer, "I told them what happened and I don't understand why they don't believe me."

796.    The black officer told him that seeing something isn't that bad and said to Yusef, "You know, you got to give us something. . . we want to let you go. . . we want to let you go home. . . You seem like a bright guy. . . You have a bright future ahead of you. . . You have to tell us something, maybe you saw something. . . Maybe you got to say something, you know, maybe you felt her breast, feeling her breast isn't as bad as having sex with her. . . ".

797.    Yusef wanted to go home and was tired, hungry and felt like he had been questioned for hours.

798.    Yusef felt that telling the truth was causing him to get weaker and weaker and weaker and the officers were getting stronger.

799.    Yusef remembers the black officer nodding and noticed his head nodding with the officer's.

800.    Yusef understood from the officer that in order for him to go home he had to say he saw something.

801.    After the black officer came in, some of the four officers who initially interrogated

95

Yusef returned to the room.  And again asked him to tell them what happened.

802.    When Yusef described walking on the east side of the North Meadow, the officers again got very upset and insisted that they knew he did something.

803.    The officers told him that they wanted to let him go but he had to tell them something.

804.    The officers then began asking him questions, such as, "Weren't the guys crouching in the bushes waiting for a woman to come by?"

805.    Although Yusef did not know what the officers were talking about, he felt his will was gone and began nodding in agreement to what they were saying about the Jogger.

806.    Yusef remembers nodding in agreement to a question as to whether he was watching from a distance and continued nodding in agreement when they would say things such as, "Didn't Kevin grab the woman and pick her up in this kind of way?". . .  "Didn't someone hit her in the head? . . .  Didn't Kharey hold her legs down?"

807.    Yusef felt he was watching everything from a distance that night and thought maybe he would be able to go home and everything would be all right.

808.    At one point, the officers asked if Yusef hit her in the head and although Yusef denied that, he nodded in agreement to the officers' statement that he "watched everything happen. . . it looked like fun."

809.    The officers would ask him did Kharey feel the Jogger's breast, did Kharey pull her pants down, did Steve have sex with her.

810.    Yusef nodded in agreement to everything they were saying.

811.    Yusef was not shown and did not read or sign anything written by McKenna or

96

any of the other interrogators which purported to record what Yusef said.

812.    Yusef was not shown, and did not read or sign anything written by McKenna or any of the other of his interrogators which purported to record what Yusef said to him and/or them.

813.    Throughout the criminal case, and in the grand jury and at trial, the only allegedly inculpatory statements used against Yusef were all prepared by Detective McKenna.

814.    McKenna claims to have made notes in the spiral notebook as he interviewed Yusef.

815.    His notes, headed by the incorrect 1973 birth year, begin with a description of Yusef allegedly hitting the Jogger with a pipe.

816.    The following day, April 22, 1989, McKenna, while in the office of the District Attorney, wrote a far more elaborate description of his "recollection" of what Yusef said.

817.    Despite his knowledge on April 22nd, 1989 that Yusef was actually 15 years old, McKenna continued to list Yusef's age as 16 years of age.

818.    On April 24, 1989, McKenna prepared an equally elaborate DD-5 complaint follow up report which also listed Yusef's age as 16 years of age.

819.    On April 26, 1989, Detective McKenna testified before the grand jury, adding even more details than appeared in the written documents he had prepared.

820.    In the documents prepared by Detective McKenna, he transformed Yusef from a witness to events that Yusef supposedly saw, to an active participant and, in the case of the Jogger, completely fabricated a script falsely portraying Yusef as a major perpetrator of the crime.

97

821.    Detective McKenna wrongfully perpetuated these false statements, which he had fabricated in the first place, by his court testimony, including, without limitation, his testimony at the trial against Yusef Salaam in which the three documents which incorporated the fabricated statements — his initial handwritten notes, his additional handwritten description, and his DD-5 report — were all used as evidence against Yusef.

822.    Detective McKenna further perpetuated his wrongful conduct with other testimony about the manner in which Yusef provided information to McKenna and the manner in which Yusef obtained information from McKenna, including, for example, his testimony that:

a.    without any inducement, Yusef spontaneously recounted the attack on the Central Park Jogger in narrative form.

b.    Yusef represented that he was 16 years of age;

c.    no one initially told Yusef that he had been implicated by other persons. As to the latter misrepresentation, when impeached at trial by a prior sworn contradictory statement he had made, McKenna shrugged it off; he "imagines" that Yusef was told he had been implicated in the case by other persons.

