of searches and arrests and never questioned them.

> . . . What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful.  As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."

Mollen Commission Report, p. 36, 40-41.

d.      Since at least 1984, defendant City and the NYPD have been on notice that their training of police officers has been inadequate and that police officers joining the force, including, on information and belief, individual defendant police officers herein, were disproportionately involved in misconduct and abuse.  See, e.g., Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

e.      The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations.

f.      Prior to July 1993, the CCRB, which is responsible for receiving and investigating complaints of police misconduct made by citizens against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity.

g.      During the 1980s and early 1990s, in and about the time frame of the Central Park Jogger case, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases.

121

h.      On average, in 1985-1988, the CCRB conducted complete investigations of only 27 percent of the complaints received, closed 45 percent of the total cases without completing full investigations, and substantiated (i.e., found the subject employee guilty of the alleged act of misconduct) only 1.9 percent of the total complaints received.

i.      In 1989, the CCRB conducted complete investigations of only 29 percent of the 3,515 complaints received, closed 41 percent of the total cases without completing full investigations, and substantiated only 2.6 percent of the total complaints received.

j.      On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received.

k.      The CCRB has also failed to recommend disciplinary action in the vast majority of its cases.

l.      On average, in 1985-1988, the CCRB recommended disciplinary action in only 6.7 percent of its disposed of cases.

m.      In 1989, the CCRB recommended specific disciplinary action to the Police Commissioner in only 3.4 percent of its disposed of cases (i.e., 110 recommendations of discipline out of the 3262 disposed of complaints).

n.      On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases.

o.      Moreover, most of the complaints that are substantiated by the CCRB do not result in any kind of meaningful discipline.  For instance, as of November 14, 1991, of the 81

officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90-day suspension.

        p.      Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107 complaints were substantiated annually by the CCRB in 1988-1992.

        q.      The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

        r.      More than $82 million was paid in damages to victims of police misconduct in 1352 cases between 1992 and 1995.

        s.      In the vast majority of police misconduct cases that result in verdicts or substantial settlements for the victims, defendant City imposes no discipline, either before or after resolution in court, almost never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

        t.      In none of the approximately 8,000 complaints reviewed by the CCRB in 1987 and 1988 did any police officer provide evidence in support of a complainant.

        u.      New York County District Attorney Robert Morgenthau has been quoted as acknowledging that in the NYPD there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully.

        v.      In 1985, former Police Commissioner Benjamin Ward, testifying before a

State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD.

       w.    Former New York City Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

953.    Upon information and belief, police officers receive no training regarding how to conduct interrogations in a manner that will prevent false statements or confessions, particularly with respect to interrogations of juveniles, and, in fact, are indoctrinated in the use of isolation, false promises, threats, and intimidation.

954.    Upon information and belief, defendant City and its agency, the NYPD, failed to effectively screen, hire, train, supervise and discipline their police officers, including the defendant police officers herein, for racial bias, lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing the defendant police officers to be in a position to elicit false confessions from the adolescent plaintiffs and to fabricate evidence sufficient to secure convictions in violation of federal and state constitutional rights, and/or to permit these actions to take place with those officers' knowledge or consent.

955.    On information and belief, the defendant police officers herein were the subject of prior civilian and departmental complaints of misconduct that gave notice to, or should have given notice to defendant City and its agency, the NYPD, that the defendant police officers herein were likely to engage in conduct that would violate the civil and constitutional rights of the public, such as the conduct complained of by the plaintiffs herein.

956.    As a result of the foregoing conscious policies, practices, customs and/or usages,

124

defendant City and its agency, the NYPD, permitted and allowed the employment and retention of individuals as police officers whose individual circumstances place the public or segments thereof at substantial risk of being the victims of racially motivated behavior and of preconceived determinations of guilt.

957.   The plaintiffs' injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

958.   Defendant City knew or should have known that the acts alleged herein would deprive plaintiffs of their rights, in violation of the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 1, 6,  11, and 12 of the Constitution of the State of New York, including, without limitation, the adolescent plaintiffs' freedom from deprivation of liberty without due process of law.

959.   The defendant City is directly liable and responsible for the acts of the defendant officers  because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the NYPD, and to require compliance with the constitutions and laws of the State of New York and the United States.

960.   The defendant City is also directly liable and responsible for the acts of the individual police defendants for state law claims under the doctrine of respondeat superior.

