```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                         Docket #03cv9685
MCRAY, RICHARDSON, SANTANA,         :
WISE AND SALAAM LITIGATION
                                    :   New York, New York
                                        July 12, 2011
------------------------------------ :


                       PROCEEDINGS BEFORE
               MAGISTRATE JUDGE RONALD L. ELLIS,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiffs       BELDOCK LEVINE & HOFFMAN
  McRay, Richardson,     BY:  MYRON BELDOCK, ESQ.
 Santana, and Salaam:         KAREN DIPPOLD, ESQ.
                         99 Park Avenue, Suite 1600
                         New York, New York 10016
                         (212) 490-0400


For the Plaintiffs       ROGER WAREHAM, ESQ.
  McRay, Richardson      MICHAEL W. WARREN, ESQ.
  and Santana:           EVELYN WARREN, ESQ.


For the Plaintiff Wise:  FISHER & BYRIALSEN, PLLC
                         BY:  JANE BYRIALSEN, ESQ.
                         291 Broadway, Suite 709
                         New York, New York 10007
```

<u>APPEARANCES CONTINUED:</u>


For the Defendants:     NEW YORK CITY LAW DEPARTMENT
                         CORPORATION COUNSEL
                        BY:  ELIZABETH DAITZ, ESQ.
                             PHILIP DEPAUL, ESQ.
                             GENEVIEVE NELSON, ESQ.
                             ANDREW MYERBERG, ESQ.
                             ELIZABETH DULHAM, ESQ.
                             RICHARD BAILEY, ESQ.
                         100 Church Street
                         New York, New York 10007

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                                                    4

 2              THE CLERK:  In the matter of McRay, Richardson,

 3   Santana, Wise & Salaam Litigation versus the City of New York.

 4   Will all counsel, please identify yourselves for the record.

 5              MR. MYRON BELDOCK:   Myron Beldock for the Salaam

 6   plaintiffs along with Karen Dippold from Beldock, Levine &

 7   Hoffman.

 8              MS. JANE FISHER BYRIALSEN:   Good morning, Your

 9   Honor, Jane Fisher Byrialsen on behalf of the Wise plaintiffs.

10              MR. ROGER WAREHAM:   Also on behalf of McCray,

11   Santana and Richardson plaintiffs and also Michael Warren and

12   --

13              MS. EVELYN WARREN:   And Evelyn Warren for the for

14   the McCray, Santana and Richardson plaintiffs.

15              HONORABLE JUDGE RONALD L. ELLIS (THE COURT):   Good

16   morning.

17              MS. WARREN:   Good morning.

18              MS. ELIZABETH DAITZ:  Good morning, Your Honor,

19   Elizabeth Daitz for defendants.

20              MR. PHILIP DePAUL:   Good morning, Your Honor,

21   Philip DePaul for defendants.

22              MS. GENEVIEVE NELSON:   Genevieve Nelson for

23   defendants.  Good morning.

