```
                     UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                               :
                                          Docket #03cv9685

MCRAY, RICHARDSON, SANTANA,           :
WISE AND SALAAM LITIGATION
                                      :   New York, New York
                                          May 31, 2011
------------------------------------ :


                        PROCEEDINGS BEFORE
                MAGISTRATE JUDGE RONALD L. ELLIS,
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:


For the Plaintiffs         BELDOCK LEVINE & HOFFMAN
  McRay, Richardson,       BY:  MYRON BELDOCK, ESQ.
 Santana, and Salaam:           KAREN DIPPOLD, ESQ.
                                JONATHAN MOORE, ESQ.
                           99 Park Avenue, Suite 1600
                           New York, New York 10016
                           (212) 490-0400


For the Plaintiffs         ROGER WAREHAM, ESQ.
  McRay, Richardson        MICHAEL W. WARREN, ESQ.
  and Santana:


For the Plaintiff Wise:    FISHER & BYRIALSEN, PLLC
                           BY:  JANE BYRIALSEN, ESQ.
                           291 Broadway, Suite 709
                           New York, New York 10007
```

Transcription Service:  Carole Ludwig, *Transcription Services*
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

<u>APPEARANCES CONTINUED:</u>


For the Defendants:      NEW YORK CITY LAW DEPARTMENT
                          CORPORATION COUNSEL
                         BY:  ELIZABETH DAITZ, ESQ.
                              JESSICA COHEN, ESQ.
                              ANDREW MYERBERG, ESQ.
                              ELIZABETH DOLLIN, ESQ.
                          100 Church Street
                          New York, New York 10007

## INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
1                                                4

2              THE CLERK:  In the matter of McRay, Richardson,

3    Santana, Wise & Salaam Litigation.  Will all counsel, please

4    identify yourselves for the record.

5              MR. MYRON BELDOCK:   Myron Beldock for the Salaam

6    plaintiffs with Karen Dippold.

7              HONORABLE JUDGE RONALD L. ELLIS (THE COURT):   Good

8    morning.

9              MS. KAREN DIPPOLD:   Good morning.

10             MS. JANE BYRIALSEN:   Good morning, Your Honor, Jane

11   Fisher Byrialsen for the Wise plaintiffs.

12             MR. ROGER WAREHAM:   Roger Wareham, John Morefore

13   (phonetic), and Michael Warren for McCray, Santana and

14   Richardson.  He just stepped out.  He'll be right back.

15             MS. ELIZABETH DAITZ:  Good morning, Your Honor,

16   Elizabeth Daitz for defendants and we are awaiting our

17   colleague Genevieve Nelson should be here momentarily.

18             MR. ANDREW MYERBERG:   Andrew Myerberg for the

19   defendants.

20             MS. ELIZABETH DOLLIN:   Good morning, Your Honor,

21   Elizabeth Dollin for defendants.

22             MS. JESSICA COHEN:   Jessica Cohen for defendants.

23   Good morning, Your Honor.

24             THE COURT:  Good morning, everyone.  I'm just

25   reviewing my file and discovered that this is about our one
```

5

1

2    year anniversary and I noticed nobody brought a cape.  Also on

3    the more serious note, I'm fairly certain that the District

4    Judge had anticipated, by referring the case to me, that we

5    would actively monitor the discovery so that it would be done

6    in as expedited a fashion as could be.

7             And this is not to say that we have not done that,

8    although I'm always concerned that we don't let these things

9    drag on, in particular in a case that has an '03 date.  So --

10   and I understand one of the things on your agenda has to do

11   with the timing of discovery.  So this is not to discourage

12   you from that; just a gentle reminder that we are in this

13   together, and hopefully there won't be anything that unduly

14   protracts the completion of discovery.

15            I also want to note that this is the first date that

16   I have my summer students, and so I also want to remind you

17   that this will be -- this turns out to be their first

18   experience here, so this will be something memorable for them.

19   So I don't want to put any --

20            MR. BELDOCK:   So we should be on our best behavior,

21   right, Judge?

22            THE COURT:   I want you to understand that this will

23   be what you'll be remembered for because you can't make a good

24   first impression after this.

25            So that having been said, I do know that you have

```
 1                                                          6

 2   been at least meeting, conferring.  I understand from my law

 3   clerk that there are a couple of applications.

 4          MS. DAITZ:   Actually, Your Honor, we anticipated

 5   making two applications this morning, but we had an

 6   opportunity to speak with plaintiffs before the conference,

 7   and I believe we may have obviated the need for one and

 8   potentially at least postpone the second.

 9          But just to let the court know, we had anticipated

10   moving to compel contact information for nonparty witnesses.

11   The plaintiffs have agreed to provide that information to

12   defendants.  And defendants had anticipated moving to compel

13   the tax returns from certain of the familial plaintiffs who

14   are claiming lost wages.

15          Plaintiffs this morning offered to execute a 4506-T

16   form and the corresponding form from the State Department of

17   Taxation and Finance for whatever states are applicable, I'm

18   assuming, to allow defendants to obtain 1099s for the past 10

19   years.

20          So defendants are going to reserve the right to make

21   an application to the court to compel tax returns, if

22   necessary.  But in the first instance, we'll accept these

23   executed forms from plaintiffs, submit them to the IRS and to

24   the State, and see if the information that we receive in

25   response is sufficient.
```

```
 1                                            7

 2            THE COURT:   Okay.  Well, that almost seems as if

 3   the statement I made in the beginning had some retractive

 4   effect.  Mr. Beldock?

