```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                             :
                                         Docket #03cv9685
MCCRAY, RICHARDSON, SANTANA,       :
WISE AND SALAAM LITIGATION

                                   :   New York, New York
                                       September 8, 2011
------------------------------------ :


                      PROCEEDINGS BEFORE
              MAGISTRATE JUDGE RONALD L. ELLIS,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiffs       BELDOCK LEVINE & HOFFMAN
  McRay, Richardson,     BY:  MYRON BELDOCK, ESQ.
 Santana, and Salaam:         KAREN DIPPOLD, ESQ.
                         99 Park Avenue, Suite 1600
                         New York, New York 10016
                         (212) 490-0400


For the Plaintiffs       MICHAEL W. WARREN, ESQ.
  McCray, Richardson     580 Washington Avenue
  and Santana:           Brooklyn, New York


For the Plaintiff Wise:  FISHER & BYRIALSEN, PLLC
                         BY:  ALISSA BOSHNACK, ESQ.
                         291 Broadway, Suite 709
                         New York, New York 10007
```

```
Transcription Service:  Carole Ludwig, Transcription Services
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

2

<u>APPEARANCES CONTINUED:</u>


For the Defendants:      NEW YORK CITY LAW DEPARTMENT
                          CORPORATION COUNSEL
                         BY:  ELIZABETH DAITZ, ESQ.
                              PHILIP DEPAUL, ESQ.
                              GENEVIEVE NELSON, ESQ.
                              ANDREW MYERBERG, ESQ.
                              ELIZABETH DOLLIN, ESQ.
                              PATRICIA BAILEY, ESQ.
                          100 Church Street
                          New York, New York 10007

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                                                    4
 2              THE CLERK:  In the matter of McRay, Richardson,
 3   Santana, Wise & Salaam Litigation.  Counsel, please state your
 4   name for the record.
 5              MR. MYRON BELDOCK:   Myron Beldock, from Beldock,
 6   Levine & Hoffman, for the Salaam plaintiffs, as well as Karen
 7   Dippold.
 8              MR. MICHAEL WARREN:  Michael Warren, 580 Washington
 9   Avenue, Brooklyn, New York, appearing on behalf of plaintiffs
10   Richardson, McCray, and Santana.
11              HONORABLE JUDGE RONALD L. ELLIS (THE COURT):   Good
12   morning.
13              MR. WARREN:  Good morning, your Honor.
14              MR. BELDOCK:  Your Honor, there is no one here on
15   behalf of defendant, pardon me, of plaintiff Wise.  That
16   counsel understands that we will stand in for them and they
17   may be able to come here, someone may be able to come here
18   while we're in process.
19              THE COURT:  From what my reports are this morning,
20   everybody had a little trouble getting here.
21              MR. BELDOCK:  They have another court appearance
22   that they had to attend to, but they understand that we're
23   proceeding without them.
24              THE COURT:  We certainly will do that.
25              MS. GENEVIEVE NELSON:   Genevieve Nelson, Assistant
```

```
1                                                          5
2    Corporation Counsel, for defendants.  With me is Elizabeth
3    Daitz and Philip DePaul. Good morning, your Honor.
4              THE COURT:  Good morning.
5              MS. PATRICIA BAILEY:   Good morning, Your Honor,
6    Patricia Bailey.
7              THE COURT:  Okay, good morning.  First of all, with
8    respect to the in camera inspection, I have not actually
9    completed it.  I did the unthinkable and took some time off.
10   But I have started going through it and some questions have
11   arisen as I was looking at them and I guess I want to direct
12   this to the City so I know what it is that I'm looking at.
13             In some of the documents, there appear to be
14   information that is listed and it seems to be based upon
15   interviews. And I wasn't sure whether or not the person was
16   looking at a video and summarizing it and that the plaintiff
17   had the video, can you --
18             MS. DAITZ:  Yes, your Honor, all the video tapes
19   have been disclosed, they were disclosed in the underlying
20   criminal trial and they were disclosed again in the civil
21   litigation. To the extent that there are handwritten notes
22   taken by the ADA defendants that are in the in camera brief
23   set provided to the Court, there were handwritten notes taken
24   during the ADA's subsequent review of the video tapes in
25   preparation for the prosecution.
```

1                                                                6

2              THE COURT:  Okay.  All right, I may ask for further

3     clarification when I'm totally finished but I don't anticipate

4     that taking too much longer.

5              With respect to the dispute that has arisen more

6     recently concerning the training materials in plaintiff

7     request 66 and 67, I must admit that although I read the

8     parties' submissions, I wasn't sure why you were having a

9     dispute. It seemed fairly clear to me that at least on the

10    basic underlying premise that the plaintiffs had set forth

11    some requests for training materials, that the simple thing

12    would be for the City to produce the training materials that

13    were asked for. And I wasn't sure why that didn't happen. I

14    understand that the City wanted some broader protection for

15    other training materials, but it seemed to me those were

16    separate issues.

17             MS. DAITZ:  Your Honor, if I may, the City, by the

18    City I mean the Corporation Counsel Office, collects training

19    materials from the Agency, obviously to review and produce in

20    connection with, for instance, this litigation. And when we

21    collected the training materials, you know, there are

22    thousands of pages that we collect at one time and some of

23    them are, for instance, like a whole criminal investigations

24    course manual or a whole detectives manual. So as they're

25    being reviewed, we make a determination with respect to

7

1

2 sections as to whether they are responsive to plaintiffs'

3 requests or whether there is something that although

4 plaintiffs did not request, we would be producing in support

5 of our defenses.

6          So they were reviewed and prepared for production

7 and asked and that's what we did in this case.  And the

8 production is ready to go out, pending an agreement as to

9 their confidentiality.  We don't understand why plaintiffs are

10 drawing a distinction in terms of confidentiality between the

11 documents that are specifically responsive to their requests

12 and documents that are produced in support of our defenses.

13          THE COURT:  Okay, well I understand that but if I

14 understand the process as these things go with training

15 materials or other materials from some defendant or some

16 entity, there are sections, and you know which sections you

17 want to produce to the plaintiff, or sometimes it's the other

18 way around, you can designate which ones are responsive so

19 that the plaintiffs know which ones are responsive to their

20 requests 66 and 67.  What you want to do is you want to

21 produce the whole thing and you don't want them to be not

22 subject to confidentiality, although it does seem to me, and

23 I'm not sure at some point the plaintiff didn't suggest this,

24 that you can designate them as confidential, the rest of the

25 training materials, and designate which ones are responsive.

                                                                8

2          MS. DAITZ:  Well, your Honor, pursuant to the

3    stipulation and protective order that governs discovery, it

4    states, specifically paragraph 283, there are only two ways

5    that a producing party can designate documents confidential

6    that are not explicitly contemplated in the language of the

7    stipulation.  And that's either pursuant to an agreement

8    between the parties, or to have the Court deem them

9    confidential. So we can't just, under the stip we can't just

10   produce them all with a confidentiality designation without an

11   agreement in place.

12         THE COURT:  Okay, let me just understand. You

13   believe that the other training materials should be

14   confidential --

15         MS. DAITZ:  Yes, your Honor --

16         THE COURT:  But you can't designate them as

17   confidential without an agreement?

18         MS. DAITZ:  That's what the stipulation says.

19         THE COURT:  And is that the way it works?

20         MS. DIPPOLD:  Your Honor, you are quite correct,

21   they're two completely separate issues.  The issue, the first

22   issue we'd like resolved is we would like a response to our

23   very specific document requests. We designated the issues we

24   want to know about, we asked for the materials, we entered

25   into an agreement with Corporation Counsel that they materials

9

1

2   they produced in response to these requests would be

3   confidential. We have no problem agreeing that training

4   materials should be confidential, we just simply want two

5   things.  We want them to respond to our specific requests,

6   which have been pending for a year and a half, and we want

7   them to give us an idea of what documents they're producing.

8   They say they're producing things from the "Police Students

9   Guide," fine, tell us that it's the "2003 Police Students

10  Guide," and that's enough, we'll agree that those documents

11  are confidential.

12          The problem is if they just produce 500 loose pages,

13  if you look at these guides, there is no way to tell what year

14  they're from or what particular course they're from. And we

15  just need the appropriate information so we can agree they're

16  confidential.  We're not going to hand them out to anyone

17  else, we're agreeing they'll be confidential, and they can,

18  pursuant to the stip, although this is not the way I think it

19  should be done, they could just produce all 500 pages and then

20  we would challenge those that we think are not appropriately

21  subject to the stipulation.

22          THE COURT:  Okay, frankly, it doesn't sound as if

23  you're that far apart. If I understand correctly, what the

24  plaintiffs want is they want to make sure that if you produce

25  anything they know where it's from and when it's from. And

1                                                                      10

2   that if you had, for example, a training manual and it had a

3   table of contents, you would designate which parts of the

4   table of contents are responsive to what the plaintiff wants.

5   And what you want to not have to do is to break it up into

6   parts and do it piecemeal.

7            MS. DAITZ:  Your Honor, if I may, with all of

8   defendants productions that we've done, close to 80,000

9   documents to date, we have always made a production

10  identifying the source of the materials being produced, what

11  range of Bates numbers, what type of document, and we certain

12  intend to do that in this case. We're not just going to

13  produce here are the training materials, but at the same time,

14  to have defendants obligated to list out the dates and the

15  years as a precursor to an agreement on confidentiality, is

16  counterproductive and it is also counter to the explicit

17  language of the stipulation which says that the receiving

18  party, upon receipt of the document, has to list out whatever

19  documents they feel are not properly designated confidential.

20           THE COURT:  All right, counsel, I'm going to go out

21  on a limb on this one, I'm going trust all of you, all right,

22  I'm going to expect that what the defendants are going to

23  produce is the training materials sufficiently designated and

24  identified so that the plaintiffs know where they are. I mean

25  if you're right, then there is no problem, then I won't hear

1

2  from the plaintiffs that say they can't figure it out.

3          I suspect, and I don't know this for sure, that in

4  some respects what the plaintiffs already have, and I'll get

5  to that later, isn't sufficiently designated so that one could

6  make those kind of determinations. But I certainly expect

7  anything that you produce to them will be identified so that

8  they know where and when it's from. As to the parts -- but you

9  need to identify which ones are specifically responsive to the

10  66 and 67.

11          As to the rest of it, just it seems to me from the

12  point of view of efficiency, it makes sense for you to produce

13  and entire document, as long as the ones that are responsive

14  are designated.  And so if the question is whether or not

15  you're going to get the plaintiffs' okay or the Court's okay,

16  I'm directing that you do it as a, I mean I wouldn't want you

17  to break up a training manual for the purpose of designating

18  when you could just tell the plaintiffs which parts of the

19  training manual are responsive.

