```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                         Docket #03cv9685
MCCRAY, RICHARDSON, SANTANA,        :
WISE AND SALAAM LITIGATION
                                    :   New York, New York
                                        September 8, 2011
------------------------------------ :


                      PROCEEDINGS BEFORE
              MAGISTRATE JUDGE RONALD L. ELLIS,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiffs       BELDOCK LEVINE & HOFFMAN
  McRay, Richardson,     BY:  MYRON BELDOCK, ESQ.
 Santana, and Salaam:         KAREN DIPPOLD, ESQ.
                         99 Park Avenue, Suite 1600
                         New York, New York 10016
                         (212) 490-0400


For the Plaintiffs       MICHAEL W. WARREN, ESQ.
  McCray, Richardson     580 Washington Avenue
   and Santana:          Brooklyn, New York


For the Plaintiff Wise:  FISHER & BYRIALSEN, PLLC
                         BY:  ALISSA BOSHNACK, ESQ.
                         291 Broadway, Suite 709
                         New York, New York 10007
```

```
Transcription Service:  Carole Ludwig, Transcription Services
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

2

<u>APPEARANCES CONTINUED:</u>


For the Defendants:      NEW YORK CITY LAW DEPARTMENT
                          CORPORATION COUNSEL
                         BY:  ELIZABETH DAITZ, ESQ.
                              PHILIP DEPAUL, ESQ.
                              GENEVIEVE NELSON, ESQ.
                              ANDREW MYERBERG, ESQ.
                              ELIZABETH DOLLIN, ESQ.
                              PATRICIA BAILEY, ESQ.
                          100 Church Street
                          New York, New York 10007

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                                                    4

 2              THE CLERK:  In the matter of McRay, Richardson,

 3   Santana, Wise & Salaam Litigation.  Counsel, please state your

 4   name for the record.

 5              MR. MYRON BELDOCK:   Myron Beldock, from Beldock,

 6   Levine & Hoffman, for the Salaam plaintiffs, as well as Karen

 7   Dippold.

 8              MR. MICHAEL WARREN:  Michael Warren, 580 Washington

 9   Avenue, Brooklyn, New York, appearing on behalf of plaintiffs

10   Richardson, McCray, and Santana.

11              HONORABLE JUDGE RONALD L. ELLIS (THE COURT):   Good

12   morning.

13              MR. WARREN:  Good morning, your Honor.

14              MR. BELDOCK:  Your Honor, there is no one here on

15   behalf of defendant, pardon me, of plaintiff Wise.  That

16   counsel understands that we will stand in for them and they

17   may be able to come here, someone may be able to come here

18   while we're in process.

19              THE COURT:  From what my reports are this morning,

20   everybody had a little trouble getting here.

21              MR. BELDOCK:  They have another court appearance

22   that they had to attend to, but they understand that we're

23   proceeding without them.

24              THE COURT:  We certainly will do that.

25              MS. GENEVIEVE NELSON:   Genevieve Nelson, Assistant
```

```
 1                                                    5
 2   Corporation Counsel, for defendants.  With me is Elizabeth
 3   Daitz and Philip DePaul. Good morning, your Honor.
 4              THE COURT:  Good morning.
 5              MS. PATRICIA BAILEY:   Good morning, Your Honor,
 6   Patricia Bailey.
 7              THE COURT:  Okay, good morning.  First of all, with
 8   respect to the in camera inspection, I have not actually
 9   completed it.  I did the unthinkable and took some time off.
10   But I have started going through it and some questions have
11   arisen as I was looking at them and I guess I want to direct
12   this to the City so I know what it is that I'm looking at.
13              In some of the documents, there appear to be
14   information that is listed and it seems to be based upon
15   interviews. And I wasn't sure whether or not the person was
16   looking at a video and summarizing it and that the plaintiff
17   had the video, can you --
18              MS. DAITZ:  Yes, your Honor, all the video tapes
19   have been disclosed, they were disclosed in the underlying
20   criminal trial and they were disclosed again in the civil
21   litigation. To the extent that there are handwritten notes
22   taken by the ADA defendants that are in the in camera brief
23   set provided to the Court, there were handwritten notes taken
24   during the ADA's subsequent review of the video tapes in
25   preparation for the prosecution.
```

```
 1                                                        6
 2            THE COURT:  Okay.  All right, I may ask for further
 3    clarification when I'm totally finished but I don't anticipate
 4    that taking too much longer.
 5            With respect to the dispute that has arisen more
 6    recently concerning the training materials in plaintiff
 7    request 66 and 67, I must admit that although I read the
 8    parties' submissions, I wasn't sure why you were having a
 9    dispute. It seemed fairly clear to me that at least on the
10    basic underlying premise that the plaintiffs had set forth
11    some requests for training materials, that the simple thing
12    would be for the City to produce the training materials that
13    were asked for. And I wasn't sure why that didn't happen. I
14    understand that the City wanted some broader protection for
15    other training materials, but it seemed to me those were
16    separate issues.
17            MS. DAITZ:  Your Honor, if I may, the City, by the
18    City I mean the Corporation Counsel Office, collects training
19    materials from the Agency, obviously to review and produce in
20    connection with, for instance, this litigation. And when we
21    collected the training materials, you know, there are
22    thousands of pages that we collect at one time and some of
23    them are, for instance, like a whole criminal investigations
24    course manual or a whole detectives manual. So as they're
25    being reviewed, we make a determination with respect to
```

7

1

2  sections as to whether they are responsive to plaintiffs'

3  requests or whether there is something that although

4  plaintiffs did not request, we would be producing in support

5  of our defenses.

6       So they were reviewed and prepared for production

7  and asked and that's what we did in this case.  And the

8  production is ready to go out, pending an agreement as to

9  their confidentiality.  We don't understand why plaintiffs are

10  drawing a distinction in terms of confidentiality between the

11  documents that are specifically responsive to their requests

12  and documents that are produced in support of our defenses.

13       THE COURT:  Okay, well I understand that but if I

14  understand the process as these things go with training

15  materials or other materials from some defendant or some

16  entity, there are sections, and you know which sections you

17  want to produce to the plaintiff, or sometimes it's the other

18  way around, you can designate which ones are responsive so

19  that the plaintiffs know which ones are responsive to their

20  requests 66 and 67.  What you want to do is you want to

21  produce the whole thing and you don't want them to be not

22  subject to confidentiality, although it does seem to me, and

23  I'm not sure at some point the plaintiff didn't suggest this,

24  that you can designate them as confidential, the rest of the

25  training materials, and designate which ones are responsive.

8

1

2          MS. DAITZ:  Well, your Honor, pursuant to the

3   stipulation and protective order that governs discovery, it

4   states, specifically paragraph 283, there are only two ways

5   that a producing party can designate documents confidential

6   that are not explicitly contemplated in the language of the

7   stipulation.  And that's either pursuant to an agreement

8   between the parties, or to have the Court deem them

9   confidential. So we can't just, under the stip we can't just

10  produce them all with a confidentiality designation without an

11  agreement in place.

12          THE COURT:  Okay, let me just understand. You

13  believe that the other training materials should be

14  confidential --

15          MS. DAITZ:  Yes, your Honor --

16          THE COURT:  But you can't designate them as

17  confidential without an agreement?

18          MS. DAITZ:  That's what the stipulation says.

19          THE COURT:  And is that the way it works?

20          MS. DIPPOLD:  Your Honor, you are quite correct,

21  they're two completely separate issues.  The issue, the first

22  issue we'd like resolved is we would like a response to our

23  very specific document requests. We designated the issues we

24  want to know about, we asked for the materials, we entered

25  into an agreement with Corporation Counsel that they materials

1

2   they produced in response to these requests would be

3   confidential. We have no problem agreeing that training

4   materials should be confidential, we just simply want two

5   things.  We want them to respond to our specific requests,

6   which have been pending for a year and a half, and we want

7   them to give us an idea of what documents they're producing.

8   They say they're producing things from the "Police Students

9   Guide," fine, tell us that it's the "2003 Police Students

10  Guide," and that's enough, we'll agree that those documents

11  are confidential.

12          The problem is if they just produce 500 loose pages,

13  if you look at these guides, there is no way to tell what year

14  they're from or what particular course they're from. And we

15  just need the appropriate information so we can agree they're

16  confidential.  We're not going to hand them out to anyone

17  else, we're agreeing they'll be confidential, and they can,

18  pursuant to the stip, although this is not the way I think it

19  should be done, they could just produce all 500 pages and then

20  we would challenge those that we think are not appropriately

21  subject to the stipulation.

22          THE COURT:  Okay, frankly, it doesn't sound as if

23  you're that far apart. If I understand correctly, what the

24  plaintiffs want is they want to make sure that if you produce

25  anything they know where it's from and when it's from. And

10

1

2   that if you had, for example, a training manual and it had a

3   table of contents, you would designate which parts of the

4   table of contents are responsive to what the plaintiff wants.

5   And what you want to not have to do is to break it up into

6   parts and do it piecemeal.

7           MS. DAITZ:  Your Honor, if I may, with all of

8   defendants productions that we've done, close to 80,000

9   documents to date, we have always made a production

10  identifying the source of the materials being produced, what

11  range of Bates numbers, what type of document, and we certain

12  intend to do that in this case. We're not just going to

13  produce here are the training materials, but at the same time,

14  to have defendants obligated to list out the dates and the

15  years as a precursor to an agreement on confidentiality, is

16  counterproductive and it is also counter to the explicit

17  language of the stipulation which says that the receiving

18  party, upon receipt of the document, has to list out whatever

19  documents they feel are not properly designated confidential.

20          THE COURT:  All right, counsel, I'm going to go out

21  on a limb on this one, I'm going trust all of you, all right,

22  I'm going to expect that what the defendants are going to

23  produce is the training materials sufficiently designated and

24  identified so that the plaintiffs know where they are. I mean

25  if you're right, then there is no problem, then I won't hear

11

1 from the plaintiffs that say they can't figure it out.

2          I suspect, and I don't know this for sure, that in

3 some respects what the plaintiffs already have, and I'll get

4 to that later, isn't sufficiently designated so that one could

5 make those kind of determinations. But I certainly expect

6 anything that you produce to them will be identified so that

7 they know where and when it's from. As to the parts -- but you

8 need to identify which ones are specifically responsive to the

9 66 and 67.

10          As to the rest of it, just it seems to me from the

11 point of view of efficiency, it makes sense for you to produce

12 and entire document, as long as the ones that are responsive

13 are designated.  And so if the question is whether or not

14 you're going to get the plaintiffs' okay or the Court's okay,

15 I'm directing that you do it as a, I mean I wouldn't want you

16 to break up a training manual for the purpose of designating

17 when you could just tell the plaintiffs which parts of the

18 training manual are responsive.

