```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                               :
                                           Docket #03cv9685
MCCRAY, RICHARDSON, SANTANA,         :
WISE AND SALAAM LITIGATION
                                     :   New York, New York
                                         March 1, 2012
------------------------------------ :


                        PROCEEDINGS BEFORE
                 MAGISTRATE JUDGE RONALD L. ELLIS,
             UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiffs       BELDOCK LEVINE & HOFFMAN
  Salaam:                BY:  MYRON BELDOCK, ESQ.
                               KAREN DIPPOLD, ESQ.
                         99 Park Avenue, Suite 1600
                         New York, New York 10016
                         (212) 490-0400


For the Plaintiffs       FISHER, BYRIALSEN & KREIZER
  Wise:                  BY:  JANE FISHER, ESQ.
                         291 Broadway
                         New York, New York


For the Plaintiffs:      JONATHAN MOORE, ESQ.




Transcription Service:  Carole Ludwig, Transcription Services
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>APPEARANCES CONTINUED:</u>


For the Defendants:     NEW YORK CITY LAW DEPARTMENT
                         CORPORATION COUNSEL
                        BY:  ELIZABETH DAITZ, ESQ.
                             PHILIP DEPAUL, ESQ.
                             GENEVIEVE NELSON, ESQ.
                             ANDREW MYERBERG, ESQ.
                             PATRICIA BAILEY, ESQ.
                         100 Church Street
                         New York, New York 10007

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-<br>Direct**</u> | <u>**Re-<br>Cross**</u> |
|---|---|---|---|---|

None

<u>**E X H I B I T S**</u>

| <u>**Exhibit<br>Number**</u> | **Description** | <u>**ID**</u> | <u>**In**</u> | <u>**Voir<br>Dire**</u> |
|---|---|---|---|---|

None

```
 1                                              4

 2              THE CLERK:  McCray, Richardson, Santana, Wise &

 3   Salaam Litigation against the State of New York, et al.  All

 4   counsel, please identify yourselves for the record.

 5              MS. KAREN DIPPOLD:  Karen Dippold --

 6              THE CLERK:  Please stand when you address the Court.

 7              MS. DIPPOLD:  Karen Dippold, Beldock, Levine &

 8   Hoffman, for the Salaam plaintiffs.

 9              JUDGE RONALD L. ELLIS (THE COURT):  Good morning.

10              MS. DIPPOLD:  Good morning.

11              MS. JANE FISHER:  Good morning, Judge, Jane Fisher

12   (indiscernible) for the Wise plaintiffs .

13              MR. MYRON BELDOCK:   Good morning, Myron Beldock,

14   also for the Salaam plaintiffs, from Beldock, Levine &

15   Hoffman.

16              JONATHAN MOORE:  Good morning, Judge, Jonathan Moore

17   for the plaintiffs.

18              THE COURT:  Good morning.

19              MS. ELIZABETH DAITZ:  Good morning, your Honor,

20   Elizabeth Daitz for defendants.

21              THE COURT:  Good morning.

22              MS. GENEVIEVE NELSON:  Genevieve Nelson for

23   defendants. Good morning, your Honor.

