BAKER & HOSTETLER LLP
John Siegal (JS-1036)
Peter B. Shapiro (PS-4886)
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
jsiegal@bakerlaw.com
pshapiro@bakerlaw.com

*Attorneys for Non-Party Movant*
*Florentine Films*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE:<br><br>      MCCRAY, *et al.* | Civil Action No. 03-cv-9685 (DAB) (RLE) |

---

## MEMORANDUM OF LAW IN SUPPORT OF FLORENTINE FILMS'
## MOTION TO QUASH NON-PARTY SUBPOENA SERVED BY DEFENDANTS

---

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

PROCEDURAL BACKGROUND ....................................................................... 4

FACTUAL BACKGROUND .............................................................................. 5

ARGUMENT ...................................................................................................... 6

POINT I ............................................................................................................. 6

FLORENTINE FILMS' RESEARCH AND REPORTING IS ENTITLED TO THE
PROTECTIONS OF THE REPORTER'S PRIVILEGE .................................... 6

    A.    The New York Shield Law, Civil Rights Law § 79-h, Applies To
            Florentine Films' Research And Reporting ........................................ 6

    B.    The Federal Reporter's Privilege Also Protects Florentine Films' Research
            And Reporting ...................................................................................... 9

    C.    *Chevron Corp. v. Berlinger* Does Not Apply To The Facts Here ...... 10

POINT II ............................................................................................................ 15

DEFENDANTS CANNOT MAKE THE SHOWING  REQUIRED TO OVERCOME
THE REPORTER'S PRIVILEGE ..................................................................... 15

    A.    Defendants Cannot Meet The Three-Part Test Required Under  New
            York's Shield Law ................................................................................ 15

    B.    Defendants Cannot Make The Showing Required To Overcome The
            Federal Reporter's Privilege .............................................................. 19

CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Broad. Co.*,
  189 Misc. 2d 805 (Sup. Ct. N.Y. Cnty. 2001) ............................................................8, 17, 18

*In re Application of CBS Inc.*,
  232 A.D.2d291 (1st Dept. 1996).........................................................................................19

*In re Beach v. Shanley*,
  62 N.Y.2d 241 (1984) ..........................................................................................................6

*Blum v. Schlegal*,
  150 F.R.D. 42 (W.D.N.Y. 1993).....................................................................................10, 19

*Brooklyn Inst. of Arts and Sciences v. City of New York*,
  64 F. Supp. 2d 184 (E.D.N.Y. 1999) ...................................................................................14

*Carey v. Hume*,
  492 F.2d 631 (D.C. Cir. 1974)..............................................................................................21

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir. 2011)......................................................................................... *passim*

*Church of Scientology Celebrity Ctr. Int'l v. Internal Revenue Serv.*,
  779 F. Supp. 273 (S.D.N.Y. 1991)........................................................................................19

*In re Consumers Union of U.S., Inc.*,
  495 F. Supp. 582 (S.D.N.Y. 1980)..........................................................................................9

*In re Fitch, Inc.*,
  330 F.3d 104 (2d Cir. 2003)..................................................................................................10

*Flynn v. NYP Holdings Inc.*,
  235 A.D.2d 907 (3d Dept. 1997) ......................................................................................8, 19

*Gonzales v. Nat'l Broad. Co.*,
  194 F.3d 29 (2d Cir. 1999)........................................................................................... *passim*

*In re Grand Jury Subpoenas Served on Nat'l Broad. Co.*,
  178 Misc. 2d 1052 (Sup. Ct. N.Y. Cnty. 1998) ...................................................................15

*Immuno AG. v. Moor-Jankowski*,
  77 N.Y.2d 235 (1991) ..........................................................................................................6

*Krase v. Graco Children Prods. (In re Nat'l Broad. Co.)*,
  79 F.3d 346 (2d Cir. 1996)........................................................................................... *passim*

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*New York Times Co. v. Gonzales*,
  382 F. Supp. 2d 457 (S.D.N.Y. 2005), *rev'd on other grounds*, 459 F.3d 160 (2d Cir.
  2006) ...............................................................................................................................9

*O'Neill v. Oakgrove Const., Inc.*,
  71 N.Y.2d 521 (1988) ..................................................................................................6, 7

*People v. Griffin*,
  21 Media L. Rep. 1030 (Sup. Ct. N.Y. Cnty. 1992) ........................................................16

*People v. Hendrix*,
  12 Misc. 3d 447 (Sup. Ct. Kings Cnty. 2006) ...................................................................8

*In re Petrol. Prods. Antitrust Litig.*,
  680 F.2d 5 (2d Cir. 1982) ...............................................................................................21

*Pugh v. Avis Rent A Car Syst., Inc.*,
  No. M8-85, 1997 WL 669876 (S.D.N.Y. Oct. 28, 1997) .................................................20

*Sikelianos v. City of New York*,
  No. 05 Civ. 7673 (RJS) (JCF), 2008 WL 2465120 (S.D.N.Y. June 18, 2008).............10, 19

*Sokolow v. Palestine Liberation Org.*,
  No. 04 Civ. 397 (GBD) (RLE), 2012 WL 3871380 (S.D.N.Y. Sept. 6, 2012)...................3, 21

*In re Subpoena Duces Tecum to American Journal*,
  No. 122512/95, *slip op*. at 9 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 30, 1996)..........................17, 18

*In re Subpoena Duces Tecum to Ayala*,
  162 Misc. 2d. 108 (Sup. Ct. Queens Cnty. 1994) ..............................................................15

