USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/05/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE MCCRAY, RICHARDSON, SANTANA, WISE, AND SALAAM LITIGATION

AMENDED OPINION AND ORDER

03 Civ. 9685 (DAB) (RLE)

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

Before the Court is a Motion to Quash a Subpoena to Produce Certain Video and Audio Tapes brought by non-party Florentine Films ("Florentine"). (Doc No. 187.) Defendants' amended subpoena, dated October 2, 2012, seeks the production of copies of audio and/or video materials documenting interviews with eighteen specifically named persons collected in the course of reporting and producing a documentary film entitled *The Central Park Five* (the "Film"). Defendants' subpoena requests the production of all outtake footage, and also extends to video and/or audio tapes documenting interviews with: (1) "current or former counsel and/or experts retained by plaintiffs"; (2) "witnesses to the events at issue in this litigation"; and (3) "any and all witnesses who were present during and/or participated in the events of April 19, 1989, the subsequent investigation, arrest or prosecution of plaintiffs." (Defs.' Mem. In Opp. To Florentine Films' Mot. To Quash Subpoena ("Defs.' Mem."), Doc. No. 200.) Florentine objects to the subpoena on several grounds, but primarily on the ground that Defendants' subpoena fails to overcome the qualified reporter's privilege both codified in the New York Shield Law, § 79-h(c) of the New York Civil Rights Law, and established by the Second Circuit for nonconfidential materials in *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29 (2d Cir. 1999).

Defendants argue that the Film's filmmakers – Kenneth Burns, David McMahon and Sarah Burns – are not independent journalists entitled to the reporter's privilege. (Def's Mem. at 12.) For the reasons set forth below, Florentine's Motion to Quash the Subpoena is **GRANTED**.

## II. BACKGROUND

The Court assumes general familiarity with the facts and circumstances of the events that gave rise to this litigation, and the facts are set forth here only to the extent necessary for the present motion. Florentine's application arises in the context of a decade of civil litigation in this case. Antron McCray, Kevin Richardson, Raymond Santana, Kharey Wise, and Yusef Salaam (collectively, the "main Plaintiffs") each served prison terms ranging from seven to thirteen years in prison after being convicted for the 1989 attack on Trisha Meili, long known to the public as the "Central Park Jogger." (Amend. Consol. Compl. ¶¶ 864-72.) In 2002, another man's confession and DNA evidence led the district attorney's office to recommend vacating the main Plaintiffs' convictions. (*Id.* at ¶¶ 874-88.) On December 19, 2002, the convictions were vacated by order in the New York Supreme Court. (*Id.* at ¶¶ 901-02.) In 2003, the main Plaintiffs and their families filed suit against the City of New York, the New York City Police Department, the New York County District Attorney's Office, and certain of the employees and agents of these offices (collectively, "Defendants") who Plaintiffs assert, *inter alia*, conspired and perpetuated false evidence in securing the main Plaintiffs' convictions. (*Id.* at ¶ 7.)

Florentine Films is a film production company. Kenneth L. Burns, David McMahon, and Sarah L. Burns make up part of the filmmaker group. (Mem. In Support of Florentine Films's Mot. To Quash ("Florentine Mot."), Doc No. 190.) In 2012, Florentine released a documentary film entitled *The Central Park Five*. (*Id.* at 4.) The Film reports on the "experiences of the five

2

men who were convicted of participating in the [1989] rape of the 'Central Park Jogger' and then served full prison terms before their convictions were vacated." (*Id.* at 5.)

## A. The First Subpoena

On September 12, 2012, Defendants originally served a subpoena on Florentine that called for the production of all "audio, video and/or written materials, in any form" that was "related in any way to the subject matter" of the case brought by Plaintiffs. (Declaration of John Siegel ("Siegel Decl."), Ex. B.) On or about September 25, 2012, Florentine objected to this subpoena on the grounds that the subpoena was overbroad and unduly burdensome under Federal Rule of Civil Procedure 26 and that the subpoena violated the reporter's privilege under both the federal common law and the New York Shield Law, Civil Rights Law, § 79-h. (*Id.* at ¶ 3; Ex. C; Defs.' Mem. at 2.) In response to Plaintiffs' objections, Defendants withdrew the original subpoena and served the amended subpoena that is now the subject of Florentine's motion. (Defs.' Mem. at 2.)