**D.    THE GROSS INCONSISTENCIES IN THE ALLEGED "CONFESSIONS"**

823.    The interrogation techniques used by defendants to elicit the alleged "confessions" from the adolescent plaintiffs, as described above, produced versions of the events in Central Park on April 19th that were grossly inconsistent and could not be reconciled.

824.    Although this complaint sometimes refers to false "confessions" of the adolescent plaintiffs, the statements obtained by the defendants from those plaintiffs were actually false inculpatory statements and, as such, were not confessions of guilt.

825.    For example, on the issue of who knocked the jogger to the ground, Richardson said that McCray, Santana and Steve Lopez did it.

826.    McCray said everyone charged the Jogger.

827.    Santana said Richardson knocked down the Jogger.

828.    Detective McKenna wrote that Salaam allegedly said he "hit her with pipe she went down and hit her again."

829.    Santana said Steve Lopez hit the Jogger twice in the head with a rock.

830.    Wise stated that the Jogger's clothes had been cut off and that her legs had been cut with a knife.

831.    The Jogger's clothes were not cut off and there were no knife wounds on the Jogger.

832.    Richardson said that the Jogger's bra was ripped off, when in fact it was still on her when she was found.

833.    Santana described the Jogger as naked when they left the scene, although she was found with her jogging bra still on and her t-shirt tied around her head.

834.    None of the plaintiffs accurately described where the attack on the Jogger took place.

835.    The adolescent plaintiffs' statements also conflicted with the physical evidence.

836.    For instance,  the Jogger lost significant amounts of blood, yet there was no blood evidence implicating any of the accused adolescent plaintiffs in the crimes against her.

837.    In addition, the impression left on the ground from the spot where the Jogger was first knocked down to where she was dragged was measured at the time by crime scene

detectives to be 40 feet long and no more than 16 to 18 inches wide, a fact which excluded the possibility that she was dragged by five un-regimented teenage boys.

838.    Simple comparisons of the alleged false "confessions" of the adolescent plaintiffs show various other material conflicts and contradictions between and among them, including, without limitation, the actions that each and all of them took during the alleged attack on the Jogger.

### E.    THE WRONGFUL ARRESTS AND CHARGES

839.    Despite the inadequacies of the false "confessions" of the adolescent plaintiffs and with knowledge of the unconstitutional and unlawful methods used to secure those alleged "confessions," defendants wrongfully arrested and criminally charged the adolescent plaintiffs for allegedly engaging in the attack on and rape of the Jogger and other events that took place in Central Park, New York City, on April 19, 1989.

840.    On May 4, 1989, based on the investigation conducted by the defendants, the adolescent plaintiffs were indicted by a New York County Grand Jury, Indictment Number 4762/89, and charged with Attempted Murder in the Second Degree; Rape in the First Degree; Sodomy in the First Degree; Sexual Abuse in the First Degree; two counts of Assault in the First Degree; Robbery in the First Degree; two counts of Robbery in the Second Degree; three counts of Assault in the Second Degree; and Riot in the First Degree.

841.    As detailed throughout this complaint, the unreliability of the wrongful methods utilized by the defendants to elicit the false statements from the adolescent plaintiffs concerning any involvement in the attack on the Jogger was also clearly demonstrated by the fact that: (a) the August 1989 results of the DNA evidence tests (that the DNA evidence did not match any of the

100

adolescent plaintiffs) was contrary to and inconsistent with the premise they were involved; (b) the similar attacks on women in the area continued during the Summer of 1989; and (c) the later confession by another individual, Matias Reyes — all totally undermining and negating the adolescent plaintiffs' false statements.

### F.    THE CONCURRENT EVIDENCE IMPLICATING MATIAS REYES

842.    In fact, at the time defendants were interrogating the adolescent plaintiffs, the teams of detectives, police officers and representatives of the District Attorney's Office, including, but not limited to ADA Fairstein, involved in the investigations knew, or reasonably should have known, of a far more likely suspect – Matias Reyes.