**2.      For the Actions of Police Commissioner Kelly
In Condoning and Ratifying the Wrongful
Conduct of the Police Officer Defendants Herein**

961.    In addition to their efforts to suppress the truth at the time of the prosecution, the

defendants have continued to actively conspire to propound the belief that the adolescent

plaintiffs were and are in fact guilty of the crimes they were charged with, notwithstanding their

exoneration by the court, the DNA evidence linking Reyes to the crimes against the Jogger, and

Reyes's confession that he alone perpetrated this crime, and that the defendants engaged in no

misconduct in the course of their investigation and prosecution of the plaintiffs.

962.    Overt acts in furtherance of this conspiracy include, *inter alia*, continuing public

statements by certain defendants that the adolescent plaintiffs committed all the crimes they were

charged with and the empaneling of a commission which was charged with reviewing the

conduct of the police in this case and which fully exonerated the police and the NYPD from any

wrong doing, thereby ratifying the bad faith, dishonest and concealment of the truth about who

raped and assaulted the Jogger on April 19, 1989.

963.    Following the revelation of Reyes's involvement in the rape and assault of the

Jogger, and notwithstanding the exoneration of the adolescent plaintiffs by the court, defendant

City of New York, acting through Police Commissioner Raymond Kelly, as well as other

individual defendants including, *inter alia*, Fairstein, Sheehan and McKenna, have continued to

publicly propound the belief that the adolescent plaintiffs were and are in fact guilty of the crimes

for which they were charged, knowing full well the impact these statements would have on the

five exonerated plaintiffs and their family members.

964.    The defendants have also continuously and actively conspired to falsely maintain

126

that they engaged in no misconduct in the course of their investigation and prosecution of the adolescent plaintiffs and to conceal information to the contrary.

965.    In particular, the defendant City of New York, acting through defendant Kelly, empaneled a commission which was purportedly charged with reviewing the conduct of the police in the Central Park Jogger case, but which went well beyond its stated purpose to further malign the plaintiffs.

966.    On November 1, 2002, defendant Police Commissioner Raymond Kelly announced the establishment of an investigatory panel (hereinafter referred to as the "Armstrong Commission") consisting of Michael Armstrong, a former prosecutor now in private practice, Stephen L. Hammerman, the former Deputy Commissioner of the NYPD for Legal Matters, and Jules Martin, a former high ranking chief in the NYPD, to review the events of April 19, 1989 and thereafter to determine, *inter alia*, whether police supervisors and officers acted properly or improperly.

967.    Based on their investigation, this panel of so-called experts issued a report on or about January 27, 2003, that concluded that there was no misconduct on the part of the New York City Police Department in the arrests and interrogations of the adolescent plaintiffs, either in the manner in which they interrogated the plaintiffs or in their failure to connect Matias Reyes to the rape and sexual assault of the Jogger prior to his admissions.

968.    In addition, although not officially charged with the task, the Armstrong Commission went further and concluded that, notwithstanding the Reyes confession and the evidence that corroborated his guilt as the sole assailant of the Jogger, the adolescent plaintiffs were nevertheless guilty of the sexual assault on the Jogger on April 19, 1989.

969.     Defendant Police Commissioner Kelly accepted the findings of this panel and by so doing has ratified the wrongful conduct perpetrated by the defendant police officers, detectives and their supervisors and has thereby participated in concealment of that wrongful conduct.

**3.     For the Actions of the Prosecutors Pursuant to the Polices and Practices in Existence at the Time of the Jogger Case**

970.     All of the acts by the defendant prosecutors described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and under the supervisory authority of the New York County District Attorney's Office.

971.     Defendant City and the District Attorney's Office, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the defendant prosecutors' wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

972.     The actions of the defendant prosecutors resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of the City, which are implemented by prosecutors, to prosecute and continue to prosecute persons through fabricated and manipulated allegations without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons.

973.     The existence of such unlawful *de facto* policies and/or well-settled and widespread customs and practices has been known to supervisory and policy-making officers and officials of the District Attorney's Office and the City, including, without limitation, DA Morgenthau, defendant ADA Fairstein, and their predecessors in interest, for a substantial period

128

of time.

974.     Despite knowledge of such unlawful *de facto* policies and practices, these
supervisory and policy-making officials of the District Attorney's Office and the City and their
predecessors in interest did not take steps to terminate these policies and practices, did not
discipline individuals who engage in such practices, or otherwise properly train prosecutors with
regard to the constitutional and statutory limits on the exercise of their authority, and instead
sanctioned and ratified these policies, customs and practices through their deliberate indifference
to or reckless disregard of the effect of said policies, customs and practices upon the
constitutional rights of persons in the City of New York.