24              MR. ANDREW MYERBERG:   Andrew Myerberg for the

25   defendants.  Good morning, Your Honor.
```

5

1

2          MS. ELIZABETH DULHAM:   Good morning, Your Honor,

3  Elizabeth Dulham for defendants.

4          MR. RICHARD BAILEY:   Good morning, Your Honor,

5  Richard Bailey (indiscernible).

6          MR. BELDOCK:   May I start, Your Honor?

7          THE COURT:   You may.

8          MR. BELDOCK:   Because it's probably appropriate

9  that I start.  We have been discussing, as both sides I think

10  have advised your law clerk, the privilege log issues which I

11  may say is the logjam in the case right now.  And we have

12  agreed upon several things.

13          A briefing schedule whereby we would serve and file

14  our brief concerning the issues next Tuesday, that's the 19th.

15  The defendants would serve their reply by the 29th, and if

16  need be, their answering papers by the 29th.  We will reply by

17  August 5th.  So the scheduled is the 19th, the 29th and the

18  5th.

19          But in regard to that, we have a sub-schedule, so to

20  speak.  We have, that is the defendants have created, and it's

21  almost completed a log, an alternate log which is based upon

22  the privilege log but is broken down into categories.  For an

23  example, ABA notes and many subheadings.  The Armstrong-

24  related papers and many sub -- and some sub-headings which we

25  think will be helpful both for the parties to attack the

6

1

2   issues and the court, of course, to consider the issues.

3         There are over 8,000, I think over 8500 documents

4   marked "Privileged."  There were more, initially, and they cut

5   them down somewhat by almost a thousand based upon some

6   exchanges that we've had.  And now we're up to the point where

7   we're going to present our legal position to Your Honor.

8   We'll present the original log, the categorized log, and you

9   will make the rulings.

10        So I'm going to get this log to them before the

11  19th, hopefully by this Friday and if the court wants it in

12  advance, you can have it, but I think it's probably better

13  that you get it along with our submission next Tuesday.

14        THE COURT:   We can probably wait.

15        MR. BELDOCK:   So that's my report.  We've spent

16  considerable time doing this and I think we're -- we want to

17  be able to keep to that schedule, barring any emergencies.

18        THE COURT:   Okay.  Well, I always appreciate when

19  things are narrowed, and if for not other reason then it does

20  seem to that there is dialog going on between the plaintiffs

21  and the defendants, so that you could give me a more limited

22  group of documents to look at.

23        MR. BELDOCK:   Yes, well that's my objective is --

24  incidentally, I didn't go on to say we're going to then have

25  another subset of documents grouping them by witnesses we are

7

1

2    -- are seeking to depose and witnesses that have been held off

3    because of these problems.  And we're going like select all

4    the documents that relate, from the privilege log, that relate

5    to Linda Fairstein, Assistant District Attorney.

6              So there's some prioritizing we're going to try to

7    do, and also we're going to suggest a method to do just what

8    Your Honor suggested -- to select from the bulk of documents

9    in the different categories what we hope are exemplary

10   documents so that you can make a general ruling.

11             THE COURT:   Okay.  And --

12             MR. BELDOCK:   And it's not easy.  It may not be

13   possible, but we're doing the best we can to get to that

14   point.

15             THE COURT:   And how are things going generally, I

16   mean in terms of scheduling depositions?  I gather you've at

17   least talked about which ones need to be held up because of

18   documents and how are we doing it if you could --

19             MR. BELDOCK:   Your Honor, we have not moved as

20   swiftly as we intended or had hoped.  We've set an ambitious

21   schedule for depositions.  We've scheduled them; we've tried

22   to reschedule them.  There've been things that happen.  We're

23   really held up on this particular issue as to a major grouping

24   of witnesses.  Others are scheduled to go forward.  There'll

25   be several next week, I think, or the week after and there

1                                                          8

2   have been several that have been held.

3           But we need to resolve this problem in the hope that

4   it can be resolved in August so that we can take the bulk of

5   the remaining depositions in August and September.  I -- I --

6   you know, representing both sides here, speaking, I think

7   we've tried and we have these problems that have to be

8   resolved.

9           THE COURT:   Okay.  Well let me just indicate one

10  thing from my point of view.  And while my law clerks might

11  disagree with this in different years, I think it'd be cruel

12  and unusual to have a new law clerk come in and deal with

13  this.

14          So it's certainly my hope that we do resolve this

15  before this young man gets grey or leaves, whichever comes

16  first.

17          MS. WARREN:   When is that?

18          THE CLERK:   September 9th.

19          MS. WARREN:   Oh, boy.

20          MR. BELDOCK:   We'll fix everything by then.  Don't

21  worry about that.

22          THE COURT:   Okay.  So -- because obviously it's

23  hard to get up to speed and have a sense of this.  And I can't

24  have conversation with someone I know, and he shows them the

25  locker the documents are in and they say, can I quit now.

9

1

2          MR. BELDOCK:   Well, I understand the City -- pardon

3    me.  I may be wrong about this; they'll have to speak to it.

4    But I believe that in setting this briefing schedule on the

5    29th, when the City is going to answer, they're also going to

6    supply documents unredacted to begin the in-camera review.

7          And we will have set up the program, the proposal,

8    before that, so it's not going to be -- it's enough to wait

9    for us, our answer, our reply in August, if we have any reply.

10          THE COURT:   Ms. Daitz?

11          MS. DAITZ:   Your Honor, I don't think we disagree

12    with the bulk of what Mr. Beldock said.  I think our only

13    issue is we'd like to see the categories that the plaintiffs

14    are working on, the breakdown of the documents as they've

15    organized them, before we can take for certain that we would

16    be prepared to submit something in-camera from each and every

17    category on the date of our opposition.

18          But Mr. Beldock assured us that he would have that

19    to us to the extent possible even before they file their

20    moving papers, and we'll obviously confer with the plaintiffs

21    again at that point regarding those issues.

22          And the other thing that I think defendants don't

23    necessarily agree with is the idea of categorizing documents

24    by witness whose deposition plaintiffs necessarily intend to

25    take I think that it would potentially lead to either -- I'm