 5            MR. BELDOCK:   Mr. Beldock.  I think I should go

 6   next.  We've agreed subject, of course, to the court's

 7   approval to ask for an extended cutoff date for discovery.  I

 8   had mentioned September 27th in the dates in company.  I see

 9   that's a Tuesday.  More logically, I think it should be the

10   Friday, September 30th.

11            MS. DAITZ:   I think that was the Jewish holiday.  I

12   think that was what --

13            MR. BELDOCK:   But as for the date itself, the end

14   of September is logical.  It's now the end of June, Judge, so

15   that's the first -- that is to say it's the end of June for

16   the cutoff date that you last set.  So we're asking for a

17   three-month extension, to the end of September.

18            MS. DAITZ:   And, Your Honor, I believe that when

19   the parties conferred last week we, you know, discussed that

20   discovery cutoff at the end of September would continue to

21   urge the parties to move forward in discovery and get as much

22   done as we can.  And I must say that we have gotten a

23   significant amount of discovery done, not just in the last

24   year, but since the last appearance before the court.

25            And I think that we are all parties will be acting
```

8

1

2  in good faith as an endeavor to meet that deadline but we are

3  not certain that we'll be able to get everything that remains

4  done by that time.

5          THE COURT:   That is absolutely a perfect segue

6  because I was going to ask you what have you done since we

7  last met so that I could see whether or not in good faith

8  you've been working so diligently that I would be giving you

9  this extension.

10         MS. DAITZ:   Your Honor, on February 22nd plaintiffs

11  advised that they were going to challenge the defendants'

12  assertion of the attorney work product privilege over

13  documents in the original case file that were created and

14  prepared by the Assistant District Attorney defendants in this

15  case.

16          So plaintiffs took a few weeks to compile a list of

17  over 8,000 Bates numbers that plaintiffs intended to challenge

18  on defendants' privilege laws.  And since that time,

19  defendants have undertaken a re-review of those documents.  We

20  have very carefully reviewed each document and last week we

21  produced 488 pages that we were reversing our assertion of

22  privilege on and provided an amplified privilege law for a

23  significant number of the remainder that totals about 4,600-

24  plus of the 8,000 documents that plaintiffs initially

25  challenged.

1

2          We have also still been receiving releases from

3    familial plaintiffs that we've been processing, serving

4    subpoenas, and we've produced the plaintiffs about 4,000 to

5    5,000 pages of documents, mostly that we received in response

6    to the subpoenas since the last appearance before the court.

7          The parties have also prepared for a number of

8    nonparty depositions certain of the other witnesses who were

9    in Central Park that night.  Unfortunately, all the parties

10   prepared for the deposition and the subpoenas were served.

11   (Indiscernible) and the witnesses didn't show up for the

12   depositions.  But, again, the preparation time was there.

13         Defendants also served to plaintiffs in early March

14   with deficiency letters regarding their responses to

15   defendants' interrogatories and document requests.  We

16   received responses from most, if not all, of the familial

17   plaintiffs to date and the Wise plaintiffs just agreed this

18   morning to provide the remaining responses by June 10th.  So

19   the parties have engaged in a significant amount of document

20   discovery in the last, I would say two months since our last

21   appearance.

22         THE COURT:   I remember that you're going to be

23   taking a lot of depositions.  Do you still plan to take them,

24   and how many have you taken, and how many do you plan to take

25   still?

10

1

2          MS. DAITZ:   Your Honor, I think we've taken over 50

3     between both sides, between defendants and nonparty witnesses

4     so far.  The defendants have a number of depositions scheduled

5     to produce defendants in the next couple of weeks.  We were

6     really unable to prepare and produce witnesses for depositions

7     at the same time that we were undertaking this privilege

8     review.

9          And because the privilege review, to the extent it

10    necessitates a ruling from the court, will bear directly upon

11    the DA depositions as well as possibly some of the nonparty

12    depositions, we postponed those, pending the outcome of the

13    anticipated briefing on the attorney work product privilege.

14         But I think the same number of depositions that we

15    anticipated is still out there in terms of what we expect to

16    take and defend.

17         THE COURT:   Are you talking about 50 more?

18         MS. DAITZ:   I would say at the least.  I mean,

19    alone there are 20 plaintiffs in the case, Your Honor.

20         THE COURT:   And between the -- you actually didn't

21    take any between the last conference and now, did you?

22         MS. DAITZ:   We prepared but I don't know that any

23    went forward.  We --

24         THE COURT:   Okay.  I understand.

25         MS. DAITZ:   Oh, I'm sorry, Your Honor.  Two

1
2   defendants' depositions went forward.

3           THE COURT:   All right.  You're not putting gloss on

4   it; these are very straightforward.  If you tell me you

5   didn't, it won't necessarily be fatal to your cause; I just

6   need to know exactly where we stand.  So you were able to take

7   two.  You prepared for some others that didn't take place, so

8   you have about 50 or 60 to go, about half on each side.

9           MS. DAITZ:   I would say that defendants have more

10  to take at this point most likely since we haven't taken of

11  the plaintiffs' depositions yet and there are 20 plaintiffs.

12          THE COURT:   Okay.

13          MR. BELDOCK:   We have five depositions scheduled

14  for June.  I can't say it's all been peaceful and light and

15  bright because we've not been happy on the plaintiffs' side

16  with the pace of discovery and the pace of scheduling

17  depositions.

18          But we understand the explanations given by our

19  adversaries about the review of the many documents that

20  they're re-reviewing to determine whether they should be

21  redacting on basis of privilege or producing them.  And it is

22  a big job, but we've not been taking as many depositions as we

23  intended in the last few months because of that.

24          We have now set up these five.  One is a two-day

25  session for this month.  We have about ten, roughly, that we

1
2  are trying to schedule.  We put off the District Attorney's
3  like Linda Fairstein and Lederer and others who are