20          So I would designate them as confidential, if the

21  plaintiff finds some that are particularly egregious, although

22  frankly I don't know why any of these things will ultimately

23  be a problem because I don't know that there would be somebody

24  particularly interested in them, but once the plaintiff finds

25  out which ones are responsive, if they think some of the

1
2  others shouldn't be designated, then you can bring them back
3  up to me. I'm not going to review them myself, but if you
4  think that they shouldn't be so designated, rather than having
5  you, two, argue over it, we'll skip that step, I'll allow them
6  to designate them as confidential, if you think for some
7  reason they need to be undesignated or they need to be
8  available for some other reason, I'll reconsider that, but in
9  the meantime everything stays confidential if it's training
10 materials.

11          But the main thing is that the plaintiffs will have
12 a specific response to their request such that they can know
13 what it is that's responsive to what they wanted. I mean if
14 that's what they want, that's what they want.

15          MS. DAITZ:  Your Honor, I'm just going to ask that
16 with respect to all productions of documents, and that both
17 parties be similarly obligated. I mean, for instance, I got
18 production from plaintiffs on August 31st that just said this
19 is supplementing Yusef Salaam's document production, with now
20 indication as to whether it was responsive to our requests, in
21 support of plaintiffs' defenses, responsive to a subpoena that
22 we served. So if defendants are obligated to parse through
23 productions to identify why we're producing the document, we
24 would just expect the same from all parties.

25          MS. DIPPOLD:  I have no problem doing that, your

1  Honor.

2        THE COURT:  I'm glad you don't.  Okay.  All right,

3  now, and the other issue which was related to that is I

4  understand that the plaintiffs have some materials and the

5  question was whether or not the plaintiffs should produce

6  them, or whether or not the plaintiffs wait and see what you

7  produced, and then produce what's not duplicative.

8        I'm torn on this one because I'm not so sure in the

9  way they're being produced, whether or not the Plaintiffs

10  would be able to make that determination, but in the interest

11  of efficiency, I would like to have the stuff produced from

12  the defendants, have the plaintiffs look at it, and then you

13  can make your determination as to whether or not what you have

14  is coextensive with the defendants.

15        MS. DIPPOLD:  We're perfectly willing to do that. If

16  there's anything -- the two volumes are right here, they're

17  the "Criminal Investigation Course," and "Investigators Guide"

18  from particular years.  Once we see what the defendants are

19  producing, if there is anything here that they haven't

20  produced to us we'll gladly copy it and give it back, you

21  know, send it to them.

22        THE COURT:  Okay, just let me give you the source of

23  my ambivalence, and that is that it seems to me that it may

24  take more work and effort for you to do that than to just

```
 1                                              14
 2   produce, I mean I don't know how many pages that you have, I
 3   mean --
 4         MS. DIPPOLD:  Several hundred.
 5         THE COURT:  Well, you know, I mean if it's just a
 6   question of the cost of reproducing --
 7         MS. DAITZ:  Your Honor, we could bear the cost of
 8   the copying, I don't know that that's the necessary question,
 9   it's just that, you know, as I said, we're producing parts of
10   certain manuals and parts of others, and to the extent that
11   they're not identified on their face by date or source, we're
12   providing that information to plaintiffs. But I think it could
13   be extremely arduous of a task for plaintiffs to make a
14   literal line by line comparison of those two manuals with the
15   500 pages of documents that we're producing.  And in the
16   interim, your Honor --
17         THE COURT:  Okay, other than the potential cost of
18   reproducing, is there any reason that you wouldn't just give
19   that to them?
20         MS. DIPPOLD:  Mr. Beldock is suggesting that they
21   should be producing the things that we're asking for, plus if
22   they told me --
23         THE COURT:  They're going to produce what you're
24   asking for, that's a different issue, the question is I mean
25   as often happens in cases, from some source or other the
```

1
2  plaintiff may have some incomplete production.  What we're
3  talking about now is what you have in your possession, which
4  may not be coextensive to what the defendants are going to be
5  produced, but that's a different issue. What the defendants
6  want is what you have as partials or undesignated, whatever,
7  if they are going to pay for the reproduction, I don't know
8  why you would object to it.

9          MR. BELDOCK: It's not exactly that, I'm responsible
10 for getting these documents in another litigation with the
11 City, they were given to me voluntarily without
12 confidentiality in another litigation with the City, with
13 other attorneys from the City. We've been trying to get
14 training material for a year and a half, we got those training
15 materials very easily from the other counsel.

16         MS. DIPPOLD:  From the co-counsel.

17         MR. BELDOCK:  From their co-counsel in the other
18 case, but Corporation Counsel was involved in it.  We don't
19 understand why they've had such difficulty producing training
20 materials to us, why it's taken a year and a half or us to get
21 them.  And at that point, we feel it's only fair that they
22 show us what they have been able to find, that we compare
23 them, and then we will obviously give them what we have gotten
24 elsewhere. It just seems wrong.  Maybe I'm not making myself
25 clear to your Honor, but for a year and a half we've been

16

1
2 trying to get training material, which in another case I got
3 within a few weeks, if not months, from the City.  The City
4 has claimed they couldn't get any training materials or they
5 couldn't find any training materials, there is something about
6 this process which is unfair to us that bothers me.

7          You want us to give them to them now, we'll exchange
8 with them, if necessary.

9          THE COURT:  I do, and I want the City do exactly
10 what you say you've been trying to do for a year and a half. I
11 don't disagree with anything you said, and I understand that
12 you each have your interests in doing things, but as I started
13 out saying, it seems to me this is a simple question of you
14 ask for stuff, you get it.  I understand that in producing,
15 when we're dealing with producing manuals and things, they're
16 not necessarily easily separable, and it makes more sense to
17 designate them, and whether or not they are going to all be
18 confidential, I don't know why you couldn't agree on that, it
19 seems to me it's a fairly simple thing, I put my imprimatur on
20 it that I would rather have the stuff just be produced, give
21 it to the plaintiffs and let the plaintiffs look at it. And
22 you're obligated to do it, you designate it, I'm more
23 concerned with whether or not what the City produces to you is
24 sufficiently designated so that you can work with it. And if
25 they do that, and they get copies of what you have, which you

1

2 say was produced in some other litigation so I'm not even sure

3 why there's an issue about it.

4          MS. DAITZ:  Your Honor, I just need to say for the

5 record that outside counsel for the City of New York produced

6 the training materials in the case that Mr. Beldock is

7 referring to.  And I don't think that that necessarily bears

8 upon our ability to retrieve responsive documents from our

9 clients in this case.

10          But aside from that, I think what we all want to do

11 is move forward with the deposition that's been on hold

12 pending the production of training materials, and the City is

13 prepared to make the production under your Honor's ruling by

14 tomorrow, and assuming we can get the materials that are in

15 plaintiffs' possession so that we have an opportunity to

16 review them.

17          I mean if we proceed with depositions while they're

18 still doing this line by line comparison --

19          THE COURT:  Okay, you understand right now that's

20 the process, so you're arguing what I've already --

21          MS. DAITZ:  I'm sorry, I was unclear, your Honor.

22          MR. BELDOCK:  We're prepared to exchange, your

23 Honor, but we don't want the City to have our documents before

24 they give us their documents.  I know I'm sounding, I may

25 sound a little --

```
 1                                                    18
 2            THE COURT:  You object to the exchange?
 3            MS. DAITZ:  No, your Honor, they'll have them
 4    tomorrow.
 5            THE COURT:  Okay.
 6            MS. DAITZ:  And we can send one messenger to
 7    Beldock, Levine and Hoffman to drop off our production and to
 8    pick up theirs.
 9            THE COURT:  You want them to meet midway like at a
10    court someplace?  Okay, I understand your frustration, Mr.
11    Beldock, you've been asking for this for a year and a half,
12    you should get it, and you will get it.
13            MR. BELDOCK: And why couldn't we get it right away?
14    Why have we been delayed and having to do witnesses without
15    that training material?  It's an issue that I just want on the
16    record, we'll take it up later if necessary.
17            MS. DAITZ:  I need to also note for the record, your
18    Honor, that the defendants interposed valid objections to
19    plaintiffs' discovery requests, we did not receive a
20    deficiency letter, it was not brought to our attention that
21    they (indiscernible) our objection until at deposition, you
22    know, ten months later where he renewed their request.
23            So I think it's not just that defendant should have
24    produced documents immediately, if there was some dispute as
25    to the nature of the request or the nature of the objection,
```

19

it was incumbent upon plaintiffs to bring it to our attention

to facilitate that production sooner than what ended up --

     THE COURT:  Okay, all I'll say is this.  All right,

I understand that we've had some stops and starts in this, but

at least I hope you understand if you bring it to my attention

I will decide it. And I looked at the correspondence, I

noticed sometimes when you are dealing with multiple people on

the side that causes issues, but I will say that Mr. Beldock

is correct that this is something that should have been

resolved a while ago.

     It is not my habit to say what went wrong in the

past, what I like to do is to make sure we go forward, okay.

And as I see it, I expect the City to produce the documents

and designate them so that the plaintiffs can work with them,

and I expect that the plaintiffs will produce to the City

whatever documents they have that are related to the same

issue.

     Is there any question about where I stand on this?

And again, I'm not going to try to reconstruct everything

that's gone wrong in the past. I know that we've had some

missteps, but at least I'm trying to get us now on the right

track. Let's hope that, and if anything else comes up, and if

there are any issues with this production I expect, I'm sure I

will hear about it.  The only, my biggest concern so that

1

2   you'll know is that this is my law clerk's last week, so some

3   other law clerk will come in and will not understand the

4   extent of the task on which they are about to undertake. I'm

5   not sure when I hired them I made it clear what the

6   responsibilities were.  So, you know, I just want to make sure

7   they don't quit after a week.

8          But the basic thing is, look, somebody asked for

9   some documents in discovery, there's supposed to be some

10  dialog between the parties, if it doesn't work, you bring it

11  to me and it took more time than it had to, perhaps the

12  plaintiffs were more solicitous than they should have been,

13  maybe they should have brought it as soon as they weren't

14  getting what they thought they should have gotten. I'm not

15  going to blame them for that because I do like people to try

16  to work things out. But they're right and they should have

17  gotten it.

18          I understand the concern you have. Again, I don't

19  think it makes sense to try to take parts of manuals or other

20  kinds of materials and parse them out. I hope now we've worked

21  out the confidentiality issue, and I don't think it's as

22  simple as just telling, okay, here's the plaintiff, and you

23  work it out and tell us what's not right. But I do think that

24  once the plaintiff knows what it is that they have, what's

25  responsive to their request, they may, in fact, find that some

1
2  of the things maybe shouldn't be confidential and maybe

3  they'll decide they don't want to make an issue of it. Because

4  unless until they want to do anything with it, there's no

5  problem with keeping it confidential anyway.