19          So I would designate them as confidential, if the

20 plaintiff finds some that are particularly egregious, although

21 frankly I don't know why any of these things will ultimately

22 be a problem because I don't know that there would be somebody

23 particularly interested in them, but once the plaintiff finds

24 out which ones are responsive, if they think some of the

1

2    others shouldn't be designated, then you can bring them back

3    up to me. I'm not going to review them myself, but if you

4    think that they shouldn't be so designated, rather than having

5    you, two, argue over it, we'll skip that step, I'll allow them

6    to designate them as confidential, if you think for some

7    reason they need to be undesignated or they need to be

8    available for some other reason, I'll reconsider that, but in

9    the meantime everything stays confidential if it's training

10   materials.

11          But the main thing is that the plaintiffs will have

12   a specific response to their request such that they can know

13   what it is that's responsive to what they wanted. I mean if

14   that's what they want, that's what they want.

15          MS. DAITZ:  Your Honor, I'm just going to ask that

16   with respect to all productions of documents, and that both

17   parties be similarly obligated. I mean, for instance, I got

18   production from plaintiffs on August 31st that just said this

19   is supplementing Yusef Salaam's document production, with now

20   indication as to whether it was responsive to our requests, in

21   support of plaintiffs' defenses, responsive to a subpoena that

22   we served. So if defendants are obligated to parse through

23   productions to identify why we're producing the document, we

24   would just expect the same from all parties.

25          MS. DIPPOLD:  I have no problem doing that, your

1

2   Honor.

3          THE COURT:  I'm glad you don't.  Okay.  All right,

4   now, and the other issue which was related to that is I

5   understand that the plaintiffs have some materials and the

6   question was whether or not the plaintiffs should produce

7   them, or whether or not the plaintiffs wait and see what you

8   produced, and then produce what's not duplicative.

9          I'm torn on this one because I'm not so sure in the

10  way they're being produced, whether or not the Plaintiffs

11  would be able to make that determination, but in the interest

12  of efficiency, I would like to have the stuff produced from

13  the defendants, have the plaintiffs look at it, and then you

14  can make your determination as to whether or not what you have

15  is coextensive with the defendants.

16         MS. DIPPOLD:  We're perfectly willing to do that. If

17  there's anything -- the two volumes are right here, they're

18  the "Criminal Investigation Course," and "Investigators Guide"

19  from particular years.  Once we see what the defendants are

20  producing, if there is anything here that they haven't

21  produced to us we'll gladly copy it and give it back, you

22  know, send it to them.

23         THE COURT:  Okay, just let me give you the source of

24  my ambivalence, and that is that it seems to me that it may

25  take more work and effort for you to do that than to just

1                                                          14

2   produce, I mean I don't know how many pages that you have, I

3   mean --

4              MS. DIPPOLD:  Several hundred.

5              THE COURT:  Well, you know, I mean if it's just a

6   question of the cost of reproducing --

7              MS. DAITZ:  Your Honor, we could bear the cost of

8   the copying, I don't know that that's the necessary question,

9   it's just that, you know, as I said, we're producing parts of

10  certain manuals and parts of others, and to the extent that

11  they're not identified on their face by date or source, we're

12  providing that information to plaintiffs. But I think it could

13  be extremely arduous of a task for plaintiffs to make a

14  literal line by line comparison of those two manuals with the

15  500 pages of documents that we're producing.  And in the

16  interim, your Honor --

17             THE COURT:  Okay, other than the potential cost of

18  reproducing, is there any reason that you wouldn't just give

19  that to them?

20             MS. DIPPOLD:  Mr. Beldock is suggesting that they

21  should be producing the things that we're asking for, plus if

22  they told me --

23             THE COURT:  They're going to produce what you're

24  asking for, that's a different issue, the question is I mean

25  as often happens in cases, from some source or other the

1

2 plaintiff may have some incomplete production.  What we're

3 talking about now is what you have in your possession, which

4 may not be coextensive to what the defendants are going to be

5 produced, but that's a different issue. What the defendants

6 want is what you have as partials or undesignated, whatever,

7 if they are going to pay for the reproduction, I don't know

8 why you would object to it.

9         MR. BELDOCK: It's not exactly that, I'm responsible

10 for getting these documents in another litigation with the

11 City, they were given to me voluntarily without

12 confidentiality in another litigation with the City, with

13 other attorneys from the City. We've been trying to get

14 training material for a year and a half, we got those training

15 materials very easily from the other counsel.

16         MS. DIPPOLD:  From the co-counsel.

17         MR. BELDOCK:  From their co-counsel in the other

18 case, but Corporation Counsel was involved in it.  We don't

19 understand why they've had such difficulty producing training

20 materials to us, why it's taken a year and a half or us to get

21 them.  And at that point, we feel it's only fair that they

22 show us what they have been able to find, that we compare

23 them, and then we will obviously give them what we have gotten

24 elsewhere. It just seems wrong.  Maybe I'm not making myself

25 clear to your Honor, but for a year and a half we've been

16

1
2 trying to get training material, which in another case I got

3 within a few weeks, if not months, from the City.  The City

4 has claimed they couldn't get any training materials or they

5 couldn't find any training materials, there is something about

6 this process which is unfair to us that bothers me.

7          You want us to give them to them now, we'll exchange

8 with them, if necessary.

9          THE COURT:  I do, and I want the City do exactly

10 what you say you've been trying to do for a year and a half. I

11 don't disagree with anything you said, and I understand that

12 you each have your interests in doing things, but as I started

13 out saying, it seems to me this is a simple question of you

14 ask for stuff, you get it.  I understand that in producing,

15 when we're dealing with producing manuals and things, they're

16 not necessarily easily separable, and it makes more sense to

17 designate them, and whether or not they are going to all be

18 confidential, I don't know why you couldn't agree on that, it

19 seems to me it's a fairly simple thing, I put my imprimatur on

20 it that I would rather have the stuff just be produced, give

21 it to the plaintiffs and let the plaintiffs look at it. And

22 you're obligated to do it, you designate it, I'm more

23 concerned with whether or not what the City produces to you is

24 sufficiently designated so that you can work with it. And if

25 they do that, and they get copies of what you have, which you

1

2 say was produced in some other litigation so I'm not even sure

3 why there's an issue about it.

4          MS. DAITZ:  Your Honor, I just need to say for the

5 record that outside counsel for the City of New York produced

6 the training materials in the case that Mr. Beldock is

7 referring to.  And I don't think that that necessarily bears

8 upon our ability to retrieve responsive documents from our

9 clients in this case.

10          But aside from that, I think what we all want to do

11 is move forward with the deposition that's been on hold

12 pending the production of training materials, and the City is

13 prepared to make the production under your Honor's ruling by

14 tomorrow, and assuming we can get the materials that are in

15 plaintiffs' possession so that we have an opportunity to

16 review them.

17          I mean if we proceed with depositions while they're

18 still doing this line by line comparison --

19          THE COURT:  Okay, you understand right now that's

20 the process, so you're arguing what I've already --

21          MS. DAITZ:  I'm sorry, I was unclear, your Honor.

22          MR. BELDOCK:  We're prepared to exchange, your

23 Honor, but we don't want the City to have our documents before

24 they give us their documents.  I know I'm sounding, I may

25 sound a little --

1

2          THE COURT:  You object to the exchange?

3          MS. DAITZ:  No, your Honor, they'll have them

4  tomorrow.

5          THE COURT:  Okay.

6          MS. DAITZ:  And we can send one messenger to

7  Beldock, Levine and Hoffman to drop off our production and to

8  pick up theirs.

9          THE COURT:  You want them to meet midway like at a

10  court someplace?  Okay, I understand your frustration, Mr.

11  Beldock, you've been asking for this for a year and a half,

12  you should get it, and you will get it.

13          MR. BELDOCK: And why couldn't we get it right away?

14  Why have we been delayed and having to do witnesses without

15  that training material?  It's an issue that I just want on the

16  record, we'll take it up later if necessary.

17          MS. DAITZ:  I need to also note for the record, your

18  Honor, that the defendants interposed valid objections to

19  plaintiffs' discovery requests, we did not receive a

20  deficiency letter, it was not brought to our attention that

21  they (indiscernible) our objection until at deposition, you

22  know, ten months later where he renewed their request.

23          So I think it's not just that defendant should have

24  produced documents immediately, if there was some dispute as

25  to the nature of the request or the nature of the objection,

1

2  it was incumbent upon plaintiffs to bring it to our attention

3  to facilitate that production sooner than what ended up --

4          THE COURT:  Okay, all I'll say is this.  All right,

5  I understand that we've had some stops and starts in this, but

6  at least I hope you understand if you bring it to my attention

7  I will decide it. And I looked at the correspondence, I

8  noticed sometimes when you are dealing with multiple people on

9  the side that causes issues, but I will say that Mr. Beldock

10  is correct that this is something that should have been

11  resolved a while ago.

12          It is not my habit to say what went wrong in the

13  past, what I like to do is to make sure we go forward, okay.

14  And as I see it, I expect the City to produce the documents

15  and designate them so that the plaintiffs can work with them,

16  and I expect that the plaintiffs will produce to the City

17  whatever documents they have that are related to the same

18  issue.

19          Is there any question about where I stand on this?

20  And again, I'm not going to try to reconstruct everything

21  that's gone wrong in the past. I know that we've had some

22  missteps, but at least I'm trying to get us now on the right

23  track. Let's hope that, and if anything else comes up, and if

24  there are any issues with this production I expect, I'm sure I

25  will hear about it.  The only, my biggest concern so that

1                                                                              20

2   you'll know is that this is my law clerk's last week, so some

3   other law clerk will come in and will not understand the

4   extent of the task on which they are about to undertake. I'm

5   not sure when I hired them I made it clear what the

6   responsibilities were.  So, you know, I just want to make sure

7   they don't quit after a week.

8          But the basic thing is, look, somebody asked for

9   some documents in discovery, there's supposed to be some

10  dialog between the parties, if it doesn't work, you bring it

11  to me and it took more time than it had to, perhaps the

12  plaintiffs were more solicitous than they should have been,

13  maybe they should have brought it as soon as they weren't

14  getting what they thought they should have gotten. I'm not

15  going to blame them for that because I do like people to try

16  to work things out. But they're right and they should have

17  gotten it.