24              MR. ANDREW MYERBERG:  Andrew Myerberg for

25   defendants, good morning, Your Honor.
```

```
 1                                                    5
 2            THE COURT:  Good morning.
 3            MR. PHILIP DEPAUL:  Philip DePaul for defendants,
 4   good morning, Your Honor.
 5            THE COURT:  Good morning.
 6            MALE VOICE:  (inaudible)
 7            THE COURT:  Good morning.  This is our regularly
 8   scheduled appointment.  There are a couple of things that are
 9   pending, I will list what I have on my pad and if there are
10   other things you should let me know. There is still the City's
11   pending motion for reconsideration, which I know has been
12   pending since December. And since it only involves four
13   documents, I think that gives another month, one month per
14   document, so I'm on schedule.
15            There is the motion to dismiss Delores Wise, the
16   latest in that was the -- I had issued an order to show cause
17   and I have not seen any, typically after I do an order to show
18   cause if I don't get a response I will make a recommendation
19   to the Judge to dismiss the case. So what we do is have sort
20   of a grace period, we don't do it as soon as the period ends,
21   but we make sure that there is no chance that somebody mailed
22   something and it didn't get to us.
23            The major issue that's on my list is this New York's
24   request for a protective order concerning Detective Arroyo and
25   Michael Sheehan, anything else?
```

                                                                    6

 1

 2          MS. DAITZ:  Your Honor, we do have sort of an

 3    overarching issue that defendants need to bring to the Court's

 4    attention today, and that is that we're having difficulty

 5    obtaining discovery from plaintiffs. In the past couple of

 6    months we have had trouble getting responses to our letters

 7    and emails, we have agreed at times on extensions for certain

 8    discovery to be completed, but those dates have come and gone

 9    with no information from plaintiffs as to when discovery would

10    be forthcoming.

11          And in particular, the parties had agreed to amend

12    their discovery responses, their written discovery responses

13    to interrogatories and documents requests following a number

14    of instructions from the Court at these conferences indicating

15    that the parties needed to provide sufficient information to

16    the other side about where responsive information can be found

17    in past document productions in order for the responses to

18    interrogatories and document requests to be useful.

19          So in July, defendants served a second set of

20    discovery requests on plaintiffs, plaintiffs responded in

21    October. We immediately realized that they had often referred

22    to all the previously produced documents. So, for instance, we

23    would ask for information, documents that evidenced

24    plaintiffs' economic losses, for instance, and the response

25    that we got was if we had such documents we've already

7

produced them, see 16,000 pages of prior production. And that

was exactly the type of response that plaintiffs complained of

about defendants' responses.

THE COURT:  Somebody's phone is ringing.  Did

somebody forget to turn off their phone?

MALE ATTORNEY:  I did, Judge.

THE COURT:  You know, in some courts that would be

the last time that would happened.

MALE ATTORNEY: It's happened to me before, Judge, so

I apologize.

THE COURT:  Okay.  Unlike in the theater, there is

nobody to remind you to turn off your phones.

MALE ATTORNEY:  Right, I agree.

MS. DAITZ:  So, Your Honor, defendants supplemented

their responses to plaintiffs' requests and responded to

plaintiffs' lengthy deficiency letter in January pursuant to

the parties' agreement, but we then gave plaintiffs an

extension until mid February to do the same, we haven't

received another request for an extension. The parties had an

extensive meet and confer on Friday, we were sure that this

information would be produced either Monday or before the

conference, and we did get supplemental responses from the

remaining Wise plaintiffs, excluding Delores, but we haven't

gotten anything from the rest of the plaintiffs. And we are

1

2  unsure why the position is now that these dates can come and

3  go and we're told that we'll get releases, you know, when

4  plaintiffs get a chance to get to it and not that the parties

5  are endeavoring to meet even our interim deadlines as we have

6  been in the past. And we find it somewhat problematic because

7  we do need to take these plaintiffs' depositions and the

8  failure to get properly amended discovery responses is really

9  holding us up. So we think it's a problem.

10          THE COURT:  Any response from the plaintiffs?

11          MS. DIPPOLD:  Your Honor, I am one of the guilty

12  parties here and I admit that I'm behind in the Bates numbered

13  project. Although I will tell you that with respect to the

14  Salaam plaintiffs, our second set of discovery responses

15  identified, many of them identified by Bates numbers documents

16  -- identified by Bates numbers the documents that were

17  responsive.  The only documents that were not identified by

18  Bates numbers were documents that were, for example, produced

19  as part of our 26(a) initial disclosure.

20          So I am working on that project, I unexpectedly

21  became involved in a trial and some other matters that have

22  taken weeks of my time. So, unfortunately, I'm the guilty

23  party. I'm working on it, I'll have it in a few days. I would

24  also add that we have, and I understand that the Richardson,

25  Santana and McCray plaintiffs have provided letters with that

information. I'll leave that to Mr. Moore to address that, but I am working on it, as soon as I'm finished I'll give it to them.

And I must say that with respect to their response to our deficiency letter, I haven't yet had time to go through that and we think there will be additional issues with respect to that.

THE COURT:  Okay, am I to understand that you pleaded guilty with an explanation?

MS. DIPPOLD:  Yes, that's right.

THE COURT:  But I guess that Ms. Daitz' overarching concern was that you respect dates, and what she would at the very least want is that the dates don't pass without some other kind of accommodation.  It sounded like oddly enough I have a case where the issue was somebody was, every six months they were getting an accommodation and then nobody heard anything, and the question was did the accommodation continue or did not continue. It's creating an issue in that case, but I gather you're also saying that you are not disputing that there was a deadline in mid February and that deadline passed and you didn't say to Ms. Daitz I'm working on it and can we at least officially change the deadline?

MS. DIPPOLD: I did not, that's correct, guilty as charged.  Oh, we did discuss it in the meet and confer that we

1

2  had on the phone on Friday.

3        THE COURT:  Okay, let me get -- there is too much of

4  the back and forth, because I do want you to as much as

5  possible to agree on things, is that to some extent, in most

6  cases, there is always an incentive for the plaintiff to move

7  cases forward. Since it is pretty clear that part of the issue

8  here is that the defendants want to take depositions of

9  plaintiffs, but get their discovery, their paper discovery

10  before they do that, to the extent that the plaintiffs do not

11  complete that process that is limiting (indiscernible) itself

12  in the case going forward.

13        So I hear your explanation and to some extent it

14  becomes a self-inflicting wound when you're the plaintiff who

15  wants the case to move forward. Because to the extent that the

16  plaintiffs are entitled to documents before they do the

17  deposition, they will get -- I'm not going to force them to go

18  through depositions, any more than I would force any party to

19  take a deposition without documentary discovery. So you have

20  an incentive to produce it, I suspect that you probably have

21  many other pulls on your time, but our universe is this case

22  and I want to make sure that parties, at least with respect to

23  discovery, continue to communicate.

24        MS. DIPPOLD: Your Honor, if I might make a

25  suggestion, almost inevitably when we get a letter from

11

defendants, they will put some arbitrary date in the letter

saying we have to get them these releases, we have to do

whatever it is the letter is asking by a particular date. They

don't consult with us regarding that date. And I think if it's

something that the rules, the federal rules, the local rules

don't provide a date for, perhaps they can consult with us

before they set an arbitrary date?

THE COURT:  Well, okay.  It is certainly possible,

before you set any dates, it is certainly possible that they

could do that, although I will tell you that I had a case in

which what happened is one party suggested a date and the

other party says how about another date, and it's sort of like

mediation. I don't think that if they put a date in they the

force of law.  So if you think that the date that they put is

arbitrary, it doesn't necessarily mean it's capricious. And if

you think you need more time, just get back and say, Ms.

Daitz, I can't do this in two weeks, give me four weeks, and

they'll say three weeks, and then you moderate that. I don't

think this is, I mean at times it seems, I'm sure it may seem

as if they're dictating, but the give and take is if they

suggest it, I can only in my mind, anything they send you is

only a suggestion. And I so you'd be free to say something

else and just give her a counter date because of your schedule

or whatever obligations you have.

1

2          MS. DAITZ:  Your Honor, I just wanted to point out

3    that defendants are amenable to granting requests for

4    extensions. We recognize that plaintiffs' counsel have, you

5    know, multiple matters on their plate and that Mr. Beldock and

6    Ms. Dippold were just on trial. We don't begrudge them that.

7    Of course, we are extremely interested in moving the case

8    along, but at the same time, you know, whether it's a date in

9    a letter or the thirty days under the rules to provide

10   responses to interrogatories or document requests, we are

11   always open to a suggestion from plaintiffs about, you know, a

12   longer time period if needed to comply or respond to a

13   request. That's not really the issue, it's more the lack of

14   communication that we're raising.

15          With respect to Ms. Dippold's representation, I

16   understand that it was, Mr. Moore will address separately, but

17   we did schedule a meet and confer on Friday and those meet and

18   confers are routinely requested by defendants so that the

19   parties can discuss any issues before the conference and much

20   of the time we do manage to hammer out at least a few things

21   before we come before the Court. And on Friday, which was two

22   weeks after the date by which we expect plaintiffs to amend

23   their discovery responses, we did discuss that issue again, as

24   Ms. Dippold represented, but we were told that we would have

25   it by today and we still don't have it.

1

2       So again, if plaintiffs had touched base with us

3 yesterday and said you are not going to have these responses

4 before the conference, you know, can we have another week, is

5 that a problem, then I think we would have been less inclined

6 to necessarily bring it to the Court's attention. But with

7 respect to the McCray, Santana and Richardson plaintiffs, we

8 haven't received any responses, and I understand that there

9 might have been some office error about who was responsible

10 for sending them. But the one thing that we did get was a

11 letter regarding plaintiff, Crystal Kuphy (phonetic), and this

12 is an issue that Ms. Dippold referenced, as well.

13       I mean plaintiffs produced something like 16,000

14 pages of documents with their initial disclosures. So in

15 response to our discovery requests for specific documents, you

16 know, or in response to our deficiency letters regarding

17 specific documents, what we got from this particular plaintiff

18 thus far is a letter saying see our 16,000 pages of initial

19 disclosure. And we don't think that that's sufficient to

20 comply with the federal rules, and indeed it's not sufficient

21 to comply with the rulings that the Court made in this case

22 instructing defendants to go back, go over their prior

23 document productions, and identify where in each production

24 you can find information responsive to those requests. And

25 considering that plaintiffs moved for sanctions against