*United Auto Grp. v. Ewing*,
  34 Media L. Rep. 1801 (S.D.N.Y. 2006)..........................................................................16

*United States v. Burke*,
  700 F.2d 70 (2d Cir. 1983)...........................................................................................9, 17

*United States v. Karen Bags, Inc.*,
  600 F. Supp. 667 (S.D.N.Y. 1985)........................................................................10, 19, 20

*United States v. Marcos*,
  17 Media L. Rep. 2005, 1990 WL 74521 (S.D.N.Y. June 1, 1990) ..................................9, 17

*Von Bulow v. Von Bulow*,
  811 F.2d 136 (2d Cir. 1987)..........................................................................................10, 14

**TABLE OF AUTHORITIES**
(continued)

<u>**Page(s)**</u>

S<small>TATUTES</small>

N.Y. Civil Rights Law § 79-h.............................................................................................1, 6, 15

N.Y. Civil Rights Law § 79-h(a)(6)..............................................................................................7

N.Y. Civil Rights Law § 79-h(c) .........................................................................................6, 15

## PRELIMINARY STATEMENT

The City defendants' sweeping subpoena for nearly all of the video and audio recordings gathered by Florentine Films in its research for the documentary film *The Central Park Five* is substantially overbroad, premature and fails to overcome the qualified reporter's privilege that applies to these unpublished, non-confidential newsgathering materials under federal common law and the state Shield Law.

Despite extended discussions among counsel after Florentine Films rejected the original, even broader subpoena, the City defendants have yet to articulate any specific, substantial, likely relevant issue in this civil litigation to which the subpoena requests are targeted. Instead, eight years into this litigation after rejecting every request by the filmmakers to interview City officials about the Central Park case, on the eve of the release of a film sympathetic to the plaintiffs who served full prison terms on convictions that have been vacated, the City now seeks to subpoena nearly all of the outtakes without any ability to meet the requirements of the reporter's privilege.

Thus far, the City's rationale for the subpoena has amounted to nothing more than hope and speculation that the outtakes may contain material useful to defendants. They have not limited the subpoena to any specific issue of likely relevance in this case. They have not made any showing that they have sought alternative sources of the information, for instance by deposing the plaintiffs first. And, they have not appropriately narrowed the outtakes they seek; they are requesting *all* recordings of *everyone* interviewed for the film who has *any* direct knowledge of the Central Park criminal case or this civil litigation. This simply fails to meet the standards required to overcome the qualified privilege to obtain newsgathering materials under the governing law.

The New York Shield Law, N.Y. Civil Rights Law Section 79-h, and the federal shield law articulated by the Second Circuit in *Gonzales v. Nat'l Broad. Co.,* 194 F.3d 29 (2d Cir.

1999), apply to Florentine Films' research under the qualified privilege that protects newsgathering efforts.  (*See* Points IA and IB *below*).  The City's contention that the reporter's privilege does not apply under the ruling in *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011), is incorrect because of the factual distinctions between the cases:  Under the particular facts at issue in *Berlinger*, the Second Circuit concluded that the filmmaker there was solicited by and ceded editorial control to the plaintiffs' lawyer and was therefore not engaged in an independent journalistic effort; whereas here, Florentine Films undertook, researched and produced *The Central Park Five* independently, without any financial or editorial control or input by the plaintiffs or their attorneys.  Indeed, in its decision in *Berlinger,* the Second Circuit went out of its way to clearly instruct that its decision could not be applied to film makers like Florentine Films who utilize an independent journalistic process even if they reach a point-of-view about the story they are covering.  Thus, the defendants' aggressive attempt to bring this subpoena within the ambit of *Berlinger* is unsustainable on the facts, contrary to the Second Circuit's express instruction, and must be rejected by this Court.  (*See* Point IC *below*).

Applying the reporter's privilege, defendants have not made—and will be unable to make—the specific showing required to overcome the qualified privilege under either federal law or state statute.  Both require a showing of greater than relevance—*viz.*, highly relevant, of likely relevance, or critical and necessary to the defense—that the defendants cannot make because they have not identified *any* specific, substantial issue in this litigation for which the subpoenaed materials are even arguably probative, let alone likely relevant.  The subpoena is nothing but speculative probing.

The federal and state privileges both also require a showing that the party seeking production has made or exhausted efforts to obtain alternative sources to discover the

unpublished material sought.  Here, defendants can make no such showing; they have yet to even depose the plaintiffs or others who appear on the subpoenaed outtakes.  Defendants are seeking newsgathering material as a shortcut to their own discovery and research.  They are essentially seeking the outtakes in the hope that they contain impeachment material that can be used for those depositions.  But that is clearly an improper purpose for invading the reporter's privilege under the governing federal and state case law.  (*See* Point II *below*).

This is not a case in which the party issuing the subpoena has agreed to limit the scope of the subpoena to a small and specific list of interviewees who are likely to have been interviewed about a specific, identified issue likely or highly relevant to the litigation.  *Cf. Sokolow v. Palestine Liberation Org.*, No. 04 Civ. 397 (GBD) (RLE), 2012 WL 3871380, at *3 (S.D.N.Y. Sept. 6, 2012) (subpoena limited to outtakes of two individual interviews of likely relevance to the likely relevant issue of links between Fatah and Al-Aqsa).  Defendants have agreed to no such focus or limitation for the subpoena at issue here.  Therefore, at this point, before depositions have been taken, without an appropriate narrowing of the scope of the outtakes sought under the subpoena and without limiting the subpoena to any specific, identified, likely or highly relevant issue, the subpoena fails under the reporter's privilege, and must be quashed.