## B. The Present Subpoena

On October 2, 2012, Defendants issued an amended subpoena that called for the production of "audio and/or video materials documenting interviews . . . in connection with the book and/or film 'The Central Park Five'" of the main and familial plaintiffs, "their current or former counsel," "experts retained by plaintiffs in this litigation," and any "witnesses to the events at issue in this litigation." (Siegel Decl. Ex. A.) On or about October 9, 2012, counsel for Florentine advised Defendants that certain materials sought by the subpoena do not exist, and therefore, the scope of the subpoena is "effectively limited to the raw footage of interviews with the plaintiffs and their counsel." (Defs.' Mem. at 2.)

3

Defendants make several claims of relevance. First, Defendants argue that the unedited interviews that appear in the Film are relevant to the claims and damages asserted in the case. Specifically, Defendants note that the materials they seek are relevant because, in the edited interviews appearing in the Film, Plaintiffs describe their recollection of the events on April 19, 1989, the circumstances surrounding their questioning by police officers, and how their criminal trials and incarcerations have affected them to the present day. (*Id.* at 8.) Second, Defendants argue that Plaintiffs' credibility is "of the utmost significance" in this case, and that the edited portions of the Film conflict with prior testimony given by certain Plaintiffs in their criminal trials and during hearings pursuant to the New York General Municipal Law, § 50-(h). (*Id.* at 8-9). Lastly, Defendants maintain that the subpoenaed materials are relevant because current or former counsel to Plaintiffs not appearing in the Film "may have been interviewed," and in so doing, it is "plausible" that counsel, or even Plaintiffs themselves, waived attorney-client privilege or attorney work product. (*Id.* at 9-10.)

Florentine objects to the amended subpoena for essentially the same reasons it objected to the original subpoena. Florentine maintains that Defendants' subpoena is: (1) substantially overbroad because it is not limited by subject matter; (2) premature because Plaintiffs have not yet been deposed; and (3) inappropriate because Defendants have failed to overcome the qualified reporter's privilege under the federal common law and state Shield Law. (Florentine Mot. at 1.)

### III. DISCUSSION

#### A. New York Shield Law, Civil Rights Law § 79-h

Florentine first argues that all of the subpoenaed material, which consists of unpublished, nonconfidential newsgathering materials, is protected by New York's Shield Law, codified in

4

Section 79-h(c) of the New York Civil Rights Law. Initially, the statutory privilege under New York's Shield Law only provided protection to confidential sources and materials under an absolute privilege. *See O'Neill v. Oakgrove Const., Inc.*, 71 N.Y.2d 521, 534 n.1 (1988). After the New York Court of Appeals recognized a qualified reporter's privilege under New York State's constitution and the United States Constitution in *O'Neill,* the law was extended to provide qualified protection to nonconfidential materials. *In re Grand Jury Subpoenas Served on Nat. Broad. Co., Inc.*, 178 Misc.2d 1052, 1055 (N.Y. 1998). Under Section 79-h(c), production of nonconfidential newsgathering materials to a party seeking such news is appropriate only with a clear and specific showing that the news is: (1) highly material and relevant; (2) critical or necessary to a party's claim, defense, or proof of a material issue; (3) not obtainable from any other source. *Id.* at 1055.

The Complaint in the present case alleges federal claims under 42 U.S.C. §§ 1981, 1983, and 1985, along with New York State law claims under the Court's supplemental jurisdiction. (Amend. Consol. Compl. ¶ 8.) While Florentine raises New York's Shield Law as a ground under which Defendants' amended subpoena should be quashed, asserted privileges in actions that raise both federal and pendent state law claims are governed by the principles of federal law. Fed. R. Evid. 501; *e.g., von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987). The Court, however, may consider the applicable state law and the policy considerations which underlie it. *von Bulow*, 811 F.2d at 144. In this case, the federal and state policies are "congruent." *Id.* "Both 'reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment.'" *Id.*

5

(citing *Baker v. F&F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972)). Thus, Florentine's motion will be considered under the Second Circuit's articulation of the reporter's privilege.

## B. The Qualified Reporter's Privilege

A reporter has "a qualified evidentiary privilege for information gathered in a journalistic investigation." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011). The privilege, which exists to support the press's important public service function to seek and reveal truthful information, *id.* at 308, protects newsgathering efforts from the burdensome wholesale production of press files that risk impeding the press in performing its duties and making journalists appear to be an "investigative arm of the . . . government, *id.* at 307. As such, any discussion of the reporter's privilege begins with an inquiry into whether a journalist can first establish entitlement to the privilege by demonstrating the independence of her journalistic process. *See id.*, at 309.