843.    The attacks on April 17, 1989 and April 19, 1989 were followed by a series of similar violent attacks on women comparable in physical appearance and age to the Jogger committed in the same general area.

844.    On June 11, 1989, a twenty-four year-old white woman was raped, robbed, stabbed, and beaten in her apartment on East 116th Street.

845.    On June 14, 1989, a twenty-four year-old light-skinned, blonde Hispanic woman was raped, robbed and stabbed to death in an apartment at 53 East 97th Street in Manhattan.

846.    On July 19, 1989, a twenty year-old white woman in her apartment on Madison Avenue between 95th and 96th Streets was stalked, raped, robbed, cut and left bound in the same manner as the Jogger.

847.    On August 5, 1989, a twenty-four year-old white woman was stalked, raped, and robbed in her apartment on East 91st Street between Lexington and Third Avenues.

848.    That victim escaped and informed others in her building who captured Matias

101

Reyes and held him until the police arrived.

849.    Beginning in August 1989, interviews of Matias Reyes were conducted, at least in part, at the 20th Precinct and, at least in part, by Detectives Michael Sheehan and Bruno Francisci, among others.

850.    Reyes was questioned by, *inter alia*, defendants Sheehan and Francisci about numerous sexual assaults that Reyes was suspected of perpetrating.

851.    Reyes's DNA was analyzed and  matched to the  sexual assaults that occurred on June 11th, July 19th and August 5th and the rape and murder that occurred on June 14th.

852.    Matias Reyes subsequently entered pleas of guilty to the rapes, murder and robberies he committed between June 11, 1989 and August 5, 1989.

853.    Reyes is serving a sentence of 33⅓ years to life imprisonment.

854.    Counsel for the adolescent plaintiffs, when they were defendants in the underlying criminal proceedings, requested from the prosecution all information and documents which might have been exculpatory or helpful to their clients.

855.    Despite the similar characteristics of the crimes for which Reyes was convicted and the attacks that took place on April 17th and 19th, information regarding Matias Reyes and/or the crimes for which he was convicted was never made available to any of the adolescent plaintiffs or their counsel in the underlying criminal proceedings.

## G.    THE UNCONSTITUTIONAL AND UNLAWFUL EFFORTS TO PERPETUATE THE FALSE CONFESSIONS

856.    The false statements elicited from the adolescent plaintiffs were admitted into evidence in the trials and were critical to their convictions.

857.    As shown by the factual statements recited above regarding the illegal interrogations of the adolescent plaintiffs, and the false reports, statements and testimony of the various police officers and assistant district attorney defendants at pretrial hearings and/or at trial, those defendants, intentionally or in reckless disregard of the truth and of their constitutional obligations and of constitutional due process requirements, thereby perpetuated and reinforced those false reports, statements and confessions throughout the underlying criminal proceeding.

### H.    THE RESULTING WRONGFUL CONVICTIONS AND SENTENCES

858.    On April 18, 1990, a jury convicted adolescent plaintiffs McCray, Santana and Salaam, who were tried jointly on the 13-count indictment, of one count of Assault in the First Degree and Rape in the First Degree for the attack on the Jogger; Robbery in the First Degree and two counts of Assault in the Second Degree for the attack on John Loughlin; Assault in the Second Degree for the attack on David Lewis; and Riot in the First Degree.

859.    Since McCray, Santana and Salaam were each less than 16 years of age, the trial court set aside all of their convictions except for First Degree Robbery and Rape.

860.    On December 11, 1990, a jury convicted adolescent plaintiff Richardson, who was tried jointly on the 13-count indictment with Kharey Wise, of each count of the indictment.

861.    Because of Richardson's age, the trial court set aside all of his  convictions except for Attempted Murder in the Second Degree, First Degree Robbery, Rape and Sodomy.

862.    On December 11, 1990, a jury convicted adolescent plaintiff Wise of Assault in the First Degree; Sexual Abuse in the First Degree; and Riot in the First Degree.

863.    McCray's convictions were affirmed by the Appellate Division, People v. McCray, 198 A.D.2d 200, 604 N.Y.S.2d 93, and the Court of Appeals denied leave to appeal, 82

N.Y.2d 927, 610 N.Y.S.2d 179 (1994).