975.     The City's policies and practices in existence at the time of the conduct
complained of herein, which caused the plaintiffs' injuries herein include, *inter alia*, the
following:

a.     The failure to properly supervise, train, instruct, and discipline prosecutors
who participate with and advise police officers in using coercive interrogation techniques during
the course of an investigation;

b.     The failure to properly supervise, train, instruct, and discipline prosecutors
who conspire with police officers during the course of an investigation to prevent persons being
interviewed to have access to counsel and, with respect to interrogation of minors, to prevent
access to family members during such interviews; and

c.     The failure to properly supervise, train, instruct, and discipline prosecutors
with regard to proper investigatory techniques and adequate evidence of crimes and to discipline
those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes

in the absence of probable cause.

976.    The aforementioned City policies, practices and customs of failing to supervise, train, instruct and discipline prosecutors and encouraging their misconduct are evidenced by the broad-sweeping prosecutorial misconduct detailed herein.  Several different members of the District Attorney's Office directly subjected each of the adolescent plaintiffs to coercive interrogations and deprived them of exculpatory evidence.  These prosecutors represent the corrupt investigative policies and practices of the District Attorney's Office.

977.    The City policies, practices and customs in existence at the time of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are further evidenced, *inter alia*, by the Mollen Commission's conclusion that the same tolerance of perjury and falsifications that is exhibited among police officers is exhibited among prosecutors. The Commission specifically noted that "several former and current prosecutors acknowledged – 'off the record' – that perjury and falsifications are serious problems in law enforcement that, though not condoned, are ignored."  Mollen Commission Report, p. 42.

## 4.    For the Actions of the District Attorney

978.    All of the acts by the defendant prosecutors described in the preceding paragraphs were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/or cooperation of the highest ranking members of the New York County District Attorney Offices as well as District Attorney Robert Morgenthau ("D.A. Morgenthau").

979.    D.A. Morgenthau and his most senior management held regular meetings attended by Bureau Chiefs, including defendant Fairstein, to review facts relating to investigations, to authorize prosecutions and to discuss the status and progress of cases brought by that office,

especially high profile cases like the Central Park Jogger Case.

980.    At meetings concerning the Central Park Jogger Case, D.A. Morgenthau and his most senior management were briefed as to the status of the case and determinations were made to authorize the continuing prosecution of the adolescent plaintiffs herein.

981.    At these meetings, D.A. Morgenthau and his most senior management were made well aware that defendants Fairstein, Lederer, and Clements, were unconstitutionally and unlawfully prosecuting and continuing to prosecute the adolescent plaintiffs herein based on fabricated and manipulated allegations without adequate basis in fact and/or despite substantial exculpatory evidence known to assistant district attorneys and police officers and withheld from the adolescent plaintiffs herein.

982.    Nonetheless, D.A. Morgenthau, either directly or by designating his authority and responsibilities to others in a senior management or supervisory capacity, failed to adequately supervise defendants Fairstein, Lederer and Clements and allowed the prosecution of the adolescent plaintiffs to continue despite being informed of the inadequacy of the evidence, particularly the DNA evidence, and the obviously coerced videotaped "statements."

983.    Despite his knowledge of impropriety of the prosecution, D.A. Morgenthau did not terminate this prosecution, did not discipline prosecutors who engage in unconstitutional and unlawful practices, and did not properly train or supervise these prosecutors with regard to the constitutional and statutory limits on the exercise of their authority, and instead acquiesced and ratified the unconstitutional and unlawful practices in this case through his callous, reckless and/or deliberate indifference to the effect of said practices upon the constitutional rights of persons in the City of New York and the adolescent plaintiffs herein.

984.    Without limiting the foregoing, D.A. Morgenthau has specifically omitted to take the following steps to terminate the unconstitutional and unlawful practices:

        a.     Has failed to properly supervise, train, instruct, and discipline prosecutors who participate with and advise police officers in using coercive interrogation techniques during the course of an investigation;

        b.     Has failed to properly supervise, train, instruct, and discipline prosecutors who conspire with police officers during the course of an investigation to prevent persons being interviewed to have access to counsel and, with respect to interrogation of minors, to prevent access to family members during such interviews;

        c.     The failure to properly supervise, train, instruct, and discipline prosecutors with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause.