1

2  not sure if they're seeking a piecemeal ruling on a per-

3  witness basis, but I don't think that the overall issues

4  really could lend themselves being broken down by witness as

5  opposed by the category of documents irrespective of who they

6  are about.

7          But I think we're open to further discussion again

8  with plaintiffs about that issue, both before and after they

9  file their moving papers.  And if it turns out that we don't

10  agree with that approach, we'll make it known in our

11  opposition on the date that we're scheduled to file it.

12          THE COURT:  The only thing I would remind all

13  counsel about is that it's not a perfect world.  And I know

14  that everybody has their litigation strategy about how they

15  want to do something.  But ultimately, we'll do the best with

16  what we can and in whatever divisions that we can work with,

17  whether it's the, you know, trying to divide documents by

18  deposition or by person or whatever.

19          If you have -- if there were a hundred documents

20  that you thought you wanted for a witness and you had 90 of

21  them, I'd say, well you do that deposition and not hold up for

22  the other 10.  But that's sort of a general comment.  I mean

23  obviously there can be exceptions to that.  Sometimes the one

24  document is more important than all the other 99.  Okay.

25          MR. WARREN:  Your Honor, just on this issue before

1

2  you move to the other, because I think this was the only

3  reason I was invited here by both parties as a representative

4  of Danny (phonetic) I just -- once I see what plaintiffs'

5  papers are and they may wish to put them along the same

6  briefing schedule papers as well.

7            THE COURT:   I'll have to explain to my interns

8  later what Danny is.  All right.  Anything else on that?  It

9  sounds like you're getting along on that.

10           MS. DIPPOLD:   Well, I believe there is a letter to

11  the court about expert disclosure and modification of the

12  original confidentiality stipulation that was filed back in

13  October of 2008.

14           THE COURT:   Yes.

15           MS. DIPPOLD:   And we are in basic agreement with

16  the idea that experts should be able to have these documents

17  in their offices.  And indeed, when the original stipulation

18  was negotiated, we negotiated with Jennifer Rawson from the

19  corporation counsel's office who is now no longer there.

20           And the idea we had was that experts were likely to

21  be not in New York City -- to be in other parts of the

22  country, and that it would be very difficult for them to come

23  to the corporation counsel office or our offices to look at

24  the confidential documents.

25           The one problem I'm having with the corporation

12

1

2   counsel's proposal to modify the stipulation has to do with an

3   order that Judge Batts entered on May the 5th of 2010.  There

4   was an application by Ms. Rawson to disclose the confidential

5   documents to a number of other city agencies:  The police

6   department, the controller's office, the mayor's office.

7          We opposed that and it was done in writing and Judge

8   Batts entered an order that provides in its final paragraph

9   that the New York City Law Department may not disclose

10  confidential information to other city agencies or their

11  staff.

12         So I am contemplating a situation, as I often

13  encountered in civil rights actions, in which the city uses an

14  expert from the police academy or some other city agency in

15  their case.  And it's our position that with respect to those

16  experts, if they are employed by a city agency, the

17  confidential documents that they use should be left in the

18  offices of corporation counsel, and they should use them in

19  the office of corporation counsel so that there's not the

20  concern that we had before, that some of these documents will

21  be shown to individuals who might disclose them.  That was our

22  concern about this.

23         Otherwise, we're in agreement that an expert who's

24  not employed by the city should be able to use these documents

25  in their offices as long as they abide by the terms of the

1    stipulation.

2

3         THE COURT:   So that's a narrowing and if you

4    disagree on that, then I just have to decide that issue.

5         MS. DAITZ:   Yes, Your Honor, and we do disagree on

6    that, in part because the language that we've requested in our

7    letter application of yesterday specifically says that the

8    documents, the confidential information, must otherwise be

9    maintained and protected in strict compliance with the

10   requirements of the applicable stipulation.

11        And we see no basis for plaintiffs' assumption that

12   an employee of the city would be any less trustworthy and

13   capable of abiding by the terms of the stipulation than an

14   outside expert to the extent that we do have the opportunity

15   or the necessity to use a city employee as a consulting or

16   expert witness in this case.

17        I think that those folks, when they've read the

18   stipulation, and signed Exhibit A -- as all on party and

19   expert witnesses and parties must do -- will be plainly

20   capable of abiding by the terms of the stipulation, even if

21   the documents are in their office to facilitate --

22        THE COURT:   Okay.  But you agree that at least on

23   its face that would be covered by Judge Batts's order.

24        MS. DAITZ:   Well, I think Judge Batts's order, I

25   mean, there was a lot of discussion about (indiscernible) at

                                                                14

1

2    the time and there were written submissions, and it didn't at

3    all accommodate expert or consulting or testifying expert

4    witnesses.  What the order contemplated, and to give the court

5    a little bit of background, the order was entered in

6    connection with the negotiation of the second stipulation of

7    protective order for plaintiffs' confidential information.

8           Judge Batts's ruling, however, was broad, to impart

9    the language to all of the stipulations that had been executed

10   to date and going forward.  And I think that the issue there,

11   as defendants presented it, was in order to ever contemplate

12   settlement of the case, certain litigation decisions, that we

13   had a necessity to confer with the client and the client

14   agencies as a whole in order to facilitate the litigation.

15          Judge Batts definitely rejected that viewpoint, but

16   that was done without any mention or consideration of

17   individuals acting as expert witnesses.  It was on an agency-

18   wide basis, unlimited to particular individuals who may need

19   to access the information.  So I think it just wasn't

20   contemplated at that time by Judge Batts's order.

21          THE COURT:   That may be so.  On the other hand was

22   whether or not technically he'll be covered by the order as

23   it's -- it may not have considered it, but it also doesn't

24   distinguish any particular person in the agency either.