4  significant to the end, more or less, wherever that will be
5  so, because we do need these documents.
6          The documents that are being withheld have to do
7  with their depositions and there's going to have to be a
8  motion to compel, or a motion to uphold their excluding
9  documents, and a briefing schedule before Your Honor on these
10 privilege issues.
11         THE COURT:  So you have an extended privilege law
12 and you have about 500 more documents than you had before.
13         MR. BELDOCK:  Yes, and that's fewer than I
14 expected, but we have it, and they've gone through thousands
15 of pages, and we're hoping that they can finish it.  What we
16 were suggesting over here, that is among the plaintiffs'
17 counsel, outside of extending the cutoff date at least to the
18 end of September -- just say till the end September for now --
19 that we have a July date for an appearance before Your Honor,
20 particularly so that we can get on top of the privilege log
21 legal issues.
22         We have among us, July 19th, which is a Tuesday,
23 would be a good day, if that's okay with the court.
24         THE COURT:  I'm sure it isn't.
25         MS. DAITZ:  I'm out of town that week.

1                                                              13

2              THE COURT:   I believe I'm away on a judicial

3    conference.

4              MR. BELDOCK:   But are you going to be away the

5    15th, which is a Friday?

6              MS. DAITZ:   I'm not going to know.

7              MR. BELDOCK:   I'm sorry.  You have to speak up.

8              MS. DIPPOLD:   She's not available.

9              MR. BELDOCK:   You're not available.

10             MS. DAITZ:   Oh, I just said we're not available.

11             THE COURT:   You're not available when?  Sounds like

12   big chunks of July.

13             MS. DAITZ:   It's my first vacation since 2009, Your

14   Honor.  I'm taking off for July 15th to the following Monday.

15   I'll be available the week before or preferably the week when

16   we return.

17             MR. BELDOCK:   Then July 12th, which is a Tuesday.

18             MS. DAITZ:   I just -- I have to say, Your Honor,

19   defendants are endeavoring with all deliberate speed to finish

20   this product and produce the documents to plaintiffs.  But we

21   don't believe it would necessarily would be fruitful to

22   schedule an appearance before the court before the parties

23   have had an opportunity to not just complete the production,

24   but then to meet and confer to try to narrow down the issues

25   that won't necessarily be before Your Honor.

14

1

2          And we started that in the most broad terms on

3   Friday, only because the defendants raised a couple of issues

4   that comprise of thousands of those pages, that if they

5   weren't being challenged, would expedite the production and

6   the review of the documents.

7          So I think we're moving forward the best that we

8   can, but I just don't know that it would be fruitful to

9   reserve a date on Your Honor's calendar at this point without

10  knowing how quickly we could complete --

11         THE COURT:   Well, first of all, what does July 12th

12  look like, Michael?

13         THE CLERK:   July 12th (indiscernible) available

14  because I'm in Chicago.

15         THE COURT:   Oh, we don't have this courtroom.

16  Okay.  All right.  Well, what exactly are you proposing, Mr.

17  Beldock?  You want -- I mean, what do you think will happen

18  between now and then that will made that a useful date?

19         MR. BELDOCK:   Well, it depends on what Your Honor

20  will say in response to my next request.  We are in dispute

21  about one scheduling issue.  It's our position that we can

22  move forward sooner than later with the motions having to do

23  with the privilege log issues.

24         We don't have to have every document unredacted as

25  will be done by our adversaries as a matter of discretion on

1

2  their part, before you rule on these legal issues.  The legal

3  issues are pretty well decided in previous cases.  There's a

4  very prominent --

5          THE COURT:   Some of the privileged issues are based

6  on specific legal positions?

7          MR. BELDOCK:   Right, they're of attorney work

8  product and mostly attorney work product.  So there are

9  principles that are pretty well established in the federal

10  courts and Southern and Eastern District.  We have Judge

11  Schein (phonetic) who is very excellent decision in Crosby.

12  It's a long decision.  There've been several decisions since.

13          I've given copies of some of them to our adversaries

14  and I've been suggesting that we don't have to wait till the

15  end of that process to bring the legal issues to you.

16          THE COURT:   But you need to tell me exactly what

17  you're talking about.  I mean, what's -- what is the legal

18  issue?  You said they're claiming work product on what basis

19  that you think is suspect?

20          MR. BELDOCK:   Well, they're claiming work product

21  on the basis that it's basically opinion of the, in many

22  instances, of the assistant district attorneys who worked on

23  the case.  And we're claiming that either the work product

24  doesn't apply or you should review the documents in-camera.

25          THE COURT:   Okay.  So if I understand it correctly

1

2    I could take a whole set of documents and either rule for you

3    or for the defendants and that would --

4              MR. BELDOCK:   That in my opinion would take care of

5    most of the issues even though you don't have all the

6    documents because the principles are fairly basic.  You're

7    going to either say yes or no or you're going to say maybe as

8    to some group, and that's going to take quite a bit of time,

9    ultimately, if you're reviewing the documents in-camera.  And

10   I would like to move that forward --

11             THE COURT:   Are you disagreeing with that, Ms.

12   Daitz --

13             MR. BELDOCK:   -- so they would have some documents.

14             THE COURT:   -- that these are -- the claim of

15   privilege is based on a view that you have as to what kinds of

16   things would make it work product and that if I were, for

17   example, if I look at ten documents and they all claim

18   privilege, and I say, well, you can't get privilege to this

19   kind of documents, then you'd know which documents fall into

20   that category.

21             MS. DAITZ:   Well, Your Honor, two things.  As a

22   procedural matter, the parties had a two hour meet-and-confer

23   on Friday afternoon.  This was not an issue that was addressed

24   as one that was being raised at the conference today or one

25   that was right for judicial intervention.

1

2        That being said, we have discussed this issue with

3   plaintiffs in the past and to give Your Honor a bit of