6          So any other questions?

7          MS. DAITZ:  Your Honor, I have a separate issue with

8  your Honor's --

9          THE COURT:  Broached already with the plaintiff?

10         MS. DAITZ:  Yes, actually I -- oh, Ms. Boshnack is

11 here.

12         THE COURT:  Did this come up in the last five hours,

13 what?

14         MS. DAITZ:  No, your Honor, actually it came up back

15 in May, defendants had requested, initially we requested tax

16 returns from the plaintiffs, first we went to their economic

17 damages claims.  The parties all reached an agreement that the

18 plaintiffs would instead produce, at least at this time,

19 releases for a particular type of tax document that is not

20 actually the full return, and all the plaintiffs have provided

21 them to defendants on a rolling basis, except for two

22 plaintiffs, Daniel Wise and Victor Wise.  And Ms. Boshnack

23 informed me by email this morning that she now has Victor

24 Wise's releases, and that we would like to make a formal

25 application to compel those releases from plaintiff, Daniel

22

1   Wise, which it's my understanding Ms. Boshnack doesn't

2   actually object to.

3          MS. BOSHNACK:  We've been trying to get him to sign

4   off on them and send them to us, and --

5          THE COURT:  You want the defendants to compel your

6   client because you can't get stuff from your client, is that

7   what I'm hearing?

8          MS. BOSHNACK:  I'm okay with having the order to

9   compel him to do it.

10          THE COURT:  I'm not so sure that that's what the

11   motion to compel is designed to do. Is there something I

12   should be aware of, should I --

13          MS. BOSHNACK:  Just so that he understands that it

14   is something that he is required to comply with if he wants to

15   be able to have that portion of his damages attacked to his

16   claim.

17          THE COURT:  Okay, it's just that I'm sitting here

18   wondering if I get a motion to compel from the Corp Counsel,

19   what kind of response am I going to get from the plaintiff?

20          MS. DAITZ:  Hopefully it will be production of the

21   document.

22          THE COURT:  Okay.  Well, what I mean is this could

23   take some time unless what I get from the plaintiff is

24   something which short circuits the whole idea of briefing and

1

2  the motions. Because if the idea is we want the plaintiff to

3  understand and comply, is this the best we can come up with, a

4  motion to compel?

5           MS. BOSHNACK:  Or I can convey to him that it was

6  discussed in court and if he doesn't comply there will be a

7  motion to compel or he'll be forfeiting that portion of his

8  claim, and perhaps that's a better way to go about it if --

9           THE COURT:  Because I don't want this, I mean there

10 are motions to compel and there are arguments on the other

11 side. If we just have a recalcitrant person, and they don't

12 want to produce documents, and they don't understand the

13 seriousness of the request, then if they file a motion I don't

14 know that there is any response on the other side. So you can

15 tell your client that if the Corp Counsel has to file a motion

16 that might be too late for this process.

17          MS. BOSHNACK:  Okay, that's what I'll do then.

18          MS. DAITZ:  Your Honor, we would just like a date

19 certain since we have been having this discussion since May

20 and the delay in getting us these releases and then, you know,

21 at no fault of any of the parties, certainly the IRS is not

22 prompt in forwarding its responses to the subpoenas with the

23 release --

24          THE COURT:  Actually, now that I think about it, I

25 don't know that we need a formal motion to compel, is there

24

1

2    any reason that the information should not be produced, do you

3    believe that it's not relevant, counsel?

4            MS. BOSHNACK:  The only way it would not be relevant

5    is if he is not claiming those damaged, and unfortunately we

6    haven't been able to get that confirmation from him as to

7    whether or not --

8            THE COURT:  Perhaps what we ought to do is we should

9    just do an order directing him to produce it, give you

10   something to do in your waning hours.  We'll set a time limit.

11   How is the communication with your client I was just trying to

12   see what would be a reasonable timeframe?  If you got an order

13   --

14           MS. BOSHNACK:  What I'll do is I'll send it to him

15   by regular and certified mail, obviously I'll also try to

16   contact him by telephone, however, it's difficult to get in

17   contact with him.  He lives in the same house as Delores Wise,

18   who is no longer represented by our firm, and so --

19           THE COURT:  My question is, let me put this more

20   precisely, is two weeks too short a time, given --

21           MS. BOSHNACK:  For the mail to arrive, I'll send it,

22   I can send the letter to him today or tomorrow, it will be

23   there by next week.

24           THE COURT:  Okay, well we'll get the order out today

25   and you'll get --

```
 1                                                    25
 2            MS. BOSHNACK:  So as soon as I get the copy of the
 3   order I'll send that out with a --
 4            THE COURT:  Okay, we'll make it two weeks from
 5   tomorrow.
 6            MS. DAITZ:  Thank you, your Honor, and with respect
 7   --
 8            THE COURT:  And that's, who is this going to be now?
 9            MS. BOSHNACK:  It's for Daniel Wise.
10            THE COURT:  Daniel Wise, and you're satisfied you
11   have the other or did you get it already?
12            MS. BOSHNACK:  And I will bring over Victor Wise's
13   either later today or tomorrow.
14            THE COURT:  All right, we'll do an order on Daniel
15   Wise.  Anything else?
16            MS. DAITZ:  Yes, your Honor, with respect to the
17   plaintiff, Delores Wise, we just want it to be put on the
18   record that we have been cc-ing her on all correspondence
19   between the parties as a plaintiff pro se, and we did advice
20   her in writing of this conference today, I don't believe she
21   has appeared. And, as well, your Honor, we have requested that
22   she appear for her continuing deposition on September 27th and
23   that she confirm her attendance by the end of this week, but
24   we haven't heard any response to that request yet.
25            THE COURT:  All right, thank you, anything else?
```

1

2          MR. WARREN:  Yes, your Honor.

3          THE COURT:  Mr. Warren.

4          MR. WARREN:  Yes.  Your Honor, I was elected to

5   represent or to depose Officer Reynolds in this case, and

6   Officer Reynolds is not a named party, but he's a third party

7   witness. But he's a third party witness who had substantial

8   contact and, in fact, was involved in substantial interaction

9   in this case, not only involving the arrest of some of the

10  people who were arrested, our plaintiffs, but also in terms of

11  the activities that occurred within the Central Park precinct,

12  itself.

13          He, for example, was part of two -- of two

14  interviews that were conducted of witnesses in the Central

15  Park precinct and was there at the time that Kevin Richardson

16  was there, and was present with a detail of police officers

17  that went to pick up Antron McCray.  And during the deposition

18  at some point near the end of the day, I became aware of

19  certain communications that were made by Officer Reynolds,

20  Detective Reynolds, to a blog which was a *Daily News* blog, in

21  fact, it was a public blog. And I noted that in those

22  communications he made references to defendants as being

23  mutts, and, of course, I couldn't help from recalling the same

24  characterization made by Detective McKenna in this case, who

25  is a defendant in this case, in his book, in which he defined

                                                                    27

1

2    our clients as being mutts.

3            He also in his communications referred to gang of

4    thugs, police wolf pack, chasing prey.  He made negative

5    characterizations about 100 Blacks In Law Enforcement, and he

6    also made a statement in one of these communications about,

7    about his belief that in spite of the convictions being

8    vacated against our clients, that they were still guilty, that

9    they were not innocent, they were still guilty.

10           And I think that, and, of course, let me just go on

11   further, I made an application to question him, naturally,

12   about whether, in fact, he was the author of the

13   communications that were a part of this blog, and immediately

14   Mr. Myerberg, who was representing him, the City represents

15   him, notwithstanding his third party status, Mr. Myerberg

16   refused or instructed him not to answer the questions.

17           Now, we would have, or I would have made an attempt

18   to get a legal ruling at that time, and the only reason I did

19   not is because of the lateness of the hour and the time that

20   was allotted us or myself in terms of the total time for the

21   deposition. And, of course, I didn't want to disturb your

22   Honor at that time, but secondly we wanted to, in good faith

23   we wanted to legitimately research the issue so that we could

24   determine whether, in fact, the objection was unfounded. And

25   in fact, we believe the objection is unfounded, there are a

28

few cases which are cited in a correspondence of July 22nd that was sent to your Honor, and in those cases, those three cases or so, it specifically indicates that discovery, whenever the issue of relevancy is at hand, that discovery is broader than admissibility. And, in fact, these issues are relevant.

I am seeking from your Honor, most respectably, to have this deposition reopened so that I can ask the vital questions of Detective Reynolds whether, in fact, it's a threshold question, you were the author of these communications, which we firmly believe that he was. And secondly, to ask other questions relating to those communications, and perhaps other communications that have a direct impact and effect on his credibility. And should there be a trial in this case, then obviously those issues would be gone into if he were on the stand and testifying as a witness. And certainly I would like to be able to ask those questions and continue to ask about those issues during the deposition.

If your Honor would indulge me for one second, please. Also, your Honor, Mr. Beldock advised me that we have the same problem with Officer Weir in terms of not being allowed to go into IAB complaints. We believe that we should be able to go into IAB complaints, anything that affects the credibility of these officers. And, in fact --

THE COURT:  Is that also one that's already taken

```
 1                                                    29
 2  place?
 3          MR. WARREN:  Yes.  Yes.  And, in fact, during the,
 4  now that I recall, during the depositions of Officer,
 5  Detective Reynolds, there are certain things that came out
 6  during the initial part of the deposition, questions that I,
 7  threshold questions that I raised, that ultimately resulted in
 8  the revelation that he was facing or had faced certain
 9  lawsuits, several lawsuits during the course of his career.
10  And I would like to be able to go more deeply into that area,
11  and one of those instances, one of the individuals who was
12  arrested in a case that he was involved in had been shot and
13  was in the hospital, and was in intensive care unit, and he
14  was sued because he, the man needed oxygen and he pulled the
15  oxygen mask off of his face in an attempt to do whatever. I
16  was not allowed to get further into that area. But it's these
17  type of inquiries that I think are legitimate inquiries. I
18  would like for your Honor to make a ruling. They're not simply
19  third party witnesses and even if they were third witnesses we
20  contend that we have a right to deal with their credibility,
21  and but this Officer Reynolds, Detective Reynolds is more than
22  a third party witness for the reasons that I've just
23  discussed.
24          THE COURT:  I get the gist of what you're saying,
25  who wants to --
```

1

2          MR. BELDOCK: Also civilian complaints, as well, Mr.

3    Beldock.

4          THE COURT:  Who wants to tell me the other side of

5    the story.

6          MR. DEPAUL: Yes, your Honor, Philip DePaul. If I

7    could just, for your Honor, bring in a little bit of content.