18         I understand the concern you have. Again, I don't

19  think it makes sense to try to take parts of manuals or other

20  kinds of materials and parse them out. I hope now we've worked

21  out the confidentiality issue, and I don't think it's as

22  simple as just telling, okay, here's the plaintiff, and you

23  work it out and tell us what's not right. But I do think that

24  once the plaintiff knows what it is that they have, what's

25  responsive to their request, they may, in fact, find that some

```
 1                                                    21
 2   of the things maybe shouldn't be confidential and maybe
 3   they'll decide they don't want to make an issue of it. Because
 4   unless until they want to do anything with it, there's no
 5   problem with keeping it confidential anyway.
 6              So any other questions?
 7              MS. DAITZ:  Your Honor, I have a separate issue with
 8   your Honor's --
 9              THE COURT:  Broached already with the plaintiff?
10              MS. DAITZ:  Yes, actually I -- oh, Ms. Boshnack is
11   here.
12              THE COURT:  Did this come up in the last five hours,
13   what?
14              MS. DAITZ:  No, your Honor, actually it came up back
15   in May, defendants had requested, initially we requested tax
16   returns from the plaintiffs, first we went to their economic
17   damages claims.  The parties all reached an agreement that the
18   plaintiffs would instead produce, at least at this time,
19   releases for a particular type of tax document that is not
20   actually the full return, and all the plaintiffs have provided
21   them to defendants on a rolling basis, except for two
22   plaintiffs, Daniel Wise and Victor Wise.  And Ms. Boshnack
23   informed me by email this morning that she now has Victor
24   Wise's releases, and that we would like to make a formal
25   application to compel those releases from plaintiff, Daniel
```

22

1

2  Wise, which it's my understanding Ms. Boshnack doesn't

3  actually object to.

4         MS. BOSHNACK:  We've been trying to get him to sign

5  off on them and send them to us, and --

6         THE COURT:  You want the defendants to compel your

7  client because you can't get stuff from your client, is that

8  what I'm hearing?

9         MS. BOSHNACK:  I'm okay with having the order to

10 compel him to do it.

11        THE COURT:  I'm not so sure that that's what the

12 motion to compel is designed to do. Is there something I

13 should be aware of, should I --

14        MS. BOSHNACK:  Just so that he understands that it

15 is something that he is required to comply with if he wants to

16 be able to have that portion of his damages attacked to his

17 claim.

18        THE COURT:  Okay, it's just that I'm sitting here

19 wondering if I get a motion to compel from the Corp Counsel,

20 what kind of response am I going to get from the plaintiff?

21        MS. DAITZ:  Hopefully it will be production of the

22 document.

23        THE COURT:  Okay.  Well, what I mean is this could

24 take some time unless what I get from the plaintiff is

25 something which short circuits the whole idea of briefing and

1                                                      23

2  the motions. Because if the idea is we want the plaintiff to

3  understand and comply, is this the best we can come up with, a

4  motion to compel?

5          MS. BOSHNACK:  Or I can convey to him that it was

6  discussed in court and if he doesn't comply there will be a

7  motion to compel or he'll be forfeiting that portion of his

8  claim, and perhaps that's a better way to go about it if --

9          THE COURT:  Because I don't want this, I mean there

10  are motions to compel and there are arguments on the other

11  side. If we just have a recalcitrant person, and they don't

12  want to produce documents, and they don't understand the

13  seriousness of the request, then if they file a motion I don't

14  know that there is any response on the other side. So you can

15  tell your client that if the Corp Counsel has to file a motion

16  that might be too late for this process.

17          MS. BOSHNACK:  Okay, that's what I'll do then.

18          MS. DAITZ:  Your Honor, we would just like a date

19  certain since we have been having this discussion since May

20  and the delay in getting us these releases and then, you know,

21  at no fault of any of the parties, certainly the IRS is not

22  prompt in forwarding its responses to the subpoenas with the

23  release --

24          THE COURT:  Actually, now that I think about it, I

25  don't know that we need a formal motion to compel, is there

24

1

2    any reason that the information should not be produced, do you

3    believe that it's not relevant, counsel?

4          MS. BOSHNACK:  The only way it would not be relevant

5    is if he is not claiming those damaged, and unfortunately we

6    haven't been able to get that confirmation from him as to

7    whether or not --

8          THE COURT:  Perhaps what we ought to do is we should

9    just do an order directing him to produce it, give you

10   something to do in your waning hours.  We'll set a time limit.

11   How is the communication with your client I was just trying to

12   see what would be a reasonable timeframe?  If you got an order

13   --

14         MS. BOSHNACK:  What I'll do is I'll send it to him

15   by regular and certified mail, obviously I'll also try to

16   contact him by telephone, however, it's difficult to get in

17   contact with him.  He lives in the same house as Delores Wise,

18   who is no longer represented by our firm, and so --

19         THE COURT:  My question is, let me put this more

20   precisely, is two weeks too short a time, given --

21         MS. BOSHNACK:  For the mail to arrive, I'll send it,

22   I can send the letter to him today or tomorrow, it will be

23   there by next week.

24         THE COURT:  Okay, well we'll get the order out today

25   and you'll get --

```
 1                                                    25
 2            MS. BOSHNACK:  So as soon as I get the copy of the
 3    order I'll send that out with a --
 4            THE COURT:  Okay, we'll make it two weeks from
 5    tomorrow.
 6            MS. DAITZ:  Thank you, your Honor, and with respect
 7    --
 8            THE COURT:  And that's, who is this going to be now?
 9            MS. BOSHNACK:  It's for Daniel Wise.
10            THE COURT:  Daniel Wise, and you're satisfied you
11    have the other or did you get it already?
12            MS. BOSHNACK:  And I will bring over Victor Wise's
13    either later today or tomorrow.
14            THE COURT:  All right, we'll do an order on Daniel
15    Wise.  Anything else?
16            MS. DAITZ:  Yes, your Honor, with respect to the
17    plaintiff, Delores Wise, we just want it to be put on the
18    record that we have been cc-ing her on all correspondence
19    between the parties as a plaintiff pro se, and we did advice
20    her in writing of this conference today, I don't believe she
21    has appeared. And, as well, your Honor, we have requested that
22    she appear for her continuing deposition on September 27th and
23    that she confirm her attendance by the end of this week, but
24    we haven't heard any response to that request yet.
25            THE COURT:  All right, thank you, anything else?
```

 1

 2          MR. WARREN:  Yes, your Honor.

 3          THE COURT:  Mr. Warren.

 4          MR. WARREN:  Yes.  Your Honor, I was elected to

 5  represent or to depose Officer Reynolds in this case, and

 6  Officer Reynolds is not a named party, but he's a third party

 7  witness. But he's a third party witness who had substantial

 8  contact and, in fact, was involved in substantial interaction

 9  in this case, not only involving the arrest of some of the

10  people who were arrested, our plaintiffs, but also in terms of

11  the activities that occurred within the Central Park precinct,

12  itself.

13          He, for example, was part of two -- of two

14  interviews that were conducted of witnesses in the Central

15  Park precinct and was there at the time that Kevin Richardson

16  was there, and was present with a detail of police officers

17  that went to pick up Antron McCray.  And during the deposition

18  at some point near the end of the day, I became aware of

19  certain communications that were made by Officer Reynolds,

20  Detective Reynolds, to a blog which was a *Daily News* blog, in

21  fact, it was a public blog. And I noted that in those

22  communications he made references to defendants as being

23  mutts, and, of course, I couldn't help from recalling the same

24  characterization made by Detective McKenna in this case, who

25  is a defendant in this case, in his book, in which he defined

1

2  our clients as being mutts.

3          He also in his communications referred to gang of

4  thugs, police wolf pack, chasing prey.  He made negative

5  characterizations about 100 Blacks In Law Enforcement, and he

6  also made a statement in one of these communications about,

7  about his belief that in spite of the convictions being

8  vacated against our clients, that they were still guilty, that

9  they were not innocent, they were still guilty.

10         And I think that, and, of course, let me just go on

11 further, I made an application to question him, naturally,

12 about whether, in fact, he was the author of the

13 communications that were a part of this blog, and immediately

14 Mr. Myerberg, who was representing him, the City represents

15 him, notwithstanding his third party status, Mr. Myerberg

16 refused or instructed him not to answer the questions.

17         Now, we would have, or I would have made an attempt

18 to get a legal ruling at that time, and the only reason I did

19 not is because of the lateness of the hour and the time that

20 was allotted us or myself in terms of the total time for the

21 deposition. And, of course, I didn't want to disturb your

22 Honor at that time, but secondly we wanted to, in good faith

23 we wanted to legitimately research the issue so that we could

24 determine whether, in fact, the objection was unfounded. And

25 in fact, we believe the objection is unfounded, there are a

28

few cases which are cited in a correspondence of July 22nd that
was sent to your Honor, and in those cases, those three cases
or so, it specifically indicates that discovery, whenever the
issue of relevancy is at hand, that discovery is broader than
admissibility. And, in fact, these issues are relevant.

I am seeking from your Honor, most respectably, to
have this deposition reopened so that I can ask the vital
questions of Detective Reynolds whether, in fact, it's a
threshold question, you were the author of these
communications, which we firmly believe that he was. And
secondly, to ask other questions relating to those
communications, and perhaps other communications that have a
direct impact and effect on his credibility. And should there
be a trial in this case, then obviously those issues would be
gone into if he were on the stand and testifying as a witness.
And certainly I would like to be able to ask those questions
and continue to ask about those issues during the deposition.

If your Honor would indulge me for one second,
please.  Also, your Honor, Mr. Beldock advised me that we have
the same problem with Officer Weir in terms of not being
allowed to go into IAB complaints.  We believe that we should
be able to go into IAB complaints, anything that affects the
credibility of these officers. And, in fact --

THE COURT:  Is that also one that's already taken

1  place?

2       MR. WARREN:  Yes.  Yes.  And, in fact, during the,

3  now that I recall, during the depositions of Officer,

4  Detective Reynolds, there are certain things that came out

5  during the initial part of the deposition, questions that I,

6  threshold questions that I raised, that ultimately resulted in

7  the revelation that he was facing or had faced certain

8  lawsuits, several lawsuits during the course of his career.

9  And I would like to be able to go more deeply into that area,

10  and one of those instances, one of the individuals who was

11  arrested in a case that he was involved in had been shot and

12  was in the hospital, and was in intensive care unit, and he

13  was sued because he, the man needed oxygen and he pulled the

14  oxygen mask off of his face in an attempt to do whatever. I

15  was not allowed to get further into that area. But it's these

16  type of inquiries that I think are legitimate inquiries. I

17  would like for your Honor to make a ruling. They're not simply

18  third party witnesses and even if they were third witnesses we

19  contend that we have a right to deal with their credibility,

20  and but this Officer Reynolds, Detective Reynolds is more than

21  a third party witness for the reasons that I've just

22  discussed.

23       THE COURT:  I get the gist of what you're saying,

24  who wants to --

                                                                    30

1

2              MR. BELDOCK: Also civilian complaints, as well, Mr.

3    Beldock.

4              THE COURT:  Who wants to tell me the other side of

5    the story.