```
 1                                                          14
 2   defense counsel when defendants took more than 24 hours to
 3   comply with that request with respect to the NYPD training
 4   materials, we're kind of confounded by the fact that we're
 5   still getting the same types of responses from plaintiffs.
 6              THE COURT:  Mr. Moore, you have the podium.
 7              MR. MOORE: Thank you, Judge. I don't understand the
 8   City's response with respect to the Santana, Richardson,
 9   McCray plaintiffs.  On February 6th we sent -- one of the
10   problems is there's so many Assistant Corporation Counsels,
11   two of whom are not here, who we have been sending stuff to.
12   So on February 6th we sent a letter to Mr. Myerberg with
13   additional authorizations for Valerie Kuphy. On February 6th we
14   sent a letter to Ms. Siskind, Shyra Siskind (phonetic),
15   Assistant Corporation Counsel, with additional releases for
16   Raymond Santana, Sr.  On February 7th -- on February 6th we
17   sent additional releases that had been requested for Crystal
18   Kuphy.  On February 6th we sent a three page letter, that
19   letter was to Mr. McQueen, the one about Crystal Kuphy.  On
20   February 6th, as well, we sent a letter to Elizabeth Dolan in
21   response to deficiency letter with respect to Joanne Santana,
22   identifying documents by Bates number and responding to that
23   deficiency letter.  And on February 7th we sent another letter
24   to Matthew McQueen, this is all before the date of February
25   15th which was the deadline that had been set, on February 7th
```

1

2    we sent a letter to, once again to Matthew McQueen with

3    respect to deficiencies identified in Crystal Kuphy's response

4    to defendants' discovery request, which included responses, as

5    well as reference to Bates stamp, Bates numbers.

6            So with respect to the specific requests, I'm not

7    aware of any that are at present outstanding with respect to

8    the McCray, Richardson, or Santana plaintiffs, other than a

9    letter I got yesterday, another ten-page, single-spaced

10   alleged deficiency letter with respect to Valerie Kuphy, which

11   I was only able to open and look at today because I was

12   otherwise engaged yesterday.

13           So specifically we've responded to it, but let me

14   make a general point about the discovery, because the

15   suggestion has been made that somehow the plaintiffs are

16   delaying the progress of this case by holding up depositions

17   and it couldn't be further from the truth.  In fact, we have

18   gone to extreme lengths to comply with the City's response.

19   Let me give you an example with respect to Linda McCray.

20           Linda McCray is a familial plaintiff, the mother of

21   Antron McCray, she works at the same job she worked at back in

22   1989, she lives in the same house she lived in, same apartment

23   she lived in back in 1989.  We have provided the City 49

24   releases for medical records, work related records, for parole

25   records, of course they wouldn't accept our representation she

1

2 was never on parole, for unemployment records, for Social

3 Security Disability records, and all the rest are different

4 doctors who for 90 percent of them, 95 percent of them, Ms.

5 McCray has no knowledge of ever having seen them or sought

6 service from them.

7 　　　　　What the City is doing is they go through the

8 records that they get and they see a doctor's name here and

9 there, and then they send another release.  This is a serial

10 process, and Ms. McCray is probably not the worst example from

11 the City's perspective of the kind of releases that they are

12 asking for. But just she alone has, we have submitted 49

13 releases, and that requires us not just to go, send a release

14 to our plaintiff and have them sign it, we have to bring them

15 in.  Because we have to go through all the names of the

16 doctors and say have you ever seen Dr. Mitchell Rosling, have

17 you ever seen Dr. Cecilia Villa, no.  Well, could, you know,

18 we'll go through the medical records, do you remember going

19 for a test. They have also asked for any records of diagnostic

20 tests, you know when they go to the doctor they take a blood

21 test so they're getting records from Quest Diagnostics and

22 other Diagnostic facilities.

23 　　　　　So I just, I'm dumbfounded to hear that, one, we

24 haven't responded, because I believe we have, and I have

25 copies of the letters, and secondly, as a general matter, we

1                                                          17

2  have done all that we can to move this case along in terms of

3  responding to the City's discovery demands.  Let me give you

4  an example of how extreme it is.

5           With respect to Raymond Santana, Sr., they asked for

6  a release from somebody, I think I have the name here, from a,

7  they identify her as a Dr. Lena Lopez, there is no Dr. Lena

8  Lopez.  Ms. Lopez was a family friend who was identified by

9  Mr. Santana in a form her prepared when he went to see a

10 doctor as a primary contact, and they sent us a release for a

11 Dr. Lena Lopez.  In fact, it's his wife.  And the -- it's that

12 kind of process that we have gone through here for months now

13 that is delaying the taking of these depositions. And I just

14 think we've really reached the limit on this.

15          And I understand on some broad theory of relevance

16 that they -- that you have given them the permission to do

17 this.  But I think it's really time to call a halt to it. I

18 can't keep bringing my client down to my office for two and

19 three hours to go through medical records of people that

20 they've produced to -- that they've produced to us, or they've

21 identified some names, and spend two or three hours saying do

22 you remember Dr. so and so or Dr. -- no, I have no idea, I

23 have no knowledge. There's just a limit to it. I think they

24 should do these depositions if there is something of

25 importance identified in the course of the deposition that

1                                                              18

2    requires them to bring the person back because this is some

3    very important medical professional that they absolutely have

4    to ask our client some information about then we'll do that.

5    But they've set up this sort of rolling process where they're

6    never satisfied, which is illustrated by the fact that just

7    yesterday I got a whole new set of --

8              THE COURT:  I get your point, Mr. Moore.  Do you

9    want to add to that point --

10             MS. FISHER:  I would like to add to that, yes.  Your

11   Honor, just to piggyback on what Mr. Moore is saying, we've

12   just, the deposition of Victor Wise has already been done.

13   And yes, it was left open, but now I've gotten another set of

14   releases for medical records for him and it's the same thing,

15   it's ongoing, it's continuous, and to be honest, I can't

16   recall from his two-day deposition that a single question was

17   asked about anything that was in the medical records that was

18   produced to me before the deposition. Now it's the same thing

19   for Michael Wise who I think has probably signed more than 49

20   releases and they're asking us to sign releases for things

21   such as acupunctures and saying well it sounds like this name

22   but it may not be the right one because we can't find someone

23   with that exact name.

24             THE COURT:  I get your point.  What's the City's

25   response?

1

2          MS. DAITZ:  Your Honor, first I think that there's

3   two separate issues here. The first is amended responses to

4   our discovery requests. We ask that plaintiffs take, you know,

5   our interrogatories and document requests, excuse me, that

6   they look at the versions that they provided to us, recognize

7   where they cite to all previously produced documents, and

8   revise those responses. We asked that in early November of

9   2011. By email of December 13th, Ms. Byrialsen represented on

10  behalf of all plaintiffs that the plaintiffs agreed to do what

11  we were asking them to do, which was revise their discovery

12  responses. That's what Ms. Dippold is referring to as the

13  Bates numbering project, to provide an indication as to where

14  in prior document productions responsive information is to be

15  found.

16          It is my understanding, and I had no reason to

17  believe otherwise, that Mr. Moore's clients were doing exactly

18  the same thing since Ms. Byrialsen represented that there was

19  no need to seek judicial intervention, as I indicated in the

20  last email I sent in mid December, that we were going to do

21  because we hadn't received any response about whether or not

22  plaintiffs even agreed to do this. And we went forward on the

23  assumption that that's what we would be getting, and, in fact,

24  that is what we got from the Wise plaintiffs earlier this

25  week. I haven't reviewed it in great detail but I do know that

                                                                    20

 1

 2   they complied with exactly what they said that they

 3   represented they were going to do. So that issue, those are

 4   what we're missing from the McCray, Santana and Richardson

 5   plaintiffs, we're missing revisions to their discovery

 6   responses.

 7          The releases that Mr. Moore has provided are a

 8   separate issue.

 9          THE COURT:  Before you get to that separate issue,

10   you're saying that what Mr. Moore says has been produced is

11   not what you're complaining about?

12          MS. DAITZ:  Exactly, what he's referring to are

13   signed authorizations for things like medical treatment,

14   employment records, et cetera, and I could address that in a

15   moment. But in the interim, what Mr. Moore has continued to

16   provide is see Bates numbers AM000001 through 016516, in

17   response to all of our discovery responses.

18          MR. MOORE:  No.

19          THE COURT:  Is this something that was agreed to

20   that you're talking about?

21          MS. DAITZ:  Well, in the first instance, Your Honor,

22   as you may recall, I just want to remind the Court of sort of

23   the history of this issue. Back in June of 2010, plaintiffs at

24   a conference, one of our first conferences before the Court,

25   complained that defendants, in their discovery responses,

21

2  merely referred to see our prior productions of documents.

3          THE COURT:  Okay, I remember that, I just want to

4  know about what are you complaining about with the plaintiffs,