## PROCEDURAL BACKGROUND[1]

After eight years of litigation in this case, on the eve of Florentine Films' release of a documentary film titled *The Central Park Five* (the "Film"), the City of New York served a sweeping Original Subpoena seeking "all documents" in the filmmakers possession relating "in any way" to the rape of the Central Park jogger or the criminal or civil processes that ensued. (Siegal Decl., Ex. A.)  The City served this absurdly overbroad Original Subpoena even though nearly all of the responsive materials are publicly available through other sources and despite the fact that every City official that the filmmakers asked for information or interviews in the course of their reporting refused to cooperate.  When the filmmakers declined to cooperate with the City's overreaching Original Subpoena (Siegal Decl., Ex. C), the City promptly withdrew it.

The City then replaced the Original Subpoena with one seeking *all* "audio and/or video materials documenting interviews with" 18 specifically named persons *plus* plaintiffs "current or former counsel and/or experts" *plus* "witnesses to the events at issue in this litigation" *plus* "any and all witnesses who were present during and/or participated in the events of April 19, 1989, the subsequent investigation, arrest or prosecution of plaintiffs."  The Subpoena contains no subject matter limitation.   (Siegal Decl., Ex. B.)  This comprises nearly all of the interviews conducted for the Film. (Ken Burns Decl. ¶1; Sarah Burns Decl. ¶1).  To support this latest Subpoena, the City takes the position that the filmmakers, Ken Burns, David McMahon and Sarah Burns— collectively d/b/a Florentine Films—are not independent journalists subject to the reporter's privilege, but rather that they are agents of plaintiffs' attorneys or otherwise advocates who have somehow forfeited their constitutional, common law and statutory protections.  (Siegal Decl., Ex.

---

[1] The facts on which this memorandum relies are submitted through the Declarations of Kenneth L. Burns (the "Ken Burns Decl."), Sarah L. Burns (the "Sarah Burns Decl.") and John Siegal (the "Siegal Decl."), all dated November 7, 2012, and the exhibits thereto.  This memorandum utilizes the defined terms set forth the in the accompanying declarations.

D.)  It is this aggressive position and still overreaching Subpoena in derogation of the rights of these acclaimed reporters and documentarians that Florentine Films now moves to quash.

## FACTUAL BACKGROUND

*The Central Park Five* is a documentary film reporting the experiences of the five men who were convicted of participating in the rape of the "Central Park Jogger" and then served full prison terms before their convictions were vacated and the experience of New York City as a community throughout the ordeal of the crime and its aftermath.  As the latest in the documentary *oeuvre* of Ken Burns and Florentine Films, it continues their acclaimed, award-winning exploration of broad issues of race relations and perceptions in America, and the ways in which civil society and the criminal justice system have been affected by race, crime and fear. (Ken Burns Decl. ¶ 4; Sarah Burns Decl. ¶ 2.)  The Film is the product of independent research and reportage, including numerous interviews—although, notably, none with any of the City defendants who denied repeated interview requests (Sarah Burns Decl. ¶ 10)—conducted over the course of several years by the filmmakers: the Emmy-winning Ken Burns, his daughter Sarah Burns and her husband David McMahon, collectively d/b/a Florentine Films.  (Ken Burns Decl. ¶ 6; Sarah Burns Decl. ¶¶ 2, 7.)  Neither the plaintiffs nor their counsel have had any role, other than as interview subjects, in the making of the Film.  (Ken Burns Decl. ¶ 6; Sarah Burns Decl. ¶¶ 9, 10.)

Sarah Burns was first exposed to the Central Park case while she was working as a paralegal at the at the law firm of Moore & Goodman during her summer break from college in 2003.  (Sarah Burns Decl. ¶¶ 4, 7.)  Ms. Burns worked on numerous cases that were being handled by the firm that summer, including providing support for Jonathan Moore's representation of plaintiffs McCray, Santana and Richardson in this civil action.  (*Id.* ¶4.)  Ms. Burns finished her job at the end of the summer and returned to Yale University, from where she

graduated in 2004.  (*Id.* ¶¶ 4, 5.)  After graduation, Ms. Burns returned to the firm to work as a paralegal until Spring 2006.  (*Id.* ¶ 5.)  During this time, Ms. Burns' only contact with this case was the digesting of one publicly available deposition transcript.  (*Id.*)

After leaving her paralegal job and marrying Mr. McMahon, Ms. Burns signed a contract to independently research the Central Park case.  (*Id.* ¶ 6.)  She did not have access to and did not utilize any privileged materials in her research.  Indeed, the filmmakers had no financial or editorial entanglements with the Plaintiffs or their lawyers.  (*Id.*, ¶¶ 9, 10.)  The Film was at all times and in every way the product of independent journalistic reporting.  (Ken Burns Decl. ¶ 6; Sarah Burns Decl. ¶¶ 9, 10.)

## ARGUMENT

## POINT I

### FLORENTINE FILMS' RESEARCH AND REPORTING IS ENTITLED TO THE PROTECTIONS OF THE REPORTER'S PRIVILEGE

**A.    The New York Shield Law, Civil Rights Law § 79-h, Applies To Florentine Films' Research And Reporting**

By serving the Subpoena, defendants are seeking nothing but material obtained by professional journalists during the newsgathering process.  All of the subpoenaed material is protected by the qualified reporter's privilege codified in the New York Shield Law, § 79-h(c) of the New York Civil Rights Law.  Thus, defendants may compel the production of this material only if they can overcome the strong protection, even for non-confidential newsgathering material, that yields only in the narrow instance where the party seeking disclosure can satisfy an exacting three-pronged test.