The reporter's privilege extends to both confidential and nonconfidential information, but the burden of overcoming the privilege for nonconfidential information is less onerous. *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999). Confidential information will not be disclosed absent a "clear and specific showing" by the requesting party that the information is: (1) "highly material and relevant"; (2) "necessary or critical to the maintenance of the claim"; and (3) "not obtainable from other available sources." *In re Petroleum Prod. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982) (citing *Baker*, 470 F.2d at 783-85). For nonconfidential information, the requesting party need only demonstrate that the materials sought are: (1) "of likely relevance to a significant issue in the case"; and (2) "not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.

### 1. Florentine has met its burden in demonstrating journalistic independence in the undertaking of the Film.

The reporter's privilege is designed to insure "a vigorous, aggressive, and independent press." *Berlinger*, 629 F.3d at 307. It is axiomatic therefore that the journalist seeking to invoke the privilege must be independent. In *Berlinger*, Joseph Berlinger had produced a documentary film entitled *Crude*. *Id.* at 303. Chevron Corporation petitioned[1] the court to issue a subpoena on the outtakes of the film. The facts indicated that Berlinger had been solicited by an attorney representing a class of Ecuadorian plaintiffs in environmental litigation against Chevron. *Id.* at 300. Berlinger was asked to make a film from the Ecuadorian plaintiffs' perspectives, and when plaintiffs' attorney asked, Berlinger removed a scene from the final version of the film. *Id.* at 302-04. Based on these, and other facts showing influence by plaintiffs, the Court of Appeals found that it was not clearly erroneous for the district court to conclude that the filmmaker had failed to show his independence, and consequently deny his claim of privilege. *Id.* at 308. The Court made it clear that the privilege is not foreclosed to a journalist who has been solicited to investigate an issue and presents the story supporting the point of view of the soliciting entity. *Id.* at 309. Other factors, such as editorial and financial independence, could still establish entitlement to the privilege. *Id.* Furthermore, an otherwise independent newsgathering process is not undermined solely because a publication reflects the journalist's previously held point of view. *Id.* at 308 n. 4. Finally, in determining journalistic independence, a court does not consider only the newsgathering process. A journalist seeking to invoke the privilege must also demonstrate that her intention *at the time the information in question is gathered* was for the purpose of disseminating the information to the public, and not for different reasons. *See id.* at 207 (citing *von Bulow*, 811 F.2d at 145) (emphasis added).

---

[1] Chevron petitioned the court under 28 U.S.C. § 1782, the statute that authorizes United States' courts to order discovery for use in foreign and international proceedings.

7

Florentine asserts that the reporter's privilege applies to all of the subpoenaed materials sought. In her declaration, Sarah Burns states that the production of the Film was not solicited by Plaintiffs or their attorneys. (Sarah Burns Declaration ("S. Burns Decl.") ¶ 9.) She further states that she proceeded over the objection of one of Plaintiffs' attorneys, who did not want her to report on the case. (*Id.*) Burns also states that the Film's co-directors retained full editorial control over the production of the Film. (*Id.* at ¶ 10.) The Parties do not dispute that there has never been any financial relationship between either Plaintiffs or their attorneys and the filmmakers. (*See* Siegel Decl. Ex. D, C; Defs.' Mem. at 20.)

While Defendants do not directly contest the editorial and financial independence of the filmmakers, they argue that such independence does not automatically translate into privilege. (*See* Defs.' Mem. at 20.) Instead, Defendants contend that other factors make the reporter's privilege inapplicable in this case. (*Id.*) Specifically, they assert that the Film's filmmakers have: (1) had a "longstanding sympathetic relationship" with Plaintiffs; (2) made certain public statements that reveal their intentions in making the Film and call for Defendants to settle this civil litigation; (3) gathered interviews from Plaintiffs about the case well before they intended to publicly disseminate information relating to this case; and (4) received assistance from Plaintiffs' counsel in creating both the book and the Film about the case. (Defs.' Mem. at 13, 15-16, 18.) Defendants rely on *Berlinger* and *von Bulow* as support for their position. This reliance is misplaced.