864.    Antron McCray served seven and one-half years in prison and was required to register as a sex offender following his release from prison.

865.    Richardson's convictions were affirmed by the Appellate Division, People v. Richardson, 204 A.D.2d 626, 612 N.Y.S.2d 627 (1st Dep't 1994).

866.    Kevin Richardson served seven years in prison and was required to register as a sex offender following his release from prison.

867.    Santana never perfected an appeal from his convictions..

868.    Raymond Santana, Jr., served seven years in prison and was required to register as a sex offender following his release from prison.

869.    Wise's convictions were affirmed by the Appellate Division, People v. Wise, 204 A.D.2d 133, 612 N.Y.S.2d 627 (1st Dep't 1994), and the Court of Appeals denied leave to appeal, 83 N.Y.2d 973 (1994).

870.    Kharey Wise served over thirteen years in prison and was required to register as a sex offender following his release from prison.

871.    Yusef Salaam's conviction and sentence were affirmed on appeal.  People v. Salaam, 187 A.D.2d 363; 590 N.Y.S.2d 195 (1st Dep't 1992), *appeal granted*, 81 N.Y.2d 846, 595 N.Y.S.2d 746 (1993), *order affirmed*, 83 N.Y.2d 51, 607 N.Y.S.2d 899 (1993).

872.    Yusef Salaam served approximately six years and eight months in prison and was required to register as a sex offender following his release from prison.

873.    Throughout their confinement in jail and subsequent to their release, the adolescent plaintiffs have consistently denied any involvement in the attack on the Jogger.

## I.     THE DISCLOSURES REGARDING MATIAS REYES

874.     In January 2002, Matias Reyes informed law enforcement officials that he alone committed the rape and other crimes against the Jogger.

875.     Subsequent DNA testing and a thorough review of the evidence by the District Attorney's Office, confirmed that Reyes alone perpetrated the crimes against the Jogger.

876.     On May 8, 2002, the District Attorney's Office was notified that Reyes's DNA matched the DNA taken from the Jogger's sock that had been found at the scene of the attack.

877.     In or about September 2002, the adolescent plaintiffs filed several motions to vacate the judgments of conviction pursuant to Criminal Procedure Law ("CPL") § 440.10(1)(g), on the grounds of newly discovered and suppressed evidence.

878.     Following an investigation of Reyes's admissions, including forensic testing, the District Attorney's Office conceded the veracity of the newly discovered evidence  that formed the grounds for the adolescent plaintiffs' motions.

879.     This newly discovered evidence consisted of accounts of events provided by Reyes, who stated that he alone attacked and raped the Jogger, and DNA test results which conclusively established that Reyes was the sole source of semen found on the sock at the crime scene and a cervical swab taken from the Jogger , as well as a pubic hair found on the same sock.

880.     The District Attorney's testing of previously untested semen found on the sock established that Reyes was the source of the DNA on the sock to a factor of one in 6,000,000,000 people.

881.     The evidence provided by Reyes included information about prior, similar attacks committed by him, including the assault and rape committed in Central Park on April 17th, just

two days before the attack on the Jogger.

882.   Reyes also described the Jogger's radio headset and keys, significant material evidence which was never revealed or mentioned to the adolescent plaintiffs or their counsel when those plaintiffs were defendants in the underlying criminal prosecutions.

883.   Further scientific test results undermined the probative value of other evidence introduced at the criminal trials.

884.   Following Reyes's revelations, the District Attorney's Office also conducted forensic testing of evidence allegedly linking adolescent plaintiff Kevin Richardson to the crimes against the Jogger .

885.   Three hairs found on Richardson were reexamined following FBI protocols for questioned hair samples.

886.   The microscopic analysis of the hairs, performed by the former Chief of the Hair and Fibers Unit of the FBI, disagreed with the expert opinion offered by the prosecution at the original trials, concluding that the hairs were not suitable for comparison and could not be used to link Richardson to the Jogger.

887.   At the time of the original trials, DNA evidence was extracted from semen deposited on the Jogger's sock, found near her at the crime scene, and from a cervical swab.