985.    The defendant City is directly liable and responsible for the acts of D.A. Morgenthau because of the repeated and knowing failure to properly supervise, train and discipline prosecutors and because of the repeated and knowing failure to enforce the professional and ethical obligations of prosecutors, and to require their compliance with the Constitutions and laws of the State of New York and the United States.

986.    The knowing and repeated failure of D.A. Morgenthau to properly supervise, train and discipline the prosecutors in his Office actually caused the injuries to plaintiffs alleged herein.

987.    Defendant City of New York knew or should have known that the acts and

failures to act of D.A. Morgenthau alleged herein would deprive plaintiffs of their rights, in

violation of the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United

States Constitution and Article 1, §§ 1, 6,  11, and 12 of the Constitution of the State of New

York, including, without limitation, the adolescent plaintiffs' freedom from deprivation of liberty

without due process of law.

### N.      LIABILITY OF POLICE DEPARTMENT SUPERVISORS

988.    All of the acts by the police defendants involved with the investigation and

prosecution of the adolescent plaintiffs were carried out with the actual or constructive

knowledge, consent, acquiescence, ratification and/or cooperation of the supervisory authority of

former Chief of Detectives Colangelo ("Chief Colangelo"), and defendants former Manhattan

Chief of Detectives Rosenthal ("Chief Rosenthal"), former Chief of Patrol Borough Manhattan

North Selvaggi ("Chief Rosenthal"), Deputy Inspector Powell, and Lieutenant Jack Doyle

(collectively the "Supervisory Police Defendants").

989.    These Supervisory Police Defendants were well aware that police officers,

including, without limitation, the individual detectives and sergeants involved in the Central Park

case, unconstitutionally and unlawfully prosecute and continue to prosecute persons through

fabricated and manipulated allegations without adequate basis in fact and/or despite substantial

exculpatory evidence known to police officers and withheld from accused persons.

990.    These Supervisory Police Defendants had not properly trained police officers with

regard to the constitutional and statutory limits on the exercise of their authority, and instead

acquiesced and ratified these unconstitutional and unlawful practices through their callous,

reckless and/or deliberate indifference to the effect of said practices upon the constitutional rights

133

of persons in the City of New York.

991.   Without limiting the foregoing, the Supervisory Police Defendants, acting jointly and severally, did the following:

a.   They failed to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

b.   They failed to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

c.   They failed to properly supervise, train and instruct police officers with regard to adequate evidence of crimes and has failed to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

d.   They failed to properly supervise, train, instruct and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

e.   They failed to properly supervise, train and instruct police officers with regard to proper methods of conducting interviews of witnesses and/or accused persons, particularly infant persons, and they failed to discipline police officers who use improper methods to coerce and/or elicit false statements and/or confessions;

f.   They encouraged a code of silence wherein police officers regularly cover up police misconduct by refusing to report other officers misconduct or by telling false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements

134

designed to cover for and/or falsely exonerate the accused police officers;

g.      They encouraged and/or failed to discipline officers for "testilying" and/or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt, including, but not limited to, such perceptions and/or determinations influenced by racial prejudice and/or ethnic bias.

992.    The Supervisory Police Defendants are rendered directly liable and responsible for the acts of the defendant detectives and sergeants because the Supervisory Police Defendants repeatedly and knowingly failed to properly supervise, train and discipline the police officers under their command and because the Supervisory Police Defendants repeatedly and knowingly failed to enforce the rules and regulations of the Police Department, and to require compliance with the Constitutions and laws of the State of New York and the United States.

993.    The knowing and repeated failure of the Supervisory Police Defendants to properly supervise, train and discipline officers under their command actually caused the injuries to plaintiffs alleged herein.

994.    The Supervisory Police Defendants knew or should have known that the acts alleged herein would deprive plaintiffs of their rights, in violation of the Fourth, Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 1, 6, 11, and 12 of the Constitution of the State of New York, including, without limitation, the adolescent plaintiffs' freedom from deprivation of liberty without due process of law.

### FIRST CLAIM
**(Violation of Rights Secured by 42 U.S.C. § 1981 and the
Thirteenth Amendment to the United States Constitution)**

995.    The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1

135

through 994 as if fully set forth herein.

996.    Defendants, acting under color of state law, subjected the adolescent plaintiffs, who are variously African-American and Hispanic-American, to the foregoing conspiracies, unlawful acts and omissions, including but not limited to malicious prosecutions, wrongful convictions and conspiracies to fabricate evidence and cover up the truth, because of their race and ethnicity.