25          MS. DAITZ:   It doesn't, Your Honor.

15

1

2          THE COURT:   Okay.  So, maybe if asked to modify it,

3    she would just say, well okay, experts are different, but that

4    wasn't presented to her.

5          MS. DAITZ:   It wasn't, Your Honor.

6          THE COURT:   Okay.  And what kinds of in-house

7    experts would we be talking about?

8          MS. DAITZ:   Well, it's something that plaintiffs

9    raised, Your Honor.  We haven't gotten to expert discovery yet

10   and, you know, in an interest of moving litigation along in

11   part why we await a ruling on the work product privilege, this

12   is one issue that we wanted to, you know, tie up as soon as

13   possible so the parties could move forward, knowing what the

14   exact parameters of the stipulation were.

15          And it was plaintiffs that raised the possibility of

16   the city using N.Y.P.D. or other city agencies as expert

17   witnesses.

18          THE COURT:   Okay.  So what you're telling me is you

19   don't know whether there'll be any of those in-house experts.

20          MS. DAITZ:   It's a possibility, Your Honor.  I

21   mean, I don't know that we could say at this point.

22          THE COURT:   Okay.  Well, this is not something that

23   would come up, like, on a five hour's notice, would it?  If

24   you're going to use any in-house experts the plaintiffs would

25   know about it, I would know about it, and we --

                                                                    16

1

2          MS. DAITZ:   Well, Your Honor -- I'm sorry.

3          THE COURT:   Since, if I understand you correctly,

4   there is no presently identified in-house expert that's a

5   problem at this point.

6          MS. DAITZ:   Well, Your Honor, this would apply to

7   consulting experts as well as testifying experts, and I don't

8   believe that parties are obligated under the federal rules to

9   disclose their use or the identity of consulting experts,

10  unless and until they become testifying experts.

11         So I don't know that this is a circumstance where we

12  would necessarily be obligated to disclose to plaintiffs or

13  certainly the court, you know, upon an order -- but in the

14  regular course -- who are consulting experts who are aware

15  they were employed.

16         THE COURT:   Okay.  And so --

17         MS. DIPPOLD:   Your Honor, if I might clarify, this

18  particular order does in fact relate to the stipulation and

19  order that was entered on October 28th, 2008.  And the written

20  exchange did not occur in the context of talking about the

21  separate stipulation confidentiality order that was entered

22  with respect to the plaintiffs' documents.

23         And just to make certain that our position is clear,

24  what we have seen in other cases is that the police department

25  will often use, for example, someone from the police academy

1

2   to talk about training issues or about how interrogations are

3   conducted or this sort of material.  Or they might use someone

4   from the medical examiner's office.  And there has been a lot

5   of hostility expressed in this case so we are concerned about

6   documents.

7           Thus far, the confidentiality stipulations have

8   worked very well.  None of the documents have seemed to have

9   gone out into the press and nothing that's harmful to either

10  side has been published, and we want to keep it that way, so

11  that's our concern.

12          THE COURT:   Well, actually my thought processes on

13  this are a little different in the sense that on a typical

14  situation where the parties have experts there is no

15  restriction on what the experts get to see.  There's no --

16  there's not this big concern about confidentiality.

17          And when there is confidentiality, what you're

18  really concerned about is that you can track who gets to see

19  what so that if there are any problems, you know who it is.

20          It seems to me that regardless of what the nature of

21  any expert is, at some point we've got to keep track of who

22  gets to see the documents.  I have the City's letter.  I don't

23  know whether the plaintiffs want to put in a letter about

24  their concerns, other than what they've stated here.

25          I would like to think about it just a wee bit what

1
2   the particular ramifications are and limitations, particularly

3   in the defendants' use of experts.

4        MS. DIPPOLD:   If I could just clarify, we're not

5   looking to prevent the City from having these sorts of

6   experts.  We just would prefer that these experts look at

7   confidential documents in the offices of corporation counsel.

8   That's really all we're asking.

9        MS. DAITZ:   Your Honor, I just want to emphasize,

10  you know, to supplement defendants' application that we are

11  talking about individuals, not about sharing the document with

12  the agency.

13       And that under the stipulation and protective order,

14  indeed under both stipulation and protective orders, any

15  individual who has access to the information must execute the

16  accompanying Exhibit A attesting to the fact that they have

17  read and understood the terms of the stipulation and that they

18  agree to review, maintain, and keep the documents, and keep

19  the information they've gained in the strictest of confidence

20  in accordance with the stipulation.

21       So the stipulation has a built-in way of keeping

22  track of exactly who has access to the information.

23       THE COURT:   The reason, as I understand it, that

24  you want to -- you want to be able to not be hampered by the

25  earlier stipulation is because it's very inefficient to use

1

2  experts and I think you both mentioned it -- experts are not

3  necessarily local.  And getting them here, not only time but

4  there's expense involved in doing it.  I'm not so sure those

5  considerations necessarily comply if you're talking about in-

6  house experts.

7        MS. DAITZ:   Your Honor, part of the issue is that -

8  - well, first of all, I think to the extent any party were to

9  retain a consulting or testifying expert within New York City,

10 there would be less of a concern about the in-office, you

11 know, the expense of the in-office review provision.  And that

12 goes for city employees as well as potentially some

13 plaintiffs' experts who reside and work, you know, within

14 blocks of their offices potentially.

15        The other issue with respect to time and expense,

16 Your Honor, is that even with respect to city employees to

17 allow them to have the ability to review these documents and,

18 you know, do the work that they're expected to do as an

19 expert, for them to be able to do it in their own time, at

20 their own place, within their own office is definitely an

21 issue, even for city employees.

22        I mean, there's definitely difficult to, you know,

23 in the broadest terms, expect someone to come to our office to

24 do the work that they're retained to do as an expert,

25 particularly where their own, you know, files and computers