4   context, in listing the 8,000-plus documents that plaintiffs

5   intended to challenge, plaintiffs separated those documents

6   into exhibits and lists, titled A, B, C, D, F, and G.

7        And in doing so, plaintiffs gave some indication as

8   to how they were organizing the documents.  For instance,

9   documents that they believed were prepared by the party

10  district attorneys as opposed to documents they believed were

11  prepared by others.  Or the time period during which they were

12  created.

13       But we found in our review is that the division of

14  documents into those exhibits are somewhat arbitrary in that

15  there are documents that clearly, on the first privilege log,

16  were indicated were created by parties that are in plaintiffs'

17  nonparty section.

18       There are documents that were listed by plaintiffs

19  that were not redacted or withheld by defendants at all, which

20  has slowed down the pace of our review and production.

21       But because of that and because we started, we

22  approached the review in the categories that plaintiffs

23  divided them, we produced Exhibits B and Exhibits G, but we

24  still have the remaining exhibits to produce.  And unless we

25  submit piecemeal briefs to the court on certain overarching

1

2 legal issues, we don't know that we won't come across more

3 issues that need to be briefed or reviewed, or that plaintiffs

4 have already, you know, researched and addressed in, you know,

5 in preparation for the briefing and we haven't even seen the

6 document yet.  So --

7          THE COURT:   I'm not sure that responds to my

8 question.  Specifically, I want to know, for example, if you -

9 - for example, you could claim attorney-client privilege

10 because these documents were given to my summer interns, and I

11 could decide whether or not giving stuff to summer interns

12 allows you to claim privilege, I don't need to see all those

13 documents; I just want to know if what Mr. Beldock is saying

14 is true.  That we can -- these are categories of documents.

15          If it lends itself to that, first of all, I don't

16 know that we'd need to have all of the categories.  Because if

17 -- and indeed, if I were to tell you that you can't get

18 privilege for interns, then subsequent ones, you wouldn't even

19 -- in looking at them you'd know that you're not going to get

20 privilege for them anyway.

21          MS. DAITZ:   Your Honor, there are only two

22 categories of documents that I could think of.  And again,

23 this is entirely off the top of my head, since we weren't

24 apprized of that this issue would be raised at today's

25 conference -- that I could would have a broad scope of a

1

2   ruling that might affect the remaining review and production.

3          And they're categories that we asked plaintiffs to

4   withdraw their challenge to, both from the grounds of

5   relevance and work product.  And what I could think of, again,

6   off the top of my head, is the ADA's legal research, there's

7   thousands of pages of case law, statutes, rules, some

8   annotated, some not annotated, that the attorneys in the

9   course of the prosecution researched these issues just like,

10  you know, we do in the course of defending this case.

11         And the second is marked-up copies of transcripts.

12  For instance, the ADAs used the hearing, there was a six-week

13  Huntley hearing and the ADAs used the transcripts from the

14  Huntley hearing to review and prepare for trial.  Most of them

15  have, you know, annotations, attorney mark-ups, questions, et

16  cetera, on those copies of the transcripts.

17         We believe that both of those categories of

18  documents are such core work product, legal thought process

19  and opinion of these District Attorneys who Judge Batts

20  dismissed the claims against them in their prosecutorial

21  capacity on the grounds of absolute immunity.  So their

22  thought process is only relevant, at most, for their role in

23  the investigative phase; that we believe that they're not

24  relevant and covered by work product.

25         But again, to brief those two issues now without

1                                                                          20

2   having reviewed the remaining documents and seeing what other

3   broader categories of documents we could address at one time,

4   I just think the briefing might be duplicative.

5            THE COURT:   Well, I don't see the downside of

6   identifying broad categories, frankly.  Because it seems to me

7   that eliminates duplication and that eliminates work.  And

8   indeed, if we're going to expedite this, if there are -- and

9   again, I don't know whether or not they're those categories.

10           If you tell me that there are two broad categories,

11  I don't know what particular categories you have in mind, Mr.

12  Beldock, or whether you've discussed them with them.  You say

13  you've given them some cases.  I mean I'm still not sure what

14  category we're talking about.

15           MS. DAITZ:   Your Honor, I think, as Mr. Beldock

16  said, the categories of documents would be like the 3,000

17  pages that we will research or the 2,000 pages of marked-up

18  transcripts.

19           MR. BELDOCK:   Those are the documents we're least

20  interested in.  I think they're not entitled to attorney-

21  client work, to attorney work product privilege protection.  I

22  don't understand why -- and I don't want to be critical -- I

23  don't understand why it takes so long to look through

24  thousands of pages of research, if that's the process, when

25  the only thing that one could be concerned about I think, if I

21

1

2  were on their side, were notes made by assistant district

3  attorneys on the research.

4        Those pages can't be every single page but I could

5  be wrong.  So I think it would be helpful if we could have a

6  briefing schedule to address these issues, both by categories

7  and in accordance with the principles laid down in these

8  cases.  The cases are very, very complete in their analysis.

9  I don't think there's anything new in the area.  Your Honor

10 probably knows --

11        THE COURT:  I may be the only one in this room

12 right now who doesn't quite understand what we're talking

13 about.  What kinds of documents are you talking about where

14 the law is clear?  I mean give me an example of the kinds of

15 things, not what it says.

16        MR. BELDOCK:  Notes taken by Linda Fairstein or by

17 Elizabeth Lederer in interviewing witnesses for hearings and

18 trials.

19        THE COURT:  Okay.

20        MR. BELDOCK:  Those documents which are significant

21 for taking the depositions of those defendants are clearly

22 identifiable and --

23        THE COURT:  Okay.  So these are notes that they

24 took when they were interviewing witnesses?

25        MR. BELDOCK:  Right.  And when they were preparing