8    These questions that were raised in the July 22nd letter of Mr.

9    Beldock, refer to a message board, comments on a message board

10   that Mr. Warren intends to ask Detective Reynolds.

11          He marked a ten-page document as an exhibit and then

12   attempted to ask questions about that document.  The comments

13   in that document refer to the Sean Bell matter, an incident

14   that is unrelated to this case, that occurred 17 years after

15   the incident that's the facts and circumstances of this

16   lawsuit.

17          Mr. Myerberg who was counsel at the time, directed

18   Mr. Reynolds not to answer the question, not on the basis of

19   relevance, but on the basis of it being harassment.  Simply

20   put, the questions don't go to Officer Reynolds' credibility,

21   they go to harassment. They are basically questions of giving

22   him to give opinion on a racially charged case, or asking his

23   opinion on African-American people, in general, it didn't go

24   to this credibility.

25          THE COURT:  You don't think that those issues that

```
 1                                                          31
 2   you just mentioned, one's thoughts about racially charged
 3   cases and the African-American community would be relevant?
 4              MR. DEPAUL:  No, your Honor, it's -- one brief
 5   moment, your Honor.  Your Honor, again, it's not relevant, it
 6   goes to the harassment of a witness about his opinions on a
 7   case that occurred 17 years after the incidents in this
 8   matter.
 9              THE COURT:  And I'm not sure why you think that
10   that's not relevant, I mean are you saying that if he -- are
11   these different opinions than he would have had 17 years ago?
12              MR. DEPAUL:  Your Honor, I'm not sure, but --
13              THE COURT:  I think you answered the question then
14   didn't you?
15              MR. DEPAUL:  What?
16              THE COURT:  I mean, first of all, the direction not
17   to answer a question, you really have to have it on, you know,
18   it's very solid, I mean it don't think it was designed to make
19   a motion. And the question of one's credibility and the issues
20   that are swirling around in this case, certainly are, one can
21   argue about what is and what is not relevant. It seems to me
22   the question about what you can ask a witness in that regard
23   in terms of his views, actually I'm not sure when or if they
24   ever lose their relevance.
25              MR. DEPAUL:  Additionally, your Honor, my colleague,
```

32

2  Mr. Myerberg, attempted to raise this issue with the Court at

3  that time, many times in fact, at the deposition. Mr. Warren

4  replied he was going to reserve his rights on the issue. So

5  while we attempted to raise the issue with the Court to

6  resolve it at the deposition, plaintiffs' counsel decided that

7  they didn't want to, and then for over an hour played 911

8  calls. So it was -- it was our position at the time that we

9  could have resolved this --

10         THE COURT:  Right, and you could have,

11  notwithstanding whatever Mr. Warren did, you could have raised

12  it with me, or he could have.  I mean was there a direction to

13  the witness not to answer?

14         MR. DEPAUL:  Correct, your Honor.

15         THE COURT:  Once there's a direction to the witness

16  not to answer, you have it in your power to contact me,

17  regardless of what Mr. Warren does.

18         MS. NELSON:  Well, your Honor, we did suggest that

19  several times to plaintiffs' counsel, we were at their

20  offices, their phones, they continued with the deposition. I

21  don't know that there was anything more for us to do barring a

22  ruling from your Honor.

23         THE COURT:  Well, I understand that, I like people

24  to be civil, but as a legal matter, at that point you could

25  have said we're stopping the deposition and we're going to get

1   a ruling from the Court.

2

3       MS. NELSON:  I agree, your Honor, but as your Honor

4   has pointed out to us on several occasions, that is not the

5   alternative that you would prefer.

6       THE COURT:  That's correct.

7       MS. NELSON:  What we did was we put plaintiff on

8   notice as to our objection, we had the witness not answer that

9   question, and we moved forward at plaintiffs' preference.  We

10  shouldn't now be penalized that we didn't call your Honor

11  because plaintiffs didn't want it. We certainly made our

12  objection known for the record, we've made it known to

13  plaintiffs several times.

14      THE COURT:  Well what does the record show at that

15  point, does the plaintiff say, okay, everything is fine, or

16  does he say --

17      MS. NELSON:  No, what the record shows, your Honor,

18  is that plaintiff said we have other matters we would like to

19  go through, let's go through them. They came back to the issue

20  again, Mr. Myerberg raised his objection again, and that

21  deposition ended without calling your Honor. And if I remember

22  correctly we were still within our seven hours, so we didn't

23  even raise that objection as a reason not to call your Honor.

24      MR. WARREN:  Your Honor, I think that Ms. Nelson

25  would have to agree that we all agreed at the eleventh hour

1                                                                    34

2  that these issues would be collectively raised, as I

3  understand it. And again, you know, there were, these issues

4  were always on the table, and certainly it became aggravated

5  at the eleventh hour when we became aware of the transmission

6  to the --

7            MS. NELSON:  Whoa, whoa, I'm not sure what the

8  eleventh hour is you're talking about, it certainly wasn't

9  late night, and we were again still within our seven hours,

10 and I won't agree with Mr. Warren, Mr. Moore on several

11 occasions stopped the deposition over our objection not to

12 answer a question, and called your Honor.  The issue got

13 resolved, the deposition continued, you know, consistent with

14 your Honor's ruling.

15           And I just want to point out that during the

16 Reynolds deposition, at one of those times, we did raise the

17 objection and asked -- an instructed the plaintiff not to

18 answer it. That was a 5:20, pursuant to Mr. Fisher.  Mr.

19 Warren said we're not going to deal with this now, we're going

20 to deal with it at the end of day, but not now, that was at

21 5:20, and by the end of the day we thought he was going to

22 call the Court.

23           How this ended was we objected, we put our objection

24 on the record, Mr. Warren ended the deposition and we left.

25           MR. WARREN:  Judge, that is not true.  The --

1

2          MS. NELSON:  But the record will --

3          THE COURT:  Counsel, counsel --

4          MS. NELSON:  My apologies, your Honor.

5          THE COURT:  Okay.  I'm, you knew where I was going

6  on this?

7          MS. NELSON:  Yes, your Honor, I apologize.

8          THE COURT:  All right.

9          MR. WARREN:  Judge, first of all, it not only

10 applies to Detective Reynolds, it also applies to Officer

11 Weir, as well. And at 5:20, I think the deposition ended at

12 approximately 7:00, and we indicated once we became aware that

13 there were other issues, that we would make these issues

14 available by way of argument and that was in the letter that

15 was sent from Mr. Beldock, at the appropriate time. Because

16 given the fact that it had arrived 7:00 at the end of the day,

17 that was, the time was about expired, and we felt that on that

18 basis it wasn't appropriate to contact the Court at that time.

19         THE COURT:  Okay, before you continue with this,

20 before you continue with the procedural issue, let's deal with

21 the substance of this. And the substance is this, okay, if you

22 had these witnesses on the stand and the question came up as

23 to whether or not they had been involved in these blogs, do

24 you think the Judge would let that question come in?

25         MS. DAITZ: Your Honor, if I may, I'm sorry, Mr.

1

2  DePaul, I would like to address that issue. I think the answer

3  is not only no, but in this particular case, you know, there

4  are hundreds of racially charged incidents in this City,

5  particularly in the past 20 years. And to allow plaintiffs,

6  with every single nonparty witness, when we're already talking

7  over sever hours per deposition, to inquire about each

8  witness' opinion as to each and every racially charged case,

9  in the hopes that a witness might say something like, you

10 know, I thought the officers' actions in the Sean Bell case

11 were justified --

12          THE COURT:  Okay, just before you continue with

13 this, I will make it clear to you that I would never let a

14 lawyer just ask a question out of the dark, that is just say,

15 okay, what's your opinion on this.  If a lawyer wants to ask a

16 question, the first thing I'm going to ask him is do you have

17 a good faith basis for believing that there is something here,

18 and what Mr. Warren has told me is not just that he's asking

19 people, okay, what's your view on the Sean Bell case, it's

20 that you've written some very incendiary things, did you write

21 this stuff?  Or there are some very incendiary things written

22 about this case, which was a racially charged case, which one

23 could argue might have some implications for how someone acted

24 in a racially charged case which they have very strong

25 feelings about.

37

Given that premise, given that intro, that's not a fishing expedition, that's trying to find out whether or not this person has some views which might affect how they would react in a certain kind of situation. I don't see this as, you know, just asking every witness what their views are.

MS. NELSON:  Except that wasn't the foundation that was laid, your Honor, Mr. Warren showed the witness and exhibit, we read it, the witness read it, I think both Mr. Myerberg and I went on the record to ask Mr. Warren if he actually intended to ask questions about a blog concerning Sean Bell, he said yes.  He gave no other explanation.

If that is all, if we have a bare bones foundation, other than what your Honor just gave us, we had not other reason to believe that we should not instruct the witness not to answer those questions.  Mr. Warren did not lay that kind of foundation. I'm sure it is in their application to the Court, but that was not the circumstances under which we objected to the questions at the deposition.

MR. WARREN:  Judge, most respectfully, the whole purpose in conducting a deposition is to establish if you have a reasonable basis that you believe supports asking a question, it's to ask questions that are relevant for purposes of further down the road being in a position, depending on the response, to enlarge on that question and ask the same

                                                                    38

1   question in the trial.

2          THE COURT:  Before we get too much into philosophy,

3   what was the specific question that was asked that resulted in

4   the direction not to answer?

5          MS. NELSON:  We'll find it, your Honor.

6          MR. WARREN:  As I recall, the question was whether,

7   in fact, Officer Reynolds or Detective Reynolds, was the

8   author of that blog.

9          MS. NELSON:  Actually --

10         MR. WARREN:  Or the communications in the blog, I'm

11  sorry.

12         MS. NELSON:  I believe there was a question about

13  whether or not Officer Reynolds created any blogs with

14  internet postings, then he answered those questions, and then

15  the reason for the objection though was have you ever made any

16  comments on any publication concerning the Sean Bell case?

17         THE COURT:  Okay, so that was the question?

18         MS. NELSON:  That was the question that led to --

19  that was the question that led to the objection. He certainly,

20  he answered the questions, your Honor, as to whether he ever

21  made any publications on any blogs or internet posts.

22         MS. DAITZ: Also, your Honor, just reading from the

23  record, would point out that the defense counsel, Mr.

24  Myerberg, inquired of Mr. Warren as to what the relevance of

39

the line of questioning was prior to instructing the witness

not to answer, and the only response was credibility. And Mr.

Myerberg explained that the witness was a nonparty, and that

he, having reviewed the blog entry about the Sean Bell case,

did not believe it to be an appropriate area of inquiry. And

Mr. Warren simply said we are going to reserve our right.