6              MR. DEPAUL: Yes, your Honor, Philip DePaul. If I

7    could just, for your Honor, bring in a little bit of content.

8    These questions that were raised in the July 22nd letter of Mr.

9    Beldock, refer to a message board, comments on a message board

10   that Mr. Warren intends to ask Detective Reynolds.

11             He marked a ten-page document as an exhibit and then

12   attempted to ask questions about that document.  The comments

13   in that document refer to the Sean Bell matter, an incident

14   that is unrelated to this case, that occurred 17 years after

15   the incident that's the facts and circumstances of this

16   lawsuit.

17             Mr. Myerberg who was counsel at the time, directed

18   Mr. Reynolds not to answer the question, not on the basis of

19   relevance, but on the basis of it being harassment.  Simply

20   put, the questions don't go to Officer Reynolds' credibility,

21   they go to harassment. They are basically questions of giving

22   him to give opinion on a racially charged case, or asking his

23   opinion on African-American people, in general, it didn't go

24   to this credibility.

25             THE COURT:  You don't think that those issues that

1  you just mentioned, one's thoughts about racially charged

2  cases and the African-American community would be relevant?

3          MR. DEPAUL:  No, your Honor, it's -- one brief

4  moment, your Honor.  Your Honor, again, it's not relevant, it

5  goes to the harassment of a witness about his opinions on a

6  case that occurred 17 years after the incidents in this

7  matter.

8          THE COURT:  And I'm not sure why you think that

9  that's not relevant, I mean are you saying that if he -- are

10 these different opinions than he would have had 17 years ago?

11         MR. DEPAUL:  Your Honor, I'm not sure, but --

12         THE COURT:  I think you answered the question then

13 didn't you?

14         MR. DEPAUL:  What?

15         THE COURT:  I mean, first of all, the direction not

16 to answer a question, you really have to have it on, you know,

17 it's very solid, I mean it don't think it was designed to make

18 a motion. And the question of one's credibility and the issues

19 that are swirling around in this case, certainly are, one can

20 argue about what is and what is not relevant. It seems to me

21 the question about what you can ask a witness in that regard

22 in terms of his views, actually I'm not sure when or if they

23 ever lose their relevance.

24         MR. DEPAUL:  Additionally, your Honor, my colleague,

32

Mr. Myerberg, attempted to raise this issue with the Court at

that time, many times in fact, at the deposition. Mr. Warren

replied he was going to reserve his rights on the issue. So

while we attempted to raise the issue with the Court to

resolve it at the deposition, plaintiffs' counsel decided that

they didn't want to, and then for over an hour played 911

calls. So it was -- it was our position at the time that we

could have resolved this --

THE COURT:  Right, and you could have,

notwithstanding whatever Mr. Warren did, you could have raised

it with me, or he could have.  I mean was there a direction to

the witness not to answer?

MR. DEPAUL:  Correct, your Honor.

THE COURT:  Once there's a direction to the witness

not to answer, you have it in your power to contact me,

regardless of what Mr. Warren does.

MS. NELSON:  Well, your Honor, we did suggest that

several times to plaintiffs' counsel, we were at their

offices, their phones, they continued with the deposition. I

don't know that there was anything more for us to do barring a

ruling from your Honor.

THE COURT:  Well, I understand that, I like people

to be civil, but as a legal matter, at that point you could

have said we're stopping the deposition and we're going to get

1   a ruling from the Court.

2           MS. NELSON:  I agree, your Honor, but as your Honor

3   has pointed out to us on several occasions, that is not the

4   alternative that you would prefer.

5           THE COURT:  That's correct.

6           MS. NELSON:  What we did was we put plaintiff on

7   notice as to our objection, we had the witness not answer that

8   question, and we moved forward at plaintiffs' preference.  We

9   shouldn't now be penalized that we didn't call your Honor

10  because plaintiffs didn't want it. We certainly made our

11  objection known for the record, we've made it known to

12  plaintiffs several times.

13          THE COURT:  Well what does the record show at that

14  point, does the plaintiff say, okay, everything is fine, or

15  does he say --

16          MS. NELSON:  No, what the record shows, your Honor,

17  is that plaintiff said we have other matters we would like to

18  go through, let's go through them. They came back to the issue

19  again, Mr. Myerberg raised his objection again, and that

20  deposition ended without calling your Honor. And if I remember

21  correctly we were still within our seven hours, so we didn't

22  even raise that objection as a reason not to call your Honor.

23          MR. WARREN:  Your Honor, I think that Ms. Nelson

24  would have to agree that we all agreed at the eleventh hour

1

2   that these issues would be collectively raised, as I

3   understand it. And again, you know, there were, these issues

4   were always on the table, and certainly it became aggravated

5   at the eleventh hour when we became aware of the transmission

6   to the –

7            (interposing)

8            THE COURT:   What's this eleventh hour that we're

9   referring to?

10           MS. NELSON:   -- I'm not sure what the eleventh hour

11  is you're talking about.

12           THE COURT:   What time was it?

13           MS. NELSON:   It certainly wasn't midnight, and we

14  were again still within our seven hours.  And I won't agree

15  with Mr. Warren, Mr. Moore on several occasions stopped the

16  deposition over our objection not to answer a question, and

17  called your Honor.  The issue got resolved, the deposition

18  continued, you know, consistent with your Honor's ruling.

19           And I just want to point out that during the

20  Reynolds deposition, at one of those times, we did raise the

21  objection and asked -- an instructed the plaintiff not to

22  answer it. That was a 5:20, pursuant to Mr. Fisher.  Mr.

23  Warren said we're not going to deal with this now, we're going

24  to deal with it at the end of day, but not now, that was at

25  5:20, and by the end of the day we thought he was going to

35

1   call the Court.

3        How this ended was we objected, we put our objection

4   on the record, Mr. Warren ended the deposition, and we left.

5        MR. WARREN:  Judge, that is not true.  The --

6        MS. NELSON:  But the record will --

7        THE COURT:  Counsel, counsel --

8        MS. NELSON:  My apologies, your Honor.

9        THE COURT:  Okay.  I'm, you knew where I was going

10  on this?

11       MS. NELSON:  Yes, your Honor, I apologize.

12       THE COURT:  All right.

13       MR. WARREN:  Judge, first of all, it not only

14  applies to Detective Reynolds, it also applies to Officer

15  Weir, as well. And at 5:20, I think the deposition ended at

16  approximately 7:00, and we indicated once we became aware that

17  there were other issues, that we would make these issues

18  available by way of argument and that was in the letter that

19  was sent from Mr. Beldock, at the appropriate time. Because

20  given the fact that it had arrived 7:00 at the end of the day,

21  that was, the time was about expired, and we felt that on that

22  basis it wasn't appropriate to contact the Court at that time.

23       THE COURT:  Okay, before you continue with this,

24  before you continue with the procedural issue, let's deal with

25  the substance of this. And the substance is this, okay, if you

1

2  had these witnesses on the stand and the question came up as

3  to whether or not they had been involved in these blogs, do

4  you think the Judge would let that question come in?

5       MS. DAITZ: Your Honor, if I may, I'm sorry, Mr.

6  DePaul, I would like to address that issue. I think the answer

7  is not only no, but in this particular case, you know, there

8  are hundreds of racially charged incidents in this City,

9  particularly in the past 20 years. And to allow plaintiffs,

10  with every single nonparty witness, when we're already talking

11  over seven hours per deposition, to inquire about each

12  witness' opinion as to each and every racially charged case,

13  in the hopes that a witness might say something like, you

14  know, I thought the officers' actions in the Sean Bell case

15  were justified --

16       THE COURT:  Okay, just before you continue with

17  this, I will make it clear to you that I would never let a

18  lawyer just ask a question out of the dark, that is just say,

19  okay, what's your opinion on this.  If a lawyer wants to ask a

20  question, the first thing I'm going to ask him is do you have

21  a good faith basis for believing that there is something here,

22  and what Mr. Warren has told me is not just that he's asking

23  people, okay, what's your view on the Sean Bell case, it's

24  that you've written some very incendiary things, did you write

25  this stuff?  Or there are some very incendiary things written

1

2 about this case, which was a racially charged case, which one

3 could argue might have some implications for how someone acted

4 in a racially charged case which they have very strong

5 feelings about.

6          Given that premise, given that intro, that's not a

7 fishing expedition, that's trying to find out whether or not

8 this person has some views which might affect how they would

9 react in a certain kind of situation. I don't see this as, you

10 know, just asking every witness what their views are.

11          MS. NELSON:  Except that wasn't the foundation that

12 was laid, your Honor, Mr. Warren showed the witness and

13 exhibit, we read it, the witness read it, I think both Mr.

14 Myerberg and I went on the record to ask Mr. Warren if he

15 actually intended to ask questions about a blog concerning

16 Sean Bell, he said yes.  He gave no other explanation.

17          If that is all, if we have a bare bones foundation,

18 other than what your Honor just gave us, we had not other

19 reason to believe that we should not instruct the witness not

20 to answer those questions.  Mr. Warren did not lay that kind

21 of foundation. I'm sure it is in their application to the

22 Court, but that was not the circumstances under which we

23 objected to the questions at the deposition.

24          MR. WARREN:  Judge, most respectfully, the whole

25 purpose in conducting a deposition is to establish if you have

38

1

2  a reasonable basis that you believe supports asking a

3  question, it's to ask questions that are relevant for purposes

4  of further down the road being in a position, depending on the

5  response, to enlarge on that question and ask the same

6  question in the trial.

7            THE COURT:  Before we get too much into philosophy,

8  what was the specific question that was asked that resulted in

9  the direction not to answer?

10            MS. NELSON:  We'll find it, your Honor.

11            MR. WARREN:  As I recall, the question was whether,

12  in fact, Officer Reynolds or Detective Reynolds, was the

13  author of that blog.

14            MS. NELSON:  Actually --

15            MR. WARREN:  Or the communications in the blog, I'm

16  sorry.

17            MS. NELSON:  I believe there was a question about

18  whether or not Officer Reynolds created any blogs with

19  internet postings, then he answered those questions, and then

20  the reason for the objection though was have you ever made any

21  comments on any publication concerning the Sean Bell case?

22            THE COURT:  Okay, so that was the question?

23            MS. NELSON:  That was the question that led to --

24  that was the question that led to the objection.  He certainly,

25  he answered the questions, your Honor, as to whether he ever

1

2    made any publications on any blogs or internet posts.

3            MS. DAITZ: Also, your Honor, just reading from the

4    record, would point out that the defense counsel, Mr.

5    Myerberg, inquired of Mr. Warren as to what the relevance of

6    the line of questioning was prior to instructing the witness

7    not to answer, and the only response was credibility. And Mr.