5  was this an agreement that they had agreed that they would

6  revise their responses?

7          MS. DAITZ:  We called to plaintiffs' attention by

8  letters that their responses did not comply with what Your

9  Honor indicated that the parties should do.  At both in June

10  of 2010, again that fall, the following year, the Court ha

11  continuously told the parties that we need to provide

12  information sufficient for us to find responsive information

13  in this enormous universe of documents that have been provided

14  to date.  Plaintiffs agreed by email from Byrialsen in mid

15  December, that they would revise their document responses,

16  discovery responses, to comply with the directives of the

17  Court and to comply with what defendants had requested that

18  they do.

19          THE COURT:  Okay, so you get something from Ms.

20  Byrialsen saying we're going to revise and you're saying

21  that's what Mr. Moore hasn't done on behalf of his clients?

22          MS. DAITS: Yes.

23          MR. MOORE:  Judge, I responded to the specific

24  letters, I'm still getting them. So I don't even understand

25  how, I mean this is somewhat of an inconsistent argument. If

 1

 2  that is, in fact, the case, why did I get a letter yesterday

 3  from Mr. McQueen, asking me for specific -- pointing out

 4  specific deficiencies in plaintiff, Valerie Kuphy's discovery

 5  responses? I mean either they're going to tell us that they

 6  want specific information or they want some kind of general

 7  revision of our general discovery demand -- responses, which I

 8  never understood was what we were required to do.  My

 9  understanding was that there were specific responses that they

10  felt were deficient, they identified them, and we responded.

11          MS. DAITZ:  Your Honor --

12          THE COURT:  Okay --

13          MR. MOORE:  And that's what we did.

14          THE COURT:  I understand what we have here is a

15  failure to communicate, because you seem to be talking about

16  two different thing.

17          MS. DAITZ:  I believe so, Your Honor, and I'm kind

18  of confounded by what Mr. Moore is saying because we made it

19  very clear in our November letter that we would address issues

20  --

21          THE COURT:  Let me just say that you're on the verge

22  of being banished to my jury room, because I will decide

23  issues, but the parties have to be talking about the same

24  issue.  And if you're saying that an agreement through Ms.

25  Byrialsen that the plaintiff would revise some answers to

1                                                                23

2   discovery requests and that Mr. Moore, on behalf of his

3   client, did not follow through with that, I'm not sure he's

4   acknowledging that, or he's saying that there were specific

5   things that he was having communications with people on the

6   defendants' side saying okay, these are things that we want, I

7   need to know what it is --

8           MR. MOORE:  Judge, I'm saying we've responded to

9   every specific deficiency --

10          THE COURT:  Do you know what she's referring to when

11  she talks about this conversation with Ms. Byrialsen about

12  revising responses --

13          MR. MOORE: I'm not aware that we had a general

14  obligation, and I still don't understand what it would be, I

15  don't know how it even worked. Is the City saying that we

16  should revise now, after going through this whole process,

17  including responding to specific deficiencies in the course of

18  specific letters sent to us by the City for specific

19  plaintiffs, that we now have to go back and revise all of our

20  preceding general discovery responses when they first filed

21  their discovery demand?  It just doesn't make any sense. And I

22  don't think they're operating under that assumption, otherwise

23  we wouldn't have got a letter yesterday asking for specific,

24  to cure specific deficiencies with respect to Valerie Kuphy's

25  discovery responses. They're talking out of two sides of their

1

2  mouth is what I'm suggesting, Judge.

3          THE COURT:  Okay, I hear what both sides are saying

4  but it's not inconsistent that the City could be expecting

5  that certain prior responses would be answered with

6  specificity and to still point out other things that were

7  separate and apart from those requests that they wanted

8  answers to.  What I'm not getting, however, is that you're

9  still talking about the same thing.  And --

10          MS. FISHER:  Your Honor, I may be able to clarify

11  this to a certain degree. I think part of the problem is that

12  the letter that was sent to Mr. Moore was different from -- it

13  was very specific to particular clients rather than a general

14  letter, information that Ms. Byrialsen and I received, that

15  was -- I think that's part of the problem and why there is

16  confusion. Because the letter that was sent to Mr. Moore did

17  not say that we have to go back and look at our prior

18  disclosure and identify those Bates numbers that are specific

19  to a particular request by Bates number.

20          MS. DAITZ:  Well, Your Honor, in November of 2011, I

21  sent two letters to all plaintiffs' counsel saying this is a

22  global issue with your responses to defendants' discovery

23  requests that needs to be addressed in accordance with the

24  Court's prior rulings and with what you have requested that

25  defendants' do.  The two letters were sent to all plaintiffs'

1

2  counsel.  Ms. Byrialsen's email response in December saying we

3  are working on this, you don't need to seek judicial

4  intervention. Was sent to all plaintiffs' counsel. I mean Mr.

5  Moore is saying that it's, you know, we're talking out of both

6  sides of our mouth about what we want, but Ms. Dippold and Ms.

7  Byrialsen and their colleagues are doing exactly what we

8  requested that they do, you know, at least that's our

9  understanding. So I don't know why Mr. Moore doesn't seem to

10 be conferring with his colleagues about these issues, but

11 everyone else is, at least as far as we know, you know, in

12 progress on that.

13         And with respect to the specific letters, the

14 subsequent letters with respect to each individual plaintiff,

15 those are the letters that in our November letter, we said we

16 would address separately deficiencies with respect to each

17 individual plaintiff while we await your revised responses.

18 And that is exactly what we have done. So I think if there was

19 any concern, you know, about what exactly we were asking or --

20 we could have discussed it.

21         THE COURT:  The good news is that now that you are

22 all here talking about this, I assume that you could have a

23 conversation which you can distill this for me so that I don't

24 have to referee so to speak, and so we're going to do two

25 things. One is we're going to chat a little bit about the

1

2   issues that I raised, and then this issue which was sort of ad

3   hoc, which has sort of overwhelmed the proceeding today, I

4   want you to at least have a meeting of the minds about what it

5   is that is the problem here. And at least what I hear Ms.

6   Daitz saying is that some of the plaintiffs are doing the

7   Bates thing and with respect to I guess McCray, Richardson and

8   Santana, that's not been done.

9           MS. DAITZ:  That is my understanding, Your Honor.

10          THE COURT:  Okay.  All right, well, let me -- let

11  me, I will give you an opportunity to make sure that you

12  understand what -- maybe you and Mr. Moore should have a

13  conversation in conjunction with the other plaintiffs to make

14  sure that everybody is doing the same thing.

15          With respect to the issues that I raised at the

16  beginning, anything (indiscernible) on those?

17          MS. DAITZ:  Your Honor, I believe you raised the

18  issue of defendants' application for a protective order

19  regarding the scope of the depositions of defendants Sheehan

20  and Arroyo. Defendants' reply is currently due to be filed on

21  -- submitted to the Court on Monday. So we don't know that

22  that issue is necessarily ripe.  We did bring to the Court's

23  attention that with respect to plaintiffs' cross motion, that

24  plaintiffs' had not raised any of those issues with

25  defendants, so we hadn't had an opportunity to, you know,

27

1
2  review the documents that were at issue and determine whether

3  we could reach an agreement before plaintiffs sought judicial

4  intervention. So it is my understanding that plaintiffs have

5  agreed to withdraw their cross motion without prejudice, with

6  leave to renew once the parties have had an opportunity to

7  confer regarding those issues.

8          And just the other issue on that was regarding the

9  confidential information contained in that information. So we

10 also discussed that with Mr. Beldock this week, but we just

11 wanted to be sure that plaintiffs' cross motion was not going

12 to be docketed since it does contain information that is

13 confidential under the stipulation and protective order.

14         MR. MOORE:  Judge, can I respond to the Arroyo and

15 Sheehan thing?  The City has made a motion to preclude areas

16 of testimony with respect to Mr. Arroyo, Detective Arroyo,

17 because he had a conviction apparently subsequent to his

18 leaving the NYPD, as did Detective Sheehan.  And I don't --

19 how can we -- so I get this request and I say, all right, I

20 know they've gone, they've turned over every stone with

21 respect to our plaintiffs, and yes, they're seeking a lot of

22 damages, okay, they are somewhat different, but these are

23 defendants in the case, in a very important case. And so I go

24 back and I say to anybody in my office have we gotten

25 Detective Arroyo's personnel file, and we haven't gotten it,

1                                                                28

2   and we've requested it, I'm sure we requested it years ago.

3   And so I understood what they were raising was, what we were

4   raising in this letter was, we can't, in our cross motion was,

5   it's disingenuous for you to say you can't inquire into this

6   and not turn over information that would allow us to somehow

7   flesh out the true relevance of that information.  Is it

8   similar to a pattern of conduct while he was in the police

9   department, I know some of these officers have extensive

10  disciplinary histories --

11          THE COURT:  I understand the point that you're

12  making, although I think Ms. Daitz was saying that their brief