New York has long provided "one of the most hospitable climates for the free exchange of ideas."  *In re Beach v. Shanley*, 62 N.Y.2d 241, 255 (1984) (Wachtler, J., concurring); *see also Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991); *O'Neill v. Oakgrove Const., Inc.*,

71 N.Y.2d 521, 529 n.3 (1988) (the history of freedom of speech in New York "call[s] for particular vigilance by the courts of this State in safeguarding the free press against undue interference.").  Reflecting this tradition, the Shield Law was enacted in 1970 to protect "professional journalists" from being drawn unnecessarily into legal matters except in only the most compelling of cases so that they may remain free and unimpaired in their newsgathering and reporting.  *See O'Neill*, 71 N.Y.2d at 527.  In *O'Neill,* the Court of Appeals explained the rationale for protecting journalists' unpublished material:

> Because journalists typically gather information about accidents, crimes, and other matters of special interest that often give rise to litigation, attempts to obtain evidence by subjecting the press to discovery as a nonparty would be widespread if not restricted on a routine basis. The practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press.

*Id*. at 526-27.

There can be no question that Florentine Films qualifies for protection under the Shield Law as "professional journalists."  The Shield Law was amended in 1981 to expand the definition of "professional journalist" to include not only those who work for traditional news media, but to anyone who works for any "professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public."  N.Y. Civil Rights Law § 79-h(a)(6).

Ken Burns has been engaged in "the processing and researching of news intended for dissemination to the public" for more than 30 years.  (Ken Burns Decl. ¶ 3.)  His films have won thirteen Emmy Awards and two Oscar nominations and, in September 2008, he was honored by the Academy of Television Arts & Sciences with a Lifetime Achievement Award.  (*Id*., Exs. A, B.)  His work has resulted in his having been bestowed more than 25 honorary doctorate degrees

from colleges and universities, and has "showed us a new way of looking at our collective past and ourselves."  (*Id.*, Ex. B.)  For the City of New York to now claim that his film production company is not a "professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public" would shred the plain meaning of the Shield Law.

Mr. Burns' co-directors of *The Central Park Five*, his son-in-law David McMahon and his daughter Sarah Burns, are younger, but their research, reporting and documentary work on this Film is no less entitled to protection under the Shield Law as it has at all times and in all ways been conducted as independent journalism, for Florentine Films is in the business of making documentary films concerning matters of public interest that are the product of scrupulous independent research.  (Sarah Burns Decl. ¶¶ 9, 10; Ken Burns Decl. ¶ 6.)

Because of the dangers of the burdens on journalists imposed by subpoenas for non-confidential, unpublished materials, New York courts routinely reject attempts by civil litigants to obtain access to such materials, s*ee, e.g.*, *Flynn v. NYP Holdings Inc.*, 235 A.D.2d 907 (3d Dept. 1997), including outtakes of videotaped interviews.  *E.g.*, *Krase v. Graco Children Prods. (In re Nat'l Broad. Co.)*, 79 F.3d 346, 351 (2d Cir. 1996) (applying New York law); *People v. Hendrix*, 12 Misc. 3d 447, 449 (Sup. Ct. Kings Cnty. 2006); *In re Am. Broad. Co.*, 189 Misc. 2d 805 (Sup. Ct. N.Y. Cnty. 2001).  These are precisely the materials sought by the defendants here.  Accordingly, they are protected by the Shield Law.

For these reasons, the qualified privilege afforded under New York's Shield Law protects all of the materials defendants seek pursuant to the Subpoena.

8

**B.      The Federal Reporter's Privilege Also Protects Florentine Films' Research
         And Reporting**

The Second Circuit has likewise recognized the qualified reporter's privilege—based in

both the First Amendment and federal common law—that protects journalists from disclosing

material obtained during the course of newsgathering.  *See Gonzales*, 194 F.3d at 32-33; *New

York Times Co. v. Gonzales*, 382 F. Supp. 2d 457, 495 (S.D.N.Y. 2005), *rev'd on other grounds*,

459 F.3d 160 (2d Cir. 2006).  The privilege protects both confidential and non-confidential

material, *Gonzales*, 194 F.3d at 35-36, and applies in both civil and criminal cases.  *See United

States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983).

The Second Circuit has made it clear that a litigant seeking non-confidential materials

will not be allowed to simply "sift through [journalists'] files in search of information supporting

its claims."  *Gonzales*, 194 F.3d at 35.  To allow parties to freely subpoena journalists at will

would not only burden journalists "with heavy costs of subpoena compliance" and impair their

ability to gather information and comment on matters of public interest, but would also inflict

"the symbolic harm of making journalists appear to be an investigative arm of the judicial

system, the government, or private parties."  *Id*.; s*ee also United States v. Marcos*, 17 Media L.

Rep. 2005, 1990 WL 74521, at *2 (S.D.N.Y. June 1, 1990) ("Many doors will be closed to

reporters who are viewed as investigative resources of litigants.  The hindrance to the free flow

of information which accompanies this perception is inimical to the First Amendment."); *In re

Consumers Union of U.S., Inc.*, 495 F. Supp. 582, 586 (S.D.N.Y. 1980) (compelled disclosure of

unpublished material would "represent a substantial intrusion on fact gathering" and would

inhibit the media's "coverage of provocative issues important to the public").