In *Berlinger*, the Court made clear that consistency of point of view does not show a lack of independence where, for example, a filmmaker has editorial and financial independence over the newsgathering process. *Berlinger*, 629 F.3d at 308 n. 4, 309. Indeed, it seems likely that a filmmaker would have a point of view going into a project. Thus, even assuming that the

relationship Defendants cite between the filmmakers and Plaintiffs somehow demonstrates that the filmmakers had a point of view in favor of the Plaintiffs' case before producing the Film, this fact, standing alone, does not resolve the question of whether the actual newsgathering process in the making of the Film remained independent.

Additionally, any statements occurring after the gathering of information by the filmmakers that advocate for Plaintiffs' position in this case are irrelevant for purposes of the reporter's privilege. *See von Bulow*, 811 F.2d at 145. In *von Bulow*, the Court focused on the timing of a journalist's intention to make information public. There, the Court limited the relevant timeframe to the point at which the information in question was gathered. *See id.* The Court then found that Andrea Reynolds, an "intimate friend" of Claus von Bulow, had no demonstrated intent to publish a manuscript and notes that detailed her observations of von Bulow's criminal trial at the time she authored the materials because she had no book contract or other indications of an interest to publish. *Id.* In contrast, Florentine had decided to publish before it had formed a conclusion concerning Plaintiffs. (Florentine Films's Reply ("Florentine Reply"), 4 ("[Florentine's] reporting led them to the conclusion that Plaintiffs were unjustly convicted, and outside of the Film, they have advocated settlement of this civil litigation."); *see* Ken Burns Decl. ¶ 7.)

Defendants also argue that certain filmmakers' statements demonstrate that the very purpose in making the Film was to encourage settlement. (Defs.' Mem. at 17, 20.) Specifically, Defendants state in their brief that Ken Burns has represented "that the purpose of the film was 'first and foremost . . . the settlement of the civil suit.'" (Defs.' Mem. at 17.) Defendants' representation of Ken Burns's statement is misleading. The actual quoted statement from Ken Burns in one article was, "[w]e're filmmakers first and foremost and we want to make a

9

difference,' . . . '[s]o having a theatrical release will, I think, amplify the pressure on the city to settle so [Plaintiffs] can put their lives back together." Dave McNary, *Ken Burns: Cannes the 'Grand Canyon' of cinema: Docu filmmaker screens 'Central Park Five' out of competition*, Variety, May 24, 2012. In another article, Burns states, "[e]veryone has wishes for their film,' he proposed. 'You want to go to Cannes, to win an Oscar, to have good reviews, to have a lot of people like it. . .Yes, but first and foremost, we want to see some sort of justice. . . the settlement of the civil suit that is now nine years old.'" Annette Insdorf, *The Central Park Five Premieres in Cannes*, Huffington Post, May 26, 2012. Burns does not indicate what the Film's "purpose" is, and the quoted portion by Defendants mischaracterizes the quotes[2] and Ken Burns's position.

In contrast to Defendants' speculative support for their position that Florentine was not independent, Sarah Burns has presented specific facts demonstrating an intent to publish at the time newsgathering commenced. Burns circulated a book proposal on the Central Park Five that led to a 2006 book contract before she had conducted any interviews of the Plaintiffs, including the video-recorded interviews Defendants seek in their subpoena. (Sarah Burns's Reply Decl. ("S. Burns. Reply Decl."), ¶ 3.) Defendants challenge at least one aspect of Burns's claim. They maintain that Florentine's newsgathering process commenced before it decided to make information about this case public. As examples, Defendants point to: (1) a newspaper article[3] that quotes Raymond Santana, one of the Plaintiffs, as stating that he and Kevin Richardson provided interviews to Burns for a college thesis that she wrote in 2003 that examined the press coverage of the Central Park Case; and (2) Burns's work on one deposition transcript related to this case during her employment as a paralegal at Plaintiffs' counsel's former law firm, Moore &

---

[2] The manipulation of the quotes in this manner is troubling. The Court does not find the point urged by Defendants to be consistent with a fair reading of the entire quoted material. Even assuming that Burns was accurately quoted, Defendants cannot bolster a weak argument by omitting language which undermines that argument.

[3] Stephon Johnson, *Burns and Santana Speak on 'Central Park Five,'* Amsterdam News, Nov. 19, 2012.