888.   The DNA evidence did not match any of the DNA samples taken from the adolescent plaintiffs (then-defendants).

889.   The testimony at the original trials established that the DNA from both the victim and the sock appeared to have come from the same source.

890.   That testimony also established that the DNA was not a mixture, but rather from a

106

single source.

891.    The attribution of the DNA to a single source indicated that only one individual had ejaculated.

892.    No physical or forensic evidence recovered at the scene or from the person or effects of the victim connected any of the adolescent plaintiffs to the attack on the Jogger.

893.    Reyes's statement that he, and he alone, was responsible for the assault on the Jogger, is corroborated by, consistent with, and explanatory of objective evidence in a number of important respects, including, *inter alia:*

a.    his DNA, and his alone, was found on the victim;

b.    the narrow physical trail left by Reyes when he dragged the Jogger from the location of the initial attack to the nearby woods clearly established that the Jogger was attacked by a single assailant;

c.    the manner in which the Jogger  was bound was consistent with other attacks perpetrated by Reyes;

d.    the manner in which the Jogger was struck around the eyes was consistent with other attacks perpetrated by Reyes;

e.    the Jogger had injuries on her face which were consistent with the ring that Reyes was wearing;

f.    he had described the Jogger's radio headset and keys, which were never mentioned in the earlier investigation; and

g.    all of Reyes's other victims, including the victim in Central Park on April 17th, were assaulted by a lone assailant, Matias Reyes.

107

894.     Corroboration of Reyes's account of his participation in the crime is found both in the pattern of his other sexual attacks and in a number of other specific facts.

895.     Reyes consistently targeted and stalked Caucasian women, or women who appeared to be Caucasian.

896.     All of his rapes or attempted rapes also involved robbery.

897.     All of Reyes's rapes or attempted rapes occurred and took in the same general area of the city.

898.     Reyes would characteristically tie and bind his victims in an unusual manner, which, combined with other aspects of the crime, clearly identified him as the perpetrator of the attack on the Jogger.

899.     He would characteristically severely beat his victims around the face and eyes in an attempt to blind them so that they would be unable to identify him.

900.     There is no evidence that, prior to April 19, 1989, Reyes knew or associated with any of the plaintiffs or any of the individuals known to have been in Central Park on the night of April 19, 1989.

901.     On December 19, 2002, Justice Charles J. Tejada of the Supreme Court, New York County, found that the new evidence offered by plaintiffs' CPL 440.10 motions was newly discovered within the meaning of the applicable statutes and case law.

902.     Justice Tejada further found the new evidence could not have been discovered by the adolescent plaintiffs (then-defendants) before the original criminal trials by the exercise of due diligence.

903.     The Court therefore granted the adolescent plaintiffs' motions to vacate the

108

judgments of convictions as to all of the plaintiffs.

**J.      THE DEFENDANTS' UNCONSTITUTIONAL SUPPRESSION AND CONCEALMENT OF EVIDENCE**

904.     As the specific facts alleged above show, the defendant police officers, detectives and district attorneys knew, or should have known, and, on information and belief, concealed from the adolescent plaintiffs and from their defense counsel in the criminal proceedings, and from the public as well that, at the time they had elicited false statements from the adolescent plaintiffs which implicated them in the rape and sexual assault on the Jogger in Central Park in April 1989, and during the time the adolescent plaintiffs were being prosecuted for that crime, a serial rapist – who habitually stalked white women in their 20's, who attacked them, who beat and raped them, who always robbed his victims and frequently stole Walkmans, who tied his victims in a fashion much like the Jogger, who beat and raped a woman in Central Park two days before the attack on the transverse a few hundred yards from where the Jogger was found, whose DNA was the only DNA recovered inside and alongside the victim, who had no connection with any of the plaintiffs or their alleged cohorts, and who committed all of his sex crimes alone -- was also at large.

905.     All of these facts were known, or should have been known, to the defendants at the time they were investigating the Jogger case.

906.     The defendants deliberately ignored and failed to disclose these facts, favoring instead their collective predetermined attributions of guilt and the speedy and the politically expedient accusation that it was the adolescent plaintiffs who had committed the attack on the Jogger.