997.    Each of the adolescent plaintiffs on whom those defendants focused their investigation and all the other adolescents accused of involvement in the rape of the Central Park jogger and contemporaneous crimes in Central Park on the night of April 19, 1989 were black or Hispanic.

998.    Defendants Rosenthal, Selvaggi, Rosario, Gonzalez, Hildebrandt, Sheehan, Hartigan, McKenna, Arroyo, Jaffer, O'Sullivan, Taglioni, Kelly, Nugent, Francisci, McCabe, Powell, Doyle, Fairstein, Lederer and Clements, and other investigative, supervisory, and command personnel, including, but not limited to, former Chief of Detectives Colangelo and Sergeant Fiston, were overwhelmingly white.

999.    Throughout the investigation and prosecution in the underlying criminal cases, those defendants portrayed the adolescents accused of these crimes as a pack of wild animals, and encouraged this as the public perception of the adolescent plaintiffs and other black and Hispanic youth accused of these crimes.

1000.    Defendants' conspiracies, unlawful acts and omissions denied plaintiffs equal rights under the law, including, but not limited to, plaintiffs' right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white and non-

Hispanic-American citizens and additionally were, instead, subjected to punishments, pains, and penalties unlike those imposed upon white and non-Hispanic-American citizens.

1001.   Defendants acted intentionally and purposefully,  without lawful justification and with a reckless disregard for the natural and probable consequences of their acts,  causing specific and serious bodily, mental and emotional harm, economic injury, pain and suffering in violation of the plaintiffs' Constitutional rights as guaranteed under 42 U.S.C. § 1981 and the Thirteenth and Fourteenth Amendments to the United States Constitution.

## SECOND CLAIM
**(Violation of Rights Secured by 42 U.S.C. § 1983 and the
First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution)**

1002.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 1001 as if fully set forth herein.

1003.   Defendants, under color of state law, subjected plaintiffs to the foregoing conspiracies, unlawful acts, and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiffs of rights, privileges and immunities secured by the Constitution and laws, including, but not limited to, those rights, privileges and immunities secured by the , Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights, privileges, and immunities:

a.      The adolescent plaintiffs were denied their constitutional rights not to be deprived of their  liberty without due process of law;

b.      The adolescent plaintiffs were denied their constitutional rights to a fair trial;

137

c.      The plaintiffs were denied their constitutional rights to the assistance of

counsel;

d.      Plaintiffs were denied their constitutional rights to equal protection of the

laws;

e.      The adolescent plaintiffs were denied their constitutional rights to due

process because they were stigmatized and subjected to infringements as "sex offenders;"

f.      Plaintiffs were deprived of their constitutional substantive and procedural

due process rights;

g.      Plaintiffs were deprived of their constitutional right to familial association.

1004.   To the extent any of these constitutional deprivations require a showing of

specific intent and/or motive, the individual defendants acted intentionally, maliciously, with

racially discriminatory motives and/or with a reckless disregard for the natural and probable

consequences of their acts.

1005.   Defendants' conspiracies, unlawful acts, and omissions, conducted without lawful

justification, caused specific and serious bodily, mental and emotional harm, economic injury,

pain and suffering in violation of the plaintiffs' Constitutional rights as guaranteed under 42

U.S.C. §1983, and the , Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United

States Constitution.

## THIRD CLAIM
**(Violation of Rights Secured by 42 U.S.C. §§ 1983 and 1985(3)
and the Fourteenth Amendment to the United States Constitution)**

1006.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1

through 1005 as if fully set forth herein.

1007.   Defendants Rosenthal, Selvaggi, Rosario, Gonzalez, Hildebrandt, Sheehan, Hartigan, McKenna, Arroyo, Jaffer, O'Sullivan, Taglioni, Kelly, Nugent, Francisci, McCabe, Powell, Doyle, Fairstein, Lederer and Clements, and former defendants Colangelo and Fiston, with other investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, and otherwise conspired among and between themselves to deprive the plaintiffs of their Constitutional rights, and did deprive plaintiffs of said rights, including, but not limited to, the adolescent plaintiffs' rights to be free from  malicious prosecutions and unjustified convictions; and plaintiffs'  rights to access to the Courts, as protected by the  Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Sec. 1983.

1008.   Because said actions were done with the knowledge and purpose of depriving plaintiffs, who are African-American and Hispanic-American, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial animus toward the plaintiffs, they also deprived plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1985(3).