```
 1                                                      20
 2   and the types of things experts would use in preparation of an
 3   expert report, or a preparation of a -- the work as a
 4   consultant that is inefficient to do it in the parties'
 5   offices.  And I think that same concern extends to any experts
 6   who's within the confines of New York City.
 7             THE COURT:   And what kind of confidential -- you're
 8   concerned that the documents get out into -- I mean, what
 9   kinds of documents are we talking about?
10             MS. DIPPOLD:   Well, the confidential documents run
11   the gamut, from our client's very personal medical records to
12   rap sheets, to the confessions, to videotapes, to all sorts of
13   investigations conducted by the officers who worked on the
14   Armstrong Commission who investigated the original case.
15             There are -- the assortment of documents is really
16   vast and some of it is very personal.  There are things like,
17   did someone ever received welfare, did they ever receive
18   public assistance, did they ever lose a job.  I mean, there
19   are employment records in there.  There are all kinds of
20   things.
21             And how much of the burden would it be for someone
22   who's employed by the police department to walk from one
23   police plaza to the corporation counsel's office to look at
24   these documents if they need to do that?
25             And one would think that the police department will
```

1

2  have an awful lot of these documents in their offices anyway.

3  So it just -- if we -- if we're talking about an independent

4  expert who's here in New York City, fine.  They can take the,

5  you know, they can have the documents in their office.  But

6  when you start defining, let's say they have someone from one

7  police plaza.

8          The stipulation refers to an expert and their staff

9  having access to these documents.  How are we going to define

10  staff in that kind of circumstance?  How far will the person

11  at the police department allow these documents to go?  That

12  was the original battle that resulted in this order from Judge

13  Batts.

14          MS. DAITZ:   Your Honor, I just have to address a

15  few things that Ms. Dippold raised.  The first issue being

16  that I contest to the fact that the city has been incredibly

17  careful with what documents are turned over to our client

18  agencies in light of Judge Batts's ruling.

19          So to say that the police department has these

20  documents in their offices already is absolutely to the extent

21  it concerns plaintiffs' information and information that was

22  produced to us from sources other than the N.Y.P.D. is

23  completely inaccurate.

24          I think the second point is that to the -- there's

25  not -- the personal information, the confidential information,

22

1

2    in this case is not solely about the plaintiffs.  Defendants

3    have also produced the individual officer's personnel files,

4    training materials, things that are normally potentially

5    covered by the law enforcement privilege, the official

6    information privilege.  I mean, things that the City equally

7    expects the confidentiality to be maintained by the

8    plaintiffs.

9         And I think we have an inherent faith in plaintiffs'

10   ability to abide by the stipulation and protective order and

11   to have their consulting and expert witnesses read it and

12   execute it and abide by it.

13        And I just see no difference with respect to

14   employees of city agencies that should be treated any

15   differently in that type of exemption.

16        THE COURT:  Well, one thing that Ms. Dippold

17   mentioned is this, and this, I mean, if you hire experts and

18   associated, they're used to being experts.  Their staff is

19   pretty well defined, we know who they are, they're probably

20   used to dealing with information and they're trained on

21   confidential documents.

22        If you talk about staff and you're dealing with a

23   city agency, I'm not sure the same kinds of experience in

24   terms of handling confidential information exists and the

25   point she made is that, well, who is this staff that's covered

                                                                    23

1

2    by the stipulation if we deal with a city agency?

3             MS. DAITZ:   Your Honor, if I may --

4             THE COURT:   I mean, if you get somebody in the

5    police department, for example, what if your expert is going

6    to be Captain So-and-So?  Who gets to see it?

7             MS. DAITZ:   Well, Your Honor, if you're dealing

8    with an individual at a city agency who is of sufficient

9    knowledge and expertise about a particular topic at issue in

10   this litigation, then more likely than not, that person does

11   not have a staff around them.

12            If someone were to, you know, even make photocopies

13   in this case, everyone is signing the exhibit.  Everyone is

14   getting a copy of the stipulation.  I mean, there's no

15   question that we're extremely careful in talking to our

16   parties, non-party fact witnesses, everyone who we've come

17   into contact with during the course of this litigation about

18   the confidentiality.

19            And I do think that there is an expectation with

20   people that are higher than your average patrolman or, you

21   know, correction officer or, you know, person walking the

22   beat, that they certainly do have an understanding and

23   appreciation for the nature of confidential information,

24   particularly with respect to this case.

25            And even at the law department our staff signed

1                                                          24

2   Exhibit A to the stipulation when they have any access to any

3   information in this case as all.  So I think -- and the fact

4   that there has been no breach when city agencies, such as the

5   law department and our staff, have had access to this

6   information, it's indicative of the fact that we don't have

7   any reason to believe there would be a breach if our

8   consultant or testifying expert were to have access to the

9   information in their offices.

10          And I think the same could be true regardless of

11  whether you're talking about the in-office review provision or

12  the out-of-office review provision.  I mean, I think anyone

13  you retain as an expert, you have to have somewhat of inherent

14  faith in their ability to abide by a confidentiality order in

15  a case as high-profile as this one.  And I don't think

16  anything about their employment with the City of New York

17  makes them less capable to do so.

18          THE COURT:  Well, I agree with you in one sense.  I

19  think just having these discussions and assuming that you'll

20  convey these discussions to your experts, has a positive

21  impact on the question of whether or not they will be

22  trustworthy.

23          My -- with respect to the specific question, I take

24  it that you're saying that we're not necessarily dealing with

25  somebody who has a staff as an outside expert might have.