1    to have them testify.

2            THE COURT:   Okay.  And you're claiming that's not

3    work product?

4            MR. BELDOCK:   I'm claming that it's -- if it is

5    work product, it's not protected because it's not -- because

6    they're defendants because one of the issues in this -- there

7    are a number of issues in this case that would call for Your

8    Honor not applying the work product protection to those

9    documents.

10           MS. DAITZ:   And Your Honor --

11           MR. BELDOCK:   I'm sorry.  I didn't really mean to

12   argue the whole issue today.  I was talking about procedure

13   and whether we could move this forward because I'm the --

14           THE COURT:   And just so -- I understand what you're

15   saying but I'm not sure we can answer that question unless we

16   know how much benefit we're going to get from it because

17   there's a lot of work to be done on both sides.

18           And if the briefing, the time taken for briefing

19   isn't going to have a benefit then I'd rather have people do

20   depositions and doing other document review.

21           MR. BELDOCK:   Some of the depositions depend upon

22   these documents being produced or not produced, depending upon

23   what you want to --

24           THE COURT:   So you -- but you've had this

1    to have them testify.

2            THE COURT:   Okay.  And you're claiming that's not

3    work product?

4            MR. BELDOCK:   I'm claming that it's -- if it is

5    work product, it's not protected because it's not -- because

6    they're defendants because one of the issues in this -- there

7    are a number of issues in this case that would call for Your

8    Honor not applying the work product protection to those

9    documents.

10           MS. DAITZ:   And Your Honor --

11           MR. BELDOCK:   I'm sorry.  I didn't really mean to

12   argue the whole issue today.  I was talking about procedure

13   and whether we could move this forward because I'm the --

14           THE COURT:   And just so -- I understand what you're

15   saying but I'm not sure we can answer that question unless we

16   know how much benefit we're going to get from it because

17   there's a lot of work to be done on both sides.

18           And if the briefing, the time taken for briefing

19   isn't going to have a benefit then I'd rather have people do

20   depositions and doing other document review.

21           MR. BELDOCK:   Some of the depositions depend upon

22   these documents being produced or not produced, depending upon

23   what you want to --

24           THE COURT:   So you -- but you've had this

1                                                              23

2    discussion with Ms. Daitz about whether or not Ms. Fairstein's

3    notes, for example, are -- first of all whether or not they're

4    privileged or whether or not they're work product, and if

5    they're work product, whether or not they're entitled to

6    protection.  You've had that discussion.

7                MR. BELDOCK:   I sent them the cases which I rely

8    upon for the principle that they should not be protected by

9    work product.  I've asked Ms. Daitz on more than one occasion

10   -- maybe as many as three or four -- to have this process

11   moved forward before all the documents are reviewed.

12               And I understand her reluctance to do so, so we

13   haven't gotten above that.

14               MS. DAITZ:   Your Honor, I just -- to resolve one of

15   these issues, I think we need to make it clear; I spoke with

16   Mr. Beldock less than a week ago and advised the plaintiffs

17   that we are producing what the case law, not just that Mr.

18   Beldock provided, but what the case law in this issue

19   generally calls fact to work product, including notes taken by

20   ADAs during the course of interviews.

21               If they were taken and produced as risorial

22   material, they were produced again in the course of either our

23   original production where there's reproduction, and they're

24   being redacted in a limited manner to the extent they reflect

25   the attorneys opinion or thought process and to the extent

1

2  that they are just factual, and we're producing the documents.

3  And I think if plaintiffs had reviewed the amplified

4  privilege log and the 488 documents that we produced last

5  week, that that would be made clear.

6  But Your Honor, I think what the court just said

7  moments ago is really what our position is on this.  To brief

8  this issue not we'll have to stop the progress of the document

9  review.  Because we can't brief the issue, review the

10  documents, and produce the witnesses that we have scheduled

11  and defendants that we have scheduled to produce in the next

12  week, all at one time.

13  THE COURT:  Well, that depends on how clear the

14  issue is.  I mean, if you've been discussing the issue, I

15  mean, how long does briefing take?

16  MS. DAITZ:  Well Your Honor, I don't think the

17  issue in this circumstance is as clear-cut as plaintiffs make

18  it out to be.  I think it's very unusual that there are party

19  district attorney defendants who are still in a case in their

20  investigative capacity but not their prosecutorial capacity in

21  a case that moves forward into discovery.

22  And by way of example, both Crosby and Abdel, the

23  cases provided by Mr. Beldock by defendants, the D.A.s were

24  not parties.  So there was no rule 26 analysis on top of the

25  Hickman v. Taylor analysis.  So I think the issues are a

                                                                    25

1  little bit more complex than how plaintiffs are --

2           THE COURT:   That still doesn't answer the question.

3  How long will this briefing going to take?  I mean --

4           MS. DAITZ:   I mean, I think --

5           THE COURT:   -- you guys are -- you've been doing

6  this a while.  You're very familiar with it.  I mean how much

7  time are you talking about briefing?

8           MS. DAITZ:   I think if we actually --

9           THE COURT:   In the --

10          MS. DAITZ:   I'm sorry, Your Honor.

11          THE COURT:   -- in the good old days, they'd tell us

12  to have this stuff in, in 48 hours.

13          MS. DAITZ:   Your Honor, I think if we awaited the

14  conclusion of the review so that we did one brief at one time,

15  that we would need I think at most two weeks to prepare, and

16  that includes calling documents for in-camera review if that

17  was necessary.

18          MR. BELDOCK:   I thought my suggestion would save

19  time.  If it doesn't save time, then I don't want to withdraw

20  it, but then it doesn't make sense.  I thought that this would

21  save reviewing documents twice, for example, in some

22  instances.

23          If we get the court ruling about categories and

24  telling us -- and then telling us what documents should be