There's no other statement on the record explaining, as

thoroughly as plaintiffs did in their subsequent letter

application, what the basis for their questioning was, and

what the good faith basis was for pursuing that line of

inquiry.

THE COURT:  And this, you keep referring to it as a

third party, is this person a potential witness?

MS. DAITZ:  He is a witness, he's a nonparty.

THE COURT:  He's a nonparty witness.

MS. DAITZ:  He's a nonparty witness, yes, your

Honor.

THE COURT:  Okay.

MS. DAITZ:  He was the arresting officer of certain

of the people in the park.

THE COURT:  And so just to be clear, as I understand

it, the question here is whether to reopen this deposition for

this line of inquiry, that's it, right?

MR. WARREN:  That's correct.

```
 1                                                    40
 2              THE COURT:  Okay.  Now what did you want to add?
 3              MR. WARREN:  No, as I said, there is a connection in
 4  terms of one of the terminologies that was used by Detective
 5  Reynolds, mutts, that was also used in public record in a book
 6  that as written by one of the defendants in this case, who
 7  worked with Detective Reynolds on this case, and that was
 8  Detective McKenna.  And, of course,  these are not questions
 9  that are simply asked out of a vacuum or asked harass, that's
10  simply not the way we operate.
11              We had a basis for asking good faith questions, we
12  would still like to and I would still like to expand on those
13  questions and reopen this deposition, not only as it relates
14  to his communications in a public blog that had what I
15  considered to be significant relevance to this case, and his
16  testimony as a witness in this case, but also, as I said
17  before, questions relating to CCRB complaints against him, IAB
18  complaints against him, the lawsuits against him.  All these
19  things are relevant in terms of his credibility as a witness.
20  I mean counsel can't have it both --
21              THE COURT:  I'm sorry, and you didn't ask those
22  either?
23              MR. WARREN:  We asked -- we asked some of them
24  initially, but we were not allowed to expand on them at an
25  point later on.  And we decided that at the, when the
```

41

1

2 questions arose concerning the communications to the blog,

3 that we would raise all of these issues, especially since

4 Officer Weir was in a similar situation in terms of us not

5 being allowed to inquire into IAB complaints, that we would

6 raise all of these matters to the Court in a logical way in

7 the communication and have a hearing on the matter so the

8 Court could make a ruling. And Mr. Beldock can --

9          THE COURT:  But I guess, but Ms. Nelson is right

10 though, other than saying credibility, you didn't really give

11 your full theory of why this was relevant.

12          MR. WARREN:  Well, I indicated that, I thought I had

13 indicated, I don't have a copy of the transcript with me, but

14 I thought I had indicated that the relevancy related to his

15 credibility as a witness in this case, and if he were called

16 as a witness at a trial, that then credibility would be a

17 relevant issue. I don't remember the exact context, but

18 certainly it is relevant, your Honor.

19          And that is the issue that is before us today. It is

20 --

21          THE COURT:  And who's the other witness?

22          MS. NELSON:  Weir.

23          MR. BELDOCK:  It was also James Weir, whose

24 deposition I took, your Honor, but it's all, this discussion

25 applies to all of the third party witnesses, police witnesses,

42

1

2 third party witnesses who are former police officers involved

3 in this case. We have been faced with the blanket objection in

4 the Weir case, and in the Reynolds matter, by the Corporation

5 Counsel, that they're third party witnesses so we can't go

6 into credibility issues of this nature.

7        Now I just want to point out to your Honor that we

8 didn't, we came upon this blog information quite close into,

9 if not the day before the Reynolds deposition. One of the most

10 key items on the blog we didn't discover till after the

11 Reynolds deposition. These items should have been given to us

12 in the first place, because that key item had to do with very

13 case. And one of those, that internet -- that internet item

14 had to do with his report to the public, to the people on his

15 blog, about the arrests he made in this case, and what he

16 considered about the defendants.

17        So this is not a singular issue, this is an across

18 the board issue, and there is no way we should be prevented

19 from asking them questions of this nature because they're

20 third party witnesses. And what's more, they have asked the

21 same questions --

22        THE COURT:  Counsel, counsel, counsel, counsel --

23        MR. BELDOCK:  They have asked all kinds of questions

24 of the same nature of our witnesses and of other witnesses.

25        THE COURT:  Mr. Beldock, I have heard enough.  Okay,

1

2   with respect to the issue, and I think I understand the issue

3   now and I understand eh defendant's objections and the

4   question of whether or not the inquiry concerning attitudes

5   that the witnesses may have is either too attenuated in terms

6   of time or circumstance. I find that the inquiry is relevant,

7   and my only issue, frankly, is whether or not it's generically

8   relevant or that there is some basis for the inquiry. And

9   while I would have, I think it would have been cleaner if the

10  dialog between counsel had made clear what was going on, I

11  understand that there was always some hesitancy on the part of

12  counsel to have a colloquy and then reveal what it is that

13  they want to ask questions about.

14        But it does seem to me that to the extent that there

15  are blogs where people are expressing opinions concerning what

16  have been termed by the parties racially charged incidents,

17  that goes beyond just somebody's personal opinions. And to the

18  extent that any witness has opined in public concerning these

19  kinds of issues, I think that's fair inquiry.

20        That deposition, the Reynolds deposition, will be

21  reopened on a limited basis to inquire about the blog.  Yes,

22  Ms. Daitz?

23        MS. DAITZ:  Your Honor, given that the witness is a

24  retire from the NYPD, and nonparty, and he has subsequent

25  employment, we would request that the questions be, or the

```
 1                                                    44
 2   deposition be reopened via a deposition upon written
 3   questions, to see if there really is any need to bring back
 4   this witness for an entirely new deposition for this limited
 5   line of inquiry.
 6              THE COURT:  All right, are you saying -- well,
 7   before you make that application, show me you cannot
 8   accommodate this within the framework of a regular deposition.
 9   We're only talking about an hour here, or so, I mean I don't
10   know.
11              MS. DAITZ:  Well, your Honor --
12              THE COURT:  I don't expect this, well, first of all,
13   I don't expect this to be more than part of a day. Are you
14   trying to tell me something different, Mr. Warren?
15              MR. WARREN:  Not at all, Judge.  I try to be very
16   frugal with time and I like to deal with the issues as they
17   are significant. So I don't intend to waste time here. I mean
18   if there is something there, it won't be an all day
19   deposition, I can tell you that. It won't be an all day --
20              THE COURT:  The bottom line is this --
21              MR. WARREN:  It won't be that.
22              THE COURT:  All right.  If you, before you request a
23   deposition on written questions, which I think, I mean, look,
24   they're just not the same as a regular deposition. So if you,
25   if there is some problem, you said, is he retired?
```

```
 1                                                        45
 2          MS. NELSON:  He is retired, your Honor, from the
 3  police department.
 4          THE COURT:  Does he live in New York?  Does he live
 5  in New York?
 6          MR. WARREN:  He lives in New York, he's in, as I
 7  recall, he said he was in real estate, he lives in the city,
 8  he has no problems getting to a deposition --
 9          MS. NELSON:  I'm not sure if that question was
10  asked, but fine.
11          THE COURT:  Look, if you want to make that
12  application, give me something more than just the idea that
13  he's a third party and --
14          MR. WARREN:  Well, your Honor, I will say that he,
15  during the deposition, one of the questions I asked him was
16  how many times did he meet with Corporation Counsel, at least
17  ten --
18          THE COURT:  You know, of course, at this point
19  you're winning this issue, so I'm not sure --
20          MR. WARREN:  I understand.
21          MS. NELSON:  Your Honor, I just want to clarify so
22  we all understand, the deposition is being reopened so that
23  Officer Reynolds can answer questions regarding the blog that
24  was marked as Exhibit 9 at the deposition?
25          THE COURT:  Well, I guess that depends on where it
```

 1
 2   leads --

 3          MR. WARREN:  Judge, I'm also seeking one other area

 4   that I've elaborated on.

 5          THE COURT:  So it's a good thing that she asked the

 6   question.

 7          MR. WARREN:  Judge, no, but we've already talked

 8   about this, the disciplinary matters, the lawsuits, these are

 9   extremely critical in terms of the credibility --

10          THE COURT:  Now you said you had asked some

11   questions along those lines?

12          MR. WARREN:  Some questions, but I wasn't able to

13   really expand.

14          THE COURT:  When you say -- I'm sorry, when you say

15   you weren't able to expand, what does that mean, you were

16   prevented or?

17          MR. WARREN:  Yes.

18          MS. NELSON:  No.  Let me just say --

19          THE COURT:  Okay, Mr. Warren.

20          MS. NELSON:  Mr. Warren.

21          THE COURT:  Don't do that.

22          MS. NELSON:  Your Honor, Officer Reynolds was asked

23   about prior lawsuits, he answered all of those questions, Mr.

24   Warren moved on.  According to Mr. Warren's statement in

25   court, is that he didn't get a chance to go back and ask more

1                                                                    47

2   questions.  That is not what we should be reopening the

3   deposition for.  He asked those questions, he ended that line

4   of questioning, and he moved on to something else.  Now in

5   retrospect he wants to go back and he wants to ask further

6   questions. I don't believe that the Court should allow him to

7   reopen the deposition to be able to do that.

8            MR. WARREN:  Your Honor, there were certain areas

9   that I attempted to inquire in, although certain answers were

10  provided, and I distinctly remember Mr. Myerberg instructing

11  him not to answer because he considered the answer to those

12  question to be, or those questions, themselves, to be

13  irrelevant.

14           And, your Honor, I think that again, that the, for

15  example, CCRB complaints, whether they were founded,

16  substantiated, IAB complaints, the fact -- I'm sorry, go

17  ahead.

18           THE COURT:  Mr. Warren, I do not disagree with you;

19  however, I am not going to reopen the deposition for stuff

20  that you had an opportunity to inquire and then you stopped on

21  your own accord. If you want anything beyond what I've just

22  ordered with respect to the blog --

23           MR. WARREN:  Yes.

24           THE COURT:  You show me in the deposition where you

25  were prevented from asking.

1                                                                    48

2              MR. WARREN:  Yes.

3              THE COURT:  If you make that showing, we'll consider

4  it. But this is not for you to get a second bite at the apple

5  for things that you didn't go into in the detail that you

6  would have liked or in retrospect you said, oh, maybe I should

7  have asked this question. Only if you, if you can demonstrate

8  to me that you were not allowed to explore those issues fully,

9  that would be the initial showing. And then if you were

10 prevented from asking, and I don't mean where counsel in a

11 colloquy said, okay, I think that's enough, then we'll deal

12 with the blog. Other than that, let's see what you've got for

13 me.