8    Myerberg explained that the witness was a nonparty, and that

9    he, having reviewed the blog entry about the Sean Bell case,

10   did not believe it to be an appropriate area of inquiry. And

11   Mr. Warren simply said we are going to reserve our right.

12   There's no other statement on the record explaining, as

13   thoroughly as plaintiffs did in their subsequent letter

14   application, what the basis for their questioning was, and

15   what the good faith basis was for pursuing that line of

16   inquiry.

17           THE COURT:  And this, you keep referring to it as a

18   third party, is this person a potential witness?

19           MS. DAITZ:  He is a witness, he's a nonparty.

20           THE COURT:  He's a nonparty witness.

21           MS. DAITZ:  He's a nonparty witness, yes, your

22   Honor.

23           THE COURT:  Okay.

24           MS. DAITZ:  He was the arresting officer of certain

25   of the people in the park.

1

2       THE COURT:  And so just to be clear, as I understand

3  it, the question here is whether to reopen this deposition for

4  this line of inquiry, that's it, right?

5       MR. WARREN:  That's correct.

6       THE COURT:  Okay.  Now what did you want to add?

7       MR. WARREN:  No, as I said, there is a connection in

8  terms of one of the terminologies that was used by Detective

9  Reynolds, mutts, that was also used in public record in a book

10 that as written by one of the defendants in this case, who

11 worked with Detective Reynolds on this case, and that was

12 Detective McKenna.  And, of course, these are not questions

13 that are simply asked out of a vacuum or asked harass, that's

14 simply not the way we operate.

15      We had a basis for asking good faith questions, we

16 would still like to and I would still like to expand on those

17 questions and reopen this deposition, not only as it relates

18 to his communications in a public blog that had what I

19 considered to be significant relevance to this case, and his

20 testimony as a witness in this case, but also, as I said

21 before, questions relating to CCRB complaints against him, IAB

22 complaints against him, the lawsuits against him.  All these

23 things are relevant in terms of his credibility as a witness.

24 I mean counsel can't have it both --

25      THE COURT:  I'm sorry, and you didn't ask those

                                                                41

1   either?

2        MR. WARREN:  We asked -- we asked some of them

3   initially, but we were not allowed to expand on them at an

4   point later on.  And we decided that at the, when the

5   questions arose concerning the communications to the blog,

6   that we would raise all of these issues, especially since

7   Officer Weir was in a similar situation in terms of us not

8   being allowed to inquire into IAB complaints, that we would

9   raise all of these matters to the Court in a logical way in

10  the communication and have a hearing on the matter so the

11  Court could make a ruling. And Mr. Beldock can --

12       THE COURT:  But I guess, but Ms. Nelson is right

13  though, other than saying credibility, you didn't really give

14  your full theory of why this was relevant.

15       MR. WARREN:  Well, I indicated that, I thought I had

16  indicated, I don't have a copy of the transcript with me, but

17  I thought I had indicated that the relevancy related to his

18  credibility as a witness in this case, and if he were called

19  as a witness at a trial, that then credibility would be a

20  relevant issue. I don't remember the exact context, but

21  certainly it is relevant, your Honor.

22       And that is the issue that is before us today. It is

23  --

24       THE COURT:  And who's the other witness?

1

2          MS. NELSON:  Weir.

3          MR. BELDOCK:  It was also James Weir, whose

4  deposition I took, your Honor, but it's all, this discussion

5  applies to all of the third party witnesses, police witnesses,

6  third party witnesses who are former police officers involved

7  in this case. We have been faced with the blanket objection in

8  the Weir case, and in the Reynolds matter, by the Corporation

9  Counsel, that they're third party witnesses so we can't go

10  into credibility issues of this nature.

11          Now I just want to point out to your Honor that we

12  didn't, we came upon this blog information quite close into,

13  if not the day before the Reynolds deposition. One of the most

14  key items on the blog we didn't discover till after the

15  Reynolds deposition. These items should have been given to us

16  in the first place, because that key item had to do with very

17  case. And one of those, that internet -- that internet item

18  had to do with his report to the public, to the people on his

19  blog, about the arrests he made in this case, and what he

20  considered about the defendants.

21          So this is not a singular issue, this is an across

22  the board issue, and there is no way we should be prevented

23  from asking them questions of this nature because they're

24  third party witnesses. And what's more, they have asked the

25  same questions --

43

```
 1
 2          THE COURT:  Counsel, counsel, counsel, counsel --
 3          MR. BELDOCK:  They have asked all kinds of questions
 4   of the same nature of our witnesses and of other witnesses.
 5          THE COURT:  Mr. Beldock, I have heard enough.  Okay,
 6   with respect to the issue, and I think I understand the issue
 7   now and I understand eh defendant's objections and the
 8   question of whether or not the inquiry concerning attitudes
 9   that the witnesses may have is either too attenuated in terms
10   of time or circumstance. I find that the inquiry is relevant,
11   and my only issue, frankly, is whether or not it's generically
12   relevant or that there is some basis for the inquiry. And
13   while I would have, I think it would have been cleaner if the
14   dialog between counsel had made clear what was going on, I
15   understand that there was always some hesitancy on the part of
16   counsel to have a colloquy and then reveal what it is that
17   they want to ask questions about.
18          But it does seem to me that to the extent that there
19   are blogs where people are expressing opinions concerning what
20   have been termed by the parties racially charged incidents,
21   that goes beyond just somebody's personal opinions. And to the
22   extent that any witness has opined in public concerning these
23   kinds of issues, I think that's fair inquiry.
24          That deposition, the Reynolds deposition, will be
25   reopened on a limited basis to inquire about the blog.  Yes,
```

```
 1                                                        44
 2   Ms. Daitz?
 3           MS. DAITZ:  Your Honor, given that the witness is a
 4   retire from the NYPD, and nonparty, and he has subsequent
 5   employment, we would request that the questions be, or the
 6   deposition be reopened via a deposition upon written
 7   questions, to see if there really is any need to bring back
 8   this witness for an entirely new deposition for this limited
 9   line of inquiry.
10           THE COURT:  All right, are you saying -- well,
11   before you make that application, show me you cannot
12   accommodate this within the framework of a regular deposition.
13   We're only talking about an hour here, or so, I mean I don't
14   know.
15           MS. DAITZ:  Well, your Honor --
16           THE COURT:  I don't expect this, well, first of all,
17   I don't expect this to be more than part of a day. Are you
18   trying to tell me something different, Mr. Warren?
19           MR. WARREN:  Not at all, Judge.  I try to be very
20   frugal with time and I like to deal with the issues as they
21   are significant. So I don't intend to waste time here. I mean
22   if there is something there, it won't be an all day
23   deposition, I can tell you that. It won't be an all day --
24           THE COURT:  The bottom line is this --
25           MR. WARREN:  It won't be that.
```

```
 1                                                      45
 2           THE COURT:  All right.  If you, before you request a
 3  deposition on written questions, which I think, I mean, look,
 4  they're just not the same as a regular deposition. So if you,
 5  if there is some problem, you said, is he retired?
 6           MS. NELSON:  He is retired, your Honor, from the
 7  police department.
 8           THE COURT:  Does he live in New York?  Does he live
 9  in New York?
10           MR. WARREN:  He lives in New York, he's in, as I
11  recall, he said he was in real estate, he lives in the city,
12  he has no problems getting to a deposition --
13           MS. NELSON:  I'm not sure if that question was
14  asked, but fine.
15           THE COURT:  Look, if you want to make that
16  application, give me something more than just the idea that
17  he's a third party and --
18           MR. WARREN:  Well, your Honor, I will say that he,
19  during the deposition, one of the questions I asked him was
20  how many times did he meet with Corporation Counsel, at least
21  ten --
22           THE COURT:  You know, of course, at this point
23  you're winning this issue, so I'm not sure --
24           MR. WARREN:  I understand.
25           MS. NELSON:  Your Honor, I just want to clarify so
```

1                                                              46

2  we all understand, the deposition is being reopened so that

3  Officer Reynolds can answer questions regarding the blog that

4  was marked as Exhibit 9 at the deposition?

5              THE COURT:  Well, I guess that depends on where it

6  leads --

7              MR. WARREN:  Judge, I'm also seeking one other area

8  that I've elaborated on.

9              THE COURT:  So it's a good thing that she asked the

10  question.

11              MR. WARREN:  Judge, no, but we've already talked

12  about this, the disciplinary matters, the lawsuits, these are

13  extremely critical in terms of the credibility --

14              THE COURT:  Now you said you had asked some

15  questions along those lines?

16              MR. WARREN:  Some questions, but I wasn't able to

17  really expand.

18              THE COURT:  When you say -- I'm sorry, when you say

19  you weren't able to expand, what does that mean, you were

20  prevented or?

21              MR. WARREN:  Yes.

22              MS. NELSON:  No.  Let me just say --

23              THE COURT:  Okay, Mr. Warren.

24              MS. NELSON:  Mr. Warren.

25              THE COURT:  Don't do that.

1                                                      47

2           MS. NELSON:  Your Honor, Officer Reynolds was asked

3    about prior lawsuits, he answered all of those questions, Mr.

4    Warren moved on.  According to Mr. Warren's statement in

5    court, is that he didn't get a chance to go back and ask more

6    questions.  That is not what we should be reopening the

7    deposition for.  He asked those questions, he ended that line

8    of questioning, and he moved on to something else.  Now in

9    retrospect he wants to go back and he wants to ask further

10   questions. I don't believe that the Court should allow him to

11   reopen the deposition to be able to do that.

12          MR. WARREN:  Your Honor, there were certain areas

13   that I attempted to inquire in, although certain answers were

14   provided, and I distinctly remember Mr. Myerberg instructing

15   him not to answer because he considered the answer to those

16   question to be, or those questions, themselves, to be

17   irrelevant.

18          And, your Honor, I think that again, that the, for

19   example, CCRB complaints, whether they were founded,

20   substantiated, IAB complaints, the fact -- I'm sorry, go

21   ahead.

22          THE COURT:  Mr. Warren, I do not disagree with you;

23   however, I am not going to reopen the deposition for stuff

24   that you had an opportunity to inquire and then you stopped on

25   your own accord. If you want anything beyond what I've just

1

2 ordered with respect to the blog --

3            MR. WARREN:  Yes.

4            THE COURT:  You show me in the deposition where you

5 were prevented from asking.

6            MR. WARREN:  Yes.

7            THE COURT:  If you make that showing, we'll consider

8 it. But this is not for you to get a second bite at the apple

9 for things that you didn't go into in the detail that you

10 would have liked or in retrospect you said, oh, maybe I should

11 have asked this question. Only if you, if you can demonstrate

12 to me that you were not allowed to explore those issues fully,

13 that would be the initial showing. And then if you were

14 prevented from asking, and I don't mean where counsel in a

15 colloquy said, okay, I think that's enough, then we'll deal

16 with the blog. Other than that, let's see what you've got for

17 me.