13  hasn't been done so it wasn't necessarily right.  And I grant

14  you that, although I do think that, I want to hear from Mr.

15  Beldock first, but I had some, I did have some comments about

16  -- yes, is there an agreement?

17          MR. BELDOCK:  There is an agreement, although I

18  would phrase it somewhat differently. I had the conversation

19  yesterday with Mr. Lambert, he says they'll review the

20  redacted materials to see whether they would agree to

21  unredact, and I said, therefore, I would agree that we would

22  -- I would rather them withdraw that portion of the motion,

23  hold it in abeyance because there are only a few days in which

24  this is going to develop, and not submit that, so to speak,

25  the cross motion, until they respond. If they respond and say

29

2   they're not going to unredact documents, then the cross motion

3   is right for determination. We actually didn't think they

4   would, but I'll take the fall for that, I supervised it. So we

5   (indiscernible) in advance.

6          We've been under a lot of pressures, we're all under

7   a lot of pressures, I explained that to Mr. Myerberg, he

8   understood. I just don't want to take --

9          THE COURT:  You didn't mean to defer on, which one

10  are you talking about?

11         MR. BELDOCK:  On the cross motion issue of,

12  compelling discovery by unredacting items in the personnel

13  file of Sheehan. I didn't think that they would unredact

14  considering the position we didn't think they would unredact

15  considering the position that they took to begin with for a

16  protective order. So it seemed futile to us, but it passed, it

17  was not thought through correctly, so we're dealing with it

18  now. I would rather not physically have to take anything back

19  from the Court. In a few days they will tell us the answer to

20  whether they are going to agree or not, and if they don't

21  agree then the motion to compel is right.

22         THE COURT:  All right, with respect, of course, to

23  confidentiality, I can understand issues being raised. I must

24  say, however, directed to the defendants, that given the fact

25  that there was a request for a protective order, I think my

1

2   initial reaction was the same as Mr. Beldock's, that it would

3   seem that if I were in the position I might think it futile to

4   think that you're going to have an agreement on the

5   information concerning the individuals.

6          MS. DAITZ: Your Honor, our motion for a protective

7   order was very discreet and it was about three discreet

8   incidents. It was not a general motion for a protective order

9   to preclude plaintiffs from discovery on disciplinary history.

10  And in the past when plaintiffs did ask for less redacted

11  versions of documents like IAB resumes, we did reconsider our

12  position and provide it to them. So we remain open to

13  discussion regarding specific redactions that were made to

14  documents to see if we could reach an agreement without

15  judicial intervention.

16         THE COURT:  Well let me just give you one comment

17  and that is that your response is due Monday?

18         MS. DAITZ:  Yes, Your Honor.

19         THE COURT:  I think you should be prepared to

20  address, although we didn't have a discussion about it, an

21  argument about it today, the comments that Mr. Moore just

22  made. I know it doesn't always seem that way, but things also

23  occur to Court even if the parties don't bring them up, and

24  that is as defendants point out, the -- you have taken some

25  rulings that I've made and extrapolated them as to behavior

1

2  that the plaintiffs should abide by. There is nothing wrong

3  with that. But also I will say it doesn't necessarily follow

4  that if I make a ruling with regards to one side it will apply

5  to the other side, although that is probably a good starting

6  point.

7           The issue that you should address is given the

8  extent of the discovery that the defendants have sought with

9  respect to the plaintiffs and the areas that have been

10  inquired into, why would information concerning these

11  defendants not be open to discovery?  That is you can argue

12  about the admissibility, but I suspect that a number of things

13  that been the subject of discovery in this case aren't going

14  to make it into the trial as evidence.

15           MR. BELDOCK:  We addressed both those issues in our

16  responsive papers, Judge. That's what we said in short, we

17  said it in long by adding many details, but that's the short

18  answer we think.

19           THE COURT:  But I don't you to miss the issue that,

20  one of the things that has been bandied about on both sides is

21  that he parties that are the subject of depositions, in

22  addition to the facts in the case, it does appear that the

23  parties have raised questions on a continuing basis concerning

24  the credibility of the witnesses that they are going to be

25  deposing.  And the credibility clearly is broader than the

1

2 claims in the case and some things that go to someone's

3 credibility go indeed, may not be constrained by time related

4 to the particular incident.

5          So I do want you to be aware that I have some

6 concerns whether or not, if you're dealing with parties to a

7 case, whether or not anything that goes to their credibility

8 might not be an appropriate subject for deposition.

9          MS. DAITZ:  Your Honor, defendants will definitely

10 address those issues in our reply Monday. I could just, you

11 know, in brief, I think our position is that plaintiffs in

12 this case are seeking, you know, $50 million plus in damages

13 and claiming -- each, and claiming lifelong economic, medical,

14 physical, and psychological injuries as a result of their, not

15 just arrests, but their respective family members' arrests.

16 And that is --

17          MR. MOORE:  Not the arrests, how about the

18 incarceration.

19          MS. DAITZ:  Excuse me.  And that --

20          THE COURT:  Excuse me, Mr. Moore, I don't want to

21 have to admonish any counsel for interrupting another counsel,

22 no matter what you think of what they're saying. I don't think

23 I have the reputation of not giving people the opportunity to

24 speak their side. So I trust we won't have any of that

25 happening again. If you have something to respond to Ms.

1

2 Daitz, you will await your turn.

3           MS. DAITZ:  Your Honor, those damages claims is and

4 were the basis for defendants' request for releases regarding,

5 you know, educational, alleged education, loss of educational

6 opportunities, loss of employment, medical and mental

7 injuries. I mean those records go directly to plaintiffs'

8 damages claims.

9           With respect to what Mr. Moore said earlier about

10 the never ending request for releases, I mean we have asked

11 plaintiffs on more than one occasion to go through a set of

12 medical records that we're producing and provide releases for

13 additional providers that they think might have relevant

14 information. And the response that we got from plaintiffs is

15 give us a list and we'll give you the releases.

16           So because we're not in any position at the outset

17 without the records to determine relevance, we've provided

18 them with lists of all the providers who are referenced in

19 those medical records.  I mean plaintiffs, assuming, you know,

20 at the time the complaint was filed and thereafter, got some

21 sense of what their, you know, the scope of their claimed

22 damages were and what the basis for that scope of claimed

23 damages were. And certainly last year when the Court ordered

24 plaintiffs to provided damages charts, breaking down by

25 category of damages what, you know, which plaintiff sought

34

1
2  lost wages, which plaintiff sought injuries for psychological

3  damages, et cetera, we're assuming that they had conversations

4  with their clients at that time and got a sense of who the

5  providers were that provided this treatment.  And if at that

6  time the releases would have been provided, it would have

7  saved sort of this ruling cycle.

8          THE COURT:  Let's just have a reality check about

9  what happens with medical providers, okay.  You know, this

10  reminds me of the medical malpractice case where the lawyer

11  sues everybody whose name appears on any document, and, you

12  know, it doesn't mean that these are the medical providers

13  that are going to give any relevant information. I mean the

14  typical person, and I have these medical malpractice cases,

15  the typical plaintiff knows who their doctor is, they don't

16  know the anesthesiologist, they don't know the other attending

17  physicians, they don't know who came to visit them on any

18  given day, you know. To me, you know, if you ask the typical

19  plaintiff to do that, whether you're the plaintiff's lawyer or

20  you're the defendant, they're not going to be able to answer

21  those questions.

22          And so, you know, as a reality, we're just not going

23  to get all of those names of all those people, and those

24  people aren't even going to be particularly relevant when it

25  comes time for trial.  I mean we're not going to exhaust this

1

2  no matter how we deal with it. And so at some point we're

3  going to have to decide how much effort we're going to require

4  people to put into the process.

5          MR. MOORE:  And Judge, that's what --

6          MS. DAITZ:  And most recently, one of the releases

7  that we requested for Michael Wise, it's not like some

8  podiatrist who was referenced in medical records, you know,

9  for a one-time visit in the hospital.  You know, plaintiff

10  Michael Wise was hospitalized for months and failed to

11  disclose that hospitalized, even a provider, to allow us to

12  obtain his medical records.  You know, within the past five to

13  ten years.

14          THE COURT:  You know, if you have examples like

15  that, we could deal with that, but, you know, you are really

16  talking about two different things. I mean Mr. Moore is

17  talking about, you know, the person who like is tenth down on

18  the list, you're talking about missing a hospital. Those

19  aren't the same things and if you want a hospital that

20  somebody went to if he tried to object to that, it wouldn't

21  get any traction. By the same token, if, you know, if you go

22  through a medical record and find the name of some medical

23  personnel who is in that, first of all, nobody is going to

24  follow up on that.

25          MS. DAITZ:  Well, Your Honor, we've tried to have