To avoid such interference with the functioning of independent journalists, courts in this

Circuit have frequently construed the reporter's privilege to protect against the compelled

disclosure of unpublished materials, including video outtakes.  *See, e.g.*, *Gonzales*, 194 F.3d at 36; *Von Bulow v. Von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987); *Sikelianos v. City of New York*, No. 05 Civ. 7673 (RJS) (JCF), 2008 WL 2465120, at *1 (S.D.N.Y. June 18, 2008); *Blum v. Schlegal*, 150 F.R.D. 42, 45-46 (W.D.N.Y. 1993); *United States v. Karen Bags, Inc.*, 600 F. Supp. 667, 669-71 (S.D.N.Y. 1985).

For all of these reasons, the federal reporter's privilege applies to all of the subpoenaed materials defendants seek from Florentine Films.

**C.    *Chevron Corp. v. Berlinger* Does Not Apply To The Facts Here**

For the City of New York to persist in its previously stated position of "contest[ing] the true independence of Florentine Films, at least in the context of this film" (Siegal Decl., Ex. D at 2), would be a distortion of the governing case law, baseless on the facts presented here, and a travesty given the long, rich tradition of protection for journalistic research in this State and Circuit.

In advancing this position, the City is relying entirely on last year's Second Circuit decision in *Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).[2]  Yet by invoking *Berlinger* to support its issuance of this Subpoena, the City is seeking to contort the particular facts of *Berlinger* beyond both the holding of that case and beyond the Second Circuit's very clear and specific directions as to what it was *not* holding when it enforced the subpoena in *Berlinger*.

---

[2] The only other authority that the City has cited, *In re Fitch, Inc.*, 330 F.3d 104 (2d Cir. 2003) (*see* Siegal Decl., Ex. D), is clearly inapplicable on the facts presented here.  The City cited *Fitch* for the proposition that "an individual who 'reports' on his or her own clients, who have paid the journalist for services, is less likely to be considered independent within the meaning of the privilege" (Siegal Decl., Ex. D at 2), yet the City has accepted Florentine Films' representation that "there is no, and has never been any, financial arrangement between Florentine Films and the plaintiffs or their attorneys," *id*. at 1, n.1, rendering *Fitch* inapposite.

*Berlinger* involved a subpoena issued by Chevron to a documentary filmmaker whose production of the film *Crude* was solicited by an attorney representing a class of some 30,000 inhabitants of the Ecuadorean rain forest.  There, the plaintiffs' attorney sought to find a filmmaker to make a film from his clients' perspective concerning pollution allegedly caused by Chevron's predecessor, and he recruited Berlinger to portray his plaintiffs' cause.  *Berlinger*, 629 F.3d at 302-03.  Here, in sharp contrast, Florentine Films' decision to produce *The Central Park Five* was made completely independently of the Plaintiffs and their attorneys.  (Sarah Burns Decl. ¶¶ 9, 10.)  Indeed, rather than soliciting the film, as in *Berlinger*, here one of the Plaintiffs' attorneys told co-director Sarah Burns that he did *not* want her reporting on the Central Park case and yet she proceeded in her reporting over his objection.  (*Id.* ¶ 9.)  Thus, the Second Circuit's finding in *Berlinger* that the District Court did not abuse its discretion in refusing to apply the reporter's privilege where the documentarian was solicited by the class action plaintiffs' lawyer, *Berlinger*, 629 F.3d at 308, is simply inapplicable on the facts here.

Likewise, in *Berlinger* the reporter's privilege was found not to apply because the filmmaker had deleted a scene from the film at the request of the plaintiffs' attorney.  *Id.*  This fact, like the plaintiffs' attorney's solicitation of the film in the first instance, evidenced what the court found to be a lack of journalistic independence.  But, again, on the facts, *Berlinger* simply does not apply here as no such editorial control or input by Plaintiffs' attorneys occurred in connection with production of *The Central Park Five.*  (Sarah Burns Decl. ¶ 10.)

For these essential factual reasons, the holding of *Berlinger* is inapplicable here, and the City will have to distort the Second Circuit's decision in *Berlinger* beyond factual and logical recognition in order to argue that it even applies here.  To reach that conclusion, this Court need not simply rely on our analysis of *Berlinger* as applied here, however, it can look as well to what

the Second Circuit expressly instructed its holding in *Berlinger* did *not* mean.  For perhaps

concerned that aggressive litigants, like the City here, would seek to apply *Berlinger* beyond its

specific—perhaps, unique—facts, the Second Circuit went to great pains to clearly and

specifically limit its holding in ways that apply with clear force here.

Florentine Films' production of *The Central Park Five* was not solicited by Plaintiffs or

their attorneys.  (Sarah Burns Decl. ¶ 9.)  Sarah Burns' summer job as a paralegal for one of the

Plaintiffs' lawyers years before Florentine Films decided to produce the Film did not provide

privileged research material utilized in the Film.  (*Id*. ¶ 8.)  The research and reporting for the

film was at all times an independent journalistic enterprise.  (*Id*. ¶¶ 9, 10.)  It is undisputed that

there has never been any financial relationship between the Plaintiffs and/or their attorneys and

the film makers.  (Siegal Decl., Ex. C.)  These are the facts here, which the City will be unable to

rebut.  And, the Second Circuit instructed in *Berlinger* that, on these facts, even if the Film had

been solicited by Plaintiffs' attorneys (which it was not) the holding in *Berlinger* would still not

apply:

> Our ruling does not imply that a journalist who has been solicited
> to investigate an issue and presents the story supporting the point
> of view of the entity that solicited her cannot establish the
> privilege. Without doubt, such a journalist can establish
> entitlement to the privilege by establishing the independence of her
> journalistic process, for example, through evidence of editorial and
> financial independence.