Goodman, LLP, in the summer of 2003 and from 2004 to 2006. (Defs.' Mem. at 14-15; S. Burns Decl. ¶ 5.) In explaining the details of her employment at Moore & Goodman, LLP, Burns states that she neither had contact with, nor access to, any attorney/client privileged material relating to Plaintiffs during or after her employment at Moore & Goodman. (S. Burns Decl. ¶ 8.)

While Burns's college thesis appears to be based solely on academic library research, (*see* S. Burns Reply Decl. Ex. 1.), the Court need not resolve this possible factual dispute. The inquiry concerning the timing of fact gathering does not occur in a vacuum. It must be tied to the discovery dispute before the Court. The question to be answered is not when *any* fact gathering began but when *the information sought by the subpoena at issue was gathered. See von Bulow*, 811 F.2d at 145. In this case, the video-recorded interviews and outtakes that Defendants seek in their subpoena were created no earlier than 2008. (*See* S. Burns Reply Decl. ¶ 3, 4; Florentine's Reply at 2.) Defendants do not contest this point. As the materials at issue were gathered after Burns secured a contract to publish a book on the Central Park Five, Defendants argument is without merit.

Lastly, Defendants argue that Florentine "received assistance" from Plaintiffs in making the Film. In making this claim, Defendants point to the Film's credits and the book's acknowledgments thanking Plaintiffs for their help. (Defs.' Mem. at 18.) As an example, Defendants state, "[i]n Ms. Burns' book, she states that she 'would not have written this book if not for my experience working for Jonathan Moore and Bill Goodman, two very principled lawyers who first introduced me to this miscarriage of justice.'" (Defs.' Mem. at 18.) Burns notes that the acknowledgments to Plaintiffs' counsel in her book and in the Film were given because counsel served as helpful interviewees and sources. (S. Burns Decl. ¶ 10; S. Burns Reply Decl. ¶ 7.) She also notes that the filmmakers made a number of requests to Defendants

11

for interviews for inclusion in the Film, but that those requests were denied. (S. Burns Decl. ¶ 10.) For their part, Defendants blindly assume that the book's acknowledgements and the Film's credits must evidence some kind of impropriety on the part of Florentine and Plaintiffs' counsel, and rely on the fact that Sarah Burns's declaration provides "no description of the actual assistance received by Ms. Burns and Florentine Films from plaintiffs and their counsel that led to the effusive acknowledgements in the credits of both the book and the film." (Defs.' Mem. at 19-20.) It is a customary practice to provide acknowledgements in a book or credits in a film. Doing so reveals little about the kinds of contributions made, substantive, or otherwise. Moreover, the Court does not find that the acknowledgements and credits Defendants cite in their brief to be particularly "effusive." On this point, Defendants' argument against Florentine's showing of independence is baseless.

The Court finds that Florentine has established its independence in the making of the Film and may claim the reporter's privilege.

### 2. Defendants fail to make a sufficient showing that the information they seek is of likely relevance to a significant issue in this case and not reasonably obtainable from another source.

The Parties do not dispute that the information sought by Defendants' subpoena is nonconfidential information. (*See* Defs.' Mem. at 7; Florentine's Mot. at 19) Defendants' burden is to "show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.

Defendants argue that the subpoenaed materials are "of course" relevant because: (1) in the edited interviews appearing in the Film, Plaintiffs describe their recollection of the events on April 19, 1989, the circumstances surrounding their questioning by police officers, and how their criminal trials and incarcerations have affected them to the present day; (2) Plaintiffs' credibility

"is of the utmost significance" in this case, and the edited portions of the Film conflict with prior testimony given by Plaintiffs Yusef Salaam and Kevin Richardson in their criminal trials and during hearings pursuant to the New York General Municipal Law, § 50-(h); and (3) current or former counsel to Plaintiffs not appearing in the Film "may have been" interviewed, and in so doing, "it is plausible" that counsel, or even Plaintiffs themselves, waived attorney-client privilege or attorney work product. (Defs.' Mem. at 8-10.)