907.    In addition to the defendants' obligations to have disclosed the Reyes-related information to the adolescent plaintiffs and their attorneys during the criminal prosecution, the defendants had the obligation to and should have caused the Reyes DNA to be compared with the Jogger DNA evidence.

908.    Failure to have done so violated obligations to act as neutral police and prosecutors, and violated the adolescent plaintiffs' constitutional rights to due process of law. Contrary to those obligation, and contributing to defendants' liability to the plaintiffs, defendant City of New York through its agencies New York County District Attorney's Office and New York City Police Department had a police and practice of failing to continue to investigate despite exculpatory evidence which came to light once they had settled on their intended suspect of a crime.

909.    The defendants, in concealing and not disclosing this evidence, not only put the public at great risk, but they also deprived the adolescent plaintiffs of due process and the opportunity to challenge the concocted theory of the case put forward by the District Attorney's Office and the police officers and detectives who testified at their criminal trials to secure the wrongful convictions of all the adolescent plaintiffs.

910.    As shown throughout this complaint, the accounts allegedly elicited from the adolescent plaintiffs were inaccurate and inconsistent, differing on significant details of the crime.

911.    In contrast, the account by Matias Reyes contained accurate specific details of the crimes against the Jogger.

912.    Reyes accurately described the crime scene in detail, as well as what the Jogger

110

was wearing.

913.    He also described using a heavy branch to attack her, a choice of weapon consistent with, and explanatory of, the forensic medical and crime scene evidence.

914.    Most persuasively, his account was corroborated by the fact that his modus operandi in the Jogger case matched the ones he had used in similar sexual attacks targeting and stalking other women during the same period of time.

915.    Moreover, although there was no DNA forensic evidence offered against the adolescent plaintiffs at trial as there was no match, Reyes's DNA matched the DNA found on one of the Jogger's socks found at the Central Park crime scene and the DNA on the cervical swab taken from the victim.

916.    In addition, mitochondrial DNA testing established that Reyes was also the source of the pubic hair found on the sock in Central Park and confirmed that no one else's DNA was present in the samples taken from the victim or at the crime scene.

917.    It is virtually self-evident that the confession of a self-admitted murderer and serial rapist, corroborated by physical evidence including scientific testing demonstrating that Reyes was the sole source of DNA evidence connected to the Central Park Jogger's rape to a factor of one to 6,000,000,000, would have resulted in an acquittal of the adolescent plaintiffs at their criminal trials.

918.    An honest appraisal of this evidence would have resulted in a dismissal of the indictment prior to any trial.

919.    Evidence which connected Reyes to the rapes and assaults on April 17, 1989 and April 19, 1989 was known to the defendant police officers, detectives and their supervisors who

111

were responsible for investigating and prosecuting the adolescent plaintiffs and was deliberately and purposefully withheld from those plaintiffs and their defense counsel, resulting in the malicious prosecution of the adolescent plaintiffs and their subsequent convictions.

920.     Such evidence was also known to persons in the New York County District Attorney's office, including persons aware of and/or involved in the prosecution of the adolescent plaintiffs — including, subject to discovery, the defendant assistant district attorneys named in this complaint.

921.     Following the arrests of the adolescent plaintiffs, information obtained by the defendants which was exculpatory or which was inconsistent with or contradictory of the defendants' theory of the case that the Jogger was attacked and assaulted by a gang of black and Hispanic youth, was not, pursuant to the policies and practices of the NYPD and the District Attorney's Office, recorded in official NYPD forms or, if recorded, was not disclosed to and was kept from the adolescent plaintiffs' attorneys during the prosecution of the underlying criminal cases.

922.     At no time from April 19, 1989 through April 18, 1990, when the first convictions were handed down by a jury, did the defendants, despite their knowledge of Matias Reyes and his method of operating, particularly after his arrest on August 5, 1989, ever reveal the existence of or any related information about Reyes to the adolescent plaintiffs, their counsel, or the Court.

923.     At no time subsequent to April 18, 1990, did the defendants reveal the existence of or any related information about Reyes to the adolescent plaintiffs or their counsel.

924.     The adolescent plaintiffs and their counsel first learned of Matias Reyes and the related significant information that he alone committed the crimes against the Jogger through

112

independent efforts and events during the year 2002.