1009.   In furtherance of these conspiracies, the defendants and others named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above, including, but not limited to, the malicious prosecution of plaintiffs and their co-defendants; the manufacture by the methods articulated above of knowingly false inculpatory evidence against plaintiffs and their co-defendants; the suppression of exonerating exculpatory evidence, including, but not limited to, the Matias Reyes evidence, closure of the active investigation of the April 17th rape in Central Park without resolution; failure to investigate the Matias Reyes

evidence, either at the time it was received or after it became known that there was no scientific

or physical evidence that linked the plaintiffs to these crimes, the physical abuse and

psychological coercion of the plaintiffs and their co-defendants in an attempt to compel them to

make false inculpatory statements against themselves and their co-defendants; the making of

known misstatements and the presentation of this knowingly false and incomplete evidence to

prosecutors, judges, juries, and appellate courts; and the filing of false and incomplete statements

and reports.

1010.   Said conspirac(ies) and overt acts were continuing in nature, and caused plaintiffs'

constitutional violations and injuries, pain, suffering, fear, mental anguish, incarceration,

conviction, imprisonment, humiliation, defamation of character and reputation, and loss of

freedom, companionship, and income, as set forth more fully above.

## FOURTH CLAIM
### (Loss of Familial Association Claim for Plaintiffs under 42 U.S.C. § 1983)

1011.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1

through 1010 as if fully set forth herein.

1012.   Prior to the time of plaintiff Antron McCray's incarceration, he and his mother,

Linda McCray, lived and associated together as a family and shared companionship, guidance

and support arising from the familial relationship.

1013.   Prior to the time of plaintiff Kevin Richardson's incarceration, he, his mother,

Grace Cuffee, and his sister, Angela Cuffee, lived together as a family.  In addition, Kevin, Grace

Cuffee, Angela Cuffee, and his sisters, Connie Richardson, Valerie Cuffee, and Crystal Cuffee,

associated together as a family and shared companionship, guidance and support arising from the

140

familial relationship.

1014.   Prior to the time of plaintiff Raymond Santana, Jr.'s incarceration, he and his father, Raymond Santana, Sr., lived together as a family.  In addition, Raymond, his father, and his sister, Joann Santana, associated together as a family and shared companionship, guidance and support arising from the familial relationship.

1015.   Prior to the time of plaintiff Kharey Wise's incarceration, he and his mother, Doloris Wise, and his brothers, Daniel Wise, Michael Wise, and Victor Wise, lived and associated together as a family and shared companionship, guidance and support arising from the familial relationship.

1016.   Prior to the time of the incarceration of plaintiff Yusef Salaam, he, his mother, Sharonne Salaam, and his siblings, Aisha Salaam and Shareef Salaam, lived and associated together as a family and shared companionship, guidance, and support arising from the familial relationship.

1017.   By reason of the foregoing conduct of the defendants, jointly and severally, acting under color of state law and within the scope of their employment, plaintiffs Linda McCray, Grace Cuffee, Connie Richardson, Valerie Cuffee, Crystal Cuffee, Angela Cuffee, Raymond Santana, Sr., Joann Santana, Doloris Wise, Daniel Wise, Michael Wise, Victor Wise, Norman Wise, Sharonne Salaam, Aisha Salaam, and Shareef Salaam were and continue to be deprived of the companionship, guidance, support, daily intimacy and services of plaintiffs Antron McCray, Kevin Richardson, Raymond Santana, Jr., Kharey Wise, and Yusef Salaam, respectively, which are guaranteed under the Fifth and Fourteenth Amendment of the United States Constitution, including the plaintiffs' liberty interest in preserving the integrity and stability of the family

141

relationship from intervention by the state without due process of law.

1018.   The foregoing acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiffs and violated their rights as guaranteed by the United States Constitution as well as their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

## FIFTH CLAIM
### (42 U.S.C. § 1983 *Monell* Claim Against the City of New York for the Actions and Omissions of the Police Officer Defendants and the Police Department)

1019.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 1018 as if fully set forth herein.