```
 1                                                        25
 2           MS. DAITZ:   I don't anticipate that at all, Your
 3   Honor.
 4           THE COURT:   And my other area of inquiry is this,
 5   and since I'm sure you two are -- both sides are very converse
 6   in this -- assuming that there was a breach, what kinds of
 7   retribution could I or Judge Batts say?
 8           MS. DAITZ:   Your Honor, I don't think the
 9   stipulation is specific with respect to the consequences of
10   the breach.  But I believe early on in Your Honor's role in
11   the litigation you made it quite clear to all parties that the
12   consequences before this court would be severe, both for the
13   attorneys, if the attorneys were responsible for a breach, or
14   if there was a witness who a breach could be traced back to.
15           And I believe -- and I -- safe to say on behalf of
16   all parties, that we took that admonishment very seriously and
17   that we take the confidentiality order very seriously.
18           THE COURT:   You do understand, of course, that that
19   probably means from my point of view is that were I to trace
20   the breach to a particular side, then it's the attorney's
21   responsibility.  You're ultimately responsible for anybody who
22   gets to see the information, that is, whatever conversations
23   you have with them, whatever you can convey to them about the
24   serious nature of any particular breach, I assume that you
25   have those conversations with the people that you allow to
```

1

2  have access to this information.

3        I agree with the general proposition that experts

4  work better when they have access to information.  I think

5  anyone who has been in the legal profession understands that

6  it's a lot easier to deal with documents and other information

7  if you have it on hand.

8        And so I think on balance, I think that I would like

9  to review the -- what the experts will have to sign.  But it

10  does not appear that even in-house experts pose a significant

11  enough problem to begin with, such that they -- we should have

12  a rule prohibiting them from seeing the information.

13        I've heard the plaintiff concern, although I think

14  ultimately the question that's balancing the efficiency of the

15  litigation versus the potential that some expert, however

16  they're designated or determined, will breach the

17  confidentiality agreement, leads me to the conclusion that

18  experts should have access outside of the area in which the

19  documents reside.

20        Again, I would like to read exactly what it is that

21  they sign and determine whether or not it requires any

22  particular supplementation.  But --

23        MS. DAITZ:   Your Honor, we can have clean copies of

24  both stipulations handed to the court this afternoon.

25        THE COURT:   So we don't have to find them in our

1    file?

2            MS. DAITZ:    Sure.

3            THE COURT:    We have these things indexed -- okay.

4            MS. BYRIALSEN:    Judge, I have an application that's

5    much simpler but related to this issue that the parties have

6    consented, that I'm going on maternity leave starting July

7    27th and have sought the consent of my co-counsels to get an

8    exception to the in-office review only, and take the

9    confidential documents with me, either on CDs or on a USB port

10   while I'm away so I'm seeing the court's permission for that.

11           THE COURT:    And you adversaries have agreed to

12   this?

13           MS. BYRIALSEN:    Yes, very nicely.

14           MS. DAITZ:    Your Honor, we have consented with

15   certain conditions that Ms. Byrialsen has agreed to that we

16   would like to just put on the record as well.

17           THE COURT:    Go ahead.

18           MS. DAITZ:    And that would be that either disks or

19   USB ports be carried on in carry-on luggage to reduce the risk

20   that they would be lost.  Not that I would wish that on Ms.

21   Byrialsen or anyone else.

22           That the confidential information will be in a

23   secure location where no one else can access them but they

24   will be in a locked safe in Ms. Byrialsen home office.