```
 1                                                        26
 2  provided in-camera because they may redact half of a
 3  particular document.  You may see that document in-camera and
 4  say none of it should be redacted.  So I thought that would be
 5  helpful.
 6           Why don't I take a different position, Judge.  Let's
 7  try to find an earlier date in July so that we can at least
 8  come to grips with these issues and I will suggest maybe July
 9  8th, which is the Friday before.
10           And I don't think it's worthwhile arguing anymore
11  this morning.  The issues are somewhat complex.  I've been
12  studying these cases.  I think briefing schedules would
13  probably two weeks on each side, roughly speaking, the burden
14  for asserting privileges on the defendants; they should go
15  first.
16           THE COURT:  Okay.  First of all, check the dates.
17  But do you really need two weeks to brief things?
18           MS. DAITZ:  Well, Your Honor, maybe --
19           THE COURT:  I'm not sure what process you go
20  through, I mean.
21           MS. DAITZ:  I think the more labor-intensive is
22  going to be calling the documents for in-camera review if it's
23  necessary.  And it also depends a little bit on whether or not
24  plaintiffs are challenging 2 or 3 categories of documents or
25  12 or 13 categories of documents and we haven't gotten that
```

27

far in the confer process because again, defendants haven't,

you know, completed their review.

THE COURT:   Okay.  Let me just be clear, though.

You'll have to convince me that you'll need two weeks to do

this when we get to this part.  So think about what you'll be

saying to me.  I -- first of all, these are not issues that

are going to come up suddenly.

You've been discussing them.  It seems to me, by the

time that you get to the point of discussing with the other

side you already know what the legal parameters are.  And if

you don't have enough of the legal parameters to be presenting

to me I'm not sure why you're presenting it to the other side.

So by the time you've made an issue of it with the

other side, it seems to me you should be able to turn around a

briefing fairly quickly so your in-camera notwithstanding.

MS. DAITZ:   Your Honor, I would just point out that

it's plaintiffs that are challenging defendants' assertion of

privilege.  So if plaintiffs made the motion to compel, that

would narrow the issue for defendants in addressing what

categories we need to address in our briefing, and what

documents we need to call to submit to the court.

So we believe if it's plaintiffs' application and

they make it, then we may need less time to respond, depending

on the parameter of the scope of their challenge.

1

2          THE COURT:   I think you should both count on less

3    time when it's teed up.  We'll try to talk to you in July when

4    you've bandied this back and forth.  Certainly by the bandying

5    back and forth you'll crystallize and sharpen the issues for

6    the court.

7          What do we got in July, Michael?

8          THE CLERK:   Early July, Your Honor.

9          THE COURT:   Well, either the week that has the 12th

10   or the 8th in it.  How about the 12th?

11         THE CLERK:   We have it on Tuesday, July 12th, at 10

12   a.m.

13         MS. DAITZ:   Your Honor, my only concern is that --

14   that it's going to be the start of the period for the parties

15   to brief.  That's right before I'll be out of town.

16         THE COURT:   Well that'll be the -- we'll decide

17   what the situation will be then.  And besides, if you're

18   correct, Mr. Beldock will start the process.

19         MS. DAITZ:   Thank you, Your Honor.  There is one

20   other issue if we're moving on from the work product, and it's

21   minor.  But because this work product meeting has postponed

22   the ADA depositions and it's been difficult for us to prepare

23   and produce parties for depositions, we've begun asking for

24   dates for the familial plaintiffs' depositions so that we can

25   begin the process of taking.  And we're still awaiting

29

1  confirmation from the Wise plaintiffs for the date we

2  suggested for Dolores Wise, and I think that's the only date

3  we've suggested thus far.

4

5        But we anticipate taking some depositions in the

6  upcoming months also to counter balance what's been delayed by

7  the privilege review.

8        THE COURT:   I'm not sure.  Is this an issue for me

9  to decide?

10        MS. DAITZ:   I don't believe so, Your Honor, I mean

11 unless plaintiffs are refusing to produce a witness or

12 something.

13        MS. DIPPOLD:   Your Honor, I would want the court to

14 be aware of one issue with respect to familial plaintiffs'

15 depositions.  And that has to do with the fact that we have

16 been and are still, as Ms. Daitz mentioned, producing releases

17 and authorizations for records that relate to the familial

18 plaintiffs.

19        And it would certainly be the plaintiffs' position

20 that until such time that responses to all those

21 authorizations have been received and those documents received

22 by defendants are produced to the plaintiffs, we would not

23 think it appropriate to schedule the depositions of those

24 familial plaintiffs.

25        And so we would expect that they'll give us the

1                                                              30

2    documents that they're getting in response to these

3    authorizations before we set dates for their depositions.

4            THE COURT:   Okay.  Well I'm a little concerned of

5    the notion of not setting dates even -- are you anticipating -

6    - what kind of information are you anticipating getting that

7    the defendants get --

8            MS. DIPPOLD:   Well for example, just within the

9    last week there is one plaintiff, familial plaintiff I know

10   of, that there were probably 20 or 30 authorizations handed

11   over at defendants' request to corporation counsel's office.

12           We don't think it would be appropriate to proceed

13   with the deposition of that person until all the records

14   responsive to those authorizations have been produced, and

15   produced to our office.  So that the witness, the non-party

16   witness, can be properly prepared to be deposed.

17           THE COURT:   What kinds of information are we

18   talking about?

19           MS. DAITZ:   Your Honor, when we get information

20   responsive to subpoenas, I think the information we're

21   discussing here is medical records, employment records, parole

22   records, arrest histories, things of that nature that we've

23   received releases for.

24           We prepare it and produce it to plaintiffs.  We

25   don't hold off the documents for some extended period of time.

1

2   We prepare them, clump them together, and serve them.  So I