14             MS. NELSON:  One separate issue, from my

15 understanding, Mr. Warren brought up three, which is the blog,

16 the lawsuits and --

17             THE COURT:  The CCRB.

18             MS. NELSON:  The CCRB, and I believe Mr. Beldock

19 also said Civilian Complaint histories.  We've always put our

20 objection on the record, actually very similar to what Mr.

21 Warren is now asking for, which is substantiate/

22 unsubstantiated, you've also added, of a similar nature, and

23 we've allowed every single witness, including the nonparty

24 witness, to answer that question.

25             We phrase our objection based on previous rulings

1                                                              49

2   that are published by your Honor, with respect to the

3   production of CCRB and IAB disciplinary information.  Apart

4   from those objections, substantiated/unsubstantiated of a

5   similar nature, we've allowed our witnesses to answer the

6   question, and we certainly allowed Eric Reynolds to answer in

7   this case.

8            So to have him go back again and revisit that issue,

9   again, I think Mr. Warren has figured out in retrospect that

10  there are other questions that he wants to ask, that weren't

11  asked at the deposition. And that he had the opportunity to

12  ask the deposition.

13           THE COURT:  So that all the parties will understand,

14  that will be the basic inquiry, from my point of view.

15           MR. BELDOCK:  Let me just read something that's very

16  pertinent.

17           THE COURT:  Yes.

18           MR. BELDOCK:  Because Ms. Nelson's memory is wrong.

19           MS. NELSON:  Okay.

20           MR. BELDOCK:  As I wrote in my letter or July 22nd to

21  your Honor:  "On Tuesday of this week in the course of my

22  deposing former Officer Seamus Weir, Assistant Corporation

23  Counsel Elizabeth Dollin objected to my asking if there were

24  ever any civilian or IAB complaints made against him, and

25  whether he was ever disciplined as a police officer. Ms.

1

2   Dollin would not let him answer on the grounds that he was a

3   nonparty witness. This relates to my previous statement that

4   this is a universal problem we have, and Ms. Nelson is simply

5   wrong in her memory, and they are blocking us from asking

6   questions that should be easily allowed and should not be

7   blocked. That point is quite significant, because it doesn't

8   have to do just with Reynolds and Weir --

9           MR. WARREN:  That's right.

10          MR. BELDOCK:  It has to do with the next ten

11   depositions we're taking.

12          MS. NELSON:  Let me just say, your Honor, we've

13   taken about between 20 and 30 of these depositions, we put the

14   same objection on the record every time, more or less, I've

15   been to every one of them.  And we have allowed the witness to

16   answer every time.  I think it is well past the time for

17   plaintiff to raise this objection, if they want to raise this

18   objection. And like I said, we base our objection on your

19   Honor's previous rulings on this issue.

20          The only thing we have asked is that the questions

21   be limited to a similar nature as the claims in this case --

22          MR. BELDOCK:  Judge, what I just put in shows that

23   she's wrong.

24          THE COURT:  Okay, counsel, I --

25          MR. BELDOCK:  She's wrong though.

```
 1                                                    51
 2            THE COURT:  If there's -- if there is an issue of
 3   witnesses being directed not to answer, and I don't mean just
 4   objections, okay, then, you know, by all means bring those to
 5   me. I mean I would prefer that lawyers not object, but there
 6   is a difference between saying that you object to a question
 7   and directing the witness not to answer. Because I get these
 8   all the time, some lawyer says I object, then the lawyers says
 9   are you going to direct him not to answer, and he says no.
10            If you're telling me that you are asking questions
11   concerning prior incidents about an officer and there was an
12   objection, you'll have to point it out to me.
13            MR. BELDOCK:  I mean but that's what I pointed out
14   in my letter. That was one of the bases for this application,
15   I'm pointing out, I specifically pointed out that Ms. Dollin
16   prevented me from asking about civilian or IAB complaints made
17   against Officer Weir. It's on the first page, it's in the
18   second paragraph, it's exactly what happened, Ms. Dollin said
19   I can't ask this of a third party witness, and Ms. Dollin
20   said, directed him not to answer.
21            Now we're going to have this problem all the time,
22   we shouldn't have it at all, these witnesses are not third
23   party neutral witnesses, they are part of the police officers
24   who were involved in this case.
25            THE COURT:  Mr. Beldock, you do say that she would
```

1                                                               52

2   not let him answer on the grounds that he was a nonparty

3   witness.

4              MR. BELDOCK:  Yes.

5              MS. ELIZABETH DOLLIN:  Your Honor?

6              THE COURT:  Yes.

7              MS. DOLLIN:  Elizabeth Dollin.  I did attend Officer

8   Weir's deposition, and I believe, and I don't have the

9   transcript in front of me, that as Ms. Nelson had pointed out,

10  I believe my objection was to limit or allow him to answer

11  questions about IAB and CCRB complaints that were similar in

12  nature and to a relevant time period.

13             Now I don't, your Honor, have that deposition

14  transcript in front of me, but that has been our practice with

15  respect to nonparty witnesses.

16             THE COURT:  And why do you make a distinction,

17  nonparty witnesses?

18             MS. DOLLIN:  With all witnesses, your Honor, I'm

19  sorry, with all witnesses.

20             THE COURT:  Oh, okay.

21             MS. DOLLIN:  And so I believe that that was our

22  objection and our instruction, but I don't have the transcript

23  in front of me.

24             THE COURT:  You didn't give me the transcript, Mr.

25  Beldock, did you?

1

2          MR. BELDOCK:  No, I did not, your Honor.

3          THE COURT:  Okay.  Well, I'm not exactly sure

4  exactly what happened though.  Mr. Beldock asked him about

5  complaints and you object, and then what happens?

6          MR. BELDOCK:  Well, if my letter is correct and I

7  thought it was when I wrote it, I asked him if there were ever

8  any civilian or IAB complaints made against him and whether he

9  was every disciplined as a police officer.  I hope I'm

10 correct, it hasn't been objected to on the fact, and Ms.

11 Dollin would not let him answer on the grounds that he was a

12 nonparty witness.  And I was less concerned about Weir than

13 the principle, in general.

14         THE COURT:  Okay.  Then what is the objection to

15 that question?

16         MS. DOLLIN:  Your Honor, again, I'm not sure that my

17 objection was, and I don't have the transcript in front of me,

18 and I also raised that this was not presented, this issue of

19 Weir was not presented to us when we had our meet and confer,

20 so I'm not fully prepared to discuss it.

21         However, it has been our practice with respect to

22 witnesses, when they're asking, when the plaintiffs are asking

23 questions about IAB and CCRBs to please limit them to allow

24 them to answer questions about cases of a similar nature and

25 limited time.

54

1

2          THE COURT:  Okay, before you continue, let me just

3    be clear about my position on this.  While I might do that if

4    I'm asking, if the question is asking the lawyers to produce

5    the information, I might make some limitation and tell them to

6    say what's relevant. I don't have the same confidence in a

7    witness. That is if you're at a deposition, I don't think you

8    can ask the witness just tell me the ones that you think are

9    relevant or similar. I just don't think that works.

10         MS. DOLLIN:  Your Honor, I understand. Again, we

11   based that objection on rulings from -- and we would, as Ms.

12   Nelson points out, we would know and point them out --

13         THE COURT:  Okay, but again, just so you'll be

14   clear, if I got a request from a party, let's say a plaintiff

15   in a case involving a police officer, and they said give me

16   the police officer's CCRB. The first issue, sustained/not

17   sustained, I would say that's not going to get you not

18   producing it. If you said similar/non-similar, I might let the

19   lawyer make that distinction because, you know, depending on

20   what kind of, if the question was if I had a case involving

21   police brutality and the question was whether or not the

22   police officer was accused of, you know, writing tickets, that

23   might be in play as to whether or not you're producing it.

24         But regardless of what I would do in terms of what I

25   would allow the lawyer to do for the City, in a deposition, it

1                                                              55

2    just can't work. That is you can't ask a witness to give me

3    only the CCRB ones that are relevant because you're not

4    asking, that person can't make that determination. And so I

5    would not allow you to direct that witness not to answer the

6    broad question because I'm not going to allow him to make the

7    determination, him or her. And so at the deposition, it will

8    necessarily be broader because until the lawyers bring it out

9    or until, because there is no way, for example, I mean, for

10   example, if it's producing a production of documents, I mean

11   most of the lawyers on the plaintiff's side will say, well,

12   Judge, I don't want the defendant to make that determination

13   because they're going to be more narrow. And at least the

14   default is I can look it and I can determine whether or not

15   I'm going to allow it in.

16          At the deposition, it can't work that way because we

17   don't know what he's going to say and we don't know the full,

18   I mean it's not as if he says, okay, no, I don't have anything

19   relevant, that the plaintiffs' attorney is going to be able to

20   do anything about that. I don't think you can limit it at the

21   deposition.

22          So I would say that whatever distinction the City

23   was making in terms of those, I think we may have an issue

24   that needs to be addressed here.

25          MS. DOLLIN: Your Honor, I would point out that,

56

1

2  again, I don't have a transcript in front of me, but I believe

3  at the Weir deposition, plaintiffs' counsel was asked to allow

4  and did ask questions like were you ever charged with theft as

5  a member of the NYPD, were you ever charged with other, and he

6  was allowed and he did answer those specific questions as to

7  whether you were ever charged with theft, with whether you

8  were ever charged with acting dishonestly. Those questions

9  were asked and answered.

10         So I hear what the Court is saying, but I don't want

11  it to appear that we just blocked the plaintiffs entirely, we

12  did not.

13         THE COURT:  Okay. Well the bottom line here is that

14  at the deposition I expect the questions to be asked and

15  answered more broadly, and that is I don't expect if you are

16  asking a police officer about his disciplinary record, that

17  there be directions not to answer. Because there is no way for

18  us to determine ahead of time which ones are going to lead to

19  relevant evidence, because I don't know what's in it.

20         MS. NELSON:  Your Honor, I do understand your

21  ruling, and once the witness answers that question and it is

22  clear from the nature of his answer that it's, really, it's

23  not relevant, how much further does he need to go into that

24  line of questions?  If he says, your Honor, have you ever been

25  disciplined by the police department; yes, I have, I lost my

1                                                              57

2   shield, is that sufficient?

3           THE COURT:  If he lost his shield?

4           MS. NELSON:  Well, it's clearly -- it's clearly an

5   issue that is not relevant, whatever the issue may be,

6   whatever he was disciplined for.

7           THE COURT:  The problem, Ms. Nelson, is I don't know

8   whether I could even answer the clearly question in the

9   abstract. So I'm not going to -- I'm not going to say, okay,

10  for the plaintiffs, you know, you have carte blanche, I'm not

11  going to say to the defendants if it's clearly not relevant,

12  because I don't know what that means.