18            MS. NELSON:  One separate issue, from my

19 understanding, Mr. Warren brought up three, which is the blog,

20 the lawsuits and --

21            THE COURT:  The CCRB.

22            MS. NELSON:  The CCRB, and I believe Mr. Beldock

23 also said Civilian Complaint histories.  We've always put our

24 objection on the record, actually very similar to what Mr.

25 Warren is now asking for, which is substantiate/

49

1

2   unsubstantiated, you've also added, of a similar nature, and

3   we've allowed every single witness, including the nonparty

4   witness, to answer that question.

5           We phrase our objection based on previous rulings

6   that are published by your Honor, with respect to the

7   production of CCRB and IAB disciplinary information.  Apart

8   from those objections, substantiated/unsubstantiated of a

9   similar nature, we've allowed our witnesses to answer the

10  question, and we certainly allowed Eric Reynolds to answer in

11  this case.

12          So to have him go back again and revisit that issue,

13  again, I think Mr. Warren has figured out in retrospect that

14  there are other questions that he wants to ask, that weren't

15  asked at the deposition. And that he had the opportunity to

16  ask the deposition.

17          THE COURT:  So that all the parties will understand,

18  that will be the basic inquiry, from my point of view.

19          MR. BELDOCK:  Let me just read something that's very

20  pertinent.

21          THE COURT:  Yes.

22          MR. BELDOCK:  Because Ms. Nelson's memory is wrong.

23          MS. NELSON:  Okay.

24          MR. BELDOCK:  As I wrote in my letter or July 22nd to

25  your Honor:  "On Tuesday of this week in the course of my

50

deposing former Officer Seamus Weir, Assistant Corporation

Counsel Elizabeth Dollin objected to my asking if there were

ever any civilian or IAB complaints made against him, and

whether he was ever disciplined as a police officer. Ms.

Dollin would not let him answer on the grounds that he was a

nonparty witness. This relates to my previous statement that

this is a universal problem we have, and Ms. Nelson is simply

wrong in her memory, and they are blocking us from asking

questions that should be easily allowed and should not be

blocked. That point is quite significant, because it doesn't

have to do just with Reynolds and Weir --

MR. WARREN:  That's right.

MR. BELDOCK:  It has to do with the next ten

depositions we're taking.

MS. NELSON:  Let me just say, your Honor, we've

taken about between 20 and 30 of these depositions, we put the

same objection on the record every time, more or less, I've

been to every one of them.  And we have allowed the witness to

answer every time.  I think it is well past the time for

plaintiff to raise this objection, if they want to raise this

objection. And like I said, we base our objection on your

Honor's previous rulings on this issue.

The only thing we have asked is that the questions

be limited to a similar nature as the claims in this case --

```
 1                                                        51
 2           MR. BELDOCK:  Judge, what I just put in shows that
 3   she's wrong.
 4           THE COURT:  Okay, counsel, I --
 5           MR. BELDOCK:  She's wrong though.
 6           THE COURT:  If there's -- if there is an issue of
 7   witnesses being directed not to answer, and I don't mean just
 8   objections, okay, then, you know, by all means bring those to
 9   me. I mean I would prefer that lawyers not object, but there
10   is a difference between saying that you object to a question
11   and directing the witness not to answer. Because I get these
12   all the time, some lawyer says I object, then the lawyers says
13   are you going to direct him not to answer, and he says no.
14           If you're telling me that you are asking questions
15   concerning prior incidents about an officer and there was an
16   objection, you'll have to point it out to me.
17           MR. BELDOCK:  I mean but that's what I pointed out
18   in my letter. That was one of the bases for this application,
19   I'm pointing out, I specifically pointed out that Ms. Dollin
20   prevented me from asking about civilian or IAB complaints made
21   against Officer Weir. It's on the first page, it's in the
22   second paragraph, it's exactly what happened, Ms. Dollin said
23   I can't ask this of a third party witness, and Ms. Dollin
24   said, directed him not to answer.
25           Now we're going to have this problem all the time,
```

1   we shouldn't have it at all, these witnesses are not third

2   party neutral witnesses, they are part of the police officers

3   who were involved in this case.

4   THE COURT:  Mr. Beldock, you do say that she would

5   not let him answer on the grounds that he was a nonparty

6   witness.

7   MR. BELDOCK:  Yes.

8   MS. ELIZABETH DOLLIN:  Your Honor?

9   THE COURT:  Yes.

10   MS. DOLLIN:  Elizabeth Dollin.  I did attend Officer

11   Weir's deposition, and I believe, and I don't have the

12   transcript in front of me, that as Ms. Nelson had pointed out,

13   I believe my objection was to limit or allow him to answer

14   questions about IAB and CCRB complaints that were similar in

15   nature and to a relevant time period.

16   Now I don't, your Honor, have that deposition

17   transcript in front of me, but that has been our practice with

18   respect to nonparty witnesses.

19   THE COURT:  And why do you make a distinction,

20   nonparty witnesses?

21   MS. DOLLIN:  With all witnesses, your Honor, I'm

22   sorry, with all witnesses.

23   THE COURT:  Oh, okay.

24   MS. DOLLIN:  And so I believe that that was our

1                                                          53

2  objection and our instruction, but I don't have the transcript

3  in front of me.

4            THE COURT:  You didn't give me the transcript, Mr.

5  Beldock, did you?

6            MR. BELDOCK:  No, I did not, your Honor.

7            THE COURT:  Okay.  Well, I'm not exactly sure

8  exactly what happened though.  Mr. Beldock asked him about

9  complaints and you object, and then what happens?

10           MR. BELDOCK:  Well, if my letter is correct and I

11  thought it was when I wrote it, I asked him if there were ever

12  any civilian or IAB complaints made against him and whether he

13  was every disciplined as a police officer.  I hope I'm

14  correct, it hasn't been objected to on the fact, and Ms.

15  Dollin would not let him answer on the grounds that he was a

16  nonparty witness.  And I was less concerned about Weir than

17  the principle, in general.

18           THE COURT:  Okay.  Then what is the objection to

19  that question?

20           MS. DOLLIN:  Your Honor, again, I'm not sure that my

21  objection was, and I don't have the transcript in front of me,

22  and I also raised that this was not presented, this issue of

23  Weir was not presented to us when we had our meet and confer,

24  so I'm not fully prepared to discuss it.

25           However, it has been our practice with respect to

1                                                                    54

2  witnesses, when they're asking, when the plaintiffs are asking

3  questions about IAB and CCRBs to please limit them to allow

4  them to answer questions about cases of a similar nature and

5  limited time.

6           THE COURT:  Okay, before you continue, let me just

7  be clear about my position on this.  While I might do that if

8  I'm asking, if the question is asking the lawyers to produce

9  the information, I might make some limitation and tell them to

10 say what's relevant. I don't have the same confidence in a

11 witness. That is if you're at a deposition, I don't think you

12 can ask the witness just tell me the ones that you think are

13 relevant or similar. I just don't think that works.

14          MS. DOLLIN:  Your Honor, I understand. Again, we

15 based that objection on rulings from -- and we would, as Ms.

16 Nelson points out, we would know and point them out --

17          THE COURT:  Okay, but again, just so you'll be

18 clear, if I got a request from a party, let's say a plaintiff

19 in a case involving a police officer, and they said give me

20 the police officer's CCRB. The first issue, sustained/not

21 sustained, I would say that's not going to get you not

22 producing it. If you said similar/non-similar, I might let the

23 lawyer make that distinction because, you know, depending on

24 what kind of, if the question was if I had a case involving

25 police brutality and the question was whether or not the

1

2   police officer was accused of, you know, writing tickets, that

3   might be in play as to whether or not you're producing it.

4           But regardless of what I would do in terms of what I

5   would allow the lawyer to do for the City, in a deposition, it

6   just can't work. That is you can't ask a witness to give me

7   only the CCRB ones that are relevant because you're not

8   asking, that person can't make that determination. And so I

9   would not allow you to direct that witness not to answer the

10  broad question because I'm not going to allow him to make the

11  determination, him or her. And so at the deposition, it will

12  necessarily be broader because until the lawyers bring it out

13  or until, because there is no way, for example, I mean, for

14  example, if it's producing a production of documents, I mean

15  most of the lawyers on the plaintiff's side will say, well,

16  Judge, I don't want the defendant to make that determination

17  because they're going to be more narrow. And at least the

18  default is I can look it and I can determine whether or not

19  I'm going to allow it in.

20          At the deposition, it can't work that way because we

21  don't know what he's going to say and we don't know the full,

22  I mean it's not as if he says, okay, no, I don't have anything

23  relevant, that the plaintiffs' attorney is going to be able to

24  do anything about that. I don't think you can limit it at the

25  deposition.

56

1

2      So I would say that whatever distinction the City

3 was making in terms of those, I think we may have an issue

4 that needs to be addressed here.

5      MS. DOLLIN: Your Honor, I would point out that,

6 again, I don't have a transcript in front of me, but I believe

7 at the Weir deposition, plaintiffs' counsel was asked to allow

8 and did ask questions like were you ever charged with theft as

9 a member of the NYPD, were you ever charged with other, and he

10 was allowed and he did answer those specific questions as to

11 whether you were ever charged with theft, with whether you

12 were ever charged with acting dishonestly. Those questions

13 were asked and answered.

14      So I hear what the Court is saying, but I don't want

15 it to appear that we just blocked the plaintiffs entirely, we

16 did not.

17      THE COURT:  Okay. Well the bottom line here is that

18 at the deposition I expect the questions to be asked and

19 answered more broadly, and that is I don't expect if you are

20 asking a police officer about his disciplinary record, that

21 there be directions not to answer. Because there is no way for

22 us to determine ahead of time which ones are going to lead to

23 relevant evidence, because I don't know what's in it.

24      MS. NELSON:  Your Honor, I do understand your

25 ruling, and once the witness answers that question and it is

 1
 2   clear from the nature of his answer that it's, really, it's
 3   not relevant, how much further does he need to go into that
 4   line of questions?  If he says, your Honor, have you ever been
 5   disciplined by the police department; yes, I have, I lost my
 6   shield, is that sufficient?
 7           THE COURT:  If he lost his shield?
 8           MS. NELSON:  Well, it's clearly -- it's clearly an
 9   issue that is not relevant, whatever the issue may be,
10   whatever he was disciplined for.
11           THE COURT:  The problem, Ms. Nelson, is I don't know
12   whether I could even answer the clearly question in the
13   abstract. So I'm not going to -- I'm not going to say, okay,
14   for the plaintiffs, you know, you have carte blanche, I'm not
15   going to say to the defendants if it's clearly not relevant,
16   because I don't know what that means.
17           MS. NELSON:  Okay.
18           THE COURT:  Because I don't even know the context in
19   which it's going to arise. I would say that you can anticipate
20   that, I'll err on the side of allowing it, because it's
21   discovery.  And I don't, I mean we're not talking about, and I
22   think this came up in an earlier conference, we're not talking
23   about information that is locked in a safe someplace. I mean
24   at this point if there is something that needs to be
25   confidential, you can argue about that, but as to whether or

1                                                                    58

2  not we're going to allow questions about it, it seems to me I

3  don't know how we're going to make any determination about

4  what can and can't be considered relevant.