```
 1                                                        36
 2   conversations with plaintiffs about --
 3           THE COURT:  But my point though, Ms. Daitz, is that
 4   you can't be, you know, the reality is, maybe you're
 5   different, I mean I can tell you that I mean I get me
 6   explanation of benefits and sometimes there's the name of a
 7   doctor there that I didn't even know that was the doctor who
 8   was going to be there.  And I think I'm pretty intrusive when
 9   it comes to the doctor. But, you know, you go get an MRI and
10   you don't know the name of the doctor.
11           So, you know, the expectations here just may be
12   what's causing the parties to have a disagreement. I gave you
13   the hospital example, you know, if somebody has been in the
14   hospital for a month, okay, you should get that, but what I
15   fear we're getting here is that we're getting caught up in the
16   players that are so far down the line that the likelihood that
17   there is going be any relevant evidence gotten from any of
18   these names of people is unlikely.
19           MS. DAITZ:  Your Honor, I think we could safely say
20   that we didn't start with the hospitals and the primary care
21   physicians, and the really important providers, for lack of a
22   better word, if we didn't know who they were.  So it's not
23   that we started with a broad scope and now what we're asking
24   for is, you know, the anesthesiologist's ex-wife's whatever,
25   you know, that has some tangential relevance, at best, I think
```

1

2  we're really not in the position to know by virtue of some of

3  these records who is going to have, you know, a huge file, and

4  who is going to come back and say I had one consult note and

5  it was included in what you got from the hospital.  And that's

6  why we asked plaintiffs to assist us in identifying who

7  actually might have relevant providers.

8          But that being said, I think the whole point that

9  we're trying to make is that plaintiffs are claiming, you

10  know, $50 million each of lifelong damages that affect every

11  aspect of their lives as a result of this incident, and that's

12  why we're trying to uncover, you know, a basis and, in

13  addition to put on a defense, you know, of not being the

14  proximate case of damages and all that.

15          THE COURT:  I hear what you're saying, although I

16  have an employment case in which the defendants kept saying

17  the plaintiffs are claiming, and I forget how many

18  (indiscernible) it was, I don't think that the claim is going

19  to mean that the Rule 26 gets to be a different animal because

20  they claim $50 million, if they claimed $5 million are you

21  saying these would not be relevant?

22          MS. DAITZ:  No, it is not the number, Your Honor,

23  it's the scope that makes up that number, the education, the

24  employment, the medical, the mental, the physical, the

25  familial, it's that aggregate --

1

2        THE COURT:  Right, the Court is not (indiscernible)

3   the medical issue. I mean I understand that you

4   (indiscernible) other than medical. I was only addressing the

5   question of medical, and that is that to the extent that what

6   happens in these cases and whether they're personal injury or

7   employment, or (indiscernible) nature, whatever, if you start

8   to try to figure out who is going to be relevant from the

9   point of view of a medical provider, okay, I'm sitting here

10  with my obligation to make sure that these things don't spin

11  out of control. And I'm wondering why does this all become

12  relevant because the normal thing that I do in these cases is,

13  you know, if the plaintiff is claiming some kind of an injury,

14  if the plaintiff wants to show that, they've got to put the

15  witness on, and if they are not going to put the witness on, I

16  guess the defendant can say, well, we might find something in

17  there in which the witness shows that there wasn't any

18  injuries.  And in theory I suppose that could always happen,

19  but --

20        MR. MOORE:  Judge, could I --

21        THE COURT:  I don't know how many files that we're

22  going to talk about. But again, I didn't mean this to suggest

23  that there is -- this has anything to do with the particular

24  limitation, it's a question of what the expectations are in

25  terms of what you are going to get from a plaintiff if you ask

39

2   them about their medical providers. I just haven't had good

3   experiences with plaintiffs being able to identify medical

4   providers.

5           MR. MOORE:  Judge --

6           THE COURT:  But the reason I'm saying this because

7   if you -- if you come in here and you are not having good

8   responses from the plaintiffs, if the thing that you take away

9   from that is that the plaintiffs are being unresponsive and

10  your reaction to that is a result of how you think the

11  plaintiffs are responding, all I want to suggest to you is

12  that the plaintiffs are probably having as much difficulty as

13  you are trying to get information about medical providers. And

14  so I think that you both should recognize that you're trying

15  to identify medical providers, you are probably on the same

16  page. I don't see that the plaintiffs have anything -- as I

17  said, it's certainly possible that there could be some medical

18  providers that say the plaintiff came to me complaining about

19  X, and I couldn't find X, I mean that's possible.  But in

20  general, in these cases the plaintiff and the defendant both

21  want to get the medical providers.

22          MS. DAITZ:  Your Honor, I think just to bring this

23  back around to Detectives Sheehan and Arroyo, the overarching

24  point that we were making is that these two defendants, unlike

25  plaintiffs, don't have claims in this case, they are not

1                                                                        40

2   putting their, you know, condition circa 2009 at issue.  There

3   is, we submit, no relevance between and arrest for driving

4   while intoxicated, to credibility, particularly when there is

5   a 20-something year gap between any role they played in the

6   incident at issue in this case and the subsequent arrest.

7           So what we're saying is that in the first instance

8   there those arrests are not at issue in this litigation,

9   unlike plaintiffs' damages.  And second, that there is no

10  relationship between a DWI and credibility. And I believe we

11  cited some case law in our initial application --

12          THE COURT:  Let me just say this, okay, you may

13  ultimately be right except that I will tell you often when

14  it's the other side, that it's defendants who are seeking

15  information about plaintiffs, they say we don't know until we

16  start asking the questions. It may be that you asked a

17  question about a DWI and it turns out that it's pretty

18  routine, there is nothing to it.  But until you know the facts

19  of it, you don't really know whether or not there is

20  credibility issues.

21          MS. DAITZ:  Well, Your Honor, the facts of these

22  cases were widely publicized. I mean they were in the paper.

23          THE COURT:  I want to tell you what I told my law

24  clerks, you can't believe everything you read in the paper.

25          MS. DAITZ:  Well --