*Berlinger*, 629 F.3d at 309.  Thus, "[w]ithout doubt," *Berlinger* does not apply to *The Central*

*Park Five* because these film makers have "establish[ed] entitlement to the privilege by

establishing the independence of her journalistic process . . . through evidence of editorial and

financial independence."  *Id.*  As the supporting Declarations here plainly establish, Florentine

Films reported and produced the Film acting at all times with complete financial and editorial

independence from Plaintiffs and their counsel.

Accordingly, Florentine Films would be entitled to the protections of the reporter's privilege even if it had been solicited by the Plaintiffs or their attorneys to make the Film, and even if this Court were to find (contrary to the facts) that Sarah Burns' prior employment by one of the Plaintiffs' attorneys somehow tainted her involvement in the Film because, since then, the editorial process has been one of journalistic independence free of any control or input, editorial or financial, from Plaintiffs' attorneys.

The filmmakers' point of view about the Central Park case and their public advocacy outside of the Film of a settlement of the *McCray* litigation likewise does not somehow bring this Subpoena within the ambit of *Berlinger* or eradicate the protections of the reporter's privilege. To be sure, based on their lengthy and in-depth research of the Central Park case and their understanding of the Plaintiffs' experiences of having served full prison terms on convictions that were subsequently vacated the filmmakers have formed strong points of view—and they have taken those views public through the classic First Amendment-protected methods of publishing articles and petitioning the Mayor to advocate a settlement.  (Ken Burns Decl. ¶ 7.) But nothing about that First Amendment expression or the point of view it reflects brings this Subpoena within the factual circumstances of the *Berlinger* case, as the Second Circuit made crystal clear:

> We do not suggest that a journalist loses or weakens her privilege merely because her publication reflects her previously held point of view. Consistency of point of view does not show lack of independence.

*Berlinger*, 629 F.3d at 308 n.4.

Advocacy occurring after the gathering of information for the Film is irrelevant for purposes of the reporter's privilege because, as the Second Circuit made clear in *Berlinger*, it is the journalist's intention at the time the information is gathered that is relevant to the inquiry into

the journalist's independence.  *See id.* at 307 (citing *Von Bulow*, 811 F.2d at 145); Ken Burns

Decl. ¶ 7.  Thus, as the Second Circuit made clear in its decision in *Berlinger,* that decision does

not serve to eliminate the protections of the reporter's privilege for point-of-view journalism.

The City is overreaching its appropriate governmental powers by claiming that the

filmmakers have somehow waived their journalists' protections by expressing an opinion on the

resolution of the *McCray* litigation.  Citing point of view journalism published by the filmmakers

as a basis for "eradicating" the Shield Law protection is a constitutionally impermissible content-

based determination by a municipal government that has no business taking a litigation position

based on the First Amendment-protected expression of the reporters whose files it is seeking to

inspect.  Municipal decision-making based on the political viewpoints expressed by its citizens is

beyond the pale of our civic discourse.  *See Brooklyn Inst. of Arts and Sciences v. City of New

York*, 64 F. Supp. 2d 184 (E.D.N.Y. 1999) (enjoining the City from penalizing the Brooklyn

Museum due to the Mayor's distaste for an exhibited painting).  Worse yet, by citing Ken Burns

having petitioned the Mayor to settle the *McCray* case as a justification for broadly subpoenaing

the protected property of a citizen, who happens to be a professional journalist (Siegal Decl., Ex.

E), the City is raising the abusive specter of governmental retaliation for First Amendment-

protected advocacy that may be unpopular in certain departments of City government.

For all of these reasons, the Second Circuit decision in *Berlinger* is distinguished from

the facts presented here—as the Second Circuit itself has plainly instructed—and that decision

does not serve as applicable authority for holding that the reporter's privilege does not apply

here.  Accordingly, the reporter's privilege applies to this Subpoena and it is defendants' burden

to overcome the qualified privilege.  This they cannot do, as we show below.

## POINT II

## DEFENDANTS CANNOT MAKE THE SHOWING
## REQUIRED TO OVERCOME THE REPORTER'S PRIVILEGE

**A.    Defendants Cannot Meet The Three-Part Test Required Under
New York's Shield Law**

Under New York's Shield Law, compelled disclosure of a professional journalist's non-confidential material is required only as a last resort. *See In re Grand Jury Subpoenas Served on Nat'l Broad. Co.*, 178 Misc. 2d 1052 (Sup. Ct. N.Y. Cnty. 1998).  The qualified privilege of the Shield Law requires a court to quash a subpoena seeking unpublished newsgathering material, even non-confidential newsgathering material, unless the party seeking disclosure can make a clear and specific showing that the information sought is (1) highly material and relevant; (2) critical or necessary to the maintenance of the prosecution of the case; and (3) not obtainable from any alternative source.  N.Y. Civ. Rights Law § 79-h.  Each of the three parts of this test must be satisfied; failure to meet even one part of this test will defeat the party's application for disclosure.  *In re Subpoena Duces Tecum to Ayala*, 162 Misc. 2d. 108 (Sup. Ct. Queens Cnty. 1994) (the three-part test mandated by section 79-h(c) is "a stringent condition precedent to any successful attempt to compel disclosure of unpublished non-confidential news obtained by a reporter.").  Here, defendants cannot make any of these three showings, let alone all of them, and certainly not clearly and convincingly.

1.    The first prong of the test set forth in section 79-h(c) requires the party requesting the material to show clearly and convincingly that the material requested is "highly relevant" and not simply an effort at speculative probing.  *See, e.g.*, *id.* at 114 ("Mere speculation without demonstrative factual corroboration is legally insufficient to impinge upon the First Amendment safeguards embodied within Civil Rights Law § 79-h.").