These broad pronouncements by Defendants fail to adequately address the twin requirements of relevance and significance. They fail to identify a "significant issue" in the case that the subpoenaed materials potentially address. Defendants seek to cure this failure by arguing that credibility is a significant issue in this litigation, and that "the edited portions of the film alone demonstrate that the interviews are also highly relevant to plaintiffs' credibility because those portions conflict with prior sworn testimony" given by Plaintiffs. (Defs.' Mem. at 9.) Here, Defendants concede, however, that they "already have evidence that prior sworn testimony by the main plaintiffs and the familial plaintiffs contrasts with the edited versions of events displayed in the film." (*Id.*) Assuming that any of the alleged conflicts are material, the edited version of the Film suffices as potential impeachment material and therefore any statements contained in the outtakes would be cumulative. *See, e.g.*, *United States v. Burke*, 700 F.2d 70, 78 (2d Cir. 1983) (noting that because of existing impeachment evidence, the district court properly concluded that subpoenaed Sports Illustrated work papers would be cumulative); *Bradosky v. Volkswagen of Am., Inc.*, No. M8-85 (SWK), 1988 WL 5433, at *3 (S.D.N.Y. Jan. 15, 1988) ("even assuming that the specific statements contained in the outtakes would be useful to defendants for impeachment purposes, their usefulness would only be cumulative."). Moreover, impeachment material is ordinarily not critical or necessary to the maintenance or

13

defense of a claim, and Defendants make no clear and sufficient showing that it would be here. *In re Nat'l Broad. Co.*, 79 F.3d 346, 352 (2d Cir. 1996).

Additionally, Defendants fail to demonstrate that the information they seek is unavailable from another source. Defendants argue that Florentine's description that its interviews are "unique and of [their] [ ] own," is an implicit admission by Florentine that the subpoenaed materials can not be obtained from another source and that depositions of Plaintiffs will be inadequate "substitutes." (Defs.' Mem. at 10.) First, it is unclear why Defendants would rely on Florentine's opinion of its interviews to make a determination about the value of Plaintiffs' depositions without first ascertaining on what basis Florentine finds its interviews to be unique.[4] Second, Defendants have failed to establish that the information sought is not obtainable elsewhere. *In re Nat'l Broad.*, 79 F.3d at 352. Establishing unavailability will require a showing that Defendants attempted to obtain the information from another source, or cannot obtain the information from another source. *Id.* The Court agrees with Florentine that Defendants cannot show unavailability from other sources before deposing Plaintiffs. (Florentine's Mot. at 21.) *See Application of Behar*, 779 F. Supp. 273, 276 (S.D.N.Y. 1991) (noting that alternative sources, including depositions, must be exhausted before any deposition seeking information potentially covered by the reporter's privilege would be warranted); *Bradosky*, 1988 WL at *3 (noting that existing deposition evidence already provided impeachment evidence and admissions useful to party issuing subpoena). Moreover, the depositions in this case will provide full access to the main Plaintiffs. Defendants will have the opportunity to pose questions concerning contradictions in the edited Film and elsewhere.

---

[4] To some extent, all artists believe their work is unique, and the product of their talent. These beliefs, sincere though they may be, are more accurately designated as opinions, not facts, and the Court declines to base its decision on such characterizations.

14

Finally, Defendants claim that "it is plausible" that counsel or Plaintiffs have waived the attorney-client privilege or attorney work-product on the subpoenaed materials. (Defs.' Mem. at 9-10.) This claim is based on a mere hypothesis and is insufficient in making a showing of likely relevance. *See, e.g., United States v. Karen Bags, Inc.*, 600 F. Supp. 667, 671 (S.D.N.Y. 1985) (noting subpoena based on a "hypothesis or 'hunch,' lacking a logical basis, that because there are 'outtakes' which show [the witness whose testimony was at issue] speaking, he must have said something which reflects adversely" to his position).

In sum, Defendants have failed to present this Court with "a concern so compelling as to override the precious rights of freedom of speech and the press" the reporter's privilege seeks to ensure. *Baker*, 470 F.2d at 785. As Defendants have failed to make a showing that the information they seek is of likely relevance to a significant issue in this case, and that the information is not reasonably obtainable from another source, Florentine's motion to quash Defendants' amended subpoena is **GRANTED**.

## IV. CONCLUSION

Based on the foregoing, Florentine's motion to quash Defendants' amended subpoena is **GRANTED** because: (1) Florentine has established entitlement to the reporter's privilege; and (2) Defendants have failed to overcome the reporter's privilege by making a showing that the information they seek pertains to a significant issue and is unavailable from alternative sources.

**SO ORDERED this 5th day of March 2013**
**New York, New York**

*[signature]*
**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**