925.    Despite the evidence demonstrating Reyes's guilt for the crimes against the Jogger, which corroborated and established the innocence of the adolescent plaintiffs, the City

926.    and individual NYPD defendants herein have continued to suppress the truth about what happened in Central Park on April 19, 1989, by, *inter alia*, establishing a special commission that ratified the wrongful conduct of these defendants.

927.    Similarly, despite the evidence demonstrating Reyes's guilt for the crimes against the Jogger, which corroborated and established the innocence of the adolescent plaintiffs, certain defendants, including but not limited to, defendant Fairstein, Sheehan and Arroyo have continued to publicly assert McCray, Richardson, Santana, Salaam and Wise participated in the attack upon the Jogger.

928.    If not in April 1989, then certainly by August 1989, the defendants knew or should have known their theory that the adolescent plaintiffs had committed the crimes against the Jogger  had no evidentiary support, particularly after DNA tests conclusively demonstrated that the adolescent plaintiffs were not responsible for the attack on her.

929.    The evidence as of August 1989, particularly after the arrest of Matias Reyes for his other crimes, would have led even the most neophyte investigator and should have led the police and ADA defendants in this action to conclude that — or at least to seriously question whether – it was more likely that a single assailant had raped and battered the Jogger.

930.    That evidence should have led those defendants to have become concerned that they had wrongfully and/or, at least, incorrectly charged and were wrongfully and incorrectly prosecuting the adolescent plaintiffs, which awareness should have caused them to reinvestigate

and reconsider the charges and continuing the prosecutions.

931.    Instead, the defendants disingenuously and slavishly stuck to the script and scenario they had created – that the adolescent plaintiffs were responsible for that crime.

932.    For example, Reyes was interviewed in the 20th Precinct on August 5, 1989, in part, by defendant Detective Michael Sheehan, who ignored the possibilities of matching DNA from Reyes to samples collected from the April 17th and April 19th attacks and claimed that there was no hint Reyes was connected to the Central Park case although Sheehan readily characterized Reyes as "one of the top five lunatics" he had ever talked to and "not a guy to have sex as part of a group of people."

933.    Certainly no later than August 1989, and probably well before, the defendants knew or should have known that the crimes committed against the Jogger and Reyes's other victims demonstrated many of the same characteristics, such as the manner in which the victim was tied and the manner in which the victim was battered in the eyes and head.

934.    Rather than question the integrity of their prosecution or admit its lack of integrity, the defendants, including those working in both the NYPD and the District Attorney's Office, suppressed the truth about Reyes, including, on information and belief, encouraging the victim of Reyes's crime on April 17, 1989, two days before the Jogger was attacked and raped, to drop the investigation about Reyes's involvement.

### K.    PLAINTIFFS WERE INJURED BY DEFENDANTS' UNCONSTITUTIONAL AND UNLAWFUL ACTS

935.    The defendants' illegal interrogation, arrest, deprivation of liberty, imprisonment, malicious prosecution, and wrongful conviction of the adolescent plaintiffs, without probable

114

cause and/or despite the dissipation of probable cause, with the attendant suppression of exonerating exculpatory evidence; the coercion, manufacture and intentional misrepresentation of knowingly false inculpatory evidence; and the deception of grand juries, judges, petit juries, and the New York courts concerning this evidence, constituted an unconstitutional seizure of the adolescent plaintiffs, and was effected without due process of law, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and proximately and directly caused the infants plaintiffs grievous permanent injury, including from approximately seven to thirteen years of imprisonment; the attendant loss of freedom, companionship and income; mental and physical pain, suffering, anguish, fear and humiliation; and defamation of character and reputation caused by their public branding as rapists and required registration as sex offenders.

936.   The conduct of the defendants in subsequently ratifying this wrongful conduct in 2003, proximately caused the adolescent plaintiffs further serious and permanent physical and emotional injury, pain and suffering, mental anguish, humiliation and embarrassment.

937.   Defendants' wrongful conduct, as described above, also caused serious and permanent damage to the intimate family relationships and family integrity of all plaintiffs — seriously damaging "the most essential and basic aspect of familial privacy," i.e., "the right of the family to remain together without the coercive interference of the awesome power of the State," a reciprocal right of both parent and children.