1020.   The City of New York, through its Police Department and Police Commissioners, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

> a.   a policy, practice and custom of suppressing, destroying or otherwise secreting from criminal defendants exculpatory or exonerating evidence; and

> b.   a policy, practice and custom of failing to properly train or supervise officers in the proper techniques of investigating serious crimes, particularly where juveniles were involved; and

> c.   a policy, practice and custom of using coercion, isolation, intimidation, manipulation, deceit, false promises, sleep deprivation, and other unlawful and improper methods to secure false confessions, particularly in matters in which juveniles were involved; and

> d.   a policy, practice and custom of failing to properly discipline officers who

142

violate the United States Constitution or law, or otherwise transgress the rights of criminal suspects during their investigations; and

       e.     a policy, practice and custom of immediate public vilification of persons accused of "high-profile" crimes with concomitant refusal to consider evidence inconsistent with that portrayal.

1021.   These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of the plaintiffs' Constitutional violations and injuries, as set forth above.

1022.   These interrelated policies, practices and customs, separately and/or together, were the direct and proximate cause of injury and damage to plaintiffs and violated their rights as guaranteed by the United States Constitution, as well as their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

1023.   The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police and prosecutor misconduct like that alleged herein.

1024.   The existence of these interrelated policies, practices and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized by individuals with policymaking authority in the Police Department.

1025.   Defendant Kelly, as Police Commissioner for the City of New York, is, by operation of state law and as a matter of fact, the final decision-maker for New York with regard to the investigative, arrest, custodial, and administrative acts, omissions, and decisions which he made or participated in, as alleged above.

1026.   On January 27, 2003, the three-person panel appointed by Commissioner Kelly to investigate whether any misconduct occurred by members of the New York City Police Department concerning the events of April 19, 1989, the Armstrong Commission,  issued a report containing its findings.  Those findings exonerated members of the New York City Police Department of any wrongdoing, and, moreover, continued to assert that the plaintiffs herein were guilty of the sexual assault on The Jogger.  Those findings were accepted by defendant Commissioner Kelly.  In so doing, defendant Kelly ratified and condoned the wrongdoing that took place.

1027.   As a member of the Police Department with policymaking authority, Kelly's ratification of said police misconduct is sufficient to infer a policy or custom of ratifying misconduct in the Police Department.

1028.   Defendant Kelly's adoption of the Armstrong Report constitutes the last actionable act of a continuous course of misconduct alleged herein, including, but not limited to, the Police Department's intentional fabrication of evidence and perjury starting with plaintiffs' arrests, extending through their prosecutions, incarcerations and post-conviction court proceedings, and culminating with Kelly's adoption of the Armstrong Report.

1029.   These acts by defendant Kelly directly and proximately caused the constitutional violations and injury to the plaintiffs, and are directly chargeable to the defendant City of New York because of Commissioner Kelly's status as final decision-maker for the City with respect to matters involving the New York City Police Department.

## SIXTH CLAIM

**(42 U.S.C. § 1983 *Monell* Claim Against the City of New York for the Actions and Omissions of the Defendant Prosecutors and the District Attorney's Office)**

1030.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 1029 as if fully set forth herein.

1031.   The City of New York, through the New York County District Attorney's Office and its District Attorneys, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

a.   The failure to properly supervise, train, instruct, and discipline prosecutors who participate with and advise police officers in using coercive interrogation techniques during the course of an investigation; and

b.   The failure to properly supervise, train, instruct, and discipline prosecutors who conspire with police officers during the course of an investigation to prevent persons being interviewed from having access to counsel and, with respect to interrogation of minors, to prevent access to family members during such interviews; and

c.   The failure to properly supervise, train, instruct, and discipline prosecutors with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause.

1032.   These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of the plaintiffs' Constitutional violations and injuries, as set forth above.

1033.   These interrelated policies, practices and customs, separately and/or together,

145

were the direct and proximate cause of injury and damage to plaintiffs and violated their rights as guaranteed by the United States Constitution, as well as their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

1034.   The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police and prosecutor misconduct like that alleged herein.

1035.   The existence of these interrelated policies, practices and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized and not terminated by individuals from the New York County District Attorney's Office with municipal policymaking authority .

1036.   All of the acts by the defendant prosecutors described in the preceding paragraphs were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/or cooperation of the highest-ranking members of the New York County District Attorney's Office, including, but not limited to, DA Morgenthau.

1037.   Morgenthau, as New York County District Attorney, is, by operation of state law and as a matter of fact, the final decision-maker for New York with regard to the investigative, arrest, custodial, prosecutorial and administrative acts, omissions, and decisions which he made or participated in, as alleged above.

1038.   As a member of the District Attorney's Office with municipal policymaking authority, Morgenthau's ratification of said prosecutor misconduct is sufficient to infer a policy or custom of ratifying prosecutor misconduct by the City.

1039.   These acts and omissions by Morgenthau directly and proximately caused the

146

constitutional violations and injury to the plaintiffs, and are directly chargeable to the defendant City of New York because of DA Morgenthau's status as final decision-maker for the City with respect to matters involving the New York County District Attorney's Office.

## SEVENTH CLAIM
### (Violation of Rights Under State Law)

1040.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 1039 as if fully set forth herein.

1041.   By the actions described above, each and all of the defendants, jointly and severally, have committed the following wrongful acts against the plaintiff, which are tortious under the laws of the State of New York:

      a.     malicious prosecution;

      b.     intentional infliction of emotional distress upon the plaintiffs, in that the defendants intended to and did cause the plaintiffs severe emotional distress through a continuous course of misconduct culminating in the Armstrong Report, and the defendants' acts were outrageous in the extreme and utterly unacceptable in a civilized society;

      c.     violation of rights otherwise guaranteed to the plaintiff under the laws and Constitution of the State of New York.

1042.   The foregoing acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiffs and violated their statutory and common law rights as guaranteed them by the laws and Constitution of the State of New York.

## EIGHTH CLAIM
### (*Respondeat Superior* Against the City of New York)

1043.   The plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 1042 as if fully set forth herein.

1044.   The individual defendants, and other individuals who joined with them in their wrongful conduct, were, at all times relevant to this Count, employees and agents of either the City of New York or the New York County District Attorney's Office.  Each of those defendants and persons was acting within the scope of his or her employment, and their acts and omissions, as alleged  above, are therefore directly chargeable to the City of New York under the state law doctrine of *respondeat superior.*

WHEREFORE, the plaintiffs demand the following relief jointly and severally against all of the defendants, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City:

a.   Compensatory and punitive damages awards, each in the separate amounts of $50,000,000, or such greater amounts as may be set by a jury for plaintiffs Antron McCray and Linda McCray;

b.   Compensatory and punitive damages awards, each in the separate amounts of $50,000,000, or such greater amounts as may be set by a jury for plaintiffs Kevin Richardson, Grace Cuffee, Connie Richardson, Valerie Cuffee, Crystal Cuffee and Angela Cuffee;

c.   Compensatory and punitive damages awards, each in the separate amounts of

148

$50,000,000, or such greater amounts as may be set by a jury for plaintiffs Raymond Santana, Jr., Raymond Santana, Sr. and Joann Santana;

d.      Compensatory and punitive damages awards, each in the separate amounts of $50,000,000, or such greater amounts as may be set by a jury for plaintiffs Kharey Wise, Doloris Wise, Daniel Wise, Michael Wise, Victor Wise, and Norman Wise;

e.      Compensatory and punitive damages awards, each in the separate amounts of $50,000,000, or such greater amounts as may be set by a jury for plaintiffs Yusef Salaam, Sharonne Salaam, Aisha Salaam and Shareef Salaam;

f.      A court order, pursuant to 42 U.S.C. §1988, that the plaintiffs are entitled to the costs involved in maintaining this action and attorneys' fees;

g.      Such other and further relief as this court may deem just and proper.

## DEMAND FOR A JURY TRIAL

A jury trial is hereby demanded on each and every one of the claims as pled herein.

Dated: April 18, 2008
      New York, New York

Myron Beldock (MB-4076)
Karen Dippold (KD-2966)
Sofia Yakren (SY-4874)
Beldock Levine & Hoffman LLP
99 Park Avenue - Suite 1600
New York, New York 10016
*Attorneys for the Salaam Plaintiffs*

Jonathan C. Moore (JM-6902)
Sofia Yakren (SY-4874)
Beldock Levine & Hoffman LLP
99 Park Avenue - Suite 1600
New York, New York 10016

Michael W. Warren, Esq. (MW-1187)
Evelyn W. Warren, Esq. (EW-5223)
Michael W. Warren, P.C.
580 Washington Avenue
Brooklyn, New York 11238

Roger S. Wareham, Esq. (RW-4751)
394 Putnam Avenue
Brooklyn, New York 11206

Lennox Hinds, Esq. (LH-8196)
Stevens Hinds & White
Juliette Chinaud (JC-3046)
Aaron B. Frishberg (AF-6139)
116 West 111th Street
New York, New York  10026
*Attorneys for the Wise Plaintiffs*

*Attorneys for the Richardson, McCray,*
*and Santana Plaintiffs*

150