```
 1                                                      28
 2          That the documents won't be accessed at times where
 3  they could be visible to or accessible by anyone else and that
 4  Ms. Byrialsen will be accessing the information only for the
 5  purposes of her own review and not preparing witnesses or
 6  clients by telephone, Skype or any other electronic means from
 7  abroad.
 8          THE COURT:   And that the disk be only accessible by
 9  256 byte inscription where she has a biometric code to access
10  the documents?
11          MS. DAITZ:   Your Honor, if I knew what that was,
12  I'm sure I would request it.  But I think it does go to show
13  how seriously the parties take their confidential information.
14          THE COURT:   Okay.  Well, again, I have no doubt
15  that the lawyers understand that if anything gets out and it
16  gets traced to them, it won't be a very pleasant situation.
17  But I -- consistent with what I've just said about the
18  difficulty of dealing with documents when you don't have
19  access to them I think -- is this a stipulation that you have
20  that's been signed by the parties?
21          MS. BYRIALSEN:   Yes, I've signed it but we haven't
22  created a written stipulation for this issue.  We have
23  discussed it by e-mail and I've made the initial application
24  to them by letter.
25          THE COURT:   Okay.
```

```
 1                                                     29
 2            MS. BYRIALSEN:   So if I could just see a court
 3   order saying that I have that, you know, an exception from
 4   July 27th to October 4th while I'm away.
 5            THE COURT:   Okay.  So we have to do an order or
 6   you've drafted an order?
 7            MS. BYRIALSEN:   No, I can send one.  I thought we
 8   could do it orally but if you wanted a written one I could
 9   certainly submit one.
10            THE COURT:   Okay.  Michael, do we have the same
11   recording capabilities here?
12            THE CLERK:   Yes, Your Honor.
13            THE COURT:   Okay.  So this has all been recorded?
14            THE CLERK:   Yes.
15            THE COURT:   Okay.  Then your application is
16   granted.
17            MS. BYRIALSEN:   Thank you, Your Honor.
18            THE COURT:   And I assume the ultimate security,
19   this gets erased after five seconds.  No, in any case -- all
20   right.  We're trying to do this so that the parties are no
21   unnecessarily hampered.  And as I said, you can anticipate
22   that the application for experts, which I do think technically
23   if they were in-house people, would be covered by Judge
24   Batts's order, although I think pretty clearly would  not
25   contemplate it and I'm assuming that we're not going to have
```

1                                                                    30

2   somebody who's designate as an expert.

3              So, and if it turned out that such a thing happened,

4   I wouldn't want to have to explain it to one of the judges.

5   So but again, I do want review what the experts have to sign

6   and then I'll issue an order.  Yes, Ms. Dippold?

7              MS. DIPPOLD:   We'd also like to provide you with a

8   copy of Judge Batts's order.

9              THE COURT:   Okay.

10             MS. DAITZ:   Your Honor, to the extent plaintiffs

11  might need 30(b)(6) witnesses, I'm not sure if they're making

12  a distinction between 30(b)(6) witnesses and consulting or

13  testifying experts.  I'm just assuming that they would all be

14  treated the same under the stipulation.

15             THE COURT:   But even whether or not the 30(b)(6)

16  witnesses can see documents?

17             MS. DIPPOLD:   I'm not sure what she means by that.

18             MS. DAITZ:   Under federal rule 30(b)(6) if

19  plaintiffs were to request than an individual testify on

20  behalf of the City on a particular issue in the litigation,

21  but they would be treated as a consulting, or in that case, a

22  testifying expert for the purposes of the stipulation.

23             THE COURT:   You mean whether or not somebody who's

24  a 30(b)(6) gets to see the confidential documents?

25             MS. DAITZ:   Outside of the office in the same way

1

2 that other experts would.  I think that's what Ms. Dippold was

3 referencing when she said often times in civil rights cases

4 that the city would designate an in-house person to testify

5 about an issue such as training, or from the medical examiners

6 office, or something of that nature.  That would be a 30(b)(6)

7 witness, as I understand, as opposed to the corporation

8 counsel's office says, you know, you get a person as an

9 expert.

10          THE COURT:  Are you anticipating that 30(b)(6)s

11 would be looking at the confidential information?  Is that --

12          MS. DAITZ:  I think they would have to, to testify,

13 Your Honor.

14          THE COURT:  I guess that depends on what they're

15 testifying about.

16          MS. DIPPOLD:  I wasn't thinking in terms that the

17 30(b)(6) witness and I think we have to take into

18 consideration here that the bulk of documents in this case are

19 coming from the police department.

20          So if I notice a 30(b)(6) police officer from the

21 police academy about training issues, one would think that any

22 documents the corporation counsel has would have come from

23 them.  So I would think they would have access to the very

24 documents they need to testify in their own premises.

25          MS. DAITZ:  Well, the problem with that, Your

1
2  Honor, is that Judge Batts's decision is rather unclear on

3  that with respect to documents that the police department

4  produced originals to the corporation counsel's office for the

5  purposes of the litigation.  And then an order was entered

6  preventing the corporation counsel office from resharing that

7  information that was produced as confidential with the police

8  department.  So we do have somewhat of an odd situation here

9  with respect the confidential information.

10         THE COURT:  Well, I understand but if I'm

11  understanding the description, a 30(b)(6), the confidential

12  information they'd be looking for is confidential information

13  produced by the defendant, generally.

14         MS. DAITZ:  I would think so, Your Honor.

15         MS. DIPPOLD:  Yes.

16         THE COURT:  So --

17         MS. DAITZ:  But again, the order --

18         THE COURT:  So although technically there would be

19  a problem in the sense that it would violate the order, the

20  plaintiffs don't have an objection to it and the defendants

21  really don't have an objection to it.

22         MS. DAITZ:  That's right, Your Honor, as far as I

23  understand Ms. Dippold.

24         THE COURT:  Okay.  And so that's why when you said

25  30(b)(6) I wasn't sure why they would be looking at the

33

2  documents that the plaintiff was concerned about.

3          But if there are some documents that the defendant

4  designated as confidential, and the 30(b)(6)s seeking to be

5  prepared as a witness, and needs to look at those documents,

6  all you want to do is be able to look at those documents

7  outside, and they're your documents.

8          MS. DAITZ:    Yes, Your Honor.

9          THE COURT:    And you don't really have an objection

10  to that.

11          MS. DIPPOLD:    No, no, and as I understand it, the

12  witnesses have been prepared in their offices anyway.  So I

13  don't understand what the issue is.

14          THE COURT:    All right.  I don't know that this

15  presents a particularly serious issue and I assume that if you

16  -- I'll put it to you this way:  If any party wants to prepare

17  -- and I guess we're really only talking about the defendant -

18  - if the defendant wants to prepare a 30(b)(6) witness and

19  that requires the defendant to look at documents that the city

20  has designated, or any of the defendant designated, as

21  confidential, then they will be allowed to look at those

22  documents consistent with whatever security the city wants to

23  impose on it, including whether or not they may need to take

24  the documents outside of where they reside.

25          They're not technically speaking an expert but

1
2  obviously, to the extent that somebody's a 30(b)(6), they
3  really are a quasi expert in the sense that they're talking
4  about policies and procedures, and are speaking
5  authoritatively for the defendant.
6          So I don't know whether you want to have a specific
7  exemption for 30(b)(6) but you can anticipate that as long as
8  they are the defendants' documents that have been designated,
9  I don't have any problem with it.  Ms. Nelson?
10         MS. NELSON:   Just one clarification, Your Honor.  I
11 think you said where the expert resides and when we're
12 actually talking about outside of defendants' counsel's
13 office.  So I just wanted to clear that up for the record.
14         THE COURT:   Right.  And I'm assuming this only
15 becomes an issue if you want them to look at it outside of --
16 I guess is -- where are these documents now?
17         MS. NELSON:   In our office at the law department.
18         THE COURT:   All right.  Outside the law department,
19 but yes, that's what I meant.
20         MS. NELSON:   Thank you, Your Honor.
21         THE COURT:   If I misspoke.  So I don't know if you
22 want to have anything more specific than that.  And since the
23 plaintiff's concern, and I think either side's concern, is
24 that the documents they've designated as confidential are to
25 some extent give you more leeway on how you deal with your

```
 1                                                      35
 2  documents.

 3          But certainly a 30(b)(6) is a unique witness in that

 4  regard.  So I don't know if you require them to see them

 5  outside of the law office, the law department, but if you --

 6  if it becomes necessary, I assume that you'll only do it in a

 7  circumstance in which you will be able to convince me without

 8  a doubt that it was necessary to do it.

 9          MS. NELSON:  Yes, Your Honor.

10          THE COURT:  Anything else.

11          MS. DAITZ:  Not from defendants, Your Honor.

12          MS. BYRIALSEN:  I think we need an adjourn date.

13          THE COURT:  Yes, we do.  Adjourn date before my law

14  clerk leaves.

15          MS. BYRIALSEN:  We had spoken about September 9th

16  but since that's the day your law clerk, perhaps --

17          THE CLERK:  I'll be here on September 9th but it'll

18  be my last day.

19          THE COURT:  You're a glutton.  What day of the --

20  that's a --

21          THE CLERK:  That's a Friday.

22          THE COURT:  Can we do it on the 8th.

23          THE CLERK:  We have a trial that week.

24          THE COURT:  We have a trial that week?

25          THE CLERK:  But hopefully (inaudible).
```

```
 1                                                      36
 2             MR. BELDOCK:   We could do the 8th, Judge, as well.
 3             THE COURT:   If we're in trial we'll give the jurors
 4    a half hour off.  I don't like to plan anything for the last
 5    day of somebody's work tenure.  You never know what we might
 6    be doing on that last day.
 7             THE CLERK:   All right.  Judge, September 8th at
 8    10:00 a.m.
 9             THE COURT:   That ought to be appropriate.  You, Ms.
10    Daitz, you'll be sending me clean copies.  I don't doubt that
11    we could find them but I'm sure you can put your hands on them
12    quicker than we can.
13             MS. DAITZ:   Yes.
14             THE COURT:   And did you want to give me a copy of
15    Judge Batts's --
16             MS. DIPPOLD:   Yes, I can do that and I think, as a
17    matter of fact, I think I have copies of both stipulations
18    that have no writing on them at all.
19             MS. DAITZ:   Okay.  Can I just take a look at them?
20             MS. DIPPOLD:   Sure.
21             MR. BELDOCK:   We'll hand them up.
22             THE COURT:   You're just getting along so well.  Is
23    it the warm weather?
24             MS. DAITZ:   Thank you, Your Honor.
25             MR. BELDOCK:   Thank you, Your Honor.
```

                                                                37

1

2            THE COURT:   Okay.   Then we'll be adjourned.

3              (Whereupon the matter is adjourned to

4    September 8th, 2011 at 10:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                      38

2                    C E R T I F I C A T E

3

4        I, Carole Ludwig, certify that the foregoing transcript

5   of proceedings in the United States District Court,

6   Southern District of New York, McRay, Richardson, et al.

7   v., Docket #03cv9685 was prepared using mechanical

8   transcription equipment and is a true and accurate record

9   of the proceedings.

10

11

12

13

14  Signature_____

15                      CAROLE LUDWIG

16  Date:    July 13, 2011

17

18

19

20

21

22

23

24

25