3   don't think there's any issue about the defendants having

4   documents and taking a deposition without producing the

5   documents to plaintiffs before the deposition goes forward.

6           And certainly, when there are familial plaintiffs

7   who are still providing releases, which it bears noting, is a

8   cause of certain of the delay here in us going forward with

9   taking the remaining depositions that we're still receiving

10  releases, that the defendants were granted a motion to compel

11  in November of 2010.

12          If we're prepared to go forward with familial

13  plaintiffs' deposition, because we've received the responses

14  that we expect to receive, and produce the documents to

15  plaintiffs, then we expect the deposition to be scheduled.

16          THE COURT:   I'm not sure you said different things

17  and I thought Ms. Dippold said don't schedule depositions

18  until you've gotten the information.  Is that the same thing

19  you're saying?

20          MS. DAITZ:   I'm sorry, Your Honor.  May I just have

21  a moment to confer with my colleagues?

22          (Pause in proceedings)

23          MS. DAITZ:   Your Honor, we believe to the extent

24  that we've suggested dates for familial plaintiffs, that we

25  have the information necessary to go forward with the

32

1

2    deposition.  And of course if we have information necessary,

3    we are -- we've produced it to plaintiffs.  I think we're

4    anxious to start taking these familial plaintiff depositions.

5    It's a, you know, 20 of the remaining depositions so they

6    certainly need to be done.

7             THE COURT:   So the bottom line is you're not

8    disagreeing with the plaintiff.  You say, yes, they have it

9    and you're giving it to the plaintiff.

10            MS. DAITZ:   Well, and to the extent if there's

11   anything outstanding.  I mean, certain providers are just not

12   giving us prompt responses.  Certain providers we've

13   subpoenaed multiple occasions and get no responses.

14            Certain subpoenas we've sent out and get returned as

15   undeliverable.  So we don't want to wait until we have an

16   outcome for every possible subpoena that we serve.  We accept

17   that we're probably not going to receive documents responsive

18   to certain of the subpoenas and we're prepared to move forward

19   with what we have now.

20            I just want to make clear that whatever we have now,

21   in anticipation of the familial plaintiff deposition such as

22   Dolores Wise, we'd produce that to plaintiffs.  We're not

23   sitting on --

24            THE COURT:   Okay.  And so Ms. Dippold, assuming

25   they -- let's say they send out ten requests and they got back

1
2  eight, and the other two don't seem like they're going to be
3  fruitful.  You want to wait until the other two come back?
4          MS. DIPPOLD:   Well, Your Honor, quite frankly when
5  I send out authorizations to them, I keep track of what
6  authorizations they have produced records that are responsive
7  to that particular authorization.  I can say that I don't know
8  of a single familial plaintiff whose records have been
9  produced for authorizations and indeed, I sent out a letter
10 about a week ago that said you haven't produced authorization
11 to the response to this authorization and that authorization.
12          So I'm keeping track of it.  I don't think they've
13 all been produced.  I think if they're in a situation where
14 they sent out an authorization and the person is not
15 responding.  If they tell me, we're not getting a response to
16 this, or this entity has said they don't have records, if they
17 tell us that, then we can fill in some of the gaps.  But I
18 don't think that they have produced all of the records that we
19 have sent authorizations for.
20          THE COURT:   Okay.  Before you say anything, but if
21 I understand you correctly, you're not suggesting that if they
22 sent out requests that they all have to come back.  Because we
23 know that sometimes there's going to be some non-responsive
24 people.
25          MS. DIPPOLD:   Indeed, and tell me that.  For

1

2    example, I can think of one familial plaintiff who underwent

3    some therapy.  Long, long ago I sent out an authorization

4    permitting them to have access to those documents.  And no one

5    has ever said they don't have any documents.  They haven't

6    produced any documents.  I've heard nothing.  So just tell me

7    what the situation is and then we can know when we're ready to

8    do that familial plaintiffs' deposition.

9         THE COURT:  Okay.  Now before you say anything, Ms.

10   Daitz, let me just say that what I'm hearing from you is

11   consistent to what I think should happen, and that is this:

12   You send out requests to a number of, whether it's hospitals

13   or whatever, and you determine who's responsive, who's not

14   responsive, whether or not it takes follow-up.

15        You have a conversation with the other side and you

16   say, okay, here you gave us ten authorizations, we got back

17   six responses, the other four we don't think we're going to do

18   anything.  Two of them, maybe, but we think we should go ahead

19   and set the date.

20        I think under those circumstances, you set the date.

21   You don't wait for the four that are recalcitrant.  And all it

22   means is that you both understand at that point, so that the

23   plaintiffs aren't wondering if the defendants are going to get

24   something and sandbag them, and the defendants let the

25   plaintiffs know whatever they have.

35

So you seem to both be agreeing on what the procedure is and so as long as you do what I've just suggested, I don't see what the problem is.  I think you should be able to set a deposition when you've gotten back all you reasonably expect to get back, and you both agree that it's a good time to set the deposition.

Now, it's certainly possible that you might set the deposition and something might come in, in the interim, then you adjust.  But for now, as long as you're not taking -- as long as the plaintiff is not taking the absolute condition that everything's got to come back, and the defendants are keeping the plaintiffs apprized, I don't see why there's a difficulty here.

MS. DAITZ:   Your Honor, only for the sake of the record, the defendants have been producing all the letters that we get back from every entity that says they have no responsive records on file.

So to the extent we've received something back, we Bates number it and produce it as a discovery document to plaintiffs.  The only entities that plaintiffs have heard no word of after months and months are the same entities that haven't responded to our multiple subpoenas.

So if they haven't heard it's because we haven't heard either; not because we have something or received some

```
1                                                          36
2  correspondence from these entities --
3           THE COURT:   Okay.  Well let me just --
4           MS. DAITZ:    -- and haven't apprized plaintiffs.
5           THE COURT:   Let me just stop you for a moment.  I
6  understand that -- so sometimes we come into these conferences
7  and I have to remind you that on each side I always perceive
8  that there's a lack of trust.
9           Okay.  The simple thing to do is to have a
10 conversation and just go through these things and say, this is
11 what we have and what we haven't had.  I understand that if
12 you're saying that there are some things that you haven't
13 gotten responses from all you need to do is have a
14 conversation about each of the named plaintiffs and just do a
15 checklist.
16          This is not a, you know, I mean -- and you could
17 both be exactly correct in what you're saying.  And when the
18 plaintiff doesn't -- there's nothing wrong with what you're
19 doing if you're saying if you don't get a response, you don't
20 tell the plaintiff.  In the abstract there's nothing wrong.
21          On the circumstances of the relationships that have
22 not developed over time in this case, just have a conversation
23 in which you each have your checklist about what you've had in
24 terms of authorizations and what responses you've gotten back
25 and then schedule a deposition.
```

1

2          And if your checklist says, we haven't heard

3   anything from this person, you tell Ms. Dippold -- or whoever

4   it is on the plaintiff side -- and you move on.  There

5   shouldn't be anything where anybody's wondering what happened

6   or what hasn't happened.  Can we just do that?

7          MS. DIPPOLD:   Yes, Your Honor.

8          THE COURT:   Okay.  For all the plaintiffs, since

9   Ms. Dippold has said that she's got a checklist, you can just

10  check with her checklist and see if everything is fine.

11  Anything else?  Do we have a date?

12         MS. DAITZ:   Nothing from defendants, Your Honor.

13         MR. BELDOCK:   Did Your Honor agree to extend the

14  time until September 30th?

15         THE COURT:   I will extend the time and since it's a

16  joint request until September 30th, and we'll talk more about

17  that on July 12th.  And this is a minor comment as we depart,

18  and this is for you, Ms. Daitz.

19         In talking about the government's responses, you

20  used the phrase that you're going to do it with all deliberate

21  speed.  I might suggest that that's probably not the best

22  phrase to use in a civil rights case.

23         MS. DAITZ:   Sorry, Your Honor.

24         THE COURT:   Because the last time I think that

25  phrase was used it was 14 years before they got around to

                                                                    38

1   doing anything.  So I'm sure I didn't mean that.

2            MS. DAITZ:   Deliberately expeditious, Your Honor.

3            THE COURT:   Without delay.  In any case, again,

4   since we're in the -- we're still in the month of May and I

5   just -- I was still thinking about the Brown decision.  And so

6   when you used that phrase I wasn't sure what was coming after

7   that.  So -- but I knew you didn't mean what they meant.

8            MS. DAITZ:   I did not, Your Honor, by any means.

9            THE COURT:   Otherwise, I'm sure that the plaintiffs

10  would've jumped up and told me that's unacceptable.  Anyway,

11  we'll see you in July.

12            (Whereupon the matter is adjourned to

13  Tuesday, July 12, 2011.)

1                                                              39

2                    C E R T I F I C A T E

3

4        I, Carole Ludwig, certify that the foregoing transcript

5   of proceedings in the United States District Court,

6   Southern District of New York, McRay, Richardson, et al.

7   v., Docket #03cv9685 was prepared using mechanical

8   transcription equipment and is a true and accurate record

9   of the proceedings.

10

11

12

13

14  Signature_____

15                    CAROLE LUDWIG

16  Date:   July 15, 2011

17

18

19

20

21

22

23

24

25