13          MS. NELSON:  Okay.

14          THE COURT:  Because I don't even know the context in

15  which it's going to arise. I would say that you can anticipate

16  that, I'll err on the side of allowing it, because it's

17  discovery.  And I don't, I mean we're not talking about, and I

18  think this came up in an earlier conference, we're not talking

19  about information that is locked in a safe someplace. I mean

20  at this point if there is something that needs to be

21  confidential, you can argue about that, but as to whether or

22  not we're going to allow questions about it, it seems to me I

23  don't know how we're going to make any determination about

24  what can and can't be considered relevant.

25          MS. DILLON:  Your Honor, I think that the only thing

1                                                          58

2    that the defendants, and I understand the difficulty in, you

3    know, ruling in the abstract and sort of putting it in context

4    is, I just think that what we're trying to avoid is mini

5    depositions on completely unrelated incidents where the

6    allegations in either unrelated lawsuits or unrelated CCRB,

7    are delved into to a significant extent in terms of who --

8              THE COURT:  Well, look, if any of the plaintiffs'

9    lawyers spends two hours talking about that and they lose

10   their seven hours, that's on them. If they want to spend time

11   on stuff like that, and the seven hours is up, the seven hours

12   is up.  They won't be able to convince me that they need any

13   more time.  I mean at some point the lawyer is their own --

14   their own limit as to what, I mean understand that for me the

15   questions you're asking become difficult because I could never

16   see myself spending two hours on something which I wouldn't

17   thin would be relevant. And I give everybody the benefit of

18   the doubt that no lawyer is going to spend time just for the

19   sake of spending time, they made their determination of what's

20   relevant, and what you think is relevant may be different, but

21   by and large lawyers spend time on what they think is

22   important.

23              But as I said, you might disagree on what's

24   important, but if they think that spending time on one

25   particular complaint is warranted, and that takes away from

1                                                              59
2    their ability to ask something else, they may, you know, they
3    may find that the seven hours is up and then they'll say we
4    want additional time and they'll come to me and I'll say,
5    well, you know, that ship has sailed.
6         MS. DILLON:  Your Honor, I think that's just what I
7    was trying to establish was that the Court's ruling that
8    inquiry into disciplinary history, CCRB history, other
9    lawsuits, are presumptively relevant for the purpose of the
10   deposition, does not mean that that's grounds to ask those
11   questions in hours seven through nine of the deposition.
12        THE COURT:  I think, I mean if, I've said what I've
13   had to say about it, I am assuming that all the lawyers here
14   are going to use their time, considering all the disagreements
15   that we've had, you know, you are always going to have the
16   burden of demonstrating to me that you didn't get to ask all
17   of the important questions.  And so I always tell lawyers
18   this, if you have any question about what's the most important
19   questions, ask the most important questions first.
20        I mean we were talking about Mr. Warren before
21   deferring, I mean if he wants, if he wanted to talk about an
22   hour about some CCRB thing, he'd better do that not in the
23   beginning and use up his seven hours. And so I think the rule
24   is there for the reason that we don't want lawyers thinking
25   that they can say and do whatever they want and take up the

 1

 2   time of a witness.

 3          So, you know, you can be judicious in your use of

 4   time and that's the limitation that people have.

 5          MR. BELDOCK:  Judge, can we speak some more about

 6   time now, your Honor, I think we're through. I hope we're

 7   through with this issue.

 8          MS. NELSON:  Just two more very small matters, Mr.

 9   Beldock, and one is, your Honor, from your Honor's ruling, I

10   don't know that I should assume, but we can raise issues

11   regarding individual witnesses that are coming up for

12   deposition, in the event we seek ahead of time that we need to

13   move for a protective order or something else we cannot agree

14   with plaintiffs once we confer?

15          THE COURT:  You lose none of the rights that you

16   have under the federal rules, and I think that's one of them.

17          MS. NELSON:  Thank you.  My, but the other thing I

18   want to discuss is the limitations to the Reynolds deposition.

19   In light of what your Honor said, I don't believe that we were

20   out of our set hours, but we certainly didn't have an hour.

21   And if all the deposition is going to be reopened for is so

22   that Mr. Warren can inquire into its Exhibit 9, then I don't

23   believe that the deposition should be extended for an hour.

24          MR. WARREN:  Judge --

25          THE COURT:  Okay.  All right, the way I answer that

61

question is always this way.  I'm not a big fan of limiting

depositions, per se, because it gives one side or the other

the opportunity to say, if I say well you get an hour, then

the other side says, well, we'll take an hour. And by the same

token, the side that's defending can stretch it out and then

it gets over the hour.

As long as Mr. Warren has traction in his questions,

then he'll be on safe ground.  If, whoever, depending on the

deposition, says, you know, gets to the point and they think

Mr. Warren is just harassing the witness and he's not asking

anything that's really productive, then, you know, stop the

deposition, call me, we'll answer that question.

But I don't know where it will lead. I mean he could

start asking him about the blog and, you know, the next thing

I know, there's a whole area of inquiry that opens up that's

going to be even longer than the blog inquiry.

MS. NELSON:  Okay, but my understanding is that the

deposition is going to be reopened for inquiries into the

blog.

THE COURT:  And anything that reasonably that leads

to, because I don't --

MS. NELSON:  The blog, you mean?

THE COURT:  Right.

MS. NELSON:  I understand.

1

2      THE COURT:  Right, I mean if, he might talk about

3  the blog and then he starts talking about a tweet and a book

4  he's drafting, and --

5      MS. NELSON:  Well, your Honor, that actually brings

6  up the other issue that I want to raise, which was the

7  documents which were found after the deposition.  The blog is

8  available to everyone, it wasn't our obligation to produce to

9  plaintiff documents that were publicly accessible.  To the

10  extent those were not ready and available at Mr. Reynolds'

11  deposition when he did his first sitting, I don't believe that

12  plaintiff should then get another bite to ask him about

13  documents that they did not locate before his deposition that

14  we did not obstruct them from locating.

15      THE COURT:  Okay, unfortunately, in the electronic

16  age, things like this can happen. I'm not going to prevent

17  them from asking questions about stuff which they discovered

18  afterwards and I'm not going to blame you for not giving them

19  any information. Because the problem, and this is the

20  difficultly we have when we start to have people make

21  determinations about what's relevant.

22      I understand your position, and if I understand your

23  position, even if you knew about it you would not have

24  produced it because you wouldn't have thought it was relevant.

25      MS. NELSON:  Well, no, it's not in our possession,

1

2  custody and control, your Honor.

3          THE COURT:  Well you would not have identified it --

4  well, if you have a witness and the witness has something, you

5  might, you might feel that you ought to reveal things about

6  the witness. I mean if the witness had written a book, you

7  don't think you would let the plaintiffs know.

8          MS. NELSON:  I think they are aware of all the books

9  that were written, your Honor.

10         THE COURT:  My point is though that I don't think

11 that I can -- I don't think it makes sense to limit someone

12 based upon information which seems related to what I opened

13 the deposition for. Are you saying what they've discovered is

14 completely, is something entirely different?

15         MS. NELSON:  We don't know, your Honor. At the

16 deposition we asked Mr. Warren to mark as exhibits those

17 documents that we were objecting to that he wanted to reserve

18 his right on.  He marked Exhibit 9, he marked nothing else.

19 And pursuant to the application that the plaintiffs made, they

20 found it after the fact.  They found other information after

21 the fact that they now want to inquire into at this sitting.

22         THE COURT:  Okay. Well, I guess there are two ways

23 to handle it. I don't know what it is that we're talking

24 about, Mr. Warren, but you can either, you can let me know and

25 I can rule on it ahead of time, or you can run the risk of

64

1   this becoming an issue.

2           MR. BELDOCK:  I covered this in my letter, Judge.

3           MR. WARREN:  It's in the letter, Judge.

4           MR. BELDOCK:  I've already, I mean this is totally,

5   this is such nitpicking. I said one such internet document,

6   one of two which we did not discover until after Reynolds'

7   deposition was ended, and which was not, and should have been

8   produced by defendants in response to the notice and subpoena

9   for Reynolds' deposition, in which we asked for any and all

10  materials, in any form he may have, related in any way to the

11  subject matter of this case, pertaining to discussion about

12  his involvement in the initial arrests of the five persons

13  including two of the present plaintiffs outside Central Park

14  on the night of the event.  I mean that we are being --

15          THE COURT:  Mr. Beldock, Mr. Beldock --

16          MR. BELDOCK:  That we are getting to this level of

17  debate --

18          MR. WARREN:  That's right, I mean we're being unduly

19  --

20          THE COURT:  Counsel, counsel, okay.  All right,

21  let's not forget rule number one, when the judge starts

22  talking, you have to let the Judge finish.  Okay.  In that

23  regard, if, if what you're telling me, and understand, when

24  you, when the parties are talking, you're a lot more familiar

1                                                      65

2   with what you've said to me than I am, because I'm not as

3   focused on what it is. And if what you're saying is that this

4   is information that should have been produced because it

5   already related to his testimony, and I don't know exactly

6   what it is, so it doesn't register the same way to me, that

7   will come out at the deposition, I'm sure. But you have not

8   let the Corp Counsel know what it is that you've discovered

9   that should have been produced?

10          MR. BELDOCK:  We've given it to them.

11          THE COURT:  Oh, so you know what it is.

12          MR. BELDOCK:  It's part of my letter.

13          MS. NELSON:  I understand that, but if there, part

14  of our objection, first, is that we should have produced it.

15  So my interpretation of that is that we now need to Google

16  every witness that we produce in order to give plaintiffs what

17  are publicly available. The document that they said they found

18  after Reynolds' deposition was something that was publicly

19  available on the internet. And apparently they found it

20  pursuant to a search that they did after his deposition. I

21  don't think that they should have the right to inquire into

22  anything that they found after his sitting where we opened

23  this deposition for a limited purpose. We asked Mr. Warren to

24  mark those documents that he intended to seek relief from the

25  Court, he marked Exhibit 9. If the deposition is going to be

66

2   reopened, it should be just issues limited just to Exhibit 9.

3            THE COURT:  Okay, I disagree.  You get to, if --

4   look, I'm not -- search engines can find stuff, you can do

5   searches, you can find stuff, if you do it on Goggle it might

6   come up, if you do it on ask.com, it might come up. If you

7   don't put in the right search terms, it might not come up.

8            Look, this is not even a question of holding the

9   defendants responsible for not finding it. I'm not sure

10  anybody would have necessarily found it. So the only question

11  for me is if I'd known about it ahead of time, would I have

12  said you can ask him about?  And since you are already doing

13  this deposition, the answer is yes.

14           MS. DILLON:  Your Honor, I just want to clarify with

15  respect to the latter part of your ruling, that the premise is

16  if we're already going to reopen this particular deposition,

17  it's not giving plaintiffs carte blanche to Google witnesses

18  after their depositions and use those documents as grounds for

19  a second sitting?

20           THE COURT:  The only thing that's in play now is the

21  exhibit that was marked having to do with the blog, what was

22  mentioned in Mr. Beldock's letter, and anything that the

23  questioning flows from.  I'm not, so you understand this, Mr.

24  Warren, if you got some minions to go out and do searches on

25  the web and found something else, don't spring it on the

```
 1                                                      67
 2   defendants.
 3             MR. WARREN:  Judge, I --
 4             THE COURT:  Just, I don't expect that you --
 5             MR. WARREN:  I, respectfully, I don't operate in
 6   that fashion, but I think that in the metaphorical sense a
 7   gentle stream oftentimes turns into a wider river, oftentimes
 8   turns into a lake, and ultimately goes to the ocean. And in
 9   terms of discovery process, which your Honor so eloquently
10   referred to not long ago, that is the nature of a deposition.
11   And so I don't want to be unduly restricted as a result of
12   entering this stream with the hopes of going to that ocean. I
13   don't want to be unduly restricted by their subjective
14   perceptions of how I should be limited.  I just, respectfully,
15   I'm requesting that your Honor agree with me on that point.
16             MS. DILLON: I think, your Honor, that we all agree
17   at this point that going forward with respect to the Reynolds
18   deposition and any other deposition is that if there is a
19   basis for defendants to instruct the witness not to answer,
20   that we'll order, in the case of the Reynolds deposition, for
21   some reason to end the deposition, that we'll promptly reach
22   out to the Court in the first instance in the hopes of getting
23   a ruling at that time.
24             THE COURT:  Okay.  And just a reminder, if you have,
25   with the Reynolds deposition, anyone that you think might be
```

1
2   potentially of interest to me, let me know when they're taking
3   place. We don't work nine to five, we're here after that, so
4   you can call us. If you call the law clerk, you can call the
5   law clerk at six, seven, who knows when they'll be here. They
6   may not go home as far as I know, they're here when I leave
7   and they're here when I come in the morning.
8          And the reality is, is that even if I'm not here, if
9   you call you may be able to reach me.  So don't even, you
10  know, there is no time that is actually off limits once you
11  get the law clerk.
12          MR. WARREN:  I guess, you know, my concern is that I
13  don't want, from what I'm listening to from the other table, I
14  don't want this to turn into an obstructive spitting contest,
15  you know, where it's an attempt to violate the nature of the
16  flow or the questions in the deposition. And whether it's
17  intentional or otherwise.
18          And so I wouldn't want to belabor, I wouldn't want
19  to, for example, be put in the situation where as a result of
20  their recalcitrance, unfounded recalcitrance, we're forced to
21  call you ever 10 minutes or every 15 minutes we're forced to
22  call you to deal with these type of issues, or 5 minutes.
23          THE COURT:  Well, okay, let me just say, the first
24  time you call me will probably be the last time you get to
25  call me, and whoever loses that probably won't get to call me

1    again.

2         MS. NELSON:  And I will say, your Honor, we've had

3    depositions that we had to reopen and we have been very

4    accommodating as to not only scheduling, but at deposition I

5    don't believe we have ever engaged in the behavior that Mr.

6    Warren is anticipating. And it's one of the reasons that we

7    want to get the parameters clear now, so that we're all aware

8    of it, so we go into this deposition, we all know what to

9    anticipate.

10        THE COURT:  Again, just so we'll understand that

11   there, and I can't anticipate a situation where information

12   could come to Mr. Warren, not necessarily even from the web,

13   as he's asking about, as he's asking questions. I think you

14   have to, you have to understand that that's not going to be

15   necessarily a situation in which I'm going to say, well, you

16   can't ask that question just because it came to you belatedly.

17   The deposition will be reopened, I don't expect there to be

18   any strange surprises, but I will let the deposition go where

19   the flow takes it.

20        MR. BELDOCK:  May I, your Honor?

21        THE COURT:  Yes.

22        MR. BELDOCK:  There is, I thought I was going to

23   raise this 15 minutes ago, there is one pressing issue,

24   discovery cutoff is now, if I remember correctly, September

1

2   30th.  Obviously, and we've discussed this, it can't be

3   September 30th.  And there is a difference of opinion on the

4   two sides as to whether your Honor should set a cutoff date.

5   It will be almost nine years since we started this case at the

6   end of this year, it's three years of discovery. We appreciate

7   the pressures, absolutely, on both sides, no matter what

8   debates we have, the case is difficult, many witnesses, many

9   papers and so on.  And you have before you the problem of

10  8,000 papers, so I'm a little hesitant to say what I'm about

11  to say, but I'm going to say it anyhow, we want a cutoff date

12  at the end of the year, except for expert witnesses.

13          We want to be able to finish the depositions. We

14  have maybe 15, 20 depositions --

15          THE COURT:  And the City doesn't want a cutoff date?

16  Is that what it is?

17          MR. WARREN:  The City does not want a -- no.  No,

18  they don't want a cutoff date at the end of the year, that's

19  our understanding.

20          MS. DAITZ:  Your Honor, it's not that we an

21  indefinite extension of discovery, we've agreed to request an

22  extension at the time until December 31st, but we don't believe

23  that we'll be able conclude all of the remaining discovery in

24  that time period. And part of the reason is not because

25  defendants are not -- you know, defendants are producing

1
2    witnesses, or producing documents, we've had a pretty

3    significant delay in getting the releases from plaintiffs that

4    we need, in getting documents from third parties in preparing

5    to take the plaintiffs' depositions. The plaintiffs just

6    requested another extension of time to respond to our

7    discovery request, which we consented to.

8           But the delays and the holdups to some extent, and

9    some have to do with joint applications or discovery

10   applications that we, you know, await a ruling, and then

11   before the depositions at that time. But defendants shouldn't

12   be in a position where plaintiffs can complete taking the

13   officer depositions by mid November and then we have six weeks

14   to do all the discovery that we need to do, even assuming, for

15   the sake of argument that we have all the information we need

16   at that time to move forward with the depositions that we need

17   to take.

18          So the only reason that we're anticipating that we

19   won't necessarily be able to complete all the fact discovery

20   by December 31st is, you know, pending the Court's ruling on

21   the work product issue at the least, we have a number of

22   witnesses that we'll need to prepare and produce for

23   deposition and then still have all of these 14, 15 familial

24   plaintiffs to take their depositions.

25          MS. NELSON:  In addition to that, your Honor, I know

72

2   your Honor is aware of the numerous depositions that the

3   parties have indicated that we wanted to take, and I believe a

4   couple of months ago plaintiffs added to that list. And we've

5   been producing those witnesses for deposition, as well.

6          So they have added to their list, we've produced

7   those people, in addition to the witnesses that they

8   previously had on notice. We just don't believe it's realistic

9   that we're going to finish everything by December 31st.

10         THE COURT:  Okay, well, first of all, I think

11  everybody wants to have an end to it, including Judge Batts,

12  so we're going to set a discovery cutoff.  But by the same

13  token, I don't think any -- well, most of the District Judges

14  don't want a case that is half prepared for discovery. So what

15  we'll do is we'll set a discovery cutoff, and I know you have

16  lots of work to do, but I need to know what's going to be

17  happening, what needs to be done in discovery so that I could

18  have some sense of whether or not you can make the deadline.

19         I mean I know you said some things here, but it's,

20  you said that there have been additions, and I'm not exactly

21  sure what you propose to do in the next three or four months.

22         MS. DAITZ:  Your Honor, I would say we probably have

23  in the vicinity of 30 to 40 depositions remaining.

24         THE COURT:  And what's the difficulty in starting to

25  schedule them now?

```
 1                                                  73
 2         MS. DAITZ:  Oh, we have, your Honor, we have
 3  depositions on the schedule and, in fact, the parties have
 4  even arranged to travel to certain correctional facilities to
 5  depose nonparty witnesses, including one in Western
 6  Pennsylvania in the coming weeks. So we certainly are all
 7  working together on the scheduling issues, and we, you know,
 8  broached the subject with plaintiffs again about just getting
 9  the last of the corrected releases and we're still awaiting,
10  like I said, the responses from the IRS regarding the tax
11  forms, and certainly of Daniel Wise.
12         And the parties are continuing cross productions of
13  documents, we're awaiting plaintiffs' responses to defendant's
14  last document request and interrogatories are due on September
15  15th. So upon receipt and review of that information, we should
16  definitely be in the position to start scheduling the
17  remaining familial plaintiffs' depositions, you know, in that
18  time period.  Assuming, because I'm an optimist, that there is
19  no deficiencies in plaintiffs' responses and we take what we
20  get and we'll be prepared to go forward at that time. And, if
21  not, we'll certainly bring any issue to your Honor's attention
22  prior to whenever our next conference --
23         THE COURT:  So you're going to attempt to schedule
24  to complete discovery, you're just not sure that you'll be
25  able to do it.
```

1                                                        74

2            MS. DAITZ:  We're just not sure that that's enough

3   time to get it done, your Honor, but we're making every

4   effort.

5            THE COURT:  Anybody who makes a good faith effort

6   will always get my ear.  Anything else?

7            MR. BELDOCK:  The next conference date before your

8   Honor --

9            THE COURT:  Yes.

10            MR. BELDOCK:  And then maybe you can be, we can be

11   more informative as to what has to be done yet.  Early

12   November I think would be a good amount of time to develop

13   what we're doing.

14            THE COURT:  Okay.  All right, tentatively, November

15   10th at 10:00.  I don't actually have my trial calendar, but

16   we'll, if there is any change we'll let you know.

17            MR. BELDOCK:  We'll bring Mr. Kendall back for that

18   day.

19            THE COURT:  I think that might be cruel and unusual

20   punishment.  Okay, we'll be adjourned and I'll get back to you

21   with the --

22            MR. BELDOCK:  Thank you.

23            MR. WARREN:  Thank you, your Honor.

24            MS. DAITZ:  Thank you, your Honor.

25            THE COURT:  Don't forget to let me know when the

75

1

2  Reynolds deposition and the others are going to be.

3            (Whereupon the matter is adjourned to

4  November 10th, 2011 at 10:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                                                    76
 2                    C E R T I F I C A T E
 3
 4       I, Carole Ludwig, certify that the foregoing transcript
 5  of proceedings in the United States District Court,
 6  Southern District of New York, McCray, Richardson, et al.
 7  v., Docket #03cv9685 was prepared using mechanical
 8  transcription equipment and is a true and accurate record
 9  of the proceedings.
10
11
12
13
14  Signature_____
15                       CAROLE LUDWIG
16  Date:    September 13, 2011
17
18
19
20
21
22
23
24
25
```