5             MS. DILLON:  Your Honor, I think that the only thing

6  that the defendants, and I understand the difficulty in, you

7  know, ruling in the abstract and sort of putting it in context

8  is, I just think that what we're trying to avoid is mini

9  depositions on completely unrelated incidents where the

10  allegations in either unrelated lawsuits or unrelated CCRB,

11  are delved into to a significant extent in terms of who --

12             THE COURT:  Well, look, if any of the plaintiffs'

13  lawyers spends two hours talking about that and they lose

14  their seven hours, that's on them. If they want to spend time

15  on stuff like that, and the seven hours is up, the seven hours

16  is up.  They won't be able to convince me that they need any

17  more time.  I mean at some point the lawyer is their own --

18  their own limit as to what, I mean understand that for me the

19  questions you're asking become difficult because I could never

20  see myself spending two hours on something which I wouldn't

21  thin would be relevant. And I give everybody the benefit of

22  the doubt that no lawyer is going to spend time just for the

23  sake of spending time, they made their determination of what's

24  relevant, and what you think is relevant may be different, but

25  by and large lawyers spend time on what they think is

59

1
2  important.

3          But as I said, you might disagree on what's

4  important, but if they think that spending time on one

5  particular complaint is warranted, and that takes away from

6  their ability to ask something else, they may, you know, they

7  may find that the seven hours is up and then they'll say we

8  want additional time and they'll come to me and I'll say,

9  well, you know, that ship has sailed.

10          MS. DILLON:  Your Honor, I think that's just what I

11  was trying to establish was that the Court's ruling that

12  inquiry into disciplinary history, CCRB history, other

13  lawsuits, are presumptively relevant for the purpose of the

14  deposition, does not mean that that's grounds to ask those

15  questions in hours seven through nine of the deposition.

16          THE COURT:  I think, I mean if, I've said what I've

17  had to say about it, I am assuming that all the lawyers here

18  are going to use their time, considering all the disagreements

19  that we've had, you know, you are always going to have the

20  burden of demonstrating to me that you didn't get to ask all

21  of the important questions.  And so I always tell lawyers

22  this, if you have any question about what's the most important

23  questions, ask the most important questions first.

24          I mean we were talking about Mr. Warren before

25  deferring, I mean if he wants, if he wanted to talk about an

60

hour about some CCRB thing, he'd better do that not in the

beginning and use up his seven hours. And so I think the rule

is there for the reason that we don't want lawyers thinking

that they can say and do whatever they want and take up the

time of a witness.

So, you know, you can be judicious in your use of

time and that's the limitation that people have.

MR. BELDOCK:  Judge, can we speak some more about

time now, your Honor, I think we're through. I hope we're

through with this issue.

MS. NELSON:  Just two more very small matters, Mr.

Beldock, and one is, your Honor, from your Honor's ruling, I

don't know that I should assume, but we can raise issues

regarding individual witnesses that are coming up for

deposition, in the event we seek ahead of time that we need to

move for a protective order or something else we cannot agree

with plaintiffs once we confer?

THE COURT:  You lose none of the rights that you

have under the federal rules, and I think that's one of them.

MS. NELSON:  Thank you.  My, but the other thing I

want to discuss is the limitations to the Reynolds deposition.

In light of what your Honor said, I don't believe that we were

out of our seven hours, but we certainly didn't have an hour

left.  And if all the deposition is going to be reopened for

                                                                61

 1   is so that Mr. Warren can inquire into its Exhibit 9, then I

 2   don't believe that the deposition should be extended for an

 3   hour.

 4           MR. WARREN:  Judge --

 5           THE COURT:  Okay.  All right, the way I answer that

 6   question is always this way.  I'm not a big fan of limiting

 7   depositions, per se, because it gives one side or the other

 8   the opportunity to say, if I say well you get an hour, then

 9   the other side says, well, we'll take an hour. And by the same

10   token, the side that's defending can stretch it out and then

11   it gets over the hour.

12           As long as Mr. Warren has traction in his questions,

13   then he'll be on safe ground.  If, whoever, depending on the

14   deposition, says, you know, gets to the point and they think

15   Mr. Warren is just harassing the witness and he's not asking

16   anything that's really productive, then, you know, stop the

17   deposition, call me, we'll answer that question.

18           But I don't know where it will lead. I mean he could

19   start asking him about the blog and, you know, the next thing

20   I know, there's a whole area of inquiry that opens up that's

21   going to be even longer than the blog inquiry.

22           MS. NELSON:  Okay, but my understanding is that the

23   deposition is going to be reopened for inquiries into the

24   blog.

1                                                                      62

2              THE COURT:  And anything that reasonably that leads

3    to, because I don't --

4              MS. NELSON:  The blog, you mean?

5              THE COURT:  Right.

6              MS. NELSON:  I understand.

7              THE COURT:  Right, I mean if, he might talk about

8    the blog and then he starts talking about a tweet and a book

9    he's drafting, and --

10             MS. NELSON:  Well, your Honor, that actually brings

11   up the other issue that I want to raise, which was the

12   documents which were found after the deposition.  The blog is

13   available to everyone, it wasn't our obligation to produce to

14   plaintiff documents that were publicly accessible.  To the

15   extent those were not ready and available at Mr. Reynolds'

16   deposition when he did his first sitting, I don't believe that

17   plaintiff should then get another bite to ask him about

18   documents that they did not locate before his deposition that

19   we did not obstruct them from locating.

20             THE COURT:  Okay, unfortunately, in the electronic

21   age, things like this can happen. I'm not going to prevent

22   them from asking questions about stuff which they discovered

23   afterwards and I'm not going to blame you for not giving them

24   any information. Because the problem, and this is the

25   difficultly we have when we start to have people make

1                                                                          63

2   determinations about what's relevant.

3           I understand your position, and if I understand your

4   position, even if you knew about it you would not have

5   produced it because you wouldn't have thought it was relevant.

6           MS. NELSON:  Well, no, it's not in our possession,

7   custody and control, your Honor.

8           THE COURT:  Well you would not have identified it --

9   well, if you have a witness and the witness has something, you

10  might, you might feel that you ought to reveal things about

11  the witness. I mean if the witness had written a book, you

12  don't think you would let the plaintiffs know.

13          MS. NELSON:  I think they are aware of all the books

14  that were written, your Honor.

15          THE COURT:  My point is though that I don't think

16  that I can -- I don't think it makes sense to limit someone

17  based upon information which seems related to what I opened

18  the deposition for. Are you saying what they've discovered is

19  completely, is something entirely different?

20          MS. NELSON:  We don't know, your Honor. At the

21  deposition we asked Mr. Warren to mark as exhibits those

22  documents that we were objecting to that he wanted to reserve

23  his right on.  He marked Exhibit 9, he marked nothing else.

24  And pursuant to the application that the plaintiffs made, they

25  found it after the fact.  They found other information after

64

1

2   the fact that they now want to inquire into at this sitting.

3            THE COURT:  Okay. Well, I guess there are two ways

4   to handle it. I don't know what it is that we're talking

5   about, Mr. Warren, but you can either, you can let me know and

6   I can rule on it ahead of time, or you can run the risk of

7   this becoming an issue.

8            MR. BELDOCK:  I covered this in my letter, Judge.

9            MR. WARREN:  It's in the letter, Judge.

10           MR. BELDOCK:  I've already, I mean this is totally,

11  this is such nitpicking. I said one such internet document,

12  one of two which we did not discover until after Reynolds'

13  deposition was ended, and which was not, and should have been

14  produced by defendants in response to the notice and subpoena

15  for Reynolds' deposition, in which we asked for any and all

16  materials, in any form he may have, related in any way to the

17  subject matter of this case, pertaining to discussion about

18  his involvement in the initial arrests of the five persons

19  including two of the present plaintiffs outside Central Park

20  on the night of the event.  I mean that we are being --

21           THE COURT:  Mr. Beldock, Mr. Beldock --

22           MR. BELDOCK:  That we are getting to this level of

23  debate --

24           MR. WARREN:  That's right, I mean we're being unduly

25  --

1                                                          65

2            THE COURT:  Counsel, counsel, okay.  All right,

3  let's not forget rule number one, when the Judge starts

4  talking, you have to let the Judge finish.  Okay.  In that

5  regard, if, if what you're telling me, and understand, when

6  you, when the parties are talking, you're a lot more familiar

7  with what you've said to me than I am, because I'm not as

8  focused on what it is. And if what you're saying is that this

9  is information that should have been produced because it

10 already related to his testimony, and I don't know exactly

11 what it is, so it doesn't register the same way to me, that

12 will come out at the deposition, I'm sure. But you have not

13 let the Corp Counsel know what it is that you've discovered

14 that should have been produced?

15            MR. BELDOCK:  We've given it to them.

16            THE COURT:  Oh, so you know what it is.

17            MR. BELDOCK:  It's part of my letter.

18            MS. NELSON:  I understand that, but if there, part

19 of our objection, first, is that we should have produced it.

20 So my interpretation of that is that we now need to Google

21 every witness that we produce in order to give plaintiffs what

22 are publicly available. The document that they said they found

23 after Reynolds' deposition was something that was publicly

24 available on the internet. And apparently they found it

25 pursuant to a search that they did after his deposition. I

66

1

2   don't think that they should have the right to inquire into

3   anything that they found after his sitting where we opened

4   this deposition for a limited purpose. We asked Mr. Warren to

5   mark those documents that he intended to seek relief from the

6   Court, he marked Exhibit 9. If the deposition is going to be

7   reopened, it should be just issues limited just to Exhibit 9.

8            THE COURT:  Okay, I disagree.  You get to, if --

9   look, I'm not -- search engines can find stuff, you can do

10  searches, you can find stuff, if you do it on Goggle it might

11  come up, if you do it on ask.com, it might come up. If you

12  don't put in the right search terms, it might not come up.

13           Look, this is not even a question of holding the

14  defendants responsible for not finding it. I'm not sure

15  anybody would have necessarily found it. So the only question

16  for me is if I'd known about it ahead of time, would I have

17  said you can ask him about?  And since you are already doing

18  this deposition, the answer is yes.

19           MS. DAITZ:  Your Honor, I just want to clarify with

20  respect to the latter part of your ruling, that the premise is

21  if we're already going to reopen this particular deposition,

22  it's not giving plaintiffs carte blanche to Google witnesses

23  after their depositions and use those documents as grounds for

24  a second sitting.

25           THE COURT:  The only thing that's in play now is the

1
2 exhibit that was marked having to do with the blog, what was
3 mentioned in Mr. Beldock's letter, and anything that the
4 questioning flows from.  I'm not, so you understand this, Mr.
5 Warren, if you got some minions to go out and do searches on
6 the web and found something else, don't spring it on the
7 defendants.

8          MR. WARREN:  Judge, I --

9          THE COURT:  Just, I don't expect that you --

10          MR. WARREN:  I, respectfully, I don't operate in
11 that fashion, but I think that in the metaphorical sense a
12 gentle stream oftentimes turns into a wider river, oftentimes
13 turns into a lake, and ultimately goes to the ocean. And in
14 terms of discovery process, which your Honor so eloquently
15 referred to not long ago, that is the nature of a deposition.
16 And so I don't want to be unduly restricted as a result of
17 entering this stream with the hopes of going to that ocean. I
18 don't want to be unduly restricted by their subjective
19 perceptions of how I should be limited.  I just, respectfully,
20 I'm requesting that your Honor agree with me on that point.

21          MS. DAITZ: I think, your Honor, that we all agree at
22 this point that going forward with respect to the Reynolds
23 deposition and any other deposition is that if there is a
24 basis for defendants to instruct the witness not to answer,
25 that we'll order, in the case of the Reynolds deposition, for

68

1
2  some reason to end the deposition, that we'll promptly reach

3  out to the Court in the first instance in the hopes of getting

4  a ruling at that time.

5          THE COURT:  Okay.  And just a reminder, if you have,

6  with the Reynolds deposition, anyone that you think might be

7  potentially of interest to me, let me know when they're taking

8  place. We don't work nine to five, we're here after that, so

9  you can call us. If you call the law clerk, you can call the

10  law clerk at six, seven, who knows when they'll be here. They

11  may not go home as far as I know, they're here when I leave

12  and they're here when I come in the morning.

13          And the reality is, is that even if I'm not here, if

14  you call you may be able to reach me.  So don't even, you

15  know, there is no time that is actually off limits once you

16  get the law clerk.

17          MR. WARREN:  I guess, you know, my concern is that I

18  don't want, from what I'm listening to from the other table, I

19  don't want this to turn into an obstructive spitting contest,

20  you know, where it's an attempt to violate the nature of the

21  flow or the questions in the deposition. And whether it's

22  intentional or otherwise.

23          And so I wouldn't want to belabor, I wouldn't want

24  to, for example, be put in the situation where as a result of

25  their recalcitrance, unfounded recalcitrance, we're forced to

1

2 call you ever 10 minutes or every 15 minutes we're forced to

3 call you to deal with these type of issues, or 5 minutes.

4 　　　　　THE COURT:  Well, okay, let me just say, the first

5 time you call me will probably be the last time you get to

6 call me, and whoever loses that probably won't get to call me

7 again.

8 　　　　　MS. NELSON:  And I will say, your Honor, we've had

9 depositions that we had to reopen and we have been very

10 accommodating as to not only scheduling, but at deposition I

11 don't believe we have ever engaged in the behavior that Mr.

12 Warren is anticipating. And it's one of the reasons that we

13 want to get the parameters clear now, so that we're all aware

14 of it, so we go into this deposition, we all know what to

15 anticipate.

16 　　　　　THE COURT:  Again, just so we'll understand that

17 there, and I can't anticipate a situation where information

18 could come to Mr. Warren, not necessarily even from the web,

19 as he's asking about, as he's asking questions. I think you

20 have to, you have to understand that that's not going to be

21 necessarily a situation in which I'm going to say, well, you

22 can't ask that question just because it came to you belatedly.

23 The deposition will be reopened, I don't expect there to be

24 any strange surprises, but I will let the deposition go where

25 the flow takes it.

2           MR. BELDOCK:  May I, your Honor?

3           THE COURT:  Yes.

4           MR. BELDOCK:  There is, I thought I was going to

5  raise this 15 minutes ago, there is one pressing issue,

6  discovery cutoff is now, if I remember correctly, September

7  30th.  Obviously, and we've discussed this, it can't be

8  September 30th.  And there is a difference of opinion on the

9  two sides as to whether your Honor should set a cutoff date.

10 It will be almost nine years since we started this case at the

11 end of this year, it's three years of discovery. We appreciate

12 the pressures, absolutely, on both sides, no matter what

13 debates we have, the case is difficult, many witnesses, many

14 papers and so on.  And you have before you the problem of

15 8,000 papers, so I'm a little hesitant to say what I'm about

16 to say, but I'm going to say it anyhow, we want a cutoff date

17 at the end of the year, except for expert witnesses.

18           We want to be able to finish the depositions. We

19 have maybe 15, 20 depositions --

20           THE COURT:  And the City doesn't want a cutoff date?

21 Is that what it is?

22           MR. WARREN:  The City does not want a -- no.  No,

23 they don't want a cutoff date at the end of the year, that's

24 our understanding.

25           MS. DAITZ:  Your Honor, it's not that we want an

1
2   indefinite extension of discovery, we've agreed to request an

3   extension at the time until December 31st, but we don't believe

4   that we'll be able conclude all of the remaining discovery in

5   that time period. And part of the reason is not because

6   defendants are not -- you know, defendants are producing

7   witnesses, or producing documents, we've had a pretty

8   significant delay in getting the releases from plaintiffs that

9   we need, in getting documents from third parties in preparing

10  to take the plaintiffs' depositions. The plaintiffs just

11  requested another extension of time to respond to our

12  discovery request, which we consented to.

13          But the delays and the holdups to some extent, and

14  some have to do with joint applications or discovery

15  applications that we, you know, await a ruling, and then

16  before the depositions at that time. But defendants shouldn't

17  be in a position where plaintiffs can complete taking the

18  officer depositions by mid November and then we have six weeks

19  to do all the discovery that we need to do, even assuming, for

20  the sake of argument that we have all the information we need

21  at that time to move forward with the depositions that we need

22  to take.

23          So the only reason that we're anticipating that we

24  won't necessarily be able to complete all the fact discovery

25  by December 31st is, you know, pending the Court's ruling on

1

2    the work product issue at the least, we have a number of

3    witnesses that we'll need to prepare and produce for

4    deposition and then still have all of these 14, 15 familial

5    plaintiffs to take their depositions.

6              MS. NELSON:  In addition to that, your Honor, I know

7    your Honor is aware of the numerous depositions that the

8    parties have indicated that we wanted to take, and I believe a

9    couple of months ago plaintiffs added to that list. And we've

10   been producing those witnesses for deposition, as well.

11             So they have added to their list, we've produced

12   those people, in addition to the witnesses that they

13   previously had on notice. We just don't believe it's realistic

14   that we're going to finish everything by December 31st.

15             THE COURT:  Okay, well, first of all, I think

16   everybody wants to have an end to it, including Judge Batts,

17   so we're going to set a discovery cutoff.  But by the same

18   token, I don't think any -- well, most of the District Judges

19   don't want a case that is half prepared for discovery. So what

20   we'll do is we'll set a discovery cutoff, and I know you have

21   lots of work to do, but I need to know what's going to be

22   happening, what needs to be done in discovery so that I could

23   have some sense of whether or not you can make the deadline.

24             I mean I know you said some things here, but it's,

25   you said that there have been additions, and I'm not exactly

1

2  sure what you propose to do in the next three or four months.

3        MS. DAITZ:  Your Honor, I would say we probably have

4  in the vicinity of 30 to 40 depositions remaining.

5        THE COURT:  And what's the difficulty in starting to

6  schedule them now?

7        MS. DAITZ:  Oh, we have, your Honor, we have

8  depositions on the schedule and, in fact, the parties have

9  even arranged to travel to certain correctional facilities to

10  depose nonparty witnesses, including one in Western

11  Pennsylvania in the coming weeks. So we certainly are all

12  working together on the scheduling issues, and we, you know,

13  broached the subject with plaintiffs again about just getting

14  the last of the corrected releases and we're still awaiting,

15  like I said, the responses from the IRS regarding the tax

16  forms, and certainly of Daniel Wise.

17        And the parties are continuing cross productions of

18  documents, we're awaiting plaintiffs' responses to defendant's

19  last document request and interrogatories are due on September

20  15th. So upon receipt and review of that information, we should

21  definitely be in the position to start scheduling the

22  remaining familial plaintiffs' depositions, you know, in that

23  time period.  Assuming, because I'm an optimist, that there is

24  no deficiencies in plaintiffs' responses and we take what we

25  get and we'll be prepared to go forward at that time. And, if

```
 1                                                    74
 2  not, we'll certainly bring any issue to your Honor's attention
 3  prior to whenever our next conference --
 4           THE COURT:  So you're going to attempt to schedule
 5  to complete discovery, you're just not sure that you'll be
 6  able to do it.
 7           MS. DAITZ:  We're just not sure that that's enough
 8  time to get it done, your Honor, but we're making every
 9  effort.
10           THE COURT:  Anybody who makes a good faith effort
11  will always get my ear.  Anything else?
12           MR. BELDOCK:  The next conference date before your
13  Honor --
14           THE COURT:  Yes.
15           MR. BELDOCK:  And then maybe you can be, we can be
16  more informative as to what has to be done yet.  Early
17  November I think would be a good amount of time to develop
18  what we're doing.
19           THE COURT:  Okay.  All right, tentatively, November
20  10th at 10:00.  I don't actually have my trial calendar, but
21  we'll, if there is any change we'll let you know.
22           MR. BELDOCK:  We'll bring Mr. Kendall back for that
23  day.
24           THE COURT:  I think that might be cruel and unusual
25  punishment.  Okay, we'll be adjourned and I'll get back to you
```

```
 1                                                   75
 2   with the --
 3            MR. BELDOCK:  Thank you.
 4            MR. WARREN:  Thank you, your Honor.
 5            MS. DAITZ:  Thank you, your Honor.
 6            THE COURT:  Don't forget to let me know when the
 7   Reynolds deposition and the others are going to be.
 8            (Whereupon the matter is adjourned to
 9   November 10th, 2011 at 10:00 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

76

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, McCray, Richardson, et al. v., Docket #03cv9685 was prepared using mechanical transcription equipment and is a true and accurate record of the proceedings.

Signature_____

                  CAROLE LUDWIG

Date:    September 13, 2011