```
 1                                                    41
 2            THE COURT:  I mean I don't think, you're not taking
 3   the position that if there is something that appeared in the
 4   paper about the City, that the plaintiffs should be able to
 5   take (indiscernible).
 6            MS. DAITZ:  Certainly not, Your Honor.
 7            THE COURT:  Okay.
 8            MS. DAITZ:  The position we're taking is merely that
 9   --
10            THE COURT:  I think with regard to these things you
11   should anticipate that, I take the view that the parties
12   generally have the opportunity to explore at least, you know,
13   as an initial matter, what the facts are beyond what somebody
14   -- what's been reported in the paper.  I don't have
15   particularly much confidence in what appears in the paper.
16   Indeed, I have a number of cases in which people are
17   complaining about what appears in the papers. And I think each
18   party has the opportunity to look at the facts and, you know,
19   if it's routine, then, you know -- look, at some point,
20   assuming that the plaintiffs start to ask questions about any
21   topic, and they get answers and the answers don't seem to be
22   going anywhere. Now you could get some lawyer who is going to
23   exhaust that and spend an hour asking questions about it, and
24   if they spend their hour asking questions about that and they
25   exhaust their seven hours, then the other side is going to say
```

1

2  they spent an hour asking about this, if you didn't.

3       If you are in a mine and you're not getting any gold

4  out of it, it's time to, you know, shut that mine and look

5  elsewhere. But that doesn't mean that, you know, we can

6  anticipate what is going to happen and what the circumstances

7  were in the case. It turns out that sometimes when we explore

8  the facts of the case we find out that there are some issues.

9  I don't know what the papers reported, but, you know, you can

10 anticipate that I'm not going to make the ruling based upon

11 somebody, either said saying this is what the newspaper said.

12      MR. BELDOCK:  Judge, we address all of these issues

13 thoroughly in our papers, I don't think I need to argue any of

14 them now, I just point out that Arroyo was the officer who

15 caught the case, he was one of the principal officers. Sheehan

16 and Arroyo both are key players in the questioning of, and the

17 confessions, supposed questions of the then defendants. There

18 is no question about this, they are not collateral --

19      THE COURT:  I'll handle it like this. Okay,

20 certainly someone could make the argument that if an officer

21 was involved in ticket fixing, maybe that's not so big a deal,

22 but I do recall a case that just happened in which the officer

23 who was involved in ticket fixing turned out to have done a

24 number of things that were just plain lies, and that came out

25 because of the ticket fixing. So whether or not these things

1                                                            43

2   are going to be admissible, I don't know, but when we're

3   dealing with parties, I think we should anticipate that I'm

4   going to be looking a little bit more closely at the potential

5   for (indiscernible).

6            MR. BELDOCK:  Again, we relied on our papers, but we

7   want to reiterate that we asked for Arroyo's disciplinary

8   records in March, 2010, we still don't have any of the

9   internal documents on Arroyo.

10           THE COURT:  And it was promised to you by mid

11  February or something like that.

12           MS. DAITZ:  Well, Your Honor, we've been producing

13  personnel files, you know, on a rolling basis well in advance

14  of witness' depositions to the extent possible.  We produced,

15  I would say, almost all of them that were in our possession,

16  and if by some oversight Detective Arroyo's wasn't produced

17  with the rest of them, then, you know, again, all plaintiffs

18  had to do was ask and if we have it, it will be produced early

19  next week.

20           Again, his deposition isn't yet scheduled, so to the

21  extent that there is some issue with respect to having that

22  information in advance of the deposition --

23           THE COURT:  Counsel said it may have been an

24  oversight, you're going to resolve this also obviously, you're

25  going to -- actually here's the deal. You don't have it.

1

2          MR. BELDOCK:  We don't have them --

3          THE COURT:  They're asking for it now.

4          MS. DAITZ: We're getting it to them by Friday, the

5   latest.  The documents that plaintiffs are calling for, we

6   will resolve this issue by next Friday at the latest.

7          THE COURT:  Okay.

8          MR. MOORE:  That's not Arroyo's personnel file or

9   his disciplinary history --

10          MS. DAITZ:  No, it is, it's Arroyo's personnel file.

11          THE COURT:  It now includes Arroyo's personnel and

12   disciplinary file because Ms. Daitz represented that they were

13   producing stuff on a rolling basis and Mr. Beldock said he

14   would -- he wanted it, I figured why should he ask for it in

15   some other form, he's in front of me, if he wants it, they

16   said they can produce it, it's on the table.  Can't do any

17   better than making a request in front of the Court.  So that

18   means that since it's on the table, if there is no resolution,

19   it's already been brought up, so, you know, you need to --

20          MR. MOORE:  Judge, can I just say, without

21   belaboring the point about the medical records, when the City

22   says, well, why don't we just identify the people who we think

23   are the primary, we've already done that. We did that in our

24   discovery responses. You look at the records, you can tell.

25   But what we are in the process of now is the tail wagging the

dog, where they get the records of the primary care physician

going back to 1986.  So you are talking about 26 years worth

of records or 24.  There's going to be tests that are sent

out, you know, all kinds of names are going to pop up, that's

what we're going through now. And, you know, I just got

something in the mail two days ago with another, you know, 20-

some-odd subpoenas that are now going out based upon

additional releases --

THE COURT:  Well, Mr. Moore, let me suggest --

MR. MOORE:  It just has to end at some point, Judge.

THE COURT:  All right. I think you should interpret

my comments to Ms. Daitz (indiscernible).  If you believe at

this point that we are so far down the totem pole of relevance

that, you know, we mined and now we're getting fool's gold,

you can make an issue of it and you can discuss it if you

don't agree, and I'll just rule on it.  But, you know, let's

just move on.

Clearly there are circumstances in which, you know,

when you are dealing with medical providers, you know, and the

reality is sometimes I get bills from people I didn't know

that I had been treated, okay.  Fortunately, my insurance

takes care of most of that.  But I don't know what is going to

be the relevance of these people.  And the City wants to argue

that there is a potential for relevance, they can make that

1
2  argument, and you can argue that it's not going to lead to

3  relevant evidence.  I don't know the nature of the people that

4  we're talking about.  If you show me that it's somebody who

5  signed something, you know, on page 368 of the record and it

6  took us like a week to find out who the person was, it's

7  probably not going to be somebody who is going to have

8  particularly very much to say because they probably won't even

9  remember it.

10        MR. MOORE:  In many cases they just give us the

11  name, we have to do the research to try to find where that

12  doctor is. We then have to contact that doctor, did you see

13  our client; no, I never, I have no records of that.

14        THE COURT:  Look, Mr. Moore, if they give you a name

15  and you don't know the name, you just tell them you don't know

16  the name. I mean I don't --

17        MR. MOORE:  We tried that, Judge, it didn't work.

18        THE COURT:  Well, then if you take that position

19  then I'll decide whether or not that has sway with me.

20        ATTORNEY FOR DEFENDANTS:  Your Honor, contrary to

21  Mr. Moore's statement, we've gone through lengths to actually

22  locate addresses and have provided addresses in letters.

23  Clearly there are providers that we won't know the addresses

24  for, we have asked, in fact, I believe at Victor Wise's

25  deposition, we asked him personally to describe a provider

1

2  that they couldn't provide us the address for or the correct

3  name.

4          So we have certainly been taking extraordinary

5  steps, and it bears repeating that we have on prior occasions

6  given plaintiffs the records and said identify who you believe

7  are the relevant providers and give us those releases.  Their

8  response is usually you give us the list and we will provide

9  the releases.  So I don't think it's fair to make the

10  arguments that Mr. Moore is making.

11          THE COURT:  Let me just give you my take on this,

12  all right. I understand the problems that the parties seem to

13  be having, but you have to appreciate from my point of view,

14  if you had -- if the plaintiffs' response had been we don't

15  think that any of these people are relevant, we'd just be

16  deciding some other issue because, I mean in some respects the

17  plaintiffs' position by tossing the ball back to you gave you

18  more power than you would have had in a lot of cases that I

19  have because plaintiffs' counsel has said we don't think any

20  of these people are relevant.  I mean in this case it seems

21  that the plaintiffs suggestion that they would allow you to

22  point out names is more than I've gotten in some cases. I mean

23  that's not to say, I don't think either of those is the way it

24  should have happened.

25          ATTORNEY FOR DEFENDANTS:  We're not disagreeing,

1
2  Your Honor, we're just saying that the complaint about the

3  releases is not clear, if Your Honor did not explain the

4  entire scope of what both parties have been experiencing.

5          THE COURT:  I take it as a given that both of you

6  are trying to do your best with regard to medical providers.

7  I reiterate that my issue here is that you should not be

8  expecting that just because you are not getting, you know, the

9  answers, like everybody remembers who's who, that the other

10 side is somehow trying to, you know, pull a fast one. I

11 believe the defendants want to find out the names of the

12 providers. I believe the plaintiffs want to identify the

13 providers, it's just in this kind of a context it's not -- it

14 wouldn't be easy if this had happened a week ago, and it's

15 certainly not easy under the circumstances that we're dealing

16 with here.  At some point you have got to give the other side

17 that the benefit that they are actually trying to do this.

18 But it may be mean that at some point the reason that you are

19 having difficulty getting and identifying people is because

20 now you are starting to get people who it is not likely that

21 they are going to be able to provide much (indiscernible).

22          MS. DAITZ:  Your Honor, I think one way to at least

23 obviate part of the repercussion of awaiting these releases

24 and doing this on a rolling basis is if plaintiffs would

25 produce to defendants the records that they have in their

1
2 possession, custody or control that they've obtained either

3 with respect to separate releases or as part of the

4 investigation they did into their client's damages, which are

5 responsive to our discovery requests. And then we can evaluate

6 them and determine whether we can go forward with the

7 deposition while some of the subpoenas are still outstanding,

8 or if we need a broader scope than what they have produced to

9 us. But we haven't gotten records of that nature, so.

10            THE COURT:  This is kind of a suggestion that gets

11 thrown out in a meet and confer, I suggest that you that.

12            MS. DAITZ:  Thank you, Your Honor.

13            THE COURT:  Michael, we need to at least schedule

14 them for another conference.  How long have we been spacing

15 the conferences?

16            MS. DAITZ:  About sixty days, Your Honor.

17            THE COURT:  Why don't we make it two months this

18 time.

19            THE CLERK:  Is May 3rd too early, that's too months.

20            THE COURT:  Can we get something early in May, Mike?

21            THE CLERK:  May 3rd is a Thursday.  Thursday May 3rd

22 at 10:00.

23            THE COURT:  I just have one question, what is the

24 representation situation with respect to Delores Wise?

25            MS. DAITZ:  Your Honor, Fisher, Byrialsen & Kreizer

1                                                             50

2   withdrew as counsel which the Court granted after an ex parte

3   conference.

4              THE COURT:  And as far as you know she is

5   unrepresented, yes?

6              MS. DAITZ:  She was instructed that she was to

7   proceed pro se until she obtained representation and I believe

8   the Court advised her of her need to keep --

9              THE COURT:  Does anybody have any information on

10  whether or not she has gotten any --

11             MS. FISHER:  It is my belief, Your Honor, that she

12  has not retained any other attorney to take over.

13             THE COURT:  So we should treat her as pro se.

14             MS. FISHER:  Well I just want to say that that's my

15  belief because I haven't heard otherwise, but I also haven't

16  heard that the hasn't retained anyone.

17             THE COURT:  And I'm assuming that if, I mean I could

18  just assume that if there was a counsel, you would expect

19  counsel to make themselves known to the Court and to the other

20  lawyers.

21             MS. DAITZ:  Your Honor, I just also want to bring to

22  the Court's attention that Ms. Wise's son, Victor Wise, who is

23  represented by Fisher, Byrialsen & Kreizer, testified at his

24  deposition that for all intents and purposes his mother wanted

25  no part of us and didn't want us to know --

```
 1                                                        51

 2              THE COURT:  And us meaning?

 3              MS. DAITZ:  The defendants, defense counsel, the

 4    case --

 5              THE COURT:  Is this Mr. Wise?

 6              MR. WISE:  Yes.

 7              MS. FISHER:  No, no, no, that's Cory Wise.

 8              MR. WISE:  Please.  Please.

 9              THE COURT:  He wants to say something?

10              MR. WISE:  I want to say yes.

11              MS. FISHER:  Just hold on one minute, Judge.

12              THE COURT:  You want to talk to him?

13              MR. WISE:  Good morning, Judge.

14              THE COURT:  You are?

15              MR. WISE:  I'm Mr. Wise --

16              MS. FISHER:  Cory Wise.

17              MR. WISE:  The spokesperson for the rest of the

18    family, the Wise family.

19              THE COURT:  You're Cory Wise?

20              MR. WISE:  Right.

21              THE COURT:  Yes.

22              MR. WISE:  This case --

23              THE COURT:  Just so, just to make it clear on the

24    record, before addressing the Court you talked with Ms.

25    Byrialsen?
```

1

2          MR. WISE:  Yes.

3          THE COURT:  Byrialsen?

4          MR. WISE:  Yes.

5          THE COURT:  And so but you wish to address the Court

6    about the progress of the case or?

7          MR. WISE:  My family is very disgusted, we lost my

8    father because of my being away.  My family disgusted, we all

9    broken up as a puzzle. I'm, me, I'm suffering post traumatic

10   stress disorder because of this here, because of the City

11   here, of this open and shut case. I'm tired, my family is

12   tired. We all broken up.  We tired.  We tired.  I'm about

13   ready to pass out, at any given day I'm ready to pass out.  I

14   can't pass out till I see you first.  I can't pass out. I got

15   to express this here.  I'm hurt.  Every day I'm hurt.  I feel

16   like I'm sick every day because of this case here. I want to

17   get through with this case, I want to live my life.  Everybody

18   live their life except for me.  I want to live my life.  It's

19   going on 23 years, I want to live my life, I want to live it.

20   Judge, listen, I want to live my life.  My family want to live

21   their life.  Everybody broken up.  Everybody is broken up.

22   They can't do no deposition, if it's a part of the program,

23   then so be it, but you will never hear from my mother again.

24   You will never hear from Victor again.  You will never hear

25   from my crack head brother again, Michael Wise.  Everybody is

broken up.  Everybody is broken up.  I'm tired of being

harassed on the street.  Everybody is broken, all I want to do

is live my life.  Live my life.  Just live my life, Judge.

That's all.  I'm knocking at forty now, I just want to live my

life, man.  Just live my life.  They want to drag their feet,

I want to end it with you.  I just want to live my life along

with the Wise family, just live our life.  Just live.  I lost

my father, I never saw him.  I never came down to visit him,

we just want to live our life, man.  I would like to go visit

his gravesite.  We just want to live our life.  Fourteen years

(indiscernible), I'm speaking out of 14 years plus 18 years,

maybe 20 years. We just want live -- I just want to live my

life as well as my family, that's it, just live.

           THE COURT:  All right, thank you, Mr. Wise.

           MR. WISE:  Thank you, Judge.

           THE COURT:  Okay.  Anything else before we adjourn?

I do expect counsel to at least take the opportunity while

they're here to make sure that (indiscernible) on some of

those discovery disputes, well at least you agree on what the

dispute is.  And particularly I want to make sure that with

respect to the issue that Ms. Daitz and Mr. Moore have

differences of opinion about, that at least you talk about it

so that at least if you are going to present it to me it will

be presented in a way that both sides understand what the

54

1

2   other side's position is.  I don't know whether you need the

3   jury room for that, but if you do it out here my deputy can

4   keep an eye on you.

5            MR. MOORE:  I don't think it's come to that, Judge.

6            THE COURT:  All right, we're adjourned until May 3rd.

7            (Whereupon the matter is adjourned to May 3,

8   2012 at 10:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript
of proceedings in the United States District Court,
Southern District of New York, McCray, Richardson, et al.
v., Docket #03cv9685 was prepared using mechanical
transcription equipment and is a true and accurate record
of the proceedings.

Signature_____

                CAROLE LUDWIG

Date:   March 14, 2012