The City has not demonstrated, and will be unable to demonstrate, that the requested material is "highly relevant."  Instead, the City offers only speculation that the material may be useful to its defense, claiming that "[i]t is *plausible* that" Plaintiffs' attorneys waived attorney-client privilege in interviews for the Film.  (Siegal Decl., Ex. D at 4 (emphasis added)).  The City also claims "upon information and belief" that certain of the Plaintiffs may have contradicted prior sworn testimony.  (*Id*.)  But speculation based on "*information and belief*" or the assertion that a hypothetical possibility is *plausible* does do not even begin to approach the "clear and specific showing" that something is "highly relevant" that the Shield Law demands.  *See, e.g.*, *United Auto Grp. v. Ewing*, 34 Media L. Rep. 1801, 1803 (S.D.N.Y. 2006) (assertions that video outtakes "may" strengthen claims do not satisfy "highly material" prong of Shield Law test); *People v. Griffin*, 21 Media L. Rep. 1030, 1032 (Sup. Ct. N.Y. Cnty. 1992) (videotape that would not prove or disprove who committed crime is not highly material or relevant).

  2. The second prong of the test requires the requesting party to demonstrate that the material sought is "critical or necessary" to the claim.  This requires the City to show that its case "virtually rises or falls with the admission or exclusion of the proffered evidence."  *In re Nat'l Broad. Co.*, 79 F.3d at 351 (citations omitted).  The test is not merely that the materials could be helpful or probative, but whether or not the City can defend the case without the information.  *Id.*

  Defendants cannot possibly meet this prong of the test either.  The City argues that the interview footage of the plaintiffs "should be available to the expert witnesses."  (Siegal Decl., Ex. D at 4.)  But that falls far short of showing that the defense will "rise or fall" with the expert testimony it will offer at trial, or that Florentine Films' outtakes are critical to any particular expert's analysis.  Indeed, by stating only that this material "should" be made available, the City

virtually concedes that the interview footage would merely be useful to the City, not "critical or necessary" to the defense of the case.

Defendants then assert they would like the interview footage for possible impeachment purposes. *Id.* This rationale fails completely under the governing case law. The desire to use unpublished material for impeachment purposes is not sufficient to show that the material is "critical or necessary" to the claim. *See, e.g.*, *In re Nat'l Broad. Co.*, 79 F.3d at 352 ("Ordinarily, impeachment material is not critical or necessary to the maintenance or defense of a claim . . ."); *In re Subpoena Duces Tecum to Am. Broad. Co.*, 189 Misc. 2d 805, 808, (Sup. Ct. N.Y. Cnty. 2001) ("when the Legislature speaks of unpublished news being critical or necessary to the proof of a claim or defense, it does not have in mind general and ordinary impeachment material or matters which might arguable bear on the assessment of credibility of witnesses.").

Nor can defendants base their application on speculation that there is something in the outtakes that is consistent with material they have seen in the Film that they think might be useful impeachment material in cross-examining Plaintiffs because, for instance, it is inconsistent with prior sworn testimony. Under this scenario, defendants can use the Film itself, which has been produced to them, to impeach Plaintiffs; any additional impeachment material in the outtakes would be cumulative. Material that is merely cumulative of already existing evidence is insufficient to meet the defendants' heavy burden to overcome the reporter's privilege. *See United States v. Marcos*, 17 Media L. Rep. 2005, 1990 WL 74521, at *4 (S.D.N.Y. 1990); *United States v. Burke*, 700 F.2d 70, 78 (2d Cir. 1983); *In re Subpoena Duces Tecum to American Journal*, No. 122512/95, *slip op.* at 9 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 30, 1996).

In *In re Am. Broad. Co.*, the court quashed a subpoena seeking video outtakes containing statements made by a key witness in a criminal case because the material was sought to impeach that witness and therefore was not "critical or necessary" to the case.  The court noted that the defendant's argument "really focuses on the need to impeach the credibility of [the witness] and seeks the unaired interview in the hope that it will reveal some things that might prove valuable during cross-examination of [the witness]."  189 Misc. 2d at 809.  The court concluded that the "arguments are conjectural at best and do not provide a reason why the unaired interviews would provide proof of a specifically delineated defense or claim."  *Id.*  Here, as in *In re Am. Broad. Co.*, the City's subpoena should be quashed insofar as it is based on its mere speculation that the Interview Material "might" contain additional inconsistent statements made by the plaintiffs.

3.      The third prong of the Shield Law test requires the party seeking disclosure to show that it has exhausted all other sources for the information purportedly contained in the non-published materials and that it is not obtainable from any alternative source.  *See In re Nat'l Broad. Co.*, 79 F.3d at 353.  As this provision makes clear, the production of unpublished media material is to be the evidentiary option of *last resort*, not the first or most convenient one.

Defendants' Subpoena is entirely premature here.  They have yet to even take Plaintiffs' depositions.  There can be no showing of unavailability and exhaustion of efforts to get statements from Plaintiffs when defendants have yet to even depose them.  In reality, at this point, defendants are seeking impeachment material for use *during depositions*; by definition, that is an opening gambit and not a last resort.  To date, the City has made no demonstration that they have sought and failed to obtain the subpoenaed information from alternative sources.  Courts in New York routinely quash subpoenas where the party seeking disclosure has not detailed the efforts made to obtain the requested information, as this Court should here.  *E.g.*,

18

*Flynn*, 235 A.D. at 909; *In re Application of CBS Inc.*, 232 A.D.2d291, 292, (1st Dept. 1996);

*Church of Scientology Celebrity Ctr. Int'l v. Internal Revenue Serv.*, 779 F. Supp. 273, 276

(S.D.N.Y. 1991).

 For each of these three reasons, this motion to quash should be granted, especially

because this litigation is only in the pre-deposition discovery phase and defendants are therefore

unable to show that the material they seek is only available as a last resort by subpoena, that it is

highly relevant *and* that it is critical and necessary for the defense of the case.

**B.** **Defendants Cannot Make The Showing Required To Overcome The Federal
Reporter's Privilege**

 Confronted with sweeping demands for unpublished material similar to the Subpoena

here, courts in the Second Circuit have routinely applied the federal reporter's privilege and

declined to enforce the subpoena.  *See, e.g.*, *In re Nat'l Broad. Co.*, 79 F.3d at 352 (baby

furniture manufacturer seeking outtakes failed to demonstrate specific need); *Sikelianos*, 2008

WL 2465120, at *1 (quashing subpoena seeking unpublished photographs where defendant

failed to show both particularized need and relevance); *Schlegal*, 150 F.R.D. at 45-46 (denying

motion to compel production of taped interview on ground that plaintiff failed to seek

information through other means, including deposing interview subject); *Karen Bags*, 600 F.

Supp. at 669-71 (denying motion seeking raw footage from *60 Minutes* as "at most based on a

hypothesis or 'hunch'").

 While a qualified privilege, under the federal reporter's privilege the party seeking

disclosure must make a sufficient showing to justify the unusual remedy of compelling the

disclosure of unpublished material.  In the Second Circuit, a subpoena seeking non-confidential

information must be quashed unless the party seeking the material demonstrates that (1) the

information sought "is of likely relevance to a significant issue in the case," *Gonzales*, 194 F.3d

at 36, and (2) the information sought is "not reasonably obtainable from other available sources." *Id*. at 36.

1.      The City has yet to articulate any basis for concluding that Florentine Films outtakes are of "*likely* relevance to a *significant* issue in the case"—a standard that requires a showing well beyond mere relevance or even highly relevant.  For the same reasons that the material defendants seek is not "critical or necessary" under the Shield Law, it is not of "likely relevance to a significant issue in the case" under the federal privilege.  (*See* Point IIA *supra*.) Providing nothing so far other than conjecture as to relevance, it is clear that the City has issued the Subpoena as nothing more than a speculative probe premised on the vague hope for impeachment or other useful evidence without any showing that it relates to "a significant issue in the case."

As many courts in this Circuit have recognized, the reporter's privilege is designed to protect "the independence of the press and the need to allow the press to publish freely on topics of public interest without harassment and scrutiny by litigants seeking to conduct 'fishing expeditions' into nonbroadcast materials in the hope that some relevant information may turn up."  *Pugh v. Avis Rent A Car Syst., Inc.*, No. M8-85, 1997 WL 669876, at *5 (S.D.N.Y. Oct. 28, 1997); *see also Karen Bags*, 600 F. Supp. at 671 (quashing subpoena "at most based on a hypothesis or 'hunch'").  The First Amendment mandates that this protection applies with extra force where the litigant engaging in the "fishing expedition" is a governmental body, for this Subpoena raises the troubling specter of a government that has been litigating this case for eight years targeting a film on the eve of its release because it is worried about the impact of the film on public opinion and, potentially, the jury pool in this case.  That is hardly the "likely relevance

20

to a significant issue in the case" that the Second Circuit case law stringently requires before the qualified privilege can be overcome.

2.      Nor can defendants yet show before even deposing the Plaintiffs that the material they seek is unavailable from other sources.  For the reasons set forth in Point IIA above, defendants have yet to make the requisite showing that the material is unavailable from other sources, and they will be unable to do so at this point when they have yet to even depose Plaintiffs.  *See, e.g.*, *In re Nat'l Broad. Co.*, 79 F.3d at 353; *In re Petrol. Prods. Antitrust Litig.*, 680 F.2d 5, 8-9 (2d Cir. 1982); *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974) (60 depositions may be appropriate before compelling journalist to testify).

For these reasons, under the federal reporter's privilege, defendants will be unable to make the showing necessary to overcome the qualified privilege.

*        *        *

This is not a situation in which a litigant, after exhausting other means of discovery, concludes that unpublished material in a reporter's file is highly relevant, of likely relevance or critical or necessary to a specific and significant issue in a case.  *Cf. Sokolow*, 2012 WL 3871380 at *3 (granting in part cross-motion to compel subpoena for outtakes of two interviews to determine a specific issue of organizational control going to a significant issue in the case).  At this point, before even deposing the Plaintiffs, defendants are seeking virtually all of the video and audio recordings Florentine Films collected in the course of its reporting (Sarah Burns Decl. ¶ 1; Ken Burns Decl. ¶ 1) and without any explanation of to what specific significant issue in the case the materials purportedly relate.  This Subpoena is simply too broad, too unfocused and too premature to be enforced at this time.

21

## <u>CONCLUSION</u>

For the foregoing reasons, non-party Florentine Films respectfully requests that the Subpoena be quashed.

Dated:  November 7, 2012

Respectfully submitted,

BAKER & HOSTETLER LLP

By:  <u>/s/  John Siegal</u>
John Siegal (JS-1036)
Peter Shapiro (PS-4886)

45 Rockefeller Plaza
New York, NY 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Non-Party Movants Florentine Films*