938.   That serious and permanent damage to the intimate family relationships and family integrity of all plaintiffs included , without limitation,  emotional and physical injury, pain and suffering, mental anguish, humiliation, embarrassment, loss of consortium and substantial expenses.

115

939.    Without limiting the foregoing, defendants' wrongful conduct against plaintiffs was motivated and implemented, at least in part, by racial and ethnic discrimination.

## L.    LIABILITY OF THE INDIVIDUAL DEFENDANTS

940.    All of the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers and prosecutors, supervisors, and employees, acting within the scope of their employment.

941.    The individual defendants, in committing the aforesaid conspiracies, acts, and omissions to act, were deliberately indifferent to, and in reckless disregard of, plaintiffs' rights and thereby caused actual injuries to plaintiffs.

942.    The defendants, in committing the aforesaid acts, were acting as joint tortfeasors.

943.    As a direct and proximate result of the conspiracies, acts and omissions to act described above, the individual defendants subjected the adolescent plaintiffs to loss of liberty and other deprivations of constitutional rights, including, but not limited to, deprivation of the rights to substantive due process and familial association, pain and suffering, severe and permanent emotional injuries, mental anguish as well as other psychological injuries, extreme emotional distress, shame, humiliation, indignity, damage to reputation, loss of earnings, and obliged them to pay for legal fees and expenses.

944.    As a direct and proximate result of the conspiracies, acts and omissions to act described above, the individual defendants subjected the families of the adolescent plaintiffs to deprivation of their constitutional rights to substantive due process and familial association, pain and suffering, severe and permanent emotional injuries, mental anguish as well as other psychological injuries, extreme emotional distress, shame, humiliation, indignity, damage to

116

reputation, loss of earnings, and legal fees and expenses.

### M.    MUNICIPAL LIABILITY

### 1.    For the Actions of the Police Defendants Pursuant to Policies and Practices in Existence at the Time of the Jogger Case

945.   All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the NYPD.

946.   Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the police defendants' wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

947.   The actions of the police defendants resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegations without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons.

948.   The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the NYPD and the City, including, without limitation Colangelo and defendants Rosenthal and Selvaggi, the supervising defendants named in this complaint, and their predecessors in interest, for a substantial period of time.

949.   Despite knowledge of such unlawful *de facto* policies and practices, these

supervisory and policy-making officers and officials of the NYPD and the City and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs and practices upon the constitutional rights of persons in the City of New York.

950.    The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiffs' injuries herein include, *inter alia*, the following:

a.    The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

b.    The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

c.    The failure to properly supervise, train, instruct, and discipline police officers with regard to adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

d.    The failure to properly supervise, train, instruct and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

e.    The failure to properly supervise, train, instruct, and discipline police

118

officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, particularly juveniles, and to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions;

       f.     The tacit acceptance of and encouragement of a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers' misconduct or by telling false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements designed to cover for and/or falsely exonerate accused police officers;

       g.     Encouraging and/or failing to discipline officers for "testilying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt, including, but not limited to, such perceptions and/or determinations influenced by racial prejudice and/or ethnic bias.

951.    The aforementioned City policies, practices and customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the broad-sweeping police misconduct detailed herein.  Distinct sets of police officers subjected each of the adolescent plaintiffs to coercive interrogations and deprived them of exculpatory evidence.  These officers, collectively numbering over a dozen, represent the corrupt policies and practices of various investigative units of the NYPD, including but not limited to the Manhattan North Task Force, Anti-Crime, Sex Crimes, Night Watch, and Homicide.

952.    The City policies, practices and customs in existence at the time of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are

119

further evidenced, *inter alia*, by the following:

        a.     The Report of the Commission to Investigate Allegations of Police

Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission

Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [New York City Police] Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment.
>
> For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

Mollen Commission Report, p. 2-3.

        b.     Accordingly, in 1990, the Office of Special Prosecutor, which investigated

charges of police corruption, was abolished.

        c.     The Mollen Commission concluded that police perjury and falsification of

official records

> is probably the most common form of police corruption facing the criminal justice system . . . .
>